ORIGINAL

FILED
AUG 2 8 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST ACTION

JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC.

Plaintiffs,

v.

UNITED STATES,

Defendant.

07-636 C

Case No. ________

Judge ____________

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs John C. Frazier, III (d/b/a Markley Cove Resort), Laguna Hermosa Corporation (d/b/a Rancho Monticello Resort), REL Limited (d/b/a Spanish Flat Resort), and Steele Park Resort, Inc. (together, "Resort Owners") bring this bid protest action against the United States of America, acting through the Department of the Interior's Bureau of Reclamation ("Reclamation"). This bid protest challenges Reclamation's unlawful June 7, 2007 Lake Berryessa Concession Prospectus ("Prospectus") which solicits proposals for seven new concession contracts for various visitor services at Lake Berryessa, located in Napa County, California. The Prospectus has established September 5, 2007 as the deadline for proposals.[1]

In support of their causes of action, the Resort Owners allege as follows:

[1] Despite recently indicating that it was willing extend this deadline, Reclamation now states that it intends to enforce the deadline and accept proposals responding to the Prospectus on September 5, 2007. *See* Appendix ("App.") at App. 2, 357.

## NATURE OF THE ACTION

1. The Resort Owners are incumbent concessionaires for four of the seven concessions at Lake Berryessa that are the subject of the Prospectus. Through the Prospectus, Reclamation seeks to effect the immediate removal of the current concessions at the lake, including those of the Resort Owners, so that the agency can reap new and greater economic profits that it envisions for the lake. In so doing, Reclamation has completely disregarded the multi-million dollar investments the Resort Owners have made, at Reclamation's behest, to meet the public's demand for visitor services and amenities at Lake Berryessa.

2. Since the creation of Lake Berryessa in 1957, Reclamation has achieved its mission to "provid[e] for public enjoyment through outdoor recreation" at the lake almost exclusively by inducing private businesses, including the Resort Owners, to incur the costs of developing and operating visitor amenities, including the facilities and utilities (such as water and electricity) necessary for such amenities. *See* App. 16. In reliance upon Reclamation's inducements, the Resort Owners have invested literally millions of dollars into facilities and amenities to satisfy public demand. App. 61, Declaration of Robert White at ¶ 8.[2]

3. Since the creation of Lake Berryessa, the Resort Owners' concession operations have provided the great majority of visitor services and amenities at the lake. *Id.* These services and amenities include approximately 100 lodging units, restaurant facilities, and extensive marina and boating facilities serving approximately a million visitors each year. *Id.* At ¶ 9.

4. The concession arrangement at Lake Berryessa has allowed Reclamation to avoid the significant costs associated with fulfilling one of its "missions" (*i.e.*, providing visitor services)

---

[2] An original executed copy of Mr. White's Declaration is attached hereto as Exhibit A.

while receiving substantial fees from concessionaires, including the Resort Owners, who have provided, and continue to provide, such services.

5. After fifty years of profiting from the Resort Owners' investment in, and operation of, the resort facilities,, Reclamation recently has determined that there may be a greater economic opportunity for the agency at the lake. *See* App. 12. In order to capitalize upon this perceived opportunity, Reclamation has decided, through the Prospectus, to demand the immediate removal of all private and concession property from the lake, including that of the Resort Owners, and to replace the Resort Owners' contracts with new concession contracts.[3]

6. The Prospectus is unlawful, however, because it fails to incorporate the provisions of Public Law 96-375, which require that new concessionaires pay "fair value" for all of the Resort Owners' concession assets and interests. This renders the Prospectus invalid as a matter of law.

7. The Prospectus also is unlawful because it capriciously, arbitrarily and without rational basis tailors the Lake Berryessa procurement in a manner that allows one company, Forever Resorts, Inc., (a large corporate provider of houseboat rentals and other concession services) to take over the majority, if not all, of the concessions at the lake. In this respect, Reclamation already has awarded to Forever Resorts the Pleasure Cove Resort concession at Lake Berryessa, (currently in bankruptcy and not a party to this suit). App. 359. That concession contract essentially provides Forever Resorts with a "pre-qualification" and a preference for the existing concessions. *See* App. 377.

8. To this end, the Prospectus provides favorable treatment to Forever Resorts, which is by far the most visible and active large corporation known to be interested in this procurement.

[3] According to the Prospectus, the Resort Owners' concession contracts are scheduled to expire as follows: (1) Markley Cove Resort May 26, 2009; (2) Rancho Monticello - June 15, 2008; (3) Spanish Flat - July 13, 2008; and (4) Steele Park Resort - May 26, 2009. *See* App. 68, FBO Daily Issue dated June 9, 2007.

Also to this end, the Prospectus imposes burdensome requirements solely upon the Resort Owners that not only unfairly discriminate against the Resort Owners, but operate as a *de facto* prior disqualification of them from consideration for the new concession contracts.

9. Moreover, the Prospectus is unlawful because it incorporates appraisals of the Resort Owners' assets and economic interests that violate Public Law 96-375 and Reclamation's own directives and instructions to its appraisers. These violations have caused the appraisals to drastically undervalue the Resort Owners' concession interests, thus rendering the Prospectus defective in several ways.

10. First, by undervaluing the resorts, the appraisals violate the "fair value" requirements of Public Law 96-376. In addition, the undervaluation of the resorts paves the way for Forever Resorts to assume control over the majority, if not all, of the resort concessions. Finally, the undervaluations will render invalid any bid for the new concession contracts, as well as any contract awarded, because they will be based upon appraisals that are in violation of Public Law 96-375.

11. If the Prospectus is not stayed at this time, the Resort Owners will be irreparably harmed because, among other things, they will be effectively disqualified from consideration for the new contracts. Indeed, as Reclamation well knows, the Prospectus's requirement that the Resort Owners must remove all private and concession property before the termination of the contracts in 2008-2009 is impossible to meet, and will result in the Resort Owners being disqualified from consideration from the new contracts. App. 63, White Declaration at ¶ 13.

12. In addition, the requirements of the Prospectus may force the Resort Owners to go out of business before the termination of their current contracts, in which event either

Reclamation or the new concessionaire will assume control over, or outright ownership of, the resort facilities at no cost. App. 65, White Declaration at ¶ 20.

13. Moreover, the Resort Owners may be forced to either transfer their facilities and concession operations to a new concessionaire at a substantially undervalued price or tear down the facilities and other personal property at their own expense *Id.*

14. Finally, Reclamation's actions in pursuing the unlawful Prospectus constitute a denial of the Resort Owners' right to a fair procurement which also will result in significant irreparable harm to the Resort Owners. There will be no adequate remedy for these losses, once incurred.

