9:45am

ORIGINAL

FILED
AUG 28 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC. | Case No. 07-636 C |
| Plaintiffs, | Judge ________________ |
| v. | |
| UNITED STATES, | |
| Defendant. | |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Gregory T. Jaeger
MARZULLA & MARZULLA
1350 Connecticut Ave, NW, Suite 410
Washington, D.C. 20036
Telephone: (202) 822-6760
Facsimile: (202) 822-6774

Attorney for Plaintiffs

ORIGINAL

Dated: August 27, 2007

**Table of Contents**

Introduction ........................................................ 1

Statement of the Issues ........................................................ 5

Statement of the Case ........................................................ 6

I. Factual Background ........................................................ 6

A. Background of Lake Berryessa Concessions ........................................................ 6

B. The Requirements and Legislative History of Public Law 96-375 ........................................................ 9

C. Background of the Prospectus for the Lake Berryessa Concessions ........................................................ 11

D. Specific Provisions of the Prospectus for the Lake Berryessa Concessions ........................................................ 12

E. Specific Provisions of the Resort Owners' Contracts ........................................................ 15

F. Reclamation's Response to the Resort Owners' Concerns ........................................................ 16

Legal Standard ........................................................ 17

Argument ........................................................ 18

I. The Resort Owners are Likely to Prevail Upon the Merits of Their Claims ........................................................ 18

A. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Violates Public Law 96-375 ........................................................ 19

B. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Unfairly Discriminates Against Them In Favor Of Forever Resorts ........................................................ 21

C. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Is Based Upon Improper Appraisals Of The Resort Owners' Assets And Economic Interests ........................................................ 25

II. The Balance of Equities Militates Strongly In Favor Of Injunctive Relief ........................................................ 27

A. The Resort Owners Will Suffer Irreparable Harm In The Absence Of Injunctive Relief ........ 27

B. Neither The Government Nor Other Third Parties Will Suffer Harm If Injunctive Relief Is Awarded ........ 30

III. Injunctive Relief Is In The Public Interest ........ 30

Conclusion ........ 32

# TABLE OF AUTHORITIES

## Cases

*A.G. Schoonmaker Co. v. Resor*, 445 F.2d 726 (D.C.Cir. 1971)................................ 31

*Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474 (2006) ............................ 19, 30

*Alanthus Data Commc'ns. Corp.*, B-206946, 1983 WL 26452 (Comp.Gen. Feb. 10, 1983)........................................................................... 31

*Alion Science and Technology Corp. v. United States*, 74 Fed. Cl. 372 (2006) ............ 17

*Arch Chemicals v. United States*, 64 Fed. Cl. 380 (2005)............................................ 26

*Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8 (2005) ............................................ 19, 27, 30

*Associated Producers Co. v. City of Independence, Mo.*, 648 F.Supp. 1255 (W.D.Mo. 1986)........................................................................................... 28

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572 (Fed.Cir. 1990) ............... 19

*Aviation Enters., Inc. v. United States*, 8 Ct. Cl. 1 (1985) ........................................... 31

*Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173 (2006) ........................................... 17

*Banknote Corp. of Am. V. United States*, 365 F.3d (Fed. Cir. 2004) ............................ 18, 20, 21

*Bannum, Inc. v. United States,* 404 F.3d 1346 (Fed.Cir. 2005) .................................... 27

*Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578 (Fed.Cir. 1995)........................ 31

*Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716 (1999) .............................. 31

*Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266 (1997) .......................................... 30

*Custom Printing Co. v. United States*, 51 Fed. Cl. 729 (2002)...................................... 31

*Dynalectron Corp. v. United States*, 659 F.Supp. 64 (D.D.C. 1987)............................. 31

*Ellsworth Assocs., Inc. v. United States,* 45 Fed. Cl. 388 (1999).................................. 29

*Essex Electro Eng'rs v. United States,* 3 Cl. Ct. 277 (1983)......................................... 29

*Ferry Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589 (8th Cir. 1984)....................... 18

*FMC Corp v. United States*, 3 F.3d 424 (Fed.Cir.1993)................................................ 17

*Four Rivers Investments, Inc. v. United States*, 2007 WL 2193884 (Fed. Cl.).............. 17

*Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350 (2004) .................. 19

*Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684 (8th Cir. 2003)...................... 18

*International Ass'n of Firefighters v. U.S. Dep't of Navy*, 536 F.Supp. 1254 (D.R.I. 1982) .......................................................................................................... 31

*Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566 (1974) ............................................ 18

*Mark Dunning Indus. v. Perry*, 890 F.Supp. 1504 (M.D.Ala. 1995) ............................. 31

*Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617 (2002) ....................................... 29

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed.Cir. 1998)................ 17

*Northern States Power Co. v. FERC*, 30 F.3d 177 (D.C.Cir. 1994) .............................. 19

*OAO Corp. v. United States*, 49 Fed. Cl. 478 (2001).................................................... 17, 29

*O'Donnell Contr. Co. v. District of Columbia*, 963 F.2d 420 (D.C.Cir. 1992) ............. 28

*Overstreet Electric Co. v. United States*, 47 Fed. Cl. 728 (2000)................................. 26, 28

*Pineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed.Cir. 1988).......................... 18

*Rotech Healthcare Inc. v. United States*, 71 Fed. Cl. 393 (2006)................................. 19

*SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731 (2004) ........................................... 29

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2nd Cir. 1970)...................... 28

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511 (Fed.Cir. 1990)..... 19

*United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312 (1998) ............ 29

*U.S. Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*, 413 F.3d 1344 (Fed.Cir. 2005)............................................................................ 17

*ViroMed Labs., Inc. v. United States*, 62 Fed. Cl. 206 (2004) ........................................ 19

*Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980) ........................................................ 17

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed.Cir. 1983)............................... 17

**Statutes and Rules**

Pub. L. No. 57-161, 32 Stat. 388 ........................................................................ 6

Pub. L. No. 96-375 ........................................................................................ *ibid.*

28 U.S.C. § 1491 ........................................................................................ 17, 19, 27

**Other Authorities**

Legislative History, H.R. 5278 ........................................................................ 4, 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC. | Case No. _________ |
| Plaintiffs, | Judge _________________ |
| v. | |
| UNITED STATES, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Plaintiffs John C. Frazier, III (d/b/a Markley Cove Resort), Laguna Hermosa Corporation (d/b/a Rancho Monticello Resort), REL Limited (d/b/a Spanish Flat Resort), and Steele Park Resort, Inc. (together, "Resort Owners") respectfully submit this memorandum in support of their application for a temporary restraining order and motion for a preliminary injunction.

## INTRODUCTION

Plaintiffs, the Resort Owners, are incumbent concessionaires for four of the seven concessions that are being offered by the Bureau of Reclamation in its June 7, 2007 Lake Berryessa Concession Prospectus ("Prospectus"). The Prospectus is soliciting offers for new concession contracts for various visitor services at Lake Berryessa, located in Napa County, California. This bid protest challenges Reclamation's unlawful Prospectus for the following reasons.

