**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; and STEELE PARK RESORT, INC.,** | ) | **Bid Protest** |
| | ) | **No. 07-636C** |
| | ) | **(Judge Lynn J. Bush)** |
| **Plaintiffs,** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel. 202-353-7972
Fax. 202-514-8640
Attorneys for Defendant

OF COUNSEL:

JAMES E. TURNER
Assistant Regional Solicitor
Office of the Solicitor
Pacific Southwest Region
United States Department of the Interior
2800 Cottage Way
Room E-1712
Sacramento, California 95825-1890
Tel. 916-978-5685
Fax. 916-978-5694

September 14, 2007

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. The Creation Of Lake Berryessa. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. Public Use At Lake Berryessa Is Negatively Impacted By The Presence Of Long-Term Mobile Homes At The Concession Areas. . . . . . . . . . . . . . . . . . . . 7

C. Public Laws Affecting Lake Berryessa. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D. The Concessionaires Continue To Provide Exclusive Long-Term Use By Mobile Home Owners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

E. The Creation Of A New Visitor's Service Plan And Issuance Of The Prospectus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

F. Key Provisions Of The Prospectus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

G. Plaintiffs' Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1. Steele Park. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. Markley Cove.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3. Rancho Monticello.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4. Spanish Flat. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

H. The Interim Mobile Home And Travel Trailer Sales Disclosure Form. . . . . . . . . 27

ARGUMENT . . . . . . . . . . 27

I. Standard Of Review . . . . . . . . . . 27

A. Substantive "Arbitrary And Capricious" Standard. . . . . . . . . . 27

B. Standard For Preliminary Injunctive Relief . . . . . . . . . . 28

II. Plaintiffs Have Failed To Satisfy Their Heavy Burden To Obtain An Injunction . . . . . . . 30

A. Plaintiffs' Arguments Seeking To Enjoin The Prospectus And Award Of New Concession Contracts At Lake Berryessa. . . . . . . . . . 30

B. The Criteria In The Prospectus Is Rational, And, Therefore, Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits . . . . . . . . . . 31

1. The Prospectus Does Not Violate Public Law 96-375. . . . . . . . . . 31

a. Public Law 96-375 Does Not Entitle The Plaintiffs To Compensation For All Of Plaintiffs' Permanent Facilities. . . . . . . 31

b. Plaintiffs Have Presented No Authority For The Proposition That A "Fair Market Value" Valuation Of Plaintiffs' Permanent Facilities Is Inconsistent With A "Fair Value" Valuation As Referenced In Public Law 96-375 . . . . . . . . . . 32

c. Plaintiffs' Complaint Involves Plaintiffs' Existing Contracts And Is Not The Proper Basis For A Bid Protest Action. . . . . . . . 35

2. The Prospectus Does Not Discriminate Against The Plaintiffs . . . . . . . . . 37

3. The Appraisals Set Forth Within The Prospectus Are Not Improper. . . . 43

C. The Balance Of Harms Compels The Denial Of Injunctive Relief. . . . . . . . . . 45

1. Plaintiffs Have Failed To Establish Irreparable Harm . . . . . . . . . . 45

2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs . . . . . . . . . . 48

3. Denying Injunctive Relief Is In The Public Interest . . . . . . . . . . 49

III. Should Plaintiffs' Motion For Preliminary Injunction Be Granted, A Bond Should Be Required Of The Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV. The United States Is Entitled To Judgment On The Administrative Record. . . . . . . . . . . 50

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## TABLE OF AUTHORITIES

### CASES

ABF Freight System, Inc. v United States,
55 Fed. Cl. 392 (2003) . . . . . 47

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) . . . . . 27

Aero Corp. S.A. v. United States,
38 Fed. Cl. 237, 242 (1997) . . . . . 48

Barrett Refining Corp. v. United States,
242 F.3d 1055 (Fed. Cir. 2001) . . . . . 34

Bean Stuyvesant L.L.C. v. United States,
48 Fed. Cl. 303 (2000) . . . . . 29

Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
419 U.S. 281 (1974) . . . . . 28, 30

C.A.C.I., Inc. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) . . . . . 28

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) . . . . . 28

Camfield v. United States,
167 U.S. 518, 525 (1897) . . . . . 40

Camp v. Pitts,
411 U.S. 138 (1973) . . . . . 27

Cane Tennessee, Inc., v. United States,
71 Fed. Cl. 432 (2005) . . . . . 33

Chapman Law Firm Co. v. United States,
67 Fed. Cl. 188 (2005) . . . . . 29, 46, 48

Chapman Law Firm Co. v. United States,
62 Fed. Cl. 464 (2004) . . . . . 28

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 266 (1997). . . . . . . . . . 28

Circle Line-Statute of Liberty Ferry, Inc. v. United States,
76 Fed. Cl. 490 (2007). . . . . . . . . . 35, 36, 46

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2nd Cir. 1985).. . . . . . . . . . 47

Co-Steel Raritan, Inc. v. Int'l Trade Comm.,
357 F.3d 1294 (Fed. Cir. 2004). . . . . . . . . . 28

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755, 762 (1985). . . . . . . . . . 29

El Paso Natural Gas Co. v. Fed. Energy Regulatory Comm'n,
96 F.3d 1460 (D.C. Cir. 1996). . . . . . . . . . 34

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993). . . . . . . . . . 28, 29

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001). . . . . . . . . . 29

JWK Int'l Corp. v. United States,
52 Fed. Cl. 650 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003). . . . . . . . . . 30

Kleppe v. New Mexico,
426 U.S. 529 (1976).. . . . . . . . . . 40

Lake Berryessa Tenants' Council v. United States,
588 F.2d 267 (9th Cir. 1978). . . . . . . . . . 6

Masayesva for and on Behalf of Hopi Indian Tribe v. Hale,
118 F.3d 1371 (9th Cir. 1997). . . . . . . . . . 33

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983).. . . . . . . . . . 30

Northern Telecom Inc. v. United States,
8 Cl. Ct. 376, 381 (1985). . . . . . . . . . 46

Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc.,

762 F.2d 1374 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

San Diego Beverage & Kup v. United States,
997 F. Supp. 1343 (S.D. Cal. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Santa Rosa Bank of Indians v. Kings County,
532 F.2d 655, 659 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Saratoga Dev. Corp. v. United States,
21 F.3d 445 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Seravalli v. United States,
845 F.2d 1571 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Simpson v. Shepard,
230 U.S. 352 (1913).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Software Testing Solutions, Inc. v. United States,
58 Fed. Cl. 533 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Sweetnam v. Babbitt,
No. Civ 94-0063 (D. Ariz. Jan. 24, 1994 ) (slip op.). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Swope v. Siegel-Robert, Inc.,
243 F.3d 486 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Town of Beverly Shores v. Lujan,
736 F. Supp. 934 (N.D. Ind. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. 179.26 Acres of Land,
644 F.2d 367 (10th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Brown,
552 F.2d 817 (8th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Miller,
317 U.S. 369 (1943). . . . . . . . 33

United States v. Shenise,
43 F. Supp.2d 1190 (D. Colo. 1999). . . . . . . . 40

Utah Power & Light Co. v. United States,
243 U.S. 389 (1917). . . . . . . . 40

Virginia Ry. Co. v. System Federation No. 40,
300 U.S. 515 (1937). . . . . . . . 29

Wyoming v. United States,
279 F.3d 1214 (10th Cir. 2002). . . . . . . . 40

Yakus v. United States,
321 U.S. 414 (1944). . . . . . . . 29

**STATUTES**

Pub. L. No. 93-493, 88 Stat. 1486. . . . . . . . 9

Pub. L. No. 93-493, § 601, 88 Stat. 1494. . . . . . . . 9

Pub. L. No. 96-375, § 5(a)-(b), 94 Stat. 1505-1507. . . . . . . . passim

Administrative Procedure Act, 5 U.S.C. § 706(2). . . . . . . . 27

Tucker Act, 28 U.S.C. § 1491(b)(4). . . . . . . . 27

Reclamation Project Act of 1939, § (9 (a), 43 U.S.C. § 485h(a). . . . . . . . 5

**MISCELLANEOUS**

Rule 52.1 of the Rules of the Court of Federal Claims. . . . . . . . 1

Rule 65 Of the Rules of the Court of Federal Claims. . . . . . . . 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; and STEELE PARK RESORT, INC.,** | ) | **Bid Protest** |
| **Plaintiffs,** | ) | **No. 07-636C** |
| **THE UNITED STATES,** | ) | **(Judge Lynn J. Bush)** |
| **Defendant.** | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rules 65 and 52.1 of the Rules of the Court of Federal Claims and the Court's directive issued on August 29, 2007, defendant, the United States, respectfully submits the following brief in opposition to the motion for preliminary injunction filed by plaintiffs John C. Frazier III and Linda Frazier, doing business as Markley Cove Resort ("Markley Cove"), Laguna Hermosa Corporation ("Laguna Hermosa"), doing business as Rancho Monticello Resort ("Rancho Monticello"), REL Limited, doing business as Spanish Flat Resort ("Spanish Flat"), and Steele Park Resort, Inc. ("Steele Park"), and in support of defendant's cross motion for summary judgment upon the administrative record.[1]/

[1]/ Although we refer to plaintiffs' motion as one for preliminary injunction herein, pursuant to this Court's order, plaintiff's motion for injunctive relief is "deemed also to incorporate plaintiffs' motion for judgment on the administrative record." Order (Aug. 30, 2007) at 2.

## SUMMARY OF THE ARGUMENT

Plaintiffs' request for injunctive relief should be denied because plaintiffs cannot prevail upon the merits of their claim. Indeed, none of justifications presented by plaintiffs to support their request to enjoin the solicitation and award of new concession contracts at Lake Berryessa withstands scrutiny.

First, plaintiffs argue that the Prospectus issued by the Department of the Interior ("DOI"), Bureau of Reclamation ("Reclamation") on June 7, 2007, for new Lake Berryessa concession contracts ("Prospectus") fails to provide for proper compensation for plaintiffs' permanent facilities at Lake Berryessa. They complain that they have a statutory right (pursuant to Public Law 96-375) to be paid for all of their permanent facilities at Lake Berryessa, regardless if they remove or abandon those facilities. They also complain that they should be paid "fair value" and not "fair market value" for their permanent facilities.