## JURISDICTION

15. Jurisdiction in this Court is proper pursuant to the Administrative Dispute Resolution Act ("ADRA") (Pub. L. No. 104-320, 110 Stat. 3870 (1996)) and the Tucker Act. *See* 28 U.S.C. § 1491(b)(1).

16. This Court may declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 1491(b) because there is an actual controversy within the Court's jurisdiction to provide a declaratory judgment concerning: (a) the legal deficiencies of Reclamation's Prospectus and its procurement process for the Lake Berryessa concessions contracts; and (b) the interpretation of the requirements of the Prospectus and its incorporated documents.

17. The Resort Owners are "interested parties" within the meaning of 28 U.S.C. § 1491(b), and are prospective bidders for the new concession contracts. In addition to being incumbent contractors for four of the concession contracts that are the subject of the Prospectus, each of the Resort Owners has a substantial chance at receiving an award of a new contract.

Because of this, each of the Resort Owners face substantial, irreparable prejudice unless the requested relief is granted by the Court pursuant to 28 U.S.C. § 1491(b)(2).

18. The Resort Owners are "objecting to a solicitation" within the meaning of 28 U.S.C. § 1491(b). In particular, the Resort Owners seek injunctive and declaratory relief to prevent Reclamation from proceeding with its unlawful Prospectus.

19. In an apparent effort to minimize the Resort Owners' ability to challenge the current Prospectus and to prepare bids for the new contracts, Reclamation has imposed an accelerated schedule for its procurement during the peak visitor season for the Resort Owners. App. 66, White Decl. at ¶ 23. Thus, unless enjoined by the Court, proposals in response to the Prospectus will be due no later than 4 p.m. (Pacific Time) on September 5, 2007. App. 4. Failure to meet this deadline precludes consideration for the new contracts.[4] App. 24. The Resort Owners are required to file their protest at this time to preserve their objections to the Prospectus. *See Blue and Gold Fleet, L.P. v. United States*, 2007 WL 1815678 (Fed. Cir. 2007).

**PARTIES**

20. Plaintiffs John C. Frazier III and Linda Frazier, d/b/a Markley Cove Resort ("Markley Cove"), are a California sole proprietorship with a principal place of business at Lake Berryessa, Napa County, California. Markley Cove is an incumbent contractor for one of the seven concession services at Lake Berryessa that Reclamation is proposing to solicit to new offerors as part of a competitive bid process for the Lake Berryessa Concessions procurement.

[4] The Prospectus also requires that questions regarding the Prospectus be submitted at least 30 days in advance of the proposal deadline. Accordingly, the allegations and claims raised in this lawsuit were submitted in writing to the designated Reclamation representative on July 19, 2007, more than 30 days in advance of the September 5 deadline. App. 77. On July 26, 2007, the DOI Solicitor's Office orally advised Plaintiffs' counsel that Reclamation had reviewed the July 19 letter but would take no action in response. The Solicitor's Officer also indicated that further objection to the Prospectus would be futile.

Markley Cove operates its Lake Berryessa concession pursuant to a Concession Agreement dated May 15, 1981 that is effective from May 15, 1981 to May 26, 2009. A copy of this contract is attached hereto. App. 85.

21. Plaintiff Laguna Hermosa Corporation, d/b/a Rancho Monticello Resort ("Rancho Monticello"), is a California corporation with its principal place of business located at Lake Berryessa, Napa County, California. Rancho Monticello is an incumbent contractor for one of the seven concession services at Lake Berryessa that Reclamation is proposing to solicit to new offerors as part of a competitive bid process for the Lake Berryessa Concessions procurement. Rancho Monticello operates its Lake Berryessa concession pursuant to a Concession Agreement dated January 25, 1979, that is effective from January 17, 1962 to June 15, 2008. A copy of this contract is attached hereto. App. 151.

22. Plaintiff REL Limited, d/b/a Spanish Flat Resort ("Spanish Flat"), is a California Limited Partnership with its principal place of business located at Lake Berryessa, Napa County, California. Spanish Flat is an incumbent contractor for one of the seven concession services at Lake Berryessa that Reclamation is proposing to solicit to new offerors as part of a competitive bid process for the Lake Berryessa Concessions procurement. Spanish Flat operates its Lake Berryessa concession pursuant to a Concession Agreement that is effective to July 13, 2008. A copy of this contract is attached hereto. App. 163.

23. Plaintiff Steele Park Resort, Inc. ("Steele Park") is a California corporation with its principal place of business located at Lake Berryessa, Napa County, California. Steele Park is an incumbent contractor for one of the seven concession services at Lake Berryessa that Reclamation is proposing to solicit to new offerors as part of a competitive bid process for the Lake Berryessa Concessions Procurement. Steele Park operates its Lake Berryessa concession

pursuant to a Concession Agreement with Reclamation, a copy of which is attached hereto. App. 80.

24. The United States, through the Department of the Interior's Bureau of Reclamation, issued the Prospectus (Solicitation Number 07SS240008) on June 7, 2007, requesting proposals for seven concessions contracts to replace the existing concession contracts, including those of the Resort Owners. *See* United States Department of Interior, Bureau of Reclamation, Mid-Pacific Region: *Lake Berryessa Concession Prospectus.* The Prospectus, draft contract, and all supporting documents are available at the Lake Berryessa Prospectus website. *See* www.usbr.gov/mp/berryessa/prospectus.html.

## FACTUAL ALLEGATIONS

### Background Of The Lake Berryessa Concessions

25. The Bureau of Reclamation was established by the Reclamation Act of 1902. Pub. L. No. 57-161, 32 Stat. 388. *See* App. 16. As part of its mission, Reclamation is responsible for assisting "States, Native American Tribes, and others [to] meet their new and ever-changing water needs while balancing a multitude of competing uses, including recreation sites" and for "providing for public enjoyment through outdoor recreation." *Id.*

26. Lake Berryessa is the operating reservoir for Reclamation's Solano Project. *See* App. 221-223. Lake Berryessa is approximately 26 miles long by 3 miles wide, and was created as the result of the Reclamation's completion of the Monticello Dam in 1957. The lake is largely surrounded by steep hills and contains numerous inlets and coves that provide a natural shelter for marinas and resort facilities.

27. Although the Solano Project did not contemplate recreation as part of its original purpose, public visitation of the lake began almost immediately. App. 225. As a result of the

immediate and significant public use, in 1958 Reclamation entered into a Management Agreement with Napa County, California, ("the County") to allow the County to administer the recreational development of the Federally owned lands at the lake. *Id.; see* App. 44. Pursuant to paragraph 15 of the Management Agreement, the Government was placed "in the County's shoes"; as a result, the rights of a party against the United States were deemed to be identical with those against the County. *See Laguna Hermosa Corporation v. B.E. Martin,* No. C-77-105 (N.D. CA) Mem. Op. at 6 (App. 248 hereto); *aff'd, Laguna Hermosa Corporation v. B.E. Martin,* 643 F.2d 1376 (9th Cir. 1981).