The Lake Berryessa Prospectus is unlawful because it: (a) violates the requirements of Public Law 96-375 by failing to require a new concessionaire to pay "fair value" for all of the Resort Owners' concession assets and interests should the Owners fail to win a new concession contract; (b) imposes requirements upon the Resort Owners that effect a *de facto* disqualification of the Owners from consideration for any new concession contract and otherwise impermissibly discriminate against the Resort Owners in favor of Forever Resorts, Inc.;[1] and (c) incorporates and is based upon appraisals of the Resort Owners' concession interests that violate Public Law 96-375 and Reclamation's own directives and instructions for the appraisals.

Also as discussed below, if the Prospectus is not enjoined, the Resort Owners will be irreparably harmed because, among other things, they will be effectively disqualified from consideration for the new contracts. Indeed, as Reclamation well knows, the Prospectus's requirement that the Resort Owners must remove all private and concession property before the termination of the contracts in 2008-2009 is impossible to meet, and will result in the Resort Owners being disqualified from consideration from the new contracts. App. 63, White Decl. at ¶ 13. In addition, the requirements of the Prospectus may force the Resort Owners to go out of business before the termination of their current contracts, in which event either Reclamation or the new concessionaire will assume control over, or outright ownership of, the resort facilities at no cost. App. 65, White Decl. at ¶ 20. Finally, the Resort Owners may be forced to either transfer their facilities and concession operations to a new concessionaire at a substantially

[1] Forever Resorts is a large corporate provider of houseboat rentals and other concession services. It is by far the most active and interested large corporation that is known to be an interested bidder for the Lake Berryessa concessions. App. 62, Declaration ("Decl.") of Robert White at ¶ 11-12. In this respect, it is noteworthy that Reclamation already has awarded to Forever Resorts the Pleasure Cove Resort concession at Lake Berryessa, (currently in bankruptcy and not a party to this suit). App. 360. That concession contract essentially provides Forever Resorts with a "pre-qualification" and a preference for the existing concessions. *See* App. 377.

undervalued price or tear down the facilities and other personal property at their own expense *Id.*

In issuing the Prospectus, Reclamation has unjustifiably ignored that, in response to the agency's inducements, the Resort Owners have invested millions of dollars in constructing and improving facilities and amenities at Lake Berrryessa to satisfy public demand. App. 61, White Decl. at ¶ 8. Indeed, since the creation of Lake Berryessa in 1957, Reclamation has achieved its mission to "provid[e] for public enjoyment through outdoor recreation" at the lake solely by inducing private businesses, including the Resort Owners, to incur the costs of developing and operating visitor amenities. *See* App. 16. In this way, Reclamation has avoided the significant costs associated with fulfilling one of its "missions" (*i.e.*, providing visitor services), while receiving substantial fees from concessionaires, including the Resort Owners, who have provided, and continue to provide, such services.

After fifty years of profiting from the Resort Owners' investment in, and operation of, the resort facilities, Reclamation recently has determined that there is a greater economic opportunity for the agency at the lake. App. 12. In order to capitalize upon this perceived economic opportunity, Reclamation has decided, through the Prospectus, to demand that the Resort Owners immediately remove all of their concession property from the lake, which is an impossible requirement, and to replace the Resort Owners' contracts with new concession contracts.[2] As a result, Reclamation will reap windfall profits based upon the multi-million dollar investments the Resort Owners have made at Lake Berryessa, all while ignoring the Resort

[2] The Resort Owners' concession contracts are scheduled to expire as follows: (1) Markley Cove Resort May 26, 2009; (2) Rancho Monticello - June 15, 2008; (3) Spanish Flat - July 13, 2008; and (4) Steele Park Resort - May 26, 2009. *See* App. 68, FBO Daily Issue dated June 9, 2007 at 2.

Owners' long and commendable history of providing concession services to the public at the lake.

Reclamation's actions clearly violate the provisions and purposes of Public Law 96-375. Indeed, the legislative history emphatically reflects the Resort Owners' plight and Congress' intent to protect the Resort Owners' investments at the lake:

> MR. LUJAN: … I want to make certain that the language which we have provided in this bill would *fully protect those people who have made sizable investments at this lake.* They have been whipsawed among three agencies over the years, each of whom has had different regulations …
>
> [M]y understanding is that the *concessionaires have made sizable investments in permanent facilities at the lake.* What happens to those facilities? Does the Government just make a windfall profit in the form of confiscated property simply by declaring the agreements terminated? *Would these people just have to walk away and leave their investments?*
>
> MR. CLAUSEN: *The answer to that is no. As we have discussed previously in the committee, the eventuality has been foreseen, and we have no intent of such a thing happening.* It is our intent that all permanent facilities placed by the concessionaires in these seven resorts at Lake Berryessa be considered the property of the respective current concessionaires, along with any permanent additions or modification to those facilities. That is only right and fair, and the committee has no intention of stripping them of those rights. . . .
>
> MR. LUJAN: I simply wanted to be certain that the intent of the language in the bill which referred to "new negotiated concession agreements," is fully understood *as to the protections we are providing against confiscation of private property by the Government. . . .*

Legislative History, H.R. 5278, App. 263 hereto. Emphasis added.

Notwithstanding this clear Congressional mandate, Reclamation has imposed an accelerated schedule for its procurement during the peak visitor season for the Resort Owners, and has formally announced that it will accept offers in response to its unlawful Prospectus on or before September 5, 2007. Despite recently indicating that it was willing to grant an extension for the submission of proposals, Reclamation now states that it intends to enforce the September

5th deadline. App. 2, 357. Reclamation has stated that a failure to meet this deadline will preclude consideration for the new contracts.

**STATEMENT OF THE ISSUES**

1. Whether the irreparable harm that the Resort Owners will suffer if the Prospectus and the termination dates for the current concession contracts are not enjoined, including the *de facto* disqualification from consideration for the new contracts and the loss of their concession investments and operations, outweighs the non-existent harm to the Government and other third parties if injunctive relief is not granted.

2. Whether the Resort Owners are likely to prevail upon the merits of their claims, including the following issues:

a. Whether the Prospectus unlawfully violates Public Law 96-375 which mandates that, in the event any of the Resort Owners are not awarded a new concession contract, they are to receive from new concessionaires "fair value" for all of their concession assets and interests. *See* Pub. L. 96-375, Section 5(b).

b. Whether the Prospectus arbitrarily, capriciously, unlawfully, and without rational basis favors Forever Resorts, Inc., while discriminating against the Resort Owners, through patently unfair requirements, including requirements that effect a *de facto* prior disqualification of the Resort Owners from consideration for the new contracts.

c. Whether the Prospectus arbitrarily, capriciously, unlawfully, and without rational basis includes and is based upon appraisals of the Resort Owners' facilities and economic interests that violate Public Law 96-375, as well as Reclamation's own instructions and directives for the appraisals.