Plaintiffs arguments fail. There is no statutory obligation pursuant to Public Law 96-375 to pay plaintiffs for all of their permanent facilities at Lake Berryessa, just the facilities that the Government specifically requests remain at the Lake after plaintiffs' current contracts expire. Moreover, there is no principled legal distinction between the appraised "fair value" and "fair market value" of plaintiffs' permanent facilities here. Indeed, plaintiffs cannot articulate any distinction other than to suggest that the "fair value" of their facilities is greater than the "fair market value." More fundamentally, plaintiffs' complaints about the compensation they may receive with respect to their permanent facilities are not properly the subject of a bid protest. Plaintiffs' speculative concerns about the ultimate prices paid for their facilities involve issues that someday may need to be resolved -- pursuant to their existing contracts.

Second, plaintiffs argue that the Prospectus discriminates against them. They allege a laundry list of purported harms particular to them. For example, they claim that the preference in the Prospectus for multi-concession offers discriminates against them because (apparently) they intend to only make single concession offers. They also claim that only they are required to remove the existing mobile homes from their concession areas; and they claim that they will likely be prevented from removing the mobile homes under a California statute that they claim provides a process of as much as a five years for the eviction of mobile home owners.

Again, plaintiffs arguments fail. Reclamation's decision to offer a value point preference for multi-concession operators in its award criteria is based on sound and rational criteria. Reclamation believes that a multi-concession operator will be more likely to recognize economies of scale in its operations, an important consideration given the transition to a short-term-use business model at the Lake, and given the potential impact of drought conditions on concession operators. Moreover, multi-concession operators will better be able to coordinate the upgrade of water and sewage treatment facilities, and will be better suited to provide an integrated lake-wide spectrum of recreation experiences for the visiting public. Reclamation has articulated other justifications for a multi-concession preference in the bidding process, but the bottom line is that it is not the role of this Court in a bid protest proceeding to question this clearly reasoned decision of Reclamation.

Furthermore, plaintiffs will not be prejudiced by the requirement that they and not the new concessionaires ensure the removal of mobile homes from their concession areas by the conclusion of plaintiffs' existing contracts. It is their existing obligation to remove the mobile homes by the conclusion of their contracts, whether they or someone else is awarded a new

contract for their concession areas. Moreover, as a practical matter, plaintiffs' argument is infirm. Plaintiffs offer no explanation how a new concessionaire could legally proceed to interfere with the existing contractual relations between the plaintiffs and the mobile home operators, forcing the removal of mobile homes from plaintiffs' concession areas. Further, the Supremacy Clause of the United States Constitution bars any claim by plaintiffs that California state law concerning mobile home eviction process might delay the implementation here of Federal policy requiring the removal of all mobile homes on Federal property by the concessionaires by end of their contracts.

Plaintiffs final argument is that the appraised values of plaintiffs' permanent facilities as set forth in the Prospectus are improper because they are based upon valuations that failed to adhere to appraisal instructions provided by Reclamation to its appraisers. Here, plaintiffs argument is flatly incorrect and is based upon a false premise. Plaintiffs have confused their own appraisal instructions given to appraisers they hired to appraise their property, with the appraisal instructions separately issued by Reclamation in connection with the appraisals performed on behalf of Reclamation. As a result, every single allegation by plaintiffs concerning a failure to follow the appraisal instructions is, as a matter of fact, simply baseless.

Because plaintiffs cannot prevail on the merits of their claims, their request for injunctive relief must be denied. Moreover, because plaintiffs' complaint is largely based upon speculative concerns about their existing contracts with Reclamation, they can show no irreparable harm. Nor, given the great public benefit to be achieved at Lake Berryessa with the award of new concession contracts and implementation of a new visitor plan, can the balance of harms be found in favor of plaintiffs. Thus, for these reasons, too, plaintiffs request for injunctive relief

must fail. In contrast, however, we have shown that we are entitled to judgment on the administrative record on the merits. Accordingly, we respectfully request that the Court deny plaintiffs' motion and grant our cross motion for judgment permitting Reclamation to resume the solicitation process and to award the new concession contracts at Lake Berryessa.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have satisfied their heavy burden to justify preliminarily enjoining Reclamation from accepting bids submitted in response to the Prospectus, whereby Reclamation seeks to procure new concession contracts for visitor services and facilities at Lake Berryessa, California.

2. Whether the Government should be granted judgment on the administrative record, permitting Reclamation to resume its receipt of bids in response to the Prospectus and to award new concessionaire contracts for the visitor services and facilities at Lake Berryessa.

## STATEMENT OF FACTS

### I. Background

#### A. The Creation Of Lake Berryessa

On November 11, 1948, and January 28, 1949, in accordance with section 9(a) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(a), the Secretary of the Interior advised the President and the Congress, respectively, that he had approved and adopted the proposal of Reclamation to construct what was then called the Solano County Project and what is now called the Solano Project, in Solano County, California, for the purposes of providing the local area with water for irrigation and municipal and industrial uses, and controlling floods. AR42557, AR4561. That project included the construction of Monticello Dam on Putah Creek, completed

in 1957, creating Lake Berryessa. AR348.

In July 1958, Reclamation entered into a Management Agreement with the County of Napa, California, authorizing the County to administer certain Federal lands adjacent to Lake Berryessa for recreation uses.[2]/ AR539, AR348. In 1958 and 1959, Napa County entered into seven concession agreements with private concessionaires for a term of 30 years each to provide the public recreation opportunities and services on designated portions of the Federal lands being administered by the County under the Management Agreement. AR42557. Plaintiffs are the successors in interest to four of the seven concession agreements.

Also in 1959, a Public Use Plan was developed for Lake Berryessa by the National Park Service, and implemented by Reclamation that same year. AR42561. The Public Use Plan was to guide the development of recreation facilities to accommodate public use. Id. Contrary to the Public Use Plan or applicable contracts, concession contractors requested and received approval from Napa County to introduce long-term trailer lease sites at the lake. Id. During the 1960s, trailer installations multiplied in disregard of the 1959 Public Use Plan. AR348. Short-term facilities serving the traditional recreating public were developed, in part, adjacent to long-term trailer areas. Id. For the most part, however, the short-term facilities were never popular destination areas for area visitors, in contrast to other Federal lake areas where short-term public use facilities were very popular and commercially successful. AR348-49.

---

[2]/ A short history of the Lake Berryessa concession arrangements is also set forth in Lake Berryessa Tenants' Council v. United States, 588 F.2d 267, 269 (9th Cir. 1978).

**B. Public Use At Lake Berryessa Is Negatively Impacted By The Presence Of Long-Term Mobile Homes At The Concession Areas**

In February 1972, as part of a survey of land acquisition and utilization policies of Federal agencies involved in the construction of water resource projects, the United States General Accounting Office ("GAO") issued a report to the Congress concerning the public recreational facilities at Lake Berryessa. AR537, AR539. The GAO's report was highly critical of the development at Lake Berryessa, finding that the principal development at the existing concessionaire areas had been the construction of mobile-home parks, with approximately 1,700 mobile homes located on Government-owned lands. AR540. As a result, the GAO concluded that "access to and use of the lake by the general public is restricted severely because of (1) extensive development by concessionaires of mobile-home parks along the shoreline and (2) failure to provide public recreational facilities in accordance with the Public Use Plan." AR540-41. The GAO found that access to and use of the lake by the general public had been severely restricted because:

> concessionaires generally have developed their resorts as mobile home parks, to the detriment of the overall public interest and contrary to the requirements of their contracts with Napa County. Although there are no signs restricting the public from using the beaches where these parks are located, the proximity of the mobile homes to the water and the presence of private docks are a strong deterrent to public use and discourage public access to the area.

AR549. The GAO recommended that Reclamation "act to ensure adequate development of public recreational facilities at the lake" through a revised Public Use Plan. AR541, AR42562.

In September 1971, after the completion of the GAO examination (but before the formal issuance of GAO report), the National Park Service, as recommended by the GAO examiners,

prepared a proposed revised Public Use Plan for recreational development at Lake Berryessa. AR547. The GAO's report to Congress described the proposed revised Public Use Plan noting that the Plan acknowledged the failure to provide public use at Lake Berryessa:

> This plan acknowledged that the Public Use Plan originally prepared by the Park Service in 1959 had not been adhered to and that all concessionaires had concentrated development at the lake on mobile home parks, which were for permanent or semipermanent occupancy. The revised plan states that such occupancy at the lake constitutes private or quasi-private residential areas, contrary to the overall public recreational interest.
>
> The plan states further:
> – That mobile home development has been carried on almost to the exclusion of other types of recreational facilities, both in land area use and in responsiveness to the public need. . . .
> – That much of the lake is restricted for public recreational use because of poor management practices and a lack of public facilities. . . .
> – That the lake is public property and that its public use should be paramount.
>
> The revised plan provides for phasing out the mobile homes and indicates that a schedule for the removal of the mobile homes will be forthcoming. It states that the public access to the normal water elevation should be established around the entire lake.
> In outlining the objectives of the recreational program at the lake, the Park Service revised plan states also that (1) the public character of the area should be recognized, (2) the highest priority should be given to the provision of facilities which meet the public needs, and (3) a balanced variety of public recreational opportunities should be provided to the optimum extent possible. . . . The report states that the development of such activities as fishing, picnicking, and swimming appears more desirable in the overall public interest because they (1) are participated in by all economic groups, (2) require limited capital outlays, and (3) will continue to be participated in even while income levels increase.

AR547-48.

In 1975, Napa County elected to terminate the Management Agreement. In accord with the terms of the Management Agreement, the United States succeeded to the interest of Napa County for the remainder of the term of the concession agreements. AR349.

**C. Public Laws Affecting Lake Berryessa**

On October 27, 1974, Public Law number 93-493, 88 Stat. 1486, was enacted. Title VI of that statute authorized the Secretary to, among other things:

> to develop, operate, and maintain such short-term recreation facilities as he deems necessary for the safety, health, protection, and outdoor recreational use of the visiting public; . . . and to otherwise administer the Federal land and water areas associated with said Lake Berryessa in such a manner that, in his opinion, will best provide for the public recreational use and enjoyment thereof.

Pub. L. No. 93-493, § 601, 88 Stat. 1494 (emphasis added).

On October 3, 1980, Congress enacted Public Law number 96-375, which, at section 5, set forth two provisions at issue here.[3]/ First, section 5 authorized the Secretary of the Interior to negotiate new contracts with the concessionaires at Lake Berryessa, with the terms of the contracts not to exceed more than two ten year periods after May 26, 1989:

> [T]he Secretary of the Interior is authorized to enter into new negotiated concession agreements with the present concessionaires at Lake Berryessa . . . for a term ending not later than May 26, 1989, [which] may be renewed at the request of the concessionaire with the consent of the Secretary of the Interior for no more than two consecutive terms of 10 years each.