28. Pursuant to its authority under the Management Agreement, the County determined that, due to limited resources and because a majority of the public use was by non-residents, recreation services and facilities at the lake should be provided through private concession contracts. App. 225. As a result, the County actively sought out businesses, including the Resort Owners, to operate the Lake Berryessa concessions. App. 60, White Decl. at ¶ 3. In soliciting these businesses, the County promised that the resort concessions would enjoy "economic stability" through long-term contract commitments. *Id.* At ¶ 4. Accordingly, the County provided the concessionaires with long-term contracts to allow them to obtain the necessary bank loans for the development of visitor facilities. *Id.*

29. As a result of the County's inducements, the Resort Owners and other concessionaires entered into seven long-term concession contracts in 1958 and 1959 for recreation services on 1,700 acres of land and water at various sites around the lake. App. 60 at ¶ 5, App. 225. After subsequent modifications, the concession contracts provided for 50-year terms. App. 60, ¶ 5.

30. To achieve the overall purpose of their concession contracts, *i.e.*, to provide visitor services and facilities, Napa County encouraged the concessionaires (including the Resort Owners) to construct, at their own expense, long-term mobile home/trailer lease sites at the lake. *Id.* at ¶ 6. At the same time that the mobile home sites were being developed, some of the short-term facilities, *i.e.*, camping, lodging, marinas, and retail, also were developed by the concessionaires. App. 44. The lake proceeded to be developed with the concessionaires' funds according to this pattern over the next several years. *See* Legislative History for Pub. L. 96-375 (comments by Rep. Clausen), App 262.

31. The availability of the long-term mobile home sites was immediately popular and has since become the core economic base for the concession operations at Lake Berryessa, including those of the Resort Owners. App. 44. Today, there are approximately 1,300 such sites at the lake, the majority of which are part of the Resort Owners' concessions. App. 61, White Decl. at ¶ 6. The sites are almost fully occupied and account for approximately 50 per cent of the overall revenue for the concessions. *Id.*, App 11.

32. Because of their permanent nature, the removal of these sites would result in environmental consequences, such as soil and vegetation disturbances. App. 61, White Decl. at ¶ 7. In addition, the removal of the sites could result in legal consequences. *Id.*. For example, because a significant number of these sites are occupied by permanent tenants, their removal would implicate the protections of the California Mobile Home Residency Act. *Id.* at ¶ 7.

33. To fulfill the purposes of their concession contracts, the Resort Owners over the years invested millions of dollars, as well as substantial effort, in constructing improvements and amenities at the resorts. *Id.* at ¶ 8. These improvements include, but are not limited to: grading and earth moving for parking lots, road and site construction, marinas for both small watercraft

and large houseboats, docks, boat slips, fuel stations, food service and retail facilities, shop buildings, bath houses, cabins, motels, travel trailer sites, tent campsites, mobile home sites, picnic areas, boat storage buildings, boat storage lots, extensive landscaping, electric and water distribution systems, sewage distribution and treatment systems, and water purification systems. *Id.* at ¶ 9. Many of these improvements cannot be removed because they involve improvements and alterations to the land. *Id.*

34. These improvements were paid for solely by the Resort Owners after obtaining prior approval from Reclamation. App. 62, White Decl. at ¶ 10. Reclamation has benefited from the construction of these improvements, both economically and in terms of fulfilling its "public enjoyment through recreation" mission. In addition, both Reclamation and any future concession awardee will benefit from the construction of these improvements. If the Prospectus is not enjoined, the Resort Owners will lose their substantial investments in the concessions, with Reclamation and Forever Resorts the likely recipients of the resulting windfall.

**The Requirements And Legislative History Of Public Law 96-375**

35. In 1980, Congress passed Public Law 96-375, which provides:

> Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That at the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, *if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.*

Section 5(b) of Pub. L. 96-375. App. 274. Emphasis added.

36. Public Law 96-375 makes clear that any new concessionaire that takes over the Resort Owners' concession, in this case through new concession contracts, must pay "Fair

Value" to the Resort Owners for all permanent facilities. This obligation includes not only improvements to the land, but to appurtenances and other facilities as well.

37. In passing Public Law 96-375, Congress made it clear that the Resort Owners were to receive fair value for their facilities:

> *[I]t is our intent that all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities by the concessionaires shall remain the property of said concessionaires*; however, at the option of the Secretary of the Interior, the United States may require that the permanent facilities not be removed from the concession areas, and instead *pay fair value* for the permanent facilities or, if the new concessionaire assumes operation of the concession, require the new concessionaire to *pay fair value* for the permanent facilities.

Legislative History, H.R. 5278 (emphasis added). App. 262.

38. In addition, the following exchange among Congressional members makes clear that the intent of Pub. L. 96-375 was to fully protect the investments of the Resort Owners:

> MR. LUJAN: ... I want to make certain that the language which we have provided in this bill would *fully protect those people who have made sizable investments at this lake.* They have been whipsawed among three agencies over the years, each of whom has had different regulations ...
>
> [M]y understanding is that the *concessionaires have made sizable investments in permanent facilities at the lake.* What happens to those facilities? Does the Government just make a windfall profit in the form of confiscated property simply by declaring the agreements terminated? *Would these people just have to walk away and leave their investments?*
>
> MR. CLAUSEN: *The answer to that is no. As we have discussed previously in the committee, the eventuality has been foreseen, and we have no intent of such a thing happening.* It is our intent that all permanent facilities placed by the concessionaires in these seven resorts at Lake Berryessa be considered the property of the respective current concessionaires, along with any permanent additions or modification to those facilities. That is only right and fair, and the committee has no intention of stripping them of those rights. . . .
>
> MR. LUJAN: I simply wanted to be certain that the intent of the language in the bill which referred to "new negotiated concession agreements," is fully

> understood *as to the protections we are providing against confiscation of private property by the Government. . . .*

App. 263 (emphasis added).

**Background Of The Prospectus For The Lake Berryessa Concessions**

39. In 2000, Reclamation initiated a visitor services planning effort for Lake Berryessa through the National Environmental Policy Act ("NEPA") process. App. 227. In November 2005, Reclamation published the Final Environmental Impact Statement ("EIS") required by NEPA. App. 227, 234. This EIS is the subject of pending litigation filed by the tenants of Lake Berryessa in the United States District Court for the District of Northern California. *See Berryessa for All v. US*, No. 07-259 (N.D. CA), App. 410.