3. Whether it is in the public interest for the Court to enter the requested injunction to preserve the integrity of the solicitation process, to adjudicate the Resort Owners' claims, to provide Reclamation with time to revise its unlawful Prospectus, and to ensure that the Prospectus furthers fair and open competition.

## STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

### A. Background Of The Lake Berryessa Concessions

The Bureau of Reclamation was established by the Reclamation Act of 1902. Pub. L. No. 57-161, 32 Stat. 388. *See* App. 16. As part of its mission, Reclamation is responsible for assisting "States, Native American Tribes, and others [to] meet their new and ever-changing water needs while balancing a multitude of competing uses, including recreation sites" and for "providing for public enjoyment through outdoor recreation." *Id.*

Lake Berryessa is the operating reservoir for Reclamation's Solano Project. *See* App. 221-223. Lake Berryessa is approximately 26 miles long by 3 miles wide, and was created as the result of the completion of the Monticello Dam in 1957. The lake is largely surrounded by steep hills and contains numerous inlets and coves that provide a natural shelter for marinas and resort facilities. Despite these natural shelters, however, the steep terrain at the lake has required significant development, such as roads, parking lots and other land alterations, to accommodate public use.

Although the Solano Project did not contemplate recreation as part of its original purpose, public visitation of the lake began almost immediately. *Id.* As a result of the immediate and significant public use, in 1958 Reclamation entered into a Management Agreement with Napa County, California, ("the County") to allow the County to administer the recreational

development of the lake. *Id.; see* App. 44. Pursuant to paragraph 15 of the Management Agreement, the Government was placed "in the County's shoes;" as a result, the rights of a party against the United States were deemed to be identical as those against the County. *See Laguna Hermosa Corporation v. B.E. Martin,* No. C-77-105 (N.D. CA) Mem. Op. at 6 (App. 248); *aff'd, Laguna Hermosa Corporation v. B.E. Martin,* 643 F.2d 1376 (9th Cir. 1981).

Pursuant to its authority under the Management Agreement, the County determined that, due to limited resources and because a majority of the public use was by non-residents, recreation services and facilities at the lake should be provided through private concession contracts. App. 225. As a result, the County actively sought out businesses, including the Resort Owners, to operate the Lake Berryessa concessions. App. 60, White Decl. at ¶ 3. In soliciting these businesses, the County promised that the resort concessions would enjoy "economic stability" through long-term contract commitments. *Id.* at ¶ 4. Accordingly, the County provided the concessionaires with long-term contracts to assist them in obtaining the necessary bank loans for the development of visitor facilities. *Id.*

As a result of the County's inducements, the Resort Owners and other concessionaires entered into seven long-term concession contracts in 1958 and 1959 for recreation services on 1,700 acres of land and water at various sites around the lake. App. 60, White Decl., ¶ 5, App. 225. After subsequent modifications, these concession contracts provided for 50-year terms. App. 60, White Decl., ¶ 5.

To achieve the overall purpose of their concession contracts, *i.e.*, to provide visitor services and facilities, Napa County encouraged the concessionaires (including the Resort Owners) to construct, at their own expense, long-term mobile home/trailer lease sites at the lake. *Id.* at ¶ 6. At the same time that the mobile home sites were being developed, some of the short-

term facilities, *i.e.*, camping, lodging, marinas, and retail, also were developed by the concessionaires. App. 44. The lake proceeded to be developed with the concessionaires' funds according to this pattern over the next several years. *See* Legislative History for Pub. L. 96-375 (comments by Rep. Clausen), App. 262.

The availability of the long-term mobile home sites was immediately popular and has since become the core economic base for the concession operations at Lake Berryessa, including those of the Resort Owners. App. 44. Today, there are approximately 1,300 such sites at the lake, the majority of which are part of the Resort Owners' concessions. App. 61, White Decl. at ¶ 6. The sites are almost fully occupied and account for approximately 50 per cent of the overall revenue for the concessions. App. 11, App. 61, White Decl., at ¶ 6.

Because of their permanent nature, the removal of these sites would result in environmental consequences, such as soil and vegetation disturbances. *Id.* at ¶ 7. In addition, the removal of the sites could result in legal consequences. *Id.* For example, because a significant number of these sites are occupied by permanent tenants, their removal would implicate the protections of the California Mobile Home Residency Act. *Id.*

To fulfill the purposes of their concession contracts, the Resort Owners over the years invested millions of dollars, as well as substantial effort, in constructing improvements and amenities at the resorts. *Id.* at ¶ 8. These improvements include, but are not limited to: grading and earth moving for parking lots, road and site construction, marinas for both small watercraft and large houseboats, docks, boat slips, fuel stations, food service and retail facilities, shop buildings, bath houses, cabins, motels, travel trailer sites, tent campsites, mobile home sites, picnic areas, boat storage buildings, boat storage lots, extensive landscaping, electric and water distribution systems, sewage distribution and treatment systems, and water purification systems.

*Id.* at ¶ 9. Many of these improvements are permanent and cannot be removed because they involve improvements and alterations to the land. *Id.* .

These improvements were paid for solely by the Resort Owners with Reclamation's approval. App. 62, White Decl. at ¶ 10. Reclamation has benefited from the construction of these improvements, both economically and in terms of fulfilling its "public enjoyment through outdoor recreation" mission. In addition, both Reclamation and any future concession awardee will benefit from the construction of these improvements. If the Prospectus is not enjoined by this Court, the Resort Owners will likely lose their substantial investments in the concessions, with Reclamation and Forever Resorts the likely recipients of the resulting windfall.

**B. The Requirements And Legislative History Of Public Law 96-375**

In 1980, Congress passed Public Law 96-375, which provides:

> Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That at the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, *if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.*

Section 5(b) of Pub. L. 96-375. App. 274. Emphasis added.

Thus, Public Law 96-375 makes clear that any new concessionaire that takes over the Resort Owners' concessions, in this case through new concession contracts, must pay "Fair Value" to the Resort Owners for all permanent facilities. This obligation includes not only improvements to the land, but to appurtenances and other facilities as well.

In passing this law, Congress stated clearly that the Resort Owners were to receive fair value for their facilities:

> *[I]t is our intent that all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities by the concessionaires shall remain the property of said concessionaires*; however, at the option of the Secretary of the Interior, the United States may require that the permanent facilities not be removed from the concession areas, and instead *pay fair value* for the permanent facilities or, if the new concessionaire assumes operation of the concession, require the new concessionaire to *pay fair value* for the permanent facilities.

Legislative History, H.R. 5278. App. 262. Emphasis added.