Pub. L. No. 96-375, § 5(a), 94 Stat. 1505, 1506 (emphasis added).

Second, section 5 set forth the manner in which permanent facilities placed at the Lake by the concessionaires would be dealt with upon the conclusion of their contracts:

---

[3]/ The legislative history of the bill is set forth at Pl. App. 258-270.

> Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That at the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.

Pub. L. No. 96-375, § 5(b), 94 Stat. at 1507. Notably, "fair value" was not defined by the statute.

### D. The Concessionaires Continue To Promote Exclusive Long-Term Use By Mobile Home Owners

On May 15, 1981, May 14, 1985, and March 22, 1989, Reclamation entered into new negotiated concession agreements with three of the seven concessionaires referred to in the statute as the "present concessionaires." One of those three new concession agreements (Pleasure Cove Marina, which is not a plaintiff) was terminated on April 15, 2004, but was replaced with two successive concession agreements, the latter of which expires on December 1, 2007. The other two of the new concession agreements, involving plaintiffs Markley Cove and Steele Park, expire on May 26, 2009. AR1293-94. Four of the seven original concessionaires who are referred to as the "present concessionaires" in Public Law No. 96-375 did not enter into new negotiated agreements, but decided to continue to operate their resorts under their respective original concession agreements as amended. One of those agreements, involving plaintiff Rancho Monticello, will expire on June 15, 2008; another, involving plaintiff Spanish Flat, will expire on July 13, 2008, and the remaining two will expire on August 13, 2008. AR1293. Once

a concession contract authorized by Public Law 96-375 expires, Reclamation has no current authority to renew or administratively extend it.

During the 1970s and 1980s, the current concessionaires continued to promote exclusive long-term use at the concession areas. AR42562. Accordingly, "[w]ith trailer sites occupying significant (and preferred) portions of the useable Federal property, public areas of the lake had grown increasingly crowded." AR42562-63.

The criticisms of private use at Lake Berryessa continued into the 1990s, with Interior's Office of the Inspector General ("OIG") finding significant deficiencies regarding exclusive use of recreation property, and recommending that "Reclamation develop and apply policies to address private use of Federal property." AR42563.

### E. The Creation Of A New Visitor's Service Plan And Issuance Of The Prospectus

In 2000, Reclamation determined that a Visitor's Services Plan ("VSP") was needed to correct over four decades of resort operations under which prime recreational areas have been reserved for long-term trailer site users to the exclusion of the majority of visitors to Lake Berryessa. AR42563. Reclamation conducted extensive outreach and public scoping to formulate alternatives for future public use services and facilities at the Lake, conducting "more than 100 briefings to the public, other agencies, local governments, and members of Congress." Id. Furthermore, to maximize public involvement, Reclamation "conducted two separate comment periods for the Draft [Environmental Impact Statement ("EIS")] for a combined 7 months during which more than 3,400 comment letters and e-mails were received. Id.

The Final EIS was released in November 2005, and it set forth the preferred alternative service and facility plan as that which called for the development of new facilities and programs to better serve the short-term visitor. Reclamation determined, through its planning and EIS work, including the consideration of thousands of public comments, "that the weak business profile for the short-term concession recreation facilities at Lake Berryessa was attributable to the proximity of the large trailer villages and the focus on their operations and not due to lack of public demand in the area for appealing short-term facilities." AR349.[4/] According to this plan "all long-term trailers and mobile homes would be removed from Federal property at Lake Berryessa and replaced with short-term facilities." AR42563. With the release of the Final EIS, Reclamation again conducted an extensive public outreach effort, with formal presentations to more than 1,200 participants at 12 different public meetings and individual briefings. Id. The outreach effort took almost five months to complete and resulted in substantive modifications to the preferred alternative identified in the Final EIS. Id.

The VSP 2006 Record of Decision ("ROD") was released in June 2006. AR42555. The goal of the VSP was to support traditional, short-term, and diverse outdoor recreation opportunities for the public. Using the directives in the 2006 ROD, Reclamation prepared the

---

[4/] See also AR1303 ("Reclamation strongly believes that the business malaise that exists both adjacent to and within many of the existing short-term facilities at Lake Berryessa is a symptom of facilities poorly maintained and the associated affiliation with the large, exclusive-use, long-term trailer installations as a business anchor. A large percentage of the traditional recreating public does not even visit Lake Berryessa because of the general lack of physical appeal of dated facilities and the fact that the trailer villages are sited on the prime lakeshore locations in nearly every existing concession operation.")

Prospectus which was issued on June 7, 2007.[5]

F. **Key Provisions Of The Prospectus**

The Prospectus has a number of terms of particular significance to plaintiffs' motion. At Part 3, section L of the Prospectus, Reclamation discusses the requirement that offerors identify every permanent facility, "whether standing structures, infrastructure or floating assets" that they propose remain or be removed from the concession area. AR1288.[6] Moreover, Reclamation noted that, pursuant to Public Law 96-375, it would retain the right to make all final determinations as to the permanent facilities that were to be retained for use in the new contract period, or removed by the existing concessionaire. Id.

For those permanent facilities that are ultimately retained at the concession area, Reclamation noted that the existing concessionaire would be "compensated at fair value which is the same as Fair Market Value." Id. See also AR1317 ("Current concession contractors hold a right of value recovery, as outlined in Public Law 96-375, for facilities that are identified by Reclamation to remain. The compensable interest in the new contract(s) will be called Capital Investment Recovery (CIR). It will be the new concession contractor's obligation, when entering into the new concession contract, to pay the existing (outgoing) concession contractor for its CIR value on any facilities identified to remain into the next contract term.").

Importantly, the Prospectus recognized that the figures set forth in the appraised values of existing concessionaires' property in the Prospectus might ultimately be determined to be

---

[5] The Prospectus is available online at http://www.usbr.gov/mp/berryessa/docs_forms/index.html

[6] The Prospectus defines "permanent facilities" as "fixed assets which are any structures, fixtures, or capital improvements permanently attached to the Federal estate." AR1289 at § M.

inaccurate and different than that ultimately found to be due to existing concessionaires. In such a case, the Prospectus noted that a re-pricing and compensation mechanism would apply, which would affect only the Government's possible future benefits through franchise fee or other financial obligations that might otherwise be due the Government from the new concessionaire:

> If the compensation for CIR that is ultimately determined to be due the former concession contractor under the expiring contract differs from the CIR identified in the Reclamation appraisal (PART 7.10) for the purposes of this prospectus (and assumed by the successful offeror/new concession contractor), an adjustment will be made to the franchise fee or other financial obligations to be paid under the new concession contract so as to not affect the net financial impact on the new concession contractor.

AR1318. Accordingly, even if the appraisals of the existing concessionaires' property were ultimately determined to be inaccurate, the Government, and not the new concessionaires, bears the long-term financial responsibility for the discrepancy in appraised values. An express recognition of this feature of the Prospectus was set forth in the mandatory series of acknowledgments and agreements that offerors were to make in filing their proposal. AR1322.

The appraisal of the existing concessionaires permanent facilities was performed by an independent appraisal contractor Integra Realty Resources Inc., supervised by the DOI Appraisal Services Directorate, through a contract issued by GovWorks, pursuant to an interagency agreement with Reclamation. AR41753-80. In connection with that appraisal, a Statement of Work for Lake Berryessa Resorts was prepared. AR41759-80. In plaintiffs' memorandum, they make a number of incorrect statements concerning the Government Statement of Work for the appraisal of the permanent facilities, claiming that the Government's appraisal failed to adhere to the appraisal Instructions and Statement of Work. Pl. Mem. at 14, 25, 26. For example,

plaintiffs claim that, "as a result of their failure to follow the Statement of Work and the Appraisal Instructions, the appraisals of the Resort Owners' facilities and economic interests are substantially undervalued. . . ." Pl. Mem. at 26. Plaintiffs's statements are flatly incorrect. Contrary to their claims (including the affidavit of Mr. White) that they are referring to and quoting from the Government's Statement of work, they are, in fact, citing to the Statement of Work issued in connection with their own separately commissioned appraisals of their facilities. See Pl. Mem. at 14, 25, 26; White Decl. at 7 ¶ 19. There can be no mistake about this error.

In the Government's Statement of Work, the appraisers repeatedly recognized that their intent was to ascertain the "fair value" of the concessionaires' permanent facilities, which was the same as "fair market value." See AR41761 ("The purpose of the appraisal is to estimate the current fair value (synonymous with market value) of the improvements, exclusive of land."); AR41762 ("The value requested is the fair value (synonymous with market value. . . . The interest to be appraised is the improvements exclusive of the land."). Contrary to plaintiffs' claims, there simply was no requirement in the Government's Statement of Work that the interest to be appraised was the "'Concessionaire's Possessory Interest" defined to include "the economic value of the concession." See Pl. Mem. at 14 (citing Pl. App. 320). That requirement was set forth in plaintiffs' own commissioned appraisal's Statement of Work. (Pl. App. 320).[7]/ Therefore, when plaintiffs state that the appraisers "failed to comply with the Statement of

[7]/ There can be no doubt that plaintiffs' citations in their memorandum are to appraisals that they commissioned. At AR42544-54, we provide an email sent from Marc Kelley, a lobbyist employed by the concessionaires, to Reclamation enclosing the appraisal instructions and Statement of Work for FMV Opinions, Inc., a private appraisal firm employed by plaintiffs. At AR42545, the identification of FMV Opinions, Inc., is set forth. At AR42548, an email from "Bob" (i.e., Robert White) to Reclamation is captured, followed by the Appraisal Instructions that FMV Opinions would use in its appraisals.

Work," (Pl. Mem. at 25), they are simply incorrect. The appraiser adhered to the Government's Statement of Work.

Reclamation provided flexible terms to new offerors with respect to the retainment of permanent facilities owned by the existing concessionaire so that the new offerors would have greater flexibility in presenting their plans and business models for the new concession fixtures and infrastructure. AR1288, AR1304. "Each offeror must decide what, if any, existing facilities they propose to retain and purchase." AR1289. Furthermore, the Prospectus noted that, in accord with Public Law 96-375, "there is no obligation on the part of Reclamation or a new concession contractor to compensate an outgoing concession contractor for facilities not selected and designated to remain for use into the next contract term." Id.; see also AR1308 ("New concessionaires . . . are not financially responsible for the removal of existing facilities that are not designated to remain (not to be removed) into the next contract term.").