40. On June 2, 2006, Reclamation issued its ROD for the future use and operation of Lake Berryessa. The ROD provided that, to the extent practicable, the Government and commercial recreation operations at Lake Berryessa would be developed, implemented, and managed on an integrated, lake-wide basis to provide the widest practical spectrum of recreation experience for the visiting public, to support the economic goals of surrounding communities (in particular, gateway communities), and to maintain the opportunity for a fair and reasonable profit by concession contractors. App. 228.

41. The ROD also provided that the seven concession areas, including those of the Resort Owners, would be developed, operated, and maintained by commercial concession contractors under long-term concession contracts with Reclamation. App. 229. The ROD further provided that final development plans for each concession area will be determined through the competitive contracting process. *Id.*

42. The ROD contained provisions for mitigation measures for the current concession contractors, including the Resort Owners. App. 233. Those measures included: (a) an

agreement by Reclamation to negotiate in good faith to amend the current contract to reduce the franchise fees for the duration of the contract to offset potential contract close-out costs; and (b) an agreement by Reclamation to consider a waiver of prevailing policies and guidelines to allow a concessionaire to charge above the most current recreation rates. *Id.*

43. As a further mitigation measure for current concessionaires, the ROD provided that:

> Reclamation will continue to work with current concession contractors to expedite valuation (appraisal) of existing contractor-owned facilities. The appraisal method and any potential acquisition of existing facilities will comply with applicable provisions of Public Law 96-375; Interior legal opinions; Interior and Reclamation policies, regulations, and directives and standards; applicable financial accounting standards and guidelines; and provisions of the current concession contracts.

*Id.*

**Specific Provisions Of The Prospectus For The Lake Berryessa Concessions**

44. On June 7, 2007, Reclamation issued the Lake Berryessa Concession Prospectus. App. 4. Among other attachments, the Prospectus incorporated the June 2, 2006 Record of Decision.

45. The Prospectus also incorporated the latest Reclamation Manual Policy and Directives and Standards. App. 24, 277, 293. In its section entitled "Concessions Contracting," the Reclamation Directives and Standards provide that:

> To ensure fair competition before and during the RFP [Prospectus] process, meetings to discuss the [Prospectus] with existing or potential concessionaires or other outside parties must not be conducted. It is appropriate to have meetings with existing concessionaires to deal with ongoing operational or contractual issues and programs. The [Prospectus] should include a schedule of meetings in which all interested parties can discuss requirements of the [Prospectus]. Other meetings requested by individual interested parties must be declined.

App. 282-283. In addition, the Reclamation Manual on Policy (App. 293) also provides that "Reclamation will ensure fair competition in the awarding of concession contracts." App. 295.

46. In addition, the Prospectus incorporates an Environmental Compliance and Facility Condition Assessment Report prepared by Kleinfelder, Inc. and dated December 19, 2002. *See Prospectus, 2002 Environmental Compliance and Facility Condition Assessment Report.* The Kleinfelder Report purports to assess the condition of the various facilities for each of the resorts. In response to this Report, the Resort Owners performed in a timely manner the necessary maintenance and improvements that corrected the conditions identified in the Report. The Report has not been updated to reflect these improvements and maintenance efforts.

47. The Prospectus provides that, if an existing concessionaire is selected as the winning offeror on any or all of the seven concession locations, that concessionaire must comply with all applicable requirements of their current contract, the ROD and the Prospectus's stipulations regarding current concessionaires, in advance of any authorization to proceed or execution of any future contract. App. 31. In particular, the Prospectus requires the current concessionaires, including the Resort Owners, to ensure the removal of all personal property, including trailers and mobile homes and appurtenant structures such as decks, stairs and storage sheds prior to the termination of their current contracts. *Id.*

48. The Prospectus states that "[f]ailure by an existing concessionaire to meet these and/or other identified requirements of the current concession contracts will result in non-

consideration or the cancellation by Reclamation of their selection as a future concessionaire and the selection of another bidder or re-issuance of another prospectus." *Id.*

49. In contrast to these provisions for the Resort Owners, the Prospectus provides that "Reclamation will work concurrently with any new contractor during negotiations to address any conditions that may delay implementation of selected proposals (*e.g.*, abandoned property)." *Id.* The Prospectus thus does not impose the same deadlines regarding removal of private property upon new concession contractors that it imposes upon the Resort Owners. App. 66, White Decl. at ¶ 24.

50. The Prospectus incorporates Public Law 96-375, quoting Section 5(b). App. 35; *see* Paragraph 35, *supra*. Despite the exclusive use of the term "fair value" in Pub. L. 96-375, however, the Prospectus interprets this term to mean "fair market value." App. 35.

51. In addition, the Prospectus interprets Public Law 96-375 to allow a new contract awardee to determine (with ultimate approval by Reclamation) which existing concessionaire facilities will be purchased, and which will not. *Id.* In the case of a decision to purchase a particular asset, a "fair market value" will be assigned; in the case where an asset is not chosen, it must be removed by the concessionaire at its own cost. *Id.*

52. In connection with this interpretation of Pub. L. 96-375, the Prospectus attaches valuation appraisals of each of the resorts as a means of establishing the purchase price for those facilities that are designated to remain. *Id.* (citing Part 7.10).

53. Reclamation engaged independent appraisers to prepare the appraisals/valuations of the concession facilities, including those of the Resort Owners. These appraisers were provided a Statement of Work (App. 296) that, along with particular "Appraisal Instructions," provided specific directions and parameters for the valuation of the resort facilities. App. 319.

54. The Statement of Work required the appraisers to "consider all three approaches to value," *i.e.*, the Income Approach, the Cost Approach and the Direct Sales Comparison Approach. App. 300. The Appraisal Instructions also required valuations under these three approaches (App. 320), and provided that the interest to be appraised was the "Concessionaire's Possessory Interest," which it "defined by Public Law 96-375 as the Fair Value of the permanent improvements and includes *the economic value of the concession*." *Id.* (emphasis added).

55. The Prospectus provides that, in the event a current concessionaire wins a bid, Reclamation will possess the first lien right to all assets of the concessionaire including, but not limited to, all personal property of the concessionaire used in performance of the concession contract. App. 42-43.

56. With respect to the evaluation of proposals, the Prospectus provides substantial additional points to an offeror who bids on all (or multiple) concessions. *See* App. 40-41. Part 5 of the Prospectus specifies that 27 out of a total of 156 points will be awarded to an offeror who bids on all seven concessions. Practically speaking, this benefits Forever Resorts, which is the only known active bidder that would be able to independently bid upon multiple concessions and obtain these additional points.

**Specific Provisions Of The Resort Owners' Contracts**

57. The current contracts of Markley Cove, Rancho Monticello and Spanish Flat contain no clauses that may be construed in any way to require the removal of permanent fixtures or improvements. Although the Steele Park contract addresses the issue of removal of fixtures and private property, it is still subject to the provisions of Pub. L. 96-375. Indeed, many of the permanent improvements cannot be removed because they are alterations to the land, *e.g.*, cut and fill improvements for the creation of the marina parking and the construction of roads.