As previously noted, the following exchange among Congressional members makes clear that the intent of Pub. L. 96-375 was to fully protect the investments of the Resort Owners:

> MR. LUJAN: ... I want to make certain that the language which we have provided in this bill would *fully protect those people who have made sizable investments at this lake.* They have been whipsawed among three agencies over the years, each of whom has had different regulations ...
>
> [M]y understanding is that the *concessionaires have made sizable investments in permanent facilities at the lake.* What happens to those facilities? Does the Government just make a windfall profit in the form of confiscated property simply by declaring the agreements terminated? *Would these people just have to walk away and leave their investments?*
>
> MR. CLAUSEN: *The answer to that is no. As we have discussed previously in the committee, the eventuality has been foreseen, and we have no intent of such a thing happening.* It is our intent that all permanent facilities placed by the concessionaires in these seven resorts at Lake Berryessa be considered the property of the respective current concessionaires, along with any permanent additions or modification to those facilities. That is only right and fair, and the committee has no intention of stripping them of those rights. . . .
>
> MR. LUJAN: I simply wanted to be certain that the intent of the language in the bill which referred to "new negotiated concession agreements," is fully understood *as to the protections we are providing against confiscation of private property by the Government. . . .*

*Id.* (emphasis added).

**C. Background Of The Prospectus For The Lake Berryessa Concessions**

In 2000, Reclamation initiated a visitor services planning effort for Lake Berryessa through the National Environmental Policy Act ("NEPA") process. App. 227. In November 2005, Reclamation published the Final Environmental Impact Statement ("EIS") required by NEPA. App. 227, 234. This EIS is the subject of pending litigation filed by the tenants of Lake Berryessa in the United States District Court for the District of Northern California. *See Berryessa For All v. US*, No. 07-259 (N.D. CA), App. 410. A hearing in that case regarding plaintiffs' request for injunctive relief is set for September 14, 2007.

On June 2, 2006, Reclamation issued its Record of Decision ("ROD") for the future use and operation of Lake Berryessa. The ROD provided that, to the extent practicable, the Government and commercial recreation operations at Lake Berryessa would be developed, implemented, and managed on an integrated, lake-wide basis to provide the widest practical spectrum of recreation experience for the visiting public, to support the economic goals of surrounding communities (in particular, gateway communities), and to maintain the opportunity for a fair and reasonable profit by concession contractors. App. 228.

The ROD also provided that the seven concession areas, including those of the Resort Owners, would be developed, operated, and maintained by commercial concession contractors under long-term concession contracts with Reclamation. App. 229. The ROD stated that final development plans for each concession area would be determined through the competitive contracting process. *Id.*

The ROD contained provisions for mitigation measures for the current concession contractors, including the Resort Owners. App. 233. Those measures included: (a) an agreement by Reclamation to negotiate in good faith to amend the current concession contracts

to reduce the franchise fees for the duration of the contract to offset potential contract close-out costs; and (b) an agreement by Reclamation to consider a waiver of prevailing policies and guidelines to allow a concessionaire to charge above the most current recreation rates. *Id.*

As a further mitigation measure for current concessionaires, the ROD provided that:

> Reclamation will continue to work with current concession contractors to expedite valuation (appraisal) of existing contractor-owned facilities. The appraisal method and any potential acquisition of existing facilities will comply with applicable provisions of Public Law 96-375; Interior legal opinions; Interior and Reclamation policies, regulations, and directives and standards; applicable financial accounting standards and guidelines; and provisions of the current concession contracts.

*Id.*

### D. Specific Provisions Of The Prospectus For The Lake Berryessa Concessions

On June 7, 2007, Reclamation issued the Lake Berryessa Concession Prospectus. App. 4. Among other attachments, the Prospectus incorporated the June 2, 2006 Record of Decision. The Prospectus also incorporated the latest Reclamation Manual Policy and Directives and Standards. App. 24, 277, 293. In its section entitled "Concessions Contracting," the Reclamation Directives and Standards provide that:

> To ensure fair competition before and during the RFP [Prospectus] process, meetings to discuss the [Prospectus] with existing or potential concessionaires or other outside parties must not be conducted. It is appropriate to have meetings with existing concessionaires to deal with ongoing operational or contractual issues and programs. The [Prospectus] should include a schedule of meetings in which all interested parties can discuss requirements of the [Prospectus]. Other meetings requested by individual interested parties must be declined.

App. 282-283. In addition, the Reclamation Manual on Policy (App. 293) also provides that "Reclamation will ensure fair competition in the awarding of concession contracts." App. 295.

The Prospectus incorporates an Environmental Compliance and Facility Condition Assessment Report prepared by Kleinfelder, Inc. and dated December 19, 2002. The Kleinfelder Report purports to assess the condition of the various facilities for each of the resorts. In response to this Report, the Resort Owners performed in a timely manner the necessary maintenance and improvements that corrected the conditions identified in the Report. The Report has not been updated to reflect these improvements and maintenance efforts.

The Prospectus provides that, if an existing concessionaire is selected as the winning offeror on any or all of the seven concession locations, that concessionaire must comply with all applicable requirements of their current contract, the ROD and the Prospectus's stipulations regarding current concessionaires, in advance of any authorization to proceed or execution of any future contract. App. 31. In particular, the Prospectus requires the current concessionaires, including the Resort Owners, to ensure the removal of all personal property, including trailers and mobile homes and appurtenant structures such as decks, stairs and storage sheds prior to the termination of their current contracts. *Id.* The Prospectus states that "[f]ailure by an existing concessionaire to meet these and/or other identified requirements of the current concession contracts will result in non-consideration or the cancellation by Reclamation of their selection as a future concessionaire and the selection of another bidder or re-issuance of another prospectus." *Id.*

In contrast to these provisions for the Resort Owners, the Prospectus provides that "Reclamation will work concurrently with any new contractor during negotiations to address any conditions that may delay implementation of selected proposals (*e.g.*, abandoned property)." *Id.*

The Prospectus thus does not impose upon new concession contractors the same deadlines regarding removal of private property that it imposes upon the Resort Owners.

The Prospectus incorporates Public Law 96-375, specifically Section 5(b). App. 35. Despite the exclusive use of the term "fair value" in Pub. L. 96-375, however, the Prospectus interprets this term to mean "fair market value" and employs this definition throughout. App. 35. In addition, the Prospectus interprets Public Law 96-375 to allow a new contract awardee to determine (with ultimate approval by Reclamation) which existing concessionaire facilities will be purchased, and which will not. *Id.* In the case of a decision to purchase a particular asset, Reclamation will assign a "fair market value;" in the case where an asset is not chosen, it must be removed by the concessionaire at its own cost. *Id.*

In connection with this interpretation of Pub. L. 96-375, the Prospectus attaches valuation appraisals of each of the resorts as a means of establishing the purchase price for those facilities and assets that are chosen by the new concessionaire. *Id.* (citing Part 7.10). As guidance for the appraisals, Reclamation issued a Statement of Work (App. 296) that, along with particular "Appraisal Instructions," provided specific directions and parameters for the valuation of the resort facilities. App. 319.