______The Prospectus also informed prospective offerors that the existing mobile homes or trailers currently at the concessionaire areas would not be permitted to remain in the new contract period as "future business models for Lake Berryessa will not include this private exclusive use which is in conflict with current Reclamation concession policy." AR1294. Accordingly, the Prospectus notes that trailers at the existing concessionaire areas "must be removed no later than the last day of the subject concession contracts." Id. With the removal of the trailers, the Prospectus describes that "the availability of acreage within the concession areas that is no longer committed to trailers will make available some of the best shoreline areas . . . for new development of short-term commercial recreation and support facilities." Id.

With respect to the condition of the permanent facilities currently existing at the concession areas, the Prospectus noted that an "Environmental Compliance and Facility Condition Assessment Report" ("Facility Condition Report") had been prepared and finalized as of December 2002. Id.[8]/ The Prospectus recognized that, since the issuance of the Facility Condition Report, "some conditions have changed at some concession locations" with various improvements or corrections occurring at some locations, "but many of the situations remain the same." Id. Accordingly, the Prospectus cautioned that "Offerors should use the [Facility Condition Report] as a reference and investigate through formal questions or on-site observations any particular concerns that would impact their proposal(s)." Id.

The Prospectus set up a point grading system for the evaluation of prospective bids. In describing the point valuation system, the Prospectus discussed five broad categories of "principal factors" or issues that Reclamation would focus upon. AR1330. Offerors are to be awarded up to 156 value points depending upon Reclamation's evaluation of the various categories in which a set amount of available points could be awarded. Id. The principal factors and their value point weighting is as follow:

- **Principal Factor 1**: The responsiveness of the proposal to the objectives of preserving and protecting the extended environment and the specific resources of the Lake Berryessa Area; 18 available value points. AR1330-34.
- **Principal Factor 2**: The responsiveness of the proposal to the objectives of providing quality visitor services; 58 available value points. AR1335-45.

[8]/ The complete Facility Condition Report was made available to the public as part of Reclamation's on-line Prospectus with background and accompanying documents. AR1294-95.

- **Principal Factor 3**: The experience and related background of the offeror, including the past performance and management of the offeror relevant to providing similar visitor services; 18 available value points. AR1345-49.
- **Principal Factor 4**: The offeror's understanding of the financial needs of the business and the financial capability to meet the necessary financial obligations; 57 available value points. AR1350-67.
- **Principal Factor 5**: Financial benefit to the Government; 5 available value points. AR1368.[9]/

One factor given emphasis in the valuation of prospective bids was a preference for a bid seeking multiple concessions. Reclamation offered several reasons for this preference. First, Reclamation believed that, given the switch from business models based in large part upon long-term mobile home facilities to short-term use business models (where lower margins might exist), the economies of scale available in a multi-concession business model might provide more sustainable business opportunities:

> The business opportunity is more robust and healthier if a concession contractor(s) is operating multiple locations. Overhead is reduced and several business efficiencies are introduced that result in a better profit potential for an operator. . . . Reclamation's contracted Economic Feasibility Analysis indicated that financial success was questionable with multiple concessionaires operating

---

[9]/ Plaintiffs suggest that the Government is looking to replace the existing concessionaires in order to gain greater financial benefit for the Government. Pl. Mem. (Aug. 27, 2007) at 3. There is no foundation to this allegation. Indeed, the fact that the Prospectus only permits at most a 5 point valuation point award for an offeror's proposed benefit to the Government belies plaintiffs' claim. Moreover, the Prospectus noted that Reclamation would "consider a wide range of franchise fee approaches <u>including a fee of 0 percent (zero percent) if properly supported</u>." AR1316 (emphasis added). Accordingly, plaintiff's claim that Reclamation wished to pursue new business models at the Lake in order to increase <u>its</u> revenue is simply incorrect.

> independent businesses at Lake Berryessa and that the best opportunity existed with a single concessionaire and the associated business efficiencies. Reclamation continues to have concerns with the opportunity for multiple operators to be financially successful and this Criterion and the additional points for multiple proposals is appropriate to address that concern.

AR1366.

Related to this "economies of scale" concern is Reclamation's concern, noted in the Administrative Record, that multiple-concession operators would have a greater capacity to withstand a downturn in business, noting especially the increased likelihood of that occurrence during drought conditions as indicated by the experience of concessioners at other Federally-owned lakes in the Western United States:

> The scoring also recognizes the value and known problems with operating businesses at a reservoir where the level of the lake has an impact on business and associated expenses. Lake Powell in Glen Canyon National Recreation Area has all concession services under a single concessionaire in multiple locations and they have been successful in withstanding the most significant, in Lake Powell history, multi-year drought that has resulted in having to actually close some locations and focusing all visitor services at the locations that can adapt better to the lake level. However, at Lake Mead National Recreation Area, where there are different concession operators at each location there has been critical financial hardships and one failure/closure because of the same drought conditions. Lake Berryessa has had years with very low water that significantly impacted each of the seven concessionaires. Reclamation is concerned that future drought conditions would have greater impacts on individual concessionaires who no longer have the fixed revenue from long-term trailer sites as the core of their financial health. Therefore, this scoring preference for multiple locations under a single operator puts a premium on the apparent increased ability to withstand likely drought conditions by a multiple location operator.

AR1452.

Furthermore, Reclamation recognized the efficiencies that a multiple concession owner could pursue as part of the upgrading or building of sewer and other infrastructures:

> Where new facilities are necessary, offerors should consider the applicability of (1) combining systems for multiple operations or (2) if a single offeror is selected, to operate multiple locations the development of a multi-location water or wastewater system(s). The offeror address of water and waste water issues will be one of the factors closely reviewed in the proposal evaluation process by Reclamation.

AR1316.

As another reason for the greater point weighting of a multiple concession proposal, Reclamation noted that a multiple concession owner possessed a greater capacity to set forth an integrated, lake-wide spectrum of recreation experience for the visiting public:

> The ability for an offeror to respond positively to the ROD's preference for an integrated business approach . . . is enhanced by an offeror who also submits additional individual or combined proposals. An offeror competing for only a single location has limited opportunity to address or impact the overall mix of concession services and facilities at Lake Berryessa through this prospectus.

AR1366; see also AR41451-52 ("Bidding on multiple locations also gives an offeror an opportunity to better address the need for an integrated business approach as outlined in the ROD and in this prospectus.").[10]/

As yet a further reason for the point weighting in favor of multiple concession proposals, Reclamation noted that the ability to phase-in construction of the new short-term facilities is

---

[10]/ See also AR1338 ("Although it is not prohibited for each of the seven concession areas being addressed by this Prospectus to all have the same combination of basic facilities and services for the public, Reclamation perceives such an approach as less desirable and not as commercially efficient as a more integrated business mix.").

enhanced by a multiple concession operator:

> The potential for an offeror to phase in various construction program components in a multi-location coordinated approach that impacts public use in a more subtle manner is enhanced by an operator that is administering more than one location. Reclamation's contracted Economic Feasibility Analysis indicated that phasing in development would be important in helping to assure financial viability.

AR1366.

Finally, Reclamation believed that providing additional points to offerors who were proposing to operate multiple concession areas was warranted given the greater initial investment risk and more complex management burden. Id.

Despite the stated preference for a multi-concession offer, multi-concession offers did not obtain other preferences from Reclamation beyond the express point preference. For example, Reclamation noted that its analyses would compare all proposals, including a combined concession proposal, "in a manner that breaks out their individual location components . . . in a manner that compares them to all other proposals on the same property." AR1339.

**G. Plaintiffs' Contracts**

Relevant to the determination of plaintiffs' motion are the existing concessionaire contracts plaintiffs hold with the Government, which after 50 years, are now set to terminate by their own terms.

**1. Steele Park**

In March 1959, the Lake Berryessa Development Company entered into an agreement with the County of Napa, California, to maintain a concession to provide accommodations, facilities, and services for the recreational use of Government lands by the public ("1959 Lake

Berryessa Development Company Agreement"). AR43010. In March 1989, the Department of the Interior, Bureau of Reclamation, entered into an agreement with Steele Park ("1989 Steele Park Agreement"), which superceded the 1959 Lake Berryessa Development Company Agreement. Id.. The 1989 Steele Park Agreement was to continue in effect for two months, until May 26, 1989, and then, pursuant to Public Law 96-375, the agreement could be extended for no more than two consecutive renewal terms of 10 years each. Id.

The 1989 Steele Park Agreement set forth provisions dealing with the ownership and valuation of the permanent facilities placed by Steele Park at Lake Berryessa. First, the Agreement provided that the permanent facilities placed by Steele Park at Lake Berryessa would remain its property; that, if the Government required that these facilities remain after the contract period, the Government or the new concessionaire would pay Steele Park "fair market value" for the property; that no payment would be due for the facilities that the concessionaire was required to remove; and that all facilities not requested to be left by Government and not removed by Steele Park within 180 days of the contract's termination would be deemed abandoned:

> All permanent facilities on the premises on the effective date of this Agreement are the property of the Concessionaire. Any permanent additions or modifications to such facilities shall be the property of the Concessionaire. Upon expiration or termination of this Agreement the Government may require that some or all of the permanent facilities mentioned herein not be removed from the premises in which case the Government or a new Concessionaire shall pay the Concessionaire the fair market value for those permanent facilities. Those facilities that the Concessionaire is required to remove upon expiration or termination of this Agreement shall be removed by the Concessionaire without compensation by the Government and at no expense to the Government. Any such facilities not removed within one hundred eighty (180) calendar days after the date of termination or

> expiration of this Agreement shall be deemed to have been abandoned by the Concessionaire.

AR43018 at § B.1(A) (emphasis added).

Second, the 1989 Steele Park Agreement provided that, if the parties could not come to an agreement as to the value of any permanent facility, arbitration would be available to determine that value, with the result binding upon the parties:

> If the Government, or the new Concessionaire and the Concessionaire, cannot agree upon the fair market value of permanent improvements which the Government directed Concessionaire not to remove, either party may serve a request for arbitration upon the other party, and the fair market value of the item or items in question shall be determined by the majority vote of a board of three arbitrators. . . . The fair market value determined by the Board of Arbitrators shall be binding on the parties.

Id. at § B.1(B) (emphasis added).