58. The Resort Owners' contracts contain no clauses that may be construed in any way to require the termination of the Resort Owners' respective business operations before the termination of the current concession contracts in 2008/2009. To the contrary, the Resort Owners are required under their contracts to continue to provide facilities and services at the lake.

59. The Resort Owners' contracts contain no clauses that may be construed in any way to require the removal of any tenant or resort-owned property prior the end of the termination of the current concession contracts in 2008/2009.

60. The Resort Owners' contracts guarantee the opportunity for each concessionaire to make a fair profit during the term of the contract.

**Reclamation's Response To The Resort Owners' Concerns**

61. The Prospectus provides for question and answer ("Q&A") sessions between Reclamation and current and prospective concessionaires prior to the submission of responsive offers. In response to one of these sessions, Reclamation provided written answers to questions posed by the Resort Owners and others. App. 324.

62. During this Q&A session, Reclamation advised the prospective bidders that the existing concession contractors are responsible to remove facilities not selected for the new contracts and for assuring that permittees remove their personal property prior to the end of the existing concession contract. App. 325.

63. In response to a question regarding whether "trailer removal" includes the removal of concrete foundation slabs, Reclamation advised the prospective offerors that each removal must be evaluated independently and that Reclamation will determine what is to be removed in each

case. *Id.* Reclamation indicated that environmental conditions may require that certain erosion prevention structures must remain. *Id.*

64. In response to a question regarding the issuance of transport permits for the mobile homes, Reclamation acknowledged that the permits are required by Napa County and the State for transport of oversized loads on their respective roadways. Reclamation advised the prospective bidders that it would require the existing concession contractors (including the Resort Owners) "to develop a plan for trailer removal to assure all trailers are removed by the end of the contracts and to meet the transport requirements of the county and the State." App. 325-326

65. In response to a question regarding the penalty for failure to remove and remediate mobile homes and their sites prior to contract termination, Reclamation advised that "[i]f an existing concessionaire fails to accomplish the removal of any or all trailers in their area they will not be further considered as qualifying offerors to the prospectus. Any other penalties will be the subject of litigation." App. 343.

**INJUNCTIVE RELIEF**

66. The Resort Owners are entitled to injunctive relief because they can show a likelihood of success on the merits of their claims, and both the public interest and a balancing of potential harms weigh decidedly in the favor of preserving the status quo, suspending the current submission due date for receiving proposals and the termination dates for the Resort Owners' contracts, and enjoining Reclamation from proceeding with its unlawful solicitation.

67. The Resort Owners are also entitled to injunctive relief because there is no adequate legal remedy for any of the claims asserted herein. If the Prospectus is not enjoined, the Resort Owners will be irreparably harmed because:

a. They will be effectively disqualified from consideration for the new contracts by operation of the requirements of the Prospectus that are so unreasonable that they cannot be met. App. 63, White Decl. at ¶ 13.

b. The requirements of the Prospectus may force them to go out of business before the termination of their current contracts, in which event either Reclamation or the new concessionaire will assume control and/or ownership of the resort facilities at no cost. App. 65, White Decl., ¶ 20.

c. They may be forced to either transfer their facilities and concession operations to a new concessionaire at a substantially undervalued price or tear down the facilities and other personal property at their own expense *Id.*

d. They will lose their right to a legally valid procurement. *Id.* at ¶ 21.

e. In the event they try to remove all of their property from the concession areas by the contract termination dates, they may be found to be in breach of their leases with their tenants. *Id.*

f. They will lose their customers and their contractual right to make a fair profit prior to the expiration of their agreements. *Id.*

68. The Bureau of Reclamation will in no way be harmed by the issuance of a preliminary injunction. The Resort Owners, as incumbent contractors are ready, willing, and able to continue to perform under the terms of the existing contracts until the Court resolves this matter. In other words, the concession services will continue to be available to Reclamation and the public under the terms of the existing contracts. Reclamation already has indicated that time is not of the essence for this procurement by recently indicating that it would be willing to provide an extension of time for the submission of proposals. App. 357.

69. Nor will any prospective bidder or any third party be harmed by the issuance of a preliminary injunction. To the contrary, prospective bidders will benefit from the resolution of the issues raised by this lawsuit prior to submitting their final bids to Reclamation. These issues present critical questions, such as the proper value of the resort facilities, that significantly affect the value of the new proposed concessions contracts and the bids for those contracts. There is no legitimate reason to require prospective bidders, including the Resort Owners, to continue to incur the considerable expense and burden of preparing and submitting proposals for a procurement that may very well be subject to significant changes.

70. The Resort Owners are also entitled to injunctive relief because the Bureau of Reclamation's unlawful solicitation will irreparably harm the public's interest in preserving the integrity of the solicitation/procurement process and ensuring that the process is fair and consistent with the requirements of law.

**CAUSES OF ACTION**

71. Section 12 of the ADRA amends the Tucker Act to clarify jurisdiction of this Court and the nature of its review in "bid protest" matters. Section 12(a)(3) (entitled "Bid Protests") is codified in 28 U.S.C. § 1491(b)(1), and provides as follows:

> [T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. The United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether the suit is instituted before or after the contract is awarded.

72. Section 12(a)(4) of the ADRA, codified at 28 U.S.C. § 1491(b)(4) of the Tucker Act, provides that, in any bid protest action brought pursuant to Section 1491, the Court 'shall review the agency's decision pursuant to the standards set forth in Section 706 of Title 5."

73. Section 706 of Title 5 provides that a reviewing court shall "hold unlawful and set aside any agency action, findings, and conclusions found to be, among other things, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706.

74. Once a violation of ADRA (as amended in the Tucker Act) is found, "the court[] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

**COUNT I**
**(Arbitrary, Capricious and Unlawful Failure To Comply With Public Law 96-375)**

75. The Resort Owners re-allege and incorporate by reference the allegations set forth in paragraphs 1-74 of this Complaint as fully set forth herein.

76. In setting the terms and conditions for awarding the next concessions contracts for Lake Berryessa, Reclamation is bound by the provisions and legislative history of Public Law 96-375.

77. Public Law 96-375 requires that new concessionaires for the Lake Berryessa resort concessions pay the Resort Owners "fair value" for all of their assets and economic interests.

78. Public Law 96-375 further requires that the Resort Owner's assets and economic interests be fully protected.

79. The Prospectus and its incorporated documents fail to comply with Pub. L. 96-375 because they wrongly interpret the definition of Fair Value as being the same as Fair Market Value.

80. This incorrect definition has led to the improper undervaluation of the Resort Owners' assets and economic interests, thus rendering the Prospectus invalid.