The Statement of Work required the appraisers to "consider all three approaches to value," *i.e.*, the Income Approach, the Cost Approach and the Direct Sales Comparison Approach. App. 300. The Appraisal Instructions also required valuations under these three approaches (App. 320), and provided that the interest to be appraised was the "Concessionaire's Possessory Interest," which it stated was "defined by Public Law 96-375 as the Fair Value of the permanent improvements and includes *the economic value of the concession.*" *Id.*. Emphasis added.

With respect to the evaluation of proposals, the Prospectus provides substantial additional points to an offeror who bids on all (or multiple) concessions. *See* App. 40-41. Part 5 of the Prospectus specifies that 27 out of a total of 156 points will be awarded to an offeror who bids on all seven concessions. Practically speaking, this directly benefits Forever Resorts, which is the only known active bidder that would be able to independently bid upon multiple concessions and obtain these additional points.

**E. Specific Provisions Of The Resort Owners' Contracts**

The current contracts of Markley Cove, Rancho Monticello and Spanish Flat contain no clauses that may be construed in any way to require the removal of permanent fixtures or improvements. Although the Steele Park contract addresses the issue of removal of fixtures and private property, it is still subject to the "fair value" compensation provisions of Pub. L. 96-375. Indeed, many of the permanent improvements cannot be removed because they are alterations to the land, *e.g.*, cut and fill improvements for the creation of the marina parking and the construction of roads.

The Resort Owners' contracts contain no clauses that may be construed in any way to require the termination of the Resort Owners' respective business operations before the termination of the current concession contracts in 2008/2009. To the contrary, the Resort Owners are required under their contracts to continue to provide facilities and services at the lake.

The Resort Owners' contracts contain no clauses that may be construed in any way to require the removal of any tenant or resort-owned property prior the end of the termination of the current concession contracts in 2008/2009. Finally, the Resort Owners' contracts guarantee the opportunity for each concessionaire to make a fair profit for the duration of the contract terms.

### F. Reclamation's Response To The Resort Owners' Concerns

The Prospectus provides for question and answer sessions between Reclamation and current and prospective concessionaires prior to the submission of responsive offers. In response to one of these sessions, Reclamation provided written answers to questions posed by the Resort Owners and others. App. 324.

During this Q&A session, Reclamation advised the prospective bidders that the existing concession contractors are responsible for the removal of facilities not continuing into new contracts and for assuring that permittees remove their personal property prior to the end of the existing concession contract. App. 325. In response to a question regarding whether "trailer removal" includes the removal of concrete foundation slabs, Reclamation advised the prospective offerors that each removal must be evaluated independently and that Reclamation will determine what is to be removed in each case. Reclamation indicated that environmental conditions may require that certain erosion prevention structures must remain. *Id.*

In response to a question regarding the issuance of transport permits for the mobile homes, Reclamation acknowledged that the permits are required by Napa County and the State for transport of oversized loads on their respective roadways. Reclamation advised the prospective bidders, however, that it would require the existing concession contractors (including the Resort Owners) "to develop a plan for trailer removal to assure all trailers are removed by the end of the contracts and to meet the transport requirements of the county and the State." App. 325-326.

In response to a question regarding the penalty for failure to remove and remediate mobile homes and their sites prior to contract termination, Reclamation advised that "[i]f an existing concessionaire fails to accomplish the removal of any or all trailers in their area they

will not be further considered as qualifying offerors to the prospectus. Any other penalties will be the subject of litigation." App. 343.

**LEGAL STANDARD**

The Tucker Act authorizes this Court to "award any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2). *Alion Science and Technology Corp. v. U.S.,* 74 Fed.Cl. 372 (Fed. Cl. 2006). "Four factors are weighed in considering a motion for a preliminary injunction: (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce,* 413 F.3d 1344, 1346 (Fed.Cir.2005) (citing) *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir.1983); *see also, Avtel Servs., Inc. v. United States,* 70 Fed.Cl. 173, 226 (2006). "No one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp v. United States,* 3 F.3d 424, 427 (Fed. Cir. 1993). A motion for a temporary restraining order is decided upon consideration of the same four factors. *Four Rivers Investments, Inc. v. United States*, WL 2193884 (Fed. Cl. 2007) (citing *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (citations omitted).

The burden for seeking an injunction is lessened where, as in this case, the moving party seeks to maintain the status quo. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 895 (Fed. Cir. 1998) (a preliminary injunction preserves the status quo "lest one side prevent resolution of the question or execution of any judgment by altering the status quo"). Where there are "serious issues" before the court, it is a "sound idea to maintain the status quo *ante litem.*" *Wetzel v. Edwards*, 635 F.3d 283, 286 (4th Cir. 1980). The focus upon the status

quo allows an assessment of the relative harm to the parties and avoids "unnecessary economic waste until the case is adjudicated." *Ferry Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).

There are four factors to be considered in determining whether the agency has acted arbitrarily and capriciously. *Keco Indus., Inc. v. United States,* 203 Ct. Cl. 566, 574 (1974). The Court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; or (4) pertinent statutes and regulations were violated. *Id.; see also Banknote Corp of Am. v. United States,* 365 F.3d 1345, 1351 (Fed. Cir. 2004). The court need not find, however, that all four factors were present in order to determine that the agency acted arbitrarily and capriciously. *Pineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988).

## ARGUMENT

The Resort Owners have amply met the requirements for the issuance of injunctive relief. The Resort Owners likely will prevail in their various challenges to the Prospectus, which would result in a declaration that the Prospectus is invalid. Indeed, the Prospectus is so legally deficient and patently unfair that Reclamation should not be permitted to proceed with the Lake Berryessa concession procurement until all of the problems are corrected. Moreover, the balance of the equities, the threat of irreparable harm and the public interest all militate strongly in favor of staying Reclamation's September 5 deadline.

### I. The Resort Owners Are Likely To Prevail Upon The Merits Of Their Claims

At the preliminary injunction stage, the moving party is "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad.*

*Cmty. Church* v. *Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *Advanced Tech. Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 483 (2006). Accordingly, where, as in this case, the balance of harms weighs in favor of the moving party, a preliminary injunction should be granted as long as the movant has "a fair chance" of prevailing on the merits. *Atari Games Corp.* v. *Nintendo of Am., Inc.*, 897 F.2d 1572, 1577 (Fed. Cir. 1990); *see also Standard Havens Prods., Inc.* v. *Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990).

The Court's review takes place in accord with "the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Asia Pac. Airlines* v. *United States*, 68 Fed. Cl. 8, 19 n. 11 (2005); *see also* 28 U.S.C. § 1491(b)(4). Section 706 requires the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under section 706 is not an "empty gesture." *Northern States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994). Although an agency is entitled to a presumption of regularity, that "presumption does not shield the agency's decision from a 'thorough, probing, in-depth review.'" *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004) (citations omitted). A court should review the basis for an agency's decision to "determine if it was legally permissible, reasonable, and supported by the facts." *Rotech Healthcare Inc.* v. *United States*, 71 Fed. Cl. 393, 401 (2006) (quoting *ViroMed Labs., Inc.* v. *United States*, 62 Fed. Cl. 206, 212 (2004)).