**2. Markley Cove**

In May 1959, Markley Canyon Resort Company, Inc., entered into an agreement with the County of Napa, California, to maintain a concession to provide accommodations, facilities, and services for the public at the Lake Berryessa ("1959 Markley Agreement"). AR42631-32. In May 1981, the Department of the Interior, Water and Power Resources Service, entered into an agreement with Carl Frazier ("1981 Markley Agreement"), which superceded and canceled the 1959 Markley Agreement. Id. The 1981 Markley Agreement was to continue until May 26, 1989, with the possibility of no more than two consecutive renewal terms of 10 years each. Id.

The 1981 Markley Agreement set forth provisions dealing with the ownership and valuation of the permanent facilities placed by Mr. Frazier at Lake Berryessa. First, the

Agreement provided, in accordance with Public Law 96-375, that the permanent facilities placed by Mr. Frazier at Lake Berryessa would remain his property, and that, if the Government required that these facilities remain after the contract period, the Government or the new concessionaire would pay him "fair value" for the property:

> In accordance with Public Law 96-375, all permanent facilities placed by the Concessionaire in the resort shall be considered the property of the current Concessionaire [i.e., Frazier]. Any permanent additions or modifications to these facilities shall remain the property of the Concessionaire. The Government, however, may require that the permanent facilities mentioned herein not be removed from the concession are, and instead, pay fair value for the permanent facilities, or, if a new concessionaire assumes operation of the concession, require that new concessionaire pay fair value for the facilities to the existing Concessionaire.

AR42641 at § B.1(a) (emphasis added); see also AR42643-44. "Fair value" was not defined in the agreement.

Second, the 1981 Markley Agreement provided that, if the parties could not come to an agreement as to the value of any permanent facility, arbitration would be available to determine that value, and once selected by any party, the result of the arbitration would be binding:

> If the Government, Concessionaire, and any successor concessionaire cannot agree upon the value of any item or items, either party may serve a request for arbitration upon the other party, and the fair value of the item or items in question shall be determined by the majority vote of a board of three arbitrators . . . . The fair value determined by the Board of Arbitrators shall be binding on the parties.

AR42641 at § B.1(b).

Finally, the 1981 Markley Agreement provided that Mr. Frazier could remove permanent facilities and improvements unless the Government directed otherwise, and that "Facilities not

removed by the Concessionaire within 180 calendar days after expiration of this agreement shall be deemed to have been abandoned by the Concessionaire." AR42642 at § B.1(c).

In November 1988, all rights and interests of the 1981 Markley Agreement with Carl Frazier were assigned to John Frazier III, with the consent of the Government. AR42622-27.

### 3. **Rancho Monticello**

On December 15, 1958, Laguna Hermosa and the County of Napa, California entered into an agreement to provide services and facilities for the public at Lake Berryessa ("1958 Rancho Monticello Agreement"). AR42978 at ¶ 1. The term of the contract was for 20 years. AR42978-79 at ¶¶ 1, 2. Pursuant to the 1958 Rancho Monticello Agreement, Laguna Hermosa agreed to construct "buildings, structure and improvements consistent with the Public Use Plan" AR42981 at ¶ 5. Laguna Hermosa's improvements were understood to mean "buildings, structures, fixtures, equipment and other improvement affixed to or pertaining to the land assigned hereunder to use of the Concessioner in such manner as to be part of the realty, including all such improvements herein constructed upon or affixed to the lands assigned to the Concessioner and all alterations, additions or improvements thereto." AR42981-82 at ¶ 6.

The 1958 Rancho Monticello Agreement continues in effect to this day, with the exception that its term has been extended such that the contract is now set to expire on June 15, 2008. AR1293. The 1958 Rancho Monticello Agreement does not specify the Concessioner's or the Government's rights and duties with respect to the permanent facilities constructed by Laguna Hermosa Corporation at Lake Berryessa upon the termination of the 1958 Rancho Monticello Agreement as modified in 1962.

**4. Spanish Flat**

On January 13, 1959, Napa County, California, and four individuals doing business in a partnership known as Spanish Flat Resort entered into a Concession Agreement to provide services and facilities for the use of the public at Lake Berryessa ("1959 Spanish Flat Concession Agreement"). AR42989 at ¶ 1. The term of the Agreement was 20 years. AR42990 at ¶ 2.

In terms identical to those in the 1958 Rancho Monticello Agreement, the 1959 Spanish Flat Concession Agreement provided that Spanish Flat would construct "buildings, structure and improvements consistent with the Public Use Plan" AR42992 at ¶ 5. Spanish Flat's improvements were understood to mean "buildings, structures, fixtures, equipment and other improvement affixed to or pertaining to the land assigned hereunder to use of the Concessioner in such manner as to be part of the realty, including all such improvements herein constructed upon or affixed to the lands assigned to the Concessioner and all alterations, additions or improvements thereto." AR42992 at ¶ 6.

On January 17, 1962, Spanish Flat Resort, Inc., the successor in interest to the Spanish Flat Resort partnership entered into an agreement with Napa County, California, modifying the 1959 Spanish Flat Concession Agreement ("1962 Spanish Flat Modification Agreement"). AR42998. Among other things, the 1962 Spanish Flat Modification Agreement extended the term of the concession to 30 years from January 13, 1959. AR42999 at ¶ 2. It further provided for two additional option terms, the first for an additional 10 years from January 13, 1989, and the second for nine years, six months after January 13, 1999 [i.e., until July 13, 2008]. Id.; AR1293. After a series of assignments between various entities, the interest in the Spanish Flat Agreements now belongs to plaintiff REL Limited.

### H. The Interim Mobile Home And Travel Trailer Sales Disclosure Form

As noted above, the plaintiff concessionaires have contracts with a large number of mobile home owners who have located mobile homes and travel trailers on the Federal land at Lake Berryessa. Reclamation has long required that all buyers and concessionaires execute an identical single-page disclosure form in which buyers and concessionaires expressly acknowledge that the use of the mobile homes would end with the expiration of the concessionaire contracts with the Government, and that, with the end of those contracts, all mobile homes, improvements and personal property must be removed by the mobile home owners, with the concessionaires ensuring that removal. See, e.g. "Buyer(s) Signature" and "Concessioner Signature" at AR42018-42161, AR4326-42414 (Rancho Monticello); AR42162-42250, AR42415-42503 (Spanish Flat); AR42251-42275, AR42504-42543 (Steele Park); AR 41960-41968 (Markley Cove).

## ARGUMENT

### I. Standard Of Review

### A. Substantive "Arbitrary And Capricious" Standard

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the review standard of the Administrative Procedure Act, 5 U.S.C. § 706(2), as incorporated by the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1291 (Fed. Cir. 1999).

Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411

U.S. 138, 140 (1973)). Rather, the Court will sustain an agency decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). The Court should ask whether there has been "a clear error of judgment," without substituting its own judgment for that of the agency. See Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004). Consequently, in the context of this action, the Court should simply assess whether the Prospectus supplies "a rational basis" for Reclamation's solicitation for bids with respect to the appropriate public use development, management and operation of seven concessionaire areas at Lake Berryessa. Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004).

**B. Standard For Preliminary Injunctive Relief**

Injunctive relief in the bid protest context is appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting C.A.C.I. Inc. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). To obtain the extraordinary relief of an injunction prior to trial, the movant must establish the following:

1) the movant is likely to succeed on the merits at trial,

2) the movant will suffer irreparable harm if preliminary relief is not granted,

3) the balance of the hardships tips in the movant's favor, and

4) a preliminary injunction will not be contrary to the public interest.

FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); accord Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266, 268 (1997) (applying standard in context of a request for a temporary restraining order in a bid protest); see also PGBA, LLC v. United States, 57 Fed. Cl.

655, 657 (2003); Bean Stuyvesant L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000). Failure to meet the criteria of any one factor may doom the request:

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient,
>
> given the weight or lack of it assigned to the other factors, to justify the denial.

FMC Corp., 3 F.3d at 427 (emphasis added).

The party seeking an injunction faces an even greater burden when the relief it seeks would interfere with Governmental operations. Yakus v. United States, 321 U.S. 414, 440 (1944); Virginia Ry Co. v. System Federation No. 40, 300 U.S. 515, 552 (1937).

The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp., 3 F.3d at 427. "[I]n the context of the review of an agency's best interests determination under the APA standard, even if the court were to find that [the agency's] actions were arbitrary and capricious, it still examines the other factors of the preliminary injunction analysis to determine whether a preliminary injunction should issue." Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 192 n.2 (2005) (citing FMC Corp., 3 F.3d at 427)).

In evaluating whether an agency official's actions were rational, the "'disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Courts have recognized that contracting officials may properly exercise wide discretion in applying

procurement regulations. See Impresa. 238 F.3d at 1332; Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985).

The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n. 8 (2002) (quotation omitted), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. Bowman, 419 U.S. at 285-86. Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained.

## II. Plaintiffs Have Failed To Satisfy Their Heavy Burden To Obtain An Injunction

An agency's decision may be arbitrary and capricious where the agency: (1) "has relied on factors which Congress has not intended it to consider;" (2) "entirely failed to consider an important aspect of the problem;" (3) "offered an explanation for its decision that runs counter to the evidence before the agency;" or (4) if the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983). Plaintiffs bear the burden to demonstrate error in the written determination and finding. PGBA, 57 Fed. Cl. at 660.

### A. Plaintiffs' Arguments Seeking To Enjoin The Prospectus And Award Of New Concession Contracts At Lake Berryessa

In their motion for a preliminary injunction, plaintiffs present three basic arguments as they argue that they are likely to prevail upon the merits of their claims. First, they claim that the

Prospectus violates Public Law 96-375 because, plaintiffs allege, the existing concessionaires (i.e., themselves), will not be compensated for all of their assets, and the compensation they receive pursuant to the appraisal values of their permanent facilities will not constitute "fair value." Pl. Mem. at 19-21. Second, plaintiffs allege that the Prospectus unfairly discriminates against the existing concessionaires because the Prospectus has a preference for multi-concession operators and because the new concessionaires will not have to remove the existing mobile homes and other improvements prior to the termination of the current concession contracts, as the existing concessionaires will. Pl. Mem. at 21-24. Third, plaintiffs allege that the Prospectus is based upon improper appraisals of the existing concessionaires assets and economic interests because the appraisers "failed to comply with the Statement of Work and Instructions in numerous ways." Pl. Mem. at 25.

Each of plaintiffs' arguments are without merit and present no basis for enjoining the receipt of bids or the award of concession contracts pursuant to the Prospectus.