81. The Prospectus and its incorporated documents also fail to comply with Pub. L. 96-375 because they wrongly allow new concessionaires to select, and pay for, those assets of the Resort Owners that they wish to retain under the new concession contracts. This violates Pub. L. 96-375's mandate to pay "fair value" and to protect fully the Resort Owners' assets and economic interests.

82. The Prospectus's adoption of the definition of Fair Market Value and its allowance of new concessionaires to selectively pay for the Resort Owners' assets are violations of Pub. L. 96-375. Accordingly, the Prospectus is invalid and Reclamation must be enjoined from proceeding according to its terms.

**COUNT II**
**(Arbitrary, Capricious and Unlawful Favorable Treatment Of Forever Resorts)**

83. The Resort Owners re-allege and incorporate by reference the allegations set forth in paragraphs 1-82 of this Complaint as fully set forth herein.

84. The Prospectus and its related documents arbitrarily, capriciously, unlawfully, and without rational basis favor Forever Resorts, and penalize the Resort Owners, in the following ways:

a. The Prospectus awards additional points for a bidder who bids upon multiple concession opportunities. This provides an unfair advantage to Forever Resorts, which is the only known interested bidder with sufficient financial resources to bid upon multiple

concessions. This advantage amounts to a penalty against the Resort Owners who, as small businesses, do not have the financial ability to independently bid upon more than one concession opportunity. This directly contravenes Reclamation's policy and directives regarding "fair competition" and fair treatment for small businesses. *See* App. 69, 295.

b. The Prospectus allows a new bidder, such as Forever Resorts, to receive a reduction of franchise fees owed to Reclamation to repay any costs associated with tenant removal. In contrast, the Prospectus does not provide the Resort Owners with such fees while demanding that they pay all costs for removal of tenant personal property. App. 39A, 233, 236; App. 66, White Decl. at ¶ 24.

85. The burdensome favorable treatment afforded to Forever Resorts by the Prospectus is contrary to agency policy and directives, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Accordingly, the Prospectus is invalid and Reclamation must be enjoined from proceeding according to its terms.

**COUNT III**
**(Arbitrary, Capricious and Unlawful Discrimination Against The Resort Owners)**

86. The Resort Owners re-allege and incorporate by reference the allegations set forth in paragraphs 1- 85 of this Complaint as fully set forth herein.

87. The Prospectus and its related documents arbitrarily, capriciously, unlawfully, and without rational basis discriminate against the Resort Owners, and in favor of Forever Resorts, in several ways.

88. First, the Prospectus requires that, to qualify for consideration for the new contracts, the Resort Owners must remove all mobile homes, trailers and other improvements from the concession property prior to the termination of the current concession contracts. App. 31. This effects a prior *de facto* disqualification of the Resort Owners from consideration for the new

concession contracts because the removal of all private property cannot be achieved before the termination of the Resort Owners' current contracts in 2008-2009. This is so because:

(a) In order to comply with California environmental and transport regulations, as well as the California Mobile Home Residency Act, the complete removal of the property could take as long as five years. *See* App. 63, White Decl. at ¶ 13. In this respect, the Prospectus improperly fails to account for the delays that will be associated with the limited number of state-issued permits that are available to transport mobile homes and with the resolution of the county tax liens that are attached to certain abandoned mobile homes. *Id.*

(b) Even if it were physically possible to remove all tenants by the removal deadline, the Resort Owners would have to begin removing tenants well in advance of the termination of the current concession contracts. *Id.* at ¶ 14. This would place the Resort Owners in the position of being in potential breach of their leases with their tenants, which run to the end of the current concession contracts. *Id.* The tenant disputes and delays associated with these potential breaches would make it impossible to meet Reclamation's removal deadline. *Id.*

(c) Reclamation has failed, as it is required to do, to identify all of the property and improvements that are to be removed prior to its removal deadline. App. 30, App. 64, White Decl. at ¶ 15. Reclamation's failure to fulfill this duty renders it impossible for the Resort Owners to comply with Reclamation's removal deadline.

(d) Reclamation also has failed to satisfy its obligation to complete an Environmental Impact Statement for the removal of individual improvements. App. 30, App. 64, White Decl. at ¶ 15. Reclamation's failure to fulfill this duty also renders it impossible for the Resort Owners to comply with Reclamation's removal deadline. App. 64, White Decl. at ¶ 15.

89. The Prospectus also unfairly discriminates against the Resort Owners by providing that, if any mobile units are left after the termination dates of the contracts, the Resort Owners may be declared in default of their agreements. App. 31. This could lead to the seizure of their permanent improvements, thereby depriving the Resort Owners of all value from their investments in the concession contract sites. *Id.* As a result, the Prospectus again places the Resort Owners in an impossible situation – by imposing a relatively short period for the removal of property, the Prospectus essentially prevents the Resort Owners from being able to remove all of the property by the removal deadline, and then allows Reclamation, or more particularly, Forever Resorts, to assume control over the property at no cost after the deadline passes.

90. The Prospectus further discriminates against the Resort Owners by not allowing the Resort Owners to remove the mobile homes in phases during the term of a new concession contract (should one be awarded to a Resort Owner). As a result, during the terms of their current contracts, the Resort Owners will be deprived of a revenue source that is critical to their ability to stay in business while awaiting the award of the new contracts and, should they prevail, the installation of the new facilities. App. 64, White Decl. at ¶ 17. This loss of revenue could result in business failure for some or all of the Resort Owners. *Id.* By no mere coincidence, in the event of such a business failure, the Pleasure Cove contract provides that Forever Resorts will be awarded with an interim contract for any failed concession. App. 377. In contrast, a new concessionaire will be permitted to phase out mobile homes during a new concession contract term and, thus, will enjoy the benefit of the interim rental income during the installation of the new facilities. App. 31.

91. The burdensome and prejudicial treatment imposed on the Resort Owners by the Prospectus is contrary to agency policy and directives, and is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law. Accordingly, the Prospectus must be declared invalid and Reclamation must be enjoined from proceeding according to its terms.

**COUNT IV**
**(Arbitrary, Capricious and Unlawful Failure to Conduct Proper Appraisals of the Resort Owners' Assets and Economic Interests)**

92. The Resort Owners re-allege and incorporate by reference the allegations set forth in paragraphs 1-91 of this Complaint as fully set forth herein.

93. Pursuant to the Prospectus and its incorporated documents (including Pub. L. 96-375 and the Kleinfelder Report), the Resort Owners' assets and economic interests were to be appraised to determine their value so that offerors would have an economic framework upon which to bid for the new concession contracts. The appraisers were to conduct their valuations pursuant to Reclamation's Statement of Work and its accompanying "Appraisal Instructions."