**A. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Violates Public Law 96-375**

The Prospectus fails to comply with Public Law 96-375, rendering it invalid. *See Banknote Corp.*, 365 F.3d at 1351. The statute requires that a new concessionaire pay "Fair Value" for the Resort Owners' assets:

> Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That at the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, *if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.*

Section 5(b) of Pub. L. 96-375. App. 274. Emphasis added. The law clearly provides that any new concessionaire that takes over the Resort Owners' concession, in this case through new concession contracts, must pay "Fair Value" to the Resort Owners for all permanent facilities. This obligation includes not only improvements to the land, but appurtenances and other facilities as well.

The Prospectus, however, violates Public Law 96-375 in two ways. First, the Prospectus purports to allow a prospective bidder to select, and pay for, only those assets that the bidder wishes to retain under a new concession contract. App. 35. This directly contravenes the statute's requirement that the Resort Owners receive "fair value" for all of their assets. This alone is sufficient to render the Prospectus invalid and justify the requested injunctive relief.

Second, the Prospectus purports to provide that the Resort Owners shall receive "Fair Market Value" for their concession assets, a valuation measure that is different from the Fair Value metric required by Public Law 96-375. The adoption of the Fair Market Value metric has resulted in a drastic undervaluation of the Resort Owners' assets. App. 64, ¶ 18. In this connection, the Resort Owners have commissioned independent appraisals for their resorts based upon the Fair Value metric. These appraisals sharply contrast with the appraisals performed by Reclamation. *Id.* For example, Reclamation's appraisal of the Rancho Monticello resort was $11,250,000, while the FV appraisal of the resort was $27,500,000. *Id.*

The gross undervaluations of the resorts and their assets not only inures to the benefit of any future contract awardee, such as Forever Resorts, in the form of a reduced price for the concessions, but denies the Resort Owners the value they are entitled to receive under the statute. This failure to comply with Public Law 96-375 renders the Prospectus invalid.

In short, the allowance of new concessionaires to selectively pay for which of the Resort Owners' assets they wish to retain, and the adoption of the definition of Fair Market Value are violations of Pub. L. 96-375. Accordingly, the Prospectus should be declared invalid and Reclamation must be enjoined from proceeding according to its terms.

**B. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Unfairly Discriminates Against Them In Favor Of Forever Resorts**

The Prospectus arbitrarily, capriciously, unlawfully, and without rational basis discriminates against the Resort Owners in favor of Forever Resorts. Indeed, the Prospectus appears to be tailored to meet Forever Resorts' apparent strengths, *i.e.*, its size and financial resources, rather than to meet the best interests of the Government. App. 27. Of course, such preferential treatment is explicitly prohibited by both the Prospectus and Reclamation's controlling rules and regulations, and renders the Prospectus invalid. App. 295; *See Banknote Corp.,* 365 F.3d at 1351.

The Prospectus arbitrarily, capriciously, unlawfully, and without rational basis discriminates against the Resort Owners in several ways. First, the Prospectus imposes an impossible requirement upon the Resort Owners before they may qualify for the new contracts; specifically, the Prospectus requires the Resort Owners, but not new concessionaires, to remove all mobile homes, trailers and other improvements from the concession property prior to the termination of the current concession contracts. App. 31. This effects a prior *de facto*

disqualification of the Resort Owners from consideration for the new concession contracts because the removal of all private property cannot be achieved before the termination of the Resort Owners' current contracts in 2008-2009.

The disqualification of the Resort Owners will occur as follows. In order to comply with California environmental and transport regulations, as well as the California Mobile Home Residency Act, the complete removal of the property could take as long as five years. *See* App. 63, White Decl. at ¶ 13. In this respect, the Prospectus completely fails to account for delays that will be associated with the limited number of state-issued permits that are available to transport mobile homes and with the resolution of the county tax liens that are attached to certain abandoned mobile homes. *Id.*

Even if it were physically possible to remove all tenants by the removal deadline, the Resort Owners would have to begin removing tenants well in advance of the termination of the current concession contracts. *Id.* at ¶ 14. This would place the Resort Owners in the impossible position of being in potential breach of their contacts with their tenants, which run until the end of the current concession contracts. *Id.* The disputes and delays with tenants that would be associated with these potential breaches would make it impossible to meet Reclamation's removal deadline. *Id.*

Moreover, Reclamation has failed, as it is required to do, to identify all of the property and improvements that are to be removed. App. 30, App. 64, White Decl. at ¶ 15. Similarly, Reclamation has failed to satisfy its obligation to complete an Environmental Impact Statement for the removal of individual improvements. App. 30, App. 64, White Decl. at ¶ 15. Reclamation's failure to satisfy these obligations also has resulted in delays that also will render

it impossible for the Resort Owners to comply with Reclamation's removal deadline. App. 64, White Decl. at ¶ 15.

The Prospectus also discriminates against the Resort Owners by requiring that, if any mobile units are left after the termination of the contracts, the Resort Owners may be declared in default of their agreements. App. 31. This could lead to the seizure of Resort Owners' permanent improvements, thereby depriving them of all value from their investments in the concession contract sites. *Id.* In this respect, the Prospectus again places the Resort Owners in an impossible situation – the Prospectus essentially prevents the Resort Owners from being able to remove all of their property by the removal deadline, and then allows Reclamation, or more particularly, Forever Resorts, to assume control over the property at no cost after the deadline passes.[3]

The Prospectus further discriminates against the Resort Owners by not allowing them to remove the mobile homes in phases during the term of a new concession contract. As a result, the Resort Owners will be deprived of a revenue source that is critical to their ability to stay in business until the termination dates of the contracts, or while awaiting the installation of the new facilities. App. 64, White Decl. at ¶ 17. This could result in business failure for some or all of the Resort Owners. *Id.* By no mere coincidence, in the event of such a business failure, the Pleasure Cove contract provides that Forever Resorts will be pre-qualified to receive an interim contract for any failed concession. App. 377. In contrast, a new concessionaire will be

[3] It should also be noted that this requirement would allow a new concessionaire to simply declare that it does not want any of the Resort Owners' property, thus forcing the Resort Owners into the position of having to pay for its removal. Because this, obviously is not possible, the new concessionaire would be in a position to take over an entire concession for nothing.

permitted to phase out mobile homes during a new concession contract term and, thus, will enjoy the benefit of the interim rental income during the installation of the new facilities. App. 31.