## B. The Criteria Set Forth In The Prospectus Are Rational, And, Therefore, Plaintiffs Have Not Demonstrated A Likelihood Of Success Upon The Merits

### 1. The Prospectus Does Not Violate Public Law 96-375

#### a. Public Law 96-375 Does Not Entitle Plaintiffs To Compensation For All Of Plaintiffs' Permanent Facilities

Invoking Public Law 96-375, plaintiffs allege that they are entitled to receive fair value for all of their assets, and not just the assets that are required to remain at Lake Berryessa by the Government. Pl. Mem. at 20. Plaintiffs' reading of Public Law 96-375 is at odds with the plain language of the statute. In effect, plaintiffs are seeking compensation for the permanent facilities and improvements that they are asked to remove or that they abandon. Thus, where their

property can be taken off Federal land, they seek to both retain their property and to be paid fair value for that property. Alternatively, they seek the right to abandon their property and be paid "fair value" for that property. This reading of Public Law 96-375 is meritless.

Public Law 96-375 recognizes that all permanent facilities placed by the concessionaires at the Lake are the property of concessionaires. It expressly takes into account, however, the idea that the permanent facilities can be removed by the concessionaires. Indeed, the gist of Public Law 96-375 is that the removal of the permanent facilities can be prevented by the Government, and it is in that case, that the Government is required to "pay fair value for the permanent facilities." Pub. L. No. 96-375, § 5(b), 94 Stat. at 1507. The statute does not require compensation for all permanent facilities, but rather "instead," it requires the Government or a new concessionaire to pay fair value for permanent facilities if the United States "require[s] that the permanent facilities mentioned herein not be removed from the concession areas." Id. Among other problems, plaintiffs' reading of the statute eviscerates the meaning of the word "instead," which indicates that, in contrast to a situation where the concessioner removes permanent facilities, when the Government requires the facilities to remain, there must be fair value paid to the concessionaire. In short, plaintiffs' reading of Public Law 96-375 as requiring payment for all of plaintiffs' permanent facilities regardless of whether they remove or abandon the property is unfounded.

**b. Plaintiffs Have Presented No Authority For The Proposition That A "Fair Market Value" Valuation Of Plaintiffs' Permanent Facilities Is Inconsistent With A "Fair Value" Valuation As Referenced In Public Law 96-375**

Plaintiffs suggest that the appraisals of their permanent facilities set forth in the

Prospectus does not comply with Public Law 96-375 because they do not set forth "fair value," and instead are based upon "fair market value." Plaintiffs, however, provide no guidance as to why, in this case, "fair market value" is inconsistent with "fair value." Plaintiffs' provide no legal basis for distinguishing the two concepts. Instead, they merely argue in a conclusory assertion that the appraisals of their permanent facilities that they arranged sets forth "fair value," while the appraisals performed on behalf of Reclamation do not. Pl. Mem. at 20. As purported evidence of the difference between "fair value" and "fair market value" they cite, as an example, their appraisal of the permanent facilities at Rancho Monticello which resulted in a valuation of $27.5 million, versus the valuation of $11.25 million as set forth in the Prospectus. Citing to different appraisal results adds nothing to distinguish the meaning of "fair value," versus "fair market value." In short, plaintiffs provide no principled guidance how or why "fair market value" is inconsistent with "fair value" in this case.

Plaintiffs failure to point to any distinguishing principles between a "fair value" appraisal and a "fair market value appraisal" is unsurprising. The Supreme Court instructs that the ascertainment of the fair value of property is not found by a formulaic reference to a given appraisal method. It "is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts." Simpson v. Shepard, 230 U.S. 352, 434 (1913).

In takings cases, "fair market value" is often found to be the appropriate standard for valuation of property. "An 'early adopted' measure of 'just compensation' as contemplated by the Fifth Amendment of the United States Constitution, 'market value is what a willing buyer would pay in cash to a willing seller.'" Cane Tennessee, Inc., v. United States, 71 Fed. Cl. 432,

437 (2005) (quoting United States v. Miller, 317 U.S. 369, 374 (1943); see also Masayesva for and on Behalf of Hopi Indian Tribe v. Hale, 118 F.3d 1371, 1378 (9th Cir. 1997) ("no material difference between evaluating 'fair value,' as set forth in the Settlement Act, and evaluating 'fair market value,' the more common standard.").[11]/ Furthermore, the law "'is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation. . . . It may be based on comparable sales, reproduction costs, capitalization of net income or an interaction of these determinants.'" Seravalli v. United States, 845 F.2d 1571, 1575 (Fed. Cir. 1988) (quoting United States v. 179.26 Acres of Land, 644 F.2d 367, 372 (10th Cir. 1981); accord Barrett Refining Corp. v. United States, 242 F.3d 1055, 1061 (Fed. Cir. 2001).

In short, plaintiffs points to no authority that states that the appraisal methodology they have chosen constitutes "fair value," nor do they cite any applicable authority that here, in the valuation of permanent facilities, "fair value" is distinct from "fair market value." What is clear, however, is that deference is due Reclamation with respect to its choice of valuation methodology. See El Paso Natural Gas Co. v. Fed. Energy Regulatory Comm'n, 96 F.3d 1460, 1464 (D.C. Cir. 1996) ("Because this inquiry [regarding the fair market value of a property] is fact intensive, it is appropriate to give significant deference to the [Federal Energy Regulatory] Commission's choice of a valuation methodology") (citing Seravalli, 845 F.2d at 1575).

---

[11]/ One area -- not applicable here-- where a difference has been found between "fair value" and "fair market value" is in the context of valuations of minority shareholder holdings in closely held corporations. There, the concerns particular to the corporate context exist, where minority and dissenting shareholders may find that the market value of their shares is much lower than the proportionate value of the shares to the book value of the corporation. The market value of minority shares in closely held corporations is often low due to a lack of marketability and liquidity. The law protects these shareholders by prohibiting majority shareholders from "squeeze plays" meant to wrest these shares from minority shareholder at the lower "market price." See, e.g., Swope v. Siegel-Robert, Inc., 243 F.3d 486, 492-93 (8th Cir. 2001).

**c. Plaintiffs' Complaint Involves Plaintiffs' Existing Contracts And Is Not The Proper Basis For A Bid Protest Action**

Plaintiffs' arguments concerning the fair value of their permanent facilities suffer from a further, more fundamental problem. Plaintiffs' disagreements concerning the valuation of their property concern their existing contractual or statutory rights. It is not a solicitation issue. A similar situation arose in Circle Line-Statute of Liberty Ferry, Inc. v. United States, 76 Fed. Cl. 490 (2007), where an existing concessionaire (operating the ferry service between Manhattan and the Statute of Liberty) sought to enjoin a solicitation by the National Parks Service for a new concession contract to provide these ferry services. There, the plaintiff was concerned that the appraisal of its existing ferry boat fleet was inadequate as set forth in the solicitation, and it believed that it was entitled to a preference in contract renewal. This Court found, however, that the plaintiff was really concerned that "the Park Service will reinterpret the existing contract in a manner contrary to its plain meaning." Id. at 496. The Court concluded that it was "simply not willing to take action against such speculative harm. The Court therefore finds it sufficient that the Park Service specified in the solicitation that the transfer of assets will occur pursuant to plaintiff's existing contract; the injuries plaintiff imagines are strictly conjectural." Id.[12]/

Here, as in Circle Line, the plaintiffs' concerns about the valuation of their permanent facilities, and their obligations to remove unwanted property from the concession area and to

[12]/ Nor can it be argued here that plaintiffs must file their protest of the Prospectus prior to the award of the concession contracts because to do otherwise (i.e., to file their own responsive bid proposal) would constitute a waiver of their rights under their contract. Circle Line further instructs that there is no such Hobson's choice: "It is not the issuance of a solicitation denying plaintiff's preference in renewal that constitutes an invasion of plaintiff's alleged contractual right. Rather, the Park Service's failure to recognize that right in the later bid evaluation process would be the source of any potential harm. Plaintiff's submission of a responsive bid waives nothing." Id. at 497.

ensure that the mobile home owners remove their property, are all governed by their existing contracts with the Government. Indeed, any disputes concerning the appraised values of plaintiffs' permanent facilities are premature here, as in Circle Line, particularly given the recognition in the Prospectus that the appraised values of those facilities can change (a fact that was anticipated by the Prospectus given that any transfer of plaintiffs' permanent facilities will not occur before plaintiffs' contracts expire in either mid-2008 or mid-2009). See AR1318. Indeed, the Prospectus provided a re-pricing and compensation mechanism for the permanent facilities in the event that its appraisal values are different than those that are "ultimately determined to be due the former concession contractor under the expiring contract." Id.

In any event, if it should someday come to pass, for example, that plaintiffs dispute the ultimate valuations of their properties, they can seek relief through the contractual remedies available pursuant to their existing contracts. Indeed, for two of the concessionaire plaintiffs (Steele Park and Markley Cove), there are express mechanisms in their contracts for resolving disputes concerning the valuation of their permanent facilities. In both the Steele Park and Markley Cove contracts, either party to those agreements is permitted to seek arbitration of valuation disputes, with the results of the arbitration binding upon both parties. See AR43018 (Steele Park); AR42641-42 (Markley Cove).

Furthermore, as the Steele Park agreement demonstrates, plaintiffs suggestion that "fair value" is different than "fair market value" rings particularly hollow. The Steele Park contract, which was executed by the parties in 1989 (AR43008), well after the passage of Public Law 96-375 in 1980, expressly states that it is to be paid the "fair market value" of its permanent improvements. AR43018. Given that Public Law 96-375 required "fair value" for the remaining

permanent improvements, the parties' agreement concerning the payment of "fair market value," reflects an understanding that the terms "fair value" and "fair market value" do not have different meanings here.

### 2. <u>The Prospectus Does Not Discriminate Against The Plaintiffs</u>

In addition to their initial argument that the Prospectus does not properly provide for "fair value" valuation of all of their permanent facilities, plaintiffs argue that the Prospectus unfairly discriminates against them. This purported prejudice takes several forms. First, plaintiffs argue that the Prospectus was tailored so as to provide preferential treatment to a particular entity, Forever Resorts, which is also an existing concessionaire at Lake Berryessa. Pl. Mem. at 21. Plaintiffs' argument is unbridled and unfounded speculation. Initially, plaintiffs only support for its claim is that the Prospectus favors entities that are large and have "financial resources." <u>Id.</u> Later, plaintiffs assert that, because "the Prospectus awards up to 27 additional points out of a potential of 156 points (a 17 percent bonus), for a bidder who bids upon multiple concession opportunities . . . [t]his provides an unfair advantage to Forever Resorts." Pl. Mem. at 24.