94. The valuations performed by the appraisers do not comply with the Statement of Work and the Appraisal Instructions because they fail to consider the Resort Owners' improvements to the land, including, but not limited to, such items as "cut and fill" work, grading, road construction and parking lots; App. 65, White Decl. at ¶ 19. Similarly, the appraisers failed to include improvements such as retaining walls, dock facilities, mobile home site pads, and sewage and utility connections. *Id.*

95. These permanent improvements, which represent millions of dollars of the Resort Owners' investments, were necessary to the development of the lake, and will be used by both Reclamation and any new concessionaire. App. 61, White Decl. at ¶ 8-10. These improvements also are an integral part of the "economic value of the concession" that is required to be valued by the Appraisal Instructions. App. 320. The appraisals, however, completely failed to account

for assets and improvements in establishing a "purchase price" for the resorts for purposes of the procurement. This failure renders the Prospectus invalid.

96. Further, the appraisers failed to conduct an evaluation of the concessions through the use of all three appraisal methods, performing instead only a "Cost Approach" appraisal. This contravenes the express requirement in the Statement of Work and Appraisal Instructions that an Income Approach valuation and a Direct Sales Comparison Approach valuation be performed on each of the resorts. *See* App. 300, 320.

97. The failure to perform valuations pursuant to the other methods has resulted in the drastic undervaluations of the Resort Owners' assets. The only way to properly arrive at the economic value of these businesses is through an Income Analysis. The appraisals, however, failed to conduct such an analysis. Accordingly, the Prospectus is invalid and Reclamation should be enjoined from proceeding with accepting offers until the appraisals are properly completed and reasonable purchase prices are established for the resort assets.

98. As a result of their failure to follow the Statement of Work and the Appraisal Instructions, the appraisals of the Resort Owners' facilities and economic interests are substantially undervalued, in violation of Public Law 96-375 and to the prejudice of the Resort Owners and the unfair advantage of prospective bidders, such as Forever Resorts.

99. The appraisals also improperly rely upon the Kleinfelder Report which is over six years old and does not properly reflect the actions and improvements by the Resort Owners to correct the issues identified in the Report. The reliance upon this outdated report also has resulted in a substantial undervaluation of the Resort Owners' assets and economic interests, in violation of Public Law 96-375 and to the prejudice of the Resort Owners and the unfair

advantage of prospective bidders for purposes of the Lake Berryessa concession contract procurement.

100. The failure of the appraisers to follow the Statement of Work and the Appraisal Instructions, combined with their improper reliance upon the outdated Kleinfelder Report is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Accordingly, the Prospectus is invalid and Reclamation must be enjoined from proceeding according to its terms.

## PRAYER FOR RELIEF

ACCORDINGLY, for the foregoing reasons, the Resort Owners request this Court to:

1. Enter an order for temporary or preliminary injunctive relief pending final resolution of this matter that suspends the September 5, 2007 (4:00 p.m. Pacific Time) deadline for submission of offers/proposals in response to the Prospectus, suspends the termination dates of the Resort Owners' current contracts, and bars Defendant, its officers, employees and agents, from implementing or enforcing any of the unlawful aspects of the Prospectus and bidding process contemplated therein;

2. Enter a permanent injunction enjoining defendants from issuing a new Prospectus for the concessions at Lake Berryessa that is deficient in any of the ways described in this complaint, or otherwise infringes on the Resort Owners' rights in the manner described in this complaint;

3. Vacate any agency action found to be arbitrary, capricious, an abuse or discretion or otherwise not in accordance with law, and remand any matters herein to the Bureau of Reclamation, or to the Department of the Interior, for further proceedings in accord with any legal instructions the Court may deem just and proper; and

4. Order such other and further relief as the Court deems appropriate including, but not limited to, an appropriate award of bid preparation and proposal costs.

Respectfully submitted,

Gregory T. Jaeger
MARZULLA & MARZULLA
1350 Connecticut Ave, NW, Suite 410
Washington, D.C. 20036
Telephone: (202) 822-6760
Facsimile: (202) 822-6774

Attorney for Plaintiffs

Dated: August 27, 2007

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
BID PROTEST ACTION

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC. | Case No. __________ |
| Plaintiffs, | Judge ____________ |
| v. | |
| UNITED STATES, | |
| Defendant. | |

**DECLARATION OF ROBERT WHITE**

I, Robert White, pursuant to 28 U.S.C. § 1746, declare:

1. I am Treasurer of Laguna Hermosa Corporation (d/b/a Rancho Monticello Resort), one of the Plaintiffs in the above-captioned matter. I have personal knowledge of the facts and circumstances in this case, including those set forth in Plaintiffs' Complaint for Injunctive and Declaratory Relief and Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction. I also have personal knowledge of the facts and circumstances of this case as they relate to the other Plaintiffs in this case (together, "the Resort Owners").

2. The Resort Owners are incumbent concessionaires for four of the seven concessions at Lake Berryessa that are the subject of the Prospectus. The Resort Owners operate the concessions by virtue of long-term concession contracts with the Bureau of Reclamation ("Reclamation").

3. In 1958, soon after the creation of Lake Berryessa, the Resort Owners entered into their concession contracts with Napa County, California, ("the County"), which was at the time Reclamation's recreation management contractor for the lake. Pursuant to its authority under its Management Agreement with Reclamation, the County determined that, due to limited resources and because a majority of the public use was by non-residents, recreation services and facilities at the lake should be provided through private concession contracts. As a result, the County actively sought out businesses, including the Resort Owners, to operate the Lake Berryessa concessions.

4. In soliciting the Resort Owners, the County promised that they would enjoy "economic stability" through long-term contract commitments. Accordingly, the County agreed to provide the Resort Owners with long-term contracts that were necessary to obtain bank loans for the development of visitor facilities.

5. As a result of the County's inducements, in 1958 and 1959 the Resort Owners and other concessionaires entered into seven long-term (30-year) concession contracts for recreation services on 1,700 acres of land and water at various sites around the lake. These agreements were later modified to allow for 50-year terms.

6. To achieve the overall purpose of their concession contracts, *i.e.*, to provide visitor services and facilities, Napa County granted permission to the Resort Owners to introduce, at their own expense, long-term mobile home/trailer lease sites at the lake. At the same time that the mobile home sites were being developed, the Resort Owners also developed some of the short-term facilities at the lake, *i.e.*, camping, lodging, marinas, and retail.

7. These long-term mobile home sites were an immediate success and have since become the core economic base for the Resort Owners' concession operations at Lake Berryessa. Today, there are approximately 1,300 such sites at the lake, the majority of which are part of the Resort Owners' concessions. The sites are almost fully occupied and account for approximately 50 percent of the overall revenue for the Resort Owners' concessions. Because of their permanent nature, the removal of these sites would result in environmental consequences, such as soil and vegetation disturbances. In addition, the removal of the sites could result in legal consequences. For example, because a great number of these sites are occupied by permanent tenants, their removal would implicate the protections of the California Mobile Home Residency Act.