In contrast to the stringent requirements imposed upon the Resort Owners, the Prospectus and its related documents unfairly and unlawfully favor Forever Resorts, to the unfair prejudice of the Resort Owners. First, the Prospectus awards up to 27 additional points out of a potential of 156 points (a 17 percent bonus), for a bidder who bids upon multiple concession opportunities. This provides an unfair advantage to Forever Resorts, which is the only known active bidder with sufficient financial resources to bid upon multiple concessions. This advantage is particularly unfair given that the Resort Owners, as small businesses, do not have the financial ability to independently bid upon more than one concession opportunity. Indeed, in these circumstances, the additional points provision amounts to a penalty against the Resort Owners and directly contravenes Reclamation's policy and directives regarding "fair competition" and equal treatment for small businesses. *See* App. 69, 295

In addition, the Prospectus allows a new bidder, such as Forever Resorts, to receive a reduction of franchise fees owed to Reclamation to repay any costs associated with tenant removal. In contrast, the Prospectus does not provide the Resort Owners with such fees while demanding that they pay all costs for removal of tenant personal property. App. 35, App. 62, White Decl. at ¶ 11. This of course, not only constitutes impermissible disparate treatment, but also is contrary to the ROD's requirement that Reclamation provide the Resort Owners with mitigation through a reduction in franchise fees. App. 39A.

**C. The Resort Owners Are Likely To Prevail Upon Their Claim That The Prospectus Is Based Upon Improper Appraisals Of The Resort Owners' Assets And Economic Interests**

Pursuant to the Prospectus and its incorporated documents (including Pub. L. 96-375), the Resort Owners' assets and economic interests were to be appraised to determine the value for each asset. The appraisers were to conduct their valuations pursuant to the Statement of Work and the accompanying "Appraisal Instructions." The appraisers, however, failed to comply with the Statement of Work and the Instructions in numerous ways.

First, the appraisers failed to include the Resort Owners' improvements to the land in the appraisals, including, but not limited to, such items as "cut and fill" work, grading, road construction and parking lots. Similarly, the appraisers failed to include improvements such as retaining walls, dock facilities, mobile home site pads, and sewage and utility connections. These permanent improvements, which represent millions of dollars of the Resort Owners' investments, were necessary to the development of the lake, and will be used by both Reclamation and any new concessionaire. App. 61, White Decl. at ¶ 8-10. These improvements also are an integral part of the "economic value of the concession" that is required to be valued by the Appraisal Instructions. App. 320. Inexplicably, however, the appraisals completely disregard these assets and improvements in establishing a "purchase price" for the resorts for purposes of the procurement.

Further, the appraisers failed to conduct an evaluation of the concessions through the use of all three appraisal methods, performing instead only a "Cost Approach" appraisal. This, of course, contravenes the express requirement in the Statement of Work and Appraisal Instructions that an Income Approach valuation and a Direct Sales Comparison Approach valuation be

performed on each of the resorts. *See* App. 300, 320. For this reason alone, the Prospectus is invalid and injunctive relief warranted.

Moreover, the failure to perform valuations pursuant to the other methods has resulted in the drastic undervaluations of the Resort Owners' assets. In this respect, the appraisers' failure to perform an Income Approach valuation for the resorts is particularly egregious, especially in view of the Appraisal Instructions' directive to appraise the "economic value of the concessions." The only way to properly arrive at the economic value of these businesses is through an Income Analysis. Accordingly, the Prospectus is invalid and Reclamation should be enjoined from proceeding with accepting offers until the appraisals are properly completed and reasonable purchase prices are established for the resort assets.

In sum, as a result of their failure to follow the Statement of Work and the Appraisal Instructions, the appraisals of the Resort Owners' facilities and economic interests are substantially undervalued, to the prejudice of the Resort Owners and the unfair advantage of prospective bidders for purposes of the Lake Berryessa concession contract procurement. This renders the Prospectus arbitrary and capricious, and requires at a minimum, that Reclamation be required to correct the Prospectus before proceeding with accepting proposals. *See Overstreet Electric Co. v. United States*, 47 Fed. Cl. 728, 738-39 (2000) (finding agency's failure to properly estimate various costs for its Invitation For Bids warranted injunctive relief and remand to the agency for correction); *see also, Arch Chemicals v. United States,* 64 Fed. Cl. 380 (2005) (permanent injunctive relief awarded where agency had no rational basis for excluding costs of shutting down incumbent's plant from price evaluation methodology as a price-related factor in solicitation). Accordingly, the Prospectus must be declared invalid and Reclamation must be enjoined from proceeding according to its terms.

## II. The Balance Of Equities Militates Strongly In Favor Of Injunctive Relief

Denying the requested injunctive relief would result in substantial, irreparable harm to the Resort Owners. In contrast, preserving the status quo in this case would not harm Reclamation or any other third parties.

### A. The Resort Owners Will Suffer Irreparable Harm In The Absence Of Injunctive Relief

The Resort Owners are "interested parties" within the meaning of 28 U.S.C. § 1491(b), and are prospective bidders for the new concession contracts. As the incumbent contractors, the Resort Owners have a substantial chance of receiving the award of a new concession contract and face substantial prejudice unless this Court grants the injunctive relief sought in this motion. *See Bannum, Inc.* v. *United States,* 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Asia Pacific Airlines v. United States,* 68 Fed. Cl. 8, 17 (2005). The prejudice that the Resort Owners face, including the possible loss of long-held concession contracts, is irreparable and cannot be fully compensated through the award of monetary damages.

Specifically, if the Prospectus is not enjoined, the Resort Owners will be irreparably harmed because, as previously discussed:

a. They will be effectively disqualified from consideration for the new contracts by operation of the requirements of the Prospectus, in particular the requirement that all property be removed from the concession areas before the termination of the contracts in 2008-2009. App. 63, White Decl. at ¶ 13.

b. The requirements of the Prospectus may force them to go out of business before the termination of their current contracts, in which event either Reclamation or the new concessionaire will assume control and/or ownership of the resort facilities at no cost. App. 63, White Decl. at ¶ 13, 14, 16, 17.

c. They may be forced to either transfer their facilities and concession operations to a new concessionaire at a substantially undervalued price or tear down the facilities and other personal property at their own expense App. 65, White Decl. at ¶ 20.

d. In the event they try to remove all of their property from the concession areas by the contract termination dates, they may be found to be in breach of their leases with their tenants. *Id.* at ¶ 21.

e. They will lose their customers and their contractual right to make a fair profit prior to the expiration of their agreements. *Id.*

Each of these is sufficient to establish irreparable harm for purposes of this case. *See Semmes Motors, Inc.* v. *Ford Motor Co.*, 429 F.2d J197, 1205 (2d Cir. 1970) (right to "continue a business" in which plaintiff "had engaged for thirty years" is "not measurable entirely in monetary terms"); *Associated Producers Co. v. City of Independence, Mo.*, 648 F. Supp. 1255, 1258 (W.D. Mo. 1986) ("loss of business threatening the very existence of an enterprise" may constitute irreparable injury).