Reclamation's preference for multiple concession offers is based upon a number of clearly stated rationales in the Prospectus and administrative record that have nothing to do with an implied illegal sweetheart or insider preference for Forever Resorts. First, as discussed above, Reclamation's value point preference for a multiple concession offer is based upon its determination that the economies of scale savings available to a multi-concession operation was advantageous given the switch from business models based upon long-term mobile home facilities to short-term use business models where lower profit margins might exist. See above at 18-19; AR1366. Second, related to the economies of scale concern, is Reclamation's concern

that multi-concession operators would have a greater capacity to withstand a downturn in business, for example, in drought conditions (which affect concessionaires at lakes particularly hard). This factor is based upon the Government's experience at other Federally-owned lakes in the Western United States. See above at 19; AR41452. Third, Reclamation's preference for multi-concession operators is based upon its recognition that such operations would permit the most efficient upgrading or building of sewer and other infrastructures at the various concession areas at Lake Berryessa. See above at 20; AR1316. Fourth, Reclamation's preference is informed by its desire that there be an integrated, lake-wide spectrum of recreation experiences for the visiting public, a goal which is most effectively achieved by multi-concession operations. See above at 20; AR1366; AR41451-52. Fifth, Reclamation's preference takes into account the fact that multi-concession operators would have a greater capacity to phase in construction programs so that the impact upon the public use would occur in a more subtle manner. See above at 20-21; AR1366. Finally, Reclamations' preference in the form of value bonus points for multi-concession offerors is based upon its recognition that, because multi-concession operators would be undertaking greater initial investment risk and a more complex management burden, they deserved additional points relative to other offerors. See above at 21; AR1366.

In short, there simply can be no doubt that Reclamation's preference for multi-concession operators at Lake Berryessa is based upon a rational preference. That preference has nothing to do with an alleged illegal sweetheart arrangement in favor of Forever Resorts.

Plaintiffs' other arguments alleging prejudice are equally unfounded. For example, plaintiffs argue that they are being unlawfully discriminated against in that they, "but not new concessionaires, are required to remove all mobile homes, trailers and other improvements from

the concession property prior to the termination of the current concession contracts." Pl. Mem. at 21. This argument suffers from several flaws. First, of course, it is yet another complaint based upon plaintiffs' obligations connected with their existing contracts. In effect, plaintiffs suggest that they are prejudiced by having to adhere to their existing contracts. Plaintiffs, and the mobile home owners in the concession areas, however, have long known that all personal property and improvements (i.e. mobile homes), must be removed upon the expiration of the existing concession agreements with the Government. See, e.g., AR41961 (Markley Cove); AR42019 (Rancho Monticello); AR42163 (Spanish Flat); AR42252 (Steele Park). Second, plaintiffs' argument implies that fairness would be restored by requiring new concessionaires to interfere with the contractual relations between the existing concessionaires and the mobile home owners in the concessionaires' areas. Plaintiffs offer no suggestion how new concessionaires could possibly act to remove privately-owned mobile homes from concession areas managed by the concessionaire plaintiffs prior to new concessionaires right to be present at a given concession areas. This sort of purported prejudice is truly fanciful.

Plaintiffs also claim that they will be disqualified from consideration of the new contract because they will likely be unable to remove the existing mobile homes from the concession areas. Plaintiffs invoke the California Mobile Home Residency Act, claiming that "the complete removal of the property could take as long as five years." Pl. Mem. at 22. Plaintiffs' argument is a red herring, and again, it simply does not withstand scrutiny. Here, plaintiffs suggest that provisions of the California Mobile Home Residency Act will interfere with the policy, contractual rights, and, indeed, statutory rights of Reclamation to require the removal of the mobile homes currently placed on Federal land upon the expiration of plaintiffs' contracts.

"[U]nder the Supremacy Clause of the United States Constitution, federal law overrides conflicting state law with respect to federal public lands." United States v. Shenise, 43 F. Supp.2d 1190, 1196 (D. Colo. 1999) (citing Kleppe v. New Mexico, 426 U.S. 529, 543 (1976). "Management of the federal public land should not be at the mercy of state legislatures." Shenise, at 1196. Indeed, "State jurisdiction over federal land 'does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them.'" Wyoming v. United States, 279 F.3d 1214, 1227 (10th Cir. 2002) (citing Utah Power & Light Co. v. United States, 243 U.S. 389, 404 (1917).

The application of the Supremacy Clause has been upheld in numerous contexts where plaintiffs have sought (unsuccessfully) to impose state law doctrines over Federally owned and managed lands. For example, in Wyoming, 279 F.3d 1214, the court found that state law concerning the vaccination of elk on Federal land was prohibited by the Supremacy Clause to the extent that state and Federal law conflict "or where state management and regulation stand as an obstacle to the accomplishment of the full purposes and objectives of the Federal Government." Id. at 1234; see also United States v. Brown, 552 F.2d 817, 822-23 (8th Cir. 1977) (state law permitting hunting within National Park overridden by Federal law because the Government has "'a power over its own property analogous to the police power of the several states'") (citing Camfield v. United States, 167 U.S. 518, 525 (1897); Shenise, 43 F. Supp. 2d at 1196 (Colorado's state fencing laws (connected with cattle grazing rights) are inapplicable to Federal land because Federal law prohibits grazing trespass on Federal land); Town of Beverly Shores v. Lujan, 736 F. Supp. 934, 944-45 (N.D. Ind. 1989) (state parking ordinances that conflict with the

Federal use of a Federally-owned lake are preempted by the Supremacy Clause); Cf. Santa Rosa Bank of Indians v. Kings County, 532 F.2d 655, 659 (9th Cir. 1976) (county mobile home building ordinance preempted by Federal authority over lands held in trust for Indian tribe).

In addition to these reported decisions, we alert the Court to an unreported decision of the United States District Court for the District of Arizona, which deals directly with the issue of whether a state's law concerning mobile home landlord/tenant law (the Arizona Mobile Home Parks Residential Landlord and Tenant Act) would be applicable on Federal land. See Sweetnam v. Babbitt, No. Civ 94-0063 (D. Ariz. Jan. 24, 1994 ) (slip opinion annexed hereto as Exhibit 1). In Sweetnam, mobile home owners were contesting the removal of their trailer village at the Lake Mead National Recreation Area because of the termination of a concessions contract. Sweetnam, slip op. at 10. The trailer owners were given 30 days to vacate the premises pursuant to their leases with the concessionaire. Id. at 11. The Arizona Mobile Home Parks Residential Landlord and Tenant Act required 180 days notice before plaintiffs could be evicted; thus, plaintiffs argued, they could not be evicted in 30 days. Id. at 14. The Government responded that a 180 day notice was not applicable because the State of Arizona did not have "the right to regulate the activities of the United States in the use and regulation of its federally-owned property." Id. at 15. The court agreed, finding that the United States was "not bound by Arizona's Landlord Tenant Act." Id. at 16. Indeed, the court noted that "[t]o hold otherwise would be to allow the State of Arizona to impermissibly interfere with the federal government's discretion in administering federal lands." Id.

Here, just as in Sweetnam, a state law concerning the rights of mobile home owners is not applicable on Federal land where that law conflicts with the Government's discretion in

administering Federal lands. In short, the Supremacy Clause preempts any attempt by plaintiffs to invoke a state law regime that conflicts with Federal policy at the Lake. Thus, plaintiffs' claim of prejudice based upon a potential five-year delay in removing the mobile homes from Lake Berryessa based upon the California Mobile Home Residency Act is entirely without merit.

In addition to the purported prejudices discussed above, plaintiffs list other baseless and speculative arguments to support their claim of prejudice. For example, plaintiffs state that, if they are required to make the mobile home owners vacate the concession areas prior to the termination of the concession agreements with the Government, they would be placed "in the impossible position of being in potential breach of their contracts with their tenants." Pl. Mem. at 22. Plaintiffs disclosure agreements with mobile home owners belie this claim. Pursuant to the disclosure forms signed by the mobile home owners and the concessionaires the mobile home owners have long known and acknowledged that they "understand that the privilege of using this mobile home or trailer on the said long-term recreation site will end on the date of the expiration or termination of the concession agreement . . . . <u>or sooner should the Concessioner decide to restructure facilities and services</u>; and, at that time (<u>unless sooner closed by condemnation, change in use or default</u>), [they] must remove all personal property and improvements from federal land at [their] expense." <u>See</u>, <u>e.g.</u>, AR41961, AR42019, AR42163, AR42252 (emphasis added). These disclosures demonstrate that plaintiffs' claims of potential lawsuits as a rationale to preclude the acceptance of bids and award of contracts under the Prospectus are speculative.

Plaintiffs further claim that they are discriminated against because the Prospectus does not permit the plaintiffs "to remove the mobile homes in phases during the term of a new concession contract." Pl. Mem. at 23. Rather than be the subject of discrimination, plaintiffs are

actually seeking the award of a special preference given to them alone where, if awarded a new concession agreement, they would not have to operate a concession based solely upon short-term public recreational use. Yet other offerors would have to be prepared to do so. Again, plaintiffs' claim of discrimination is simply unfounded.

### 3. The Appraisals Set Forth Within The Prospectus Are Not Improper

Plaintiffs' final substantive argument as to why they are likely to prevail upon the merits of their claims is that the appraisals of their permanent facilities set forth within the Prospectus are improper. Plaintiffs' arguments in this regard are based upon a false premise.

Specifically, and as noted above, plaintiffs claim that the appraisals obtained by Reclamation failed to comply with the Instructions and Statement of Work issued by Reclamation for the appraisals. Pl. Mem. at 25-26; see above at 14-16. Plaintiffs, for example, claim that their "economic interests were to be appraised" as required by the Instructions and Statement of Work. Pl. Mem. at 25. They also claim that the appraisers "failed to conduct an evaluation of the concessions through the use of all three appraisal methods . . . contraven[ing] the express requirement in the Statement of Work and Appraisal Instructions." Id.

Plaintiffs, however, are wrong. In fact, plaintiffs do not cite Reclamation's Instructions and Statement of Work for Reclamation's appraisal; they are citing to their own Instructions and Statement of Work for the separate appraisal of their own properties that they commissioned to be performed by FMV Opinions, Inc. See Pl. Mem. at 25 citing Pl. App. at 320. The document appended to plaintiffs' motion which is described as "Appraisal Instruction" is actually the plaintiffs' own appraisal instructions for FMV Opinions, Inc. See Pl. App. at 320-23; AR42544. The appraisal Instructions and Statement of Work for the GovWorks appraisal performed on

behalf of Reclamation is an entirely different document. See AR41753-41780. In short, plaintiffs have confused the requirements of their appraisal that they commissioned, with the requirements of the appraisal performed on behalf of Reclamation. There can be no doubt about this error.