8. To fulfill the purposes of the concession contracts, the Resort Owners over the years have invested millions of dollars, as well as substantial time and effort, in constructing amenities and improvements at the resorts. Indeed, since the creation of Lake Berryessa, the Resort Owners' concession operations have provided the great majority of visitor services and amenities at the lake.

9. The Resort Owners' amenities include lodging units, restaurant facilities, extensive marina and boating facilities, and water and electricity systems. The improvements include, but are not limited to: grading and earth moving for parking lots, road and site construction, marinas for both small watercraft and large houseboats, docks, boat slips, fuel stations, food service and retail facilities, shop buildings, bath houses, cabins, motels, travel trailer sites, tent campsites, mobile home sites, picnic areas, boat storage buildings, boat storage lots, extensive landscaping, electric and water distribution systems, sewage distribution and treatment systems, and water purification systems.

These improvements and facilities serve hundreds of thousands of visitors each year. Many of these improvements cannot be removed because they involve improvements and alterations to the land.

10. The foregoing improvements were paid for solely by the Resort Owners, and for the purpose of fulfilling Reclamation's public visitation mission at the lake, after obtaining prior approval from Reclamation. Reclamation has benefited from the construction of these improvements, both economically and in terms of fulfilling its "public enjoyment through recreation" mission. In addition, both Reclamation and any future concession awardee will benefit from the construction of these improvements. If the Prospectus is not enjoined by this Court, the Resort Owners will lose their substantial investments in the concessions, with Reclamation and Forever Resorts the likely recipients of the resulting windfall.

11. The Prospectus, in its current form, unfairly and unlawfully favors Forever Resorts, a large corporate provider of house boat rentals and other concession services and the only large corporation known to be interested in the Lake Berryessa procurement. For example, the Prospectus identifies the Environmental Management Plan ("EMP"), Maintenance Plan, and Operation Plan of Forever Resorts as being acceptable, thus "pre-qualifying" Forever Resorts as an awardee for the new concession contracts. In addition, the Prospectus allows a new bidder, such as Forever Resorts, to receive a reduction of franchise fees owed to Reclamation to repay any costs associated with tenant removal. In contrast, the Prospectus does not provide the Resort Owners such fees while demanding that they pay all costs for removal of tenant personal property.

tenants that would be associated with these potential breaches would make it impossible to meet Reclamation's removal deadline.

15. Reclamation is required to identify all of the property and improvements that are to be removed by the Resort Owners. Reclamation also is required to complete an Environmental Impact Statement for the removal of individual improvements. Reclamation has failed to complete either of these tasks. Reclamation's failure to satisfy these obligations also renders it impossible for the Resort Owners to comply with Reclamation's removal deadline.

16. The Prospectus also discriminates against the Resort Owners by requiring that, if any mobile units are left after the termination of the contracts, the Resort Owners may be declared in default of their agreements. This could lead to the seizure of their permanent improvements, thereby depriving the Resort Owners of all value from their investments in the concession contract sites.

17. The Prospectus further discriminates against the Resort Owners by not allowing the Resort Owners to remove the mobile homes in phases during the term of a new concession contract, should one be awarded to a Resort Owner. As a result, the Resort Owners will be deprived of a revenue source that is critical to their ability to stay in business while awaiting the installation of the new facilities. This could result in business failure for some or all of the Resort Owners.

18. The Prospectus employs a valuation measure, Fair Market Value, that is different from the Fair Value metric required by Public Law 96-375. The adoption of Fair Market Value has resulted in an improper undervaluation of the Resort Owners' assets. As just one example, the Fair Value for Rancho Monticello has been appraised at

$27,500,000 while Reclamation's appraisal is for $11,250,000. The Fair Value appraisals for the other resorts have resulted in similar discrepancies with Reclamation's appraisals.

19. The Prospectus relies upon appraisals for each of the Lake Berryessa resorts. The valuations performed by the appraisers are defective because the appraisers neglected to comply with the Statement of Work and the Instructions by failing to:

a. Consider the Resort Owners' improvements to the land, including, but not limited to, such items as "cut and fill" work, grading, road construction and parking lots;

b. Include improvements such as retaining walls, dock facilities, mobile home site pads, sewage and utility connections, and similar improvements; and

c. Conduct an evaluation of the concessions by all three appraisal methods, performing instead only a "Cost Approach" appraisal.

20. If the Prospectus is not enjoined, the Resort Owners will be irreparably harmed because they may be forced to either: (i) transfer their facilities and concession operations to a new concessionaire at a substantially undervalued price; (ii) tear down the facilities and other personal property at their own expense; (iii) abandon the facilities, in which event either Reclamation or the new concessionaire will assume control and/or ownership at no cost.

21. If the Prospectus is not enjoined, the Resort Owners will be irreparably harmed because, in the event they try to remove all of their property off of the surrounding areas by the concession contract termination dates, they may be found to be in breach of their contracts with tenants. If the Prospectus is not enjoined, the Resort Owners will lose their right to a legally valid procurement and lose anticipated profits. If

the Prospectus is not enjoined, the Resort Owners will lose their customers and their contractual right to make a fair profit prior to the expiration of their agreements.

22. As incumbent contractors, the Resort Owners are ready, willing, and able to continue to perform under the terms of the existing contracts until the Court resolves this matter. The Lake Berryessa visitor services will continue to be available to Reclamation and the public under the terms of the existing contracts.

23. Reclamation has imposed an accelerated schedule for its procurement during the peak visitor season for the Resort Owners. Recently, Reclamation solicited opinions from the Resort Owners regarding an extension of the September 5 deadline for proposals. In so doing, Reclamation indicated that it was amenable to such an extension. Some of the Resort Owners did not favor an extension, however, because it was not accompanied by a commensurate extension of the termination dates for the current concession contracts. This would have rendered the period between contract award and the termination dates, during which the Resort Owners would be compelled to achieve numerous difficult tasks, such as tenant removal, and site removal and development, in an even shorter period.

24. In addition, the Prospectus incorporates an Environmental Compliance and Facility Condition Assessment Report prepared by Kleinfelder, Inc. and dated December 19, 2002. The Kleinfelder Report purports to assess the condition of the various facilities for each of the resorts. In response to this Report, the Resort Owners performed in a timely manner the necessary maintenance and improvements that corrected the conditions identified in the report.

25. The Prospectus allows a new bidder, such as Forever Resorts, to receive a reduction of franchise fees owed to Reclamation to repay any costs associated with tenant removal. In contrast, the Prospectus does not provide the Resort Owners with such fees while demanding that they pay all costs for removal of tenant personal property.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Robert White

Executed on this 20th day of August, 2007.