Moreover, if the Prospectus is not enjoined, the Resort Owners will lose their right to a legally valid procurement and lose anticipated profits. In these circumstances, preliminary injunctive relief is warranted. *See Overstreet Elec. Co.*, 47 Fed. Cl. at 744 ("loss of valuable business . . . deriving from a lost opportunity to compete in a fair competitive bidding process" is sufficient to prove irreparable harm); *0'Donnell Contr. Co.* v. *District of Columbia,* 963 F.2d 420, 429 (D.C. Cir. 1992) ("damages cannot adequately compensate for" the loss of the "right to a legally valid procurement"). Indeed, as courts have recognized, an abrogation of "the opportunity to compete for a contract and secure any resulting profits . . . constitute[s] significant harm." *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed. CJ. 312, 323 (1998);

*Ellsworth Assocs., Inc.* v. *United States,* 45 Fed. Cl. 388, 398 (1999); *Essex Electro Eng'rs v. United States,* 3 Cl. Cl. 277,287 (1983), *affd.* 757 F.2d 247 (Fed. Cir. *1985); OAO Corp.* v. *United States,* 49 Fed. Cl. 478,480 (200!); *SAI Indus. Corp.* v. *United States,* 60 Fed. Cl. 73 J, 747 (2004). Most important here, a "loss of anticipated profits" "generally" qualifies as "irreparable harm," (*Minnesota Mining and Mfg. Co. v. Shultz,* 582 F. Supp. 184, 191 (D.D.C. 1984)), because "it is difficult several months after the occurrence giving rise to litigation to fashion relief." *Delta Data Sys. Corp.* v. *Webster,* 744 F.2d 197, 207 (D.C. Cir. 1984) (citation omitted). In this respect, past events often "cannot be reconstructed" and "injury complained of cannot be adequately corrected." *Id.*[4]

Further, the Prospectus requires prospective offerors to accept "the minimum requirements of [the] Prospectus," and states that an offeror must accept those terms in order to be considered responsive. App. 24. Accordingly, unless it is enjoined, the Prospectus may subject the Resort Owners to an untenable choice: either consent to the Prospectus's unlawful terms, or forgo bidding upon the new concession opportunity. *See Metcalf Constr. Co. v. United States,* 53 Fed. CI. 617, 645 (2002) (irreparable injury shown in the "form of lost opportunity to fairly compete for and perform work under the contract"). This Court therefore must resolve the Resort Owners' claims before the September 5 deadline for proposals, or stay that deadline, in order to preserve the Resort Owners' right to redress.

[4] For Rancho Monticello and Spanish Flat, the loss of profits will be exacerbated because, in the absence of an injunction, they will have their concession agreements terminated six months earlier than provided for in Pub. L. 96-375 and Reclamation's letter dated July 2, 1998. App. 74.

**B. Neither The Government Nor Other Third Parties Will Suffer Harm If Injunctive Relief Is Awarded**

In contrast to the substantial irreparable harm that the Resort Owners will suffer in the absence of injunctive relief, Reclamation will in no way be harmed by the issuance of a preliminary injunction. This is emphatically demonstrated by the fact that Reclamation recently was considering an extension of the September 5 deadline, indicating that it was amenable to such an extension if there were enough offerors who needed or requested it. App. 2, 357. Thus, Reclamation may not claim any injury from a suspension of the current proposal deadline.

In addition, the Resort Owners, as incumbent contractors, are ready, willing, and able to continue to perform under the terms of the existing contracts until the Court resolves this matter. App. 66, White Decl. at ¶ 22. In other words, the visitor services will continue to be available to Reclamation and the public under the terms of the existing contracts.

Nor will any prospective bidder or any third party be harmed by the issuance of a preliminary injunction. To the contrary, prospective bidders will benefit by the resolution of the issues raised by this lawsuit prior to submitting their final bids to Reclamation. These issues present critical questions, such as the proper value of the Resort Owners' facilities, which will significantly affect the value and the terms of the new proposed concessions contracts. There is no legitimate reason to require prospective bidders, including the Resort Owners, to continue to incur the considerable expense and inconvenience of preparing and submitting proposals for a procurement that may very well be subject to significant changes.

**III. Injunctive Relief Is In The Public Interest**

The most compelling and clear-cut of all of the four factors is, in this case, the public interest. There "is an overriding public interest in preserving the integrity of the procurement process," *Advanced Systems,* 69 Fed. Cl. at 486 (citing *Cincom Sys., Inc.* v. *United States*,

37 Fed. Cl. 266, 269 (1997)); specifically, in "ensuring that the government procurement process is fair." *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995). Indeed, Reclamation's own policy and guidelines recognize these principles. App. 278, 294.

In the context of agency solicitations for government contracts, the requirement of fairness and integrity means, above all, competition based on common knowledge and full disclosure of relevant, material, contract requirements. It is "axiomatic" that "'there can be no effective competition on a common basis, and that there can be no intelligent bidding for a contract, unless all offerors know what the contract requirements will be." *Alanthus Data Commc'ns. Corp.*, B-206946, 1983 WL 26452, at *5 (Comp. Gen. Feb. 10, 1983). Contracting agencies thus must avoid ambiguities in requirements that would "imped[e] full and open competition." *Custom Printing Co.* v. *United States,* 51 Fed. Cl. 729, 735 (2002) (citing *Caldwell & Santmyer* v. *Glickman,* 55 F.3d 1578, ]580 (Fed. Cir. 1995)).

Controlling case precedent therefore holds that where, as in this case, a solicitation's terms are false, misleading, or incomplete, "cancellation of the solicitation is appropriate." *Charles H. Tompkins Co. v. United States*, 43 Fed. CL 716, 723 (1999); *Aviation Enters., Inc.* v. *United States*, 8 Cl. Cl. 1, 19 (1985). Misleading or ambiguous contractual provisions do "not further competition." Rather, they present "a compelling reason to cancel all bids" and to start anew. *International Ass 'n of Firefighters* v. *U.S. Dep't of Navy*, 536 F. Supp. 1254, 1269 (D.R.I. 1982); *Mark Dunning Industries v. Perry,* 890 F. Supp. 1504, 1515 (M.D. Ala. 1995); *A.G. Schoonmaker Co. v. Resor*, 445 F.2d 726, 728 (D.C. Cir. 1971).

Here, Reclamation has utterly failed to address the legal and equitable issues presented by the Prospectus, simply indicating instead that it will proceed with the procurement. Because the Resort Owners can continue to provide visitor services under the terms of their existing

contracts, and because they have been performing under the contract without incident, they can continue to provide service without harming the public interest - at least until final relief can be fashioned. *See Dynalectron Corp.* v. *United States,* 659 F. Supp. 64, 70 (D.D.C. 1987).

**CONCLUSION**

For all of the foregoing reasons, this Court should enjoin Reclamation from proceeding with the Prospectus for the Lake Berryessa concessions until the deficiencies identified in this lawsuit are corrected.

Respectfully submitted,

Gregory T. Jaeger
MARZULLA & MARZULLA
1350 Connecticut Ave, NW, Suite 410
Washington, D.C. 20036
Telephone: (202) 822-6760
Facsimile: (202) 822-6774

Dated: August 27, 2007

Attorney for Plaintiffs