We will not belabor this point. The mistake is manifest and obvious. Given this fact, plaintiffs' claim that the appraisals of their permanent facilities are improper because they did not follow appraisal instructions is simply baseless. The appraisal of plaintiffs' permanent facilities did, in fact, adhere to the requirements of the appraisal instructions.

In addition to failing because they are based on a false premise, plaintiffs' arguments connected with the appraised value of their properties suffer other infirmities. Plaintiffs are, yet again, arguing about a matter that involves rights connected with their existing contracts. If they dispute the ultimate value assigned to their permanent facilities, they retain their contractual rights to seek redress. Furthermore, plaintiffs arguments are premature, given that the Prospectus acknowledges that the appraised values set forth in the Prospectus are not necessarily the final valuation of the permanent facilities. For example, the Prospectus notes that the condition assessment report was not a final ascertainment of the condition of the permanent facilities at the concession areas:

> The [condition assessment report] was finalized in December 2002, and some conditions have changed at some concession locations. Various improvements or corrections occurred as a result of the report, but many of the situations remain the same. Offeror should use the [condition assessment report] as a reference and investigate through formal questions or on-site observations any particular concerns that would impact their proposal(s).

AR1294.

More importantly, the Prospectus recognizes that the posted appraisal valuation may not be the final appraised value by providing a mechanism for providing additional compensation to the existing concessionaires should that be required, while at the same time not affecting the ultimate price paid by the new concessionaire for remaining permanent facilities:

> If the compensation for CIR [capital investment recovery] that is ultimately determined to be due the former concession contractor under the expiring contract differs from the CIR identified in the Reclamation appraisal (PART 7.10) for the purposes of this prospectus (and assumed by the successful offeror/new concession contractor), an adjustment will be made to the franchise fee or other financial obligations to be paid under the new concession contract so as to not affect the net financial impact on the new concession contractor.

AR1318; see also AR1322.

Thus, contrary to plaintiffs' arguments, they are not prejudiced by the mechanisms in the Prospectus for valuing the permanent facilities and for permitting differences in values to be resolved at a later point in a fashion; those mechanisms prejudice neither the existing concessionaires nor the new concessionaires.

## C. The Balance Of Harms Compels The Denial Of Injunctive Relief

We demonstrated above that plaintiffs cannot prevail on the merits of their claims, and accordingly, for this reason their motion for injunctive relief should be denied. Further supporting the denial of their motion is that the balances of the harms favors the Government.

### 1. Plaintiffs Have Failed To Establish Irreparable Harm

First, as we repeatedly demonstrated above, plaintiffs have failed to establish irreparable harm. The majority of the harms that they perceive are based upon their existing contracts. Irrespective of the bidding and award of new concessionaire contracts, they will retain their rights

pursuant to those contracts. Furthermore, for the most part, the injuries plaintiffs complain about (e.g., the ultimate prices paid to be paid for permanent facilities required to be left at Lake Berryessa should they not win the bids for their concession area), are purely conjectural.

Plaintiffs' complaints based upon their existing contracts are not the proper subject of a bid protest action. It is well settled that this Court's jurisdiction to entertain bid protests does not permit it to entertain assertions that the awardee has violated the contract. See, e.g., Northern Telecom Inc. v. United States, 8 Cl. Ct. 376, 381 (1985) (endorsing view that "[p]rotests . . . alleging that the awardee will not deliver equipment in conformance with contract requirements concern matters of contract administration, which are the responsibility of the contracting agency and which are not considered under our bid protest function."). If it were in fact the case that Reclamation materially breached its obligations under plaintiffs' contracts by failing to provide adequate compensation to the plaintiffs for their permanent facilities, the appropriate remedy in such a circumstance would not be resolicitation of bids for the Lake Berryessa concessions, but, rather, for the plaintiffs to seek to enforce their contractual rights. Again, if plaintiffs believe their contractual rights have been abrogated, they retain those rights, irrespective of the bid solicitation and evaluation process. See Circle Line, 76 Fed. Cl. at 497. Thus, there is no irreparable harm in requiring that the bidding for and award of the new concessions go forward.

Plaintiffs also fail to show irreparable harm because the upshot of their complaint is really that they are concerned that the bidding for new concession contracts at Lake Berryessa will result in the loss of their existing concessions. Such concerns do not present irreparable harm under the law. "Normally, an injury is not considered 'irreparable' if the only injury alleged is monetary loss." Chapman, 67 Fed. Cl. 193. Loss of business is not irreparable harm. "In every

procurement award there are generally more losers than winners. To find that a losing procurement participant suffers irreparable harm merely because it did not succeed with its contract proposal would create in the losing party an automatic right to injunctive relief." San Diego Beverage & Kup v. United States, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998).

Finally, plaintiffs fail to show irreparable harm in the very timing of their bid protest. Plaintiffs waited until August 28, 2007, to file their bid protest. This was merely four business days before the close of the Prospectus's solicitation period on September 5, 2007. Such dilatory tactics have been found to demonstrate the lack of irreparable harm. See, e.g., Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 537 (2003) ("'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact no irreparable injury,'") (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2nd Cir. 1985)); Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985) (finding that delay in requesting a preliminary injunction "implies a lack of urgency and irreparable harm"); ABF Freight Systems, Inc. v. United States, 55 Fed. Cl. 392, 399-401 (2003) (the complaint was untimely because of claimants' failure to file within the 10 day limit of GAO rule). Here, if plaintiffs truly believed that they faced irreparable harm in the solicitation process, they would have filed their complaint much sooner, rather than hope that their last minute complaint would effect a *fait accompli*.

As this Court has observed, "[e]xcept in the most extraordinary circumstances, judicial infringement on the procurement process in the form of preliminary relief [is] inappropriate, where, as here, the plaintiff . . . waits an inordinate period of time . . . before pressing its claim." Software Testing Solutions, 58 Fed. Cl. at 538. While the public interest is served by

competitive procurements, it is equally served by insuring that there is a minimum of "excessive judicial infringement upon the agency's discretion" to procure supplies and services in the public interest. Id. (quoting Aero Corp. S.A. v. United States, 38 Fed. Cl. 237, 242 (1997)). The longer a plaintiff waits to challenge a procurement the more difficult it becomes for the agency, such as Reclamation here, to satisfy the needs for which the procurement was initiated.

### 2. The Harm To The United States Equals Or Outweighs The Harm To Plaintiffs

Even if plaintiffs were to suffer some harm, however, the harm to the Government in delaying the solicitation process far outweighs the harm to plaintiffs. If Reclamation is forced to redraft, reissue, re-advertise the Prospectus and delay award of new contracts as a result of a restraining order and a truncated transition period before the beginning of the new concessionaire contracts, Reclamation will be harmed: (1) by likely being deprived of the receipt of development proposals from other offerors who will lose interest or will be intimidated into withdrawing from offering proposals; (2) by the loss of franchise fee revenue to the Treasury if the award of new contracts is delayed beyond the dates the existing contracts expire; and (3) by general disruption to the Lake Berryessa recreation program causing the burden of additional Government staff providing security and recreation services at locations now managed by plaintiffs.

Furthermore, this Court's consideration of the balance of harms includes the balance of potential harms to third parties. Chapman, 67 Fed. Cl. at 193 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1230 (Fed. Cir. 2004)). In PGBA, the Court of Appeals for the Federal Circuit upheld the trial court's denial of an injunction, after finding that any injunctive remedy would create administrative and financial burdens for the Government, as well as possibly create

risks for third parties. PGBA, 389 F.3d at 1231. Here, there are a number of interested third-party bidders who, because the deadline for the solicitation of bids was fast approaching at the time plaintiffs filed their motion, have undoubtedly already gone to great expense in preparing their bid proposals. They are due a timely consideration of their bids, especially given the fact that, if awarded a contract, the new concessionaire or concessionaires will need to undertake significant financial and logistical plans to begin the process of changing the concession areas to short term use for the public benefit. Given that plaintiffs' complaint really concerns the plaintiffs' existing contracts, there is no good reason to effect a harm upon third parties who have relied for months on the solicitation process and schedule posted by Reclamation.

### 3. Denying Injunctive Relief Is In The Public Interest

Finally, plaintiffs' motion for injunctive relief should be denied because it is in the public interest. In our discussion of the background facts in this case we demonstrated the longstanding effort of Reclamation to open up Lake Berryessa to the public for short-term recreational uses that can be enjoyed by a much greater number of people, at all socio-economic levels. For more than 35 years Reclamation and other Government agencies have recognized that the public interest is not best served by the continued presence of long-term, privately-owned mobile homes and trailers on Federal lands, frequently in the choicest locations at the Lake. It is simply not in the public interest to delay the transition from the current state to a future where all citizens have the capacity to enjoy Lake Berryessa.

## III. Should Plaintiffs' Motion For Preliminary Injunction Be Granted A Bond Should Be Provided By Plaintiffs

Pursuant to Rule 65(c) of the Rules of the Court of Federal Claims, "No restraining order

or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Should the Court grant plaintiffs motion for a preliminary injunction, plaintiffs should be required to post security in an amount to be determined at a later date. To be sure, however, the Government will incur damages if plaintiffs are found to have wrongfully enjoined the solicitation process for the new concessions at Lake Berryessa.

## IV. The United States Is Entitled To Judgment On The Administrative Record

We have demonstrated that plaintiffs motion for a preliminary injunction does not withstand scrutiny. Accordingly, and for the same reasons that plaintiffs' motion should be denied, the Government's motion for judgment on the administrative record should be granted, permitting the Government to accept bids beginning on October 31, 2007, and to award the new concessionaire contracts at Lake Berryessa in accord with the Prospectus.

## CONCLUSION

For the reasons stated above, we respectfully request that plaintiffs' motion for injunctive relief be denied and the Government's cross motion for judgment be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel. 202-353-7972
Fax. 202-514-8640
Attorneys for Defendant

OF COUNSEL:

JAMES E. TURNER
Assistant Regional Solicitor
Office of the Solicitor
Pacific Southwest Region
United States Department of the Interior
2800 Cottage Way
Room E-1712
Sacramento, California 95825-1890
Tel. 916-978-5685
Fax. 916-978-5694

September 14, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2007, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson