IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC., | No. 07-636C (Judge Lynn J. Bush) |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Gregory T. Jaeger
MARZULLA LAW
1350 Connecticut Ave, NW, Suite 410
Washington, D.C. 20036
Telephone: (202) 822-6760
Facsimile: (202) 822-6774

Attorney for Plaintiffs

Dated: October 9, 2007

## TABLE OF CONTENTS


I. The Prospectus Violates Public Law 96-375 .......... 2

II. The Prospectus Prohibits Plaintiffs From Bidding On The New Contracts By Imposing On Them Alone The Impossible Requirements Of Removing All Of Their Property Prior To Termination Of Their Existing Contracts .......... 7

III. The Prospectus Is Illegal Because The Appraisals On Which It Is Based Were Not Performed In Compliance With P.L. 96-375 .......... 10

IV. The Prospectus Is Illegal Because It Violates Plaintiffs' Contracts .......... 11

V. The Prospectus Improperly Prejudices Plaintiffs By Awarding Large Corporations, Such As Forever Resorts, An Unwarranted 27-Point Advantage .......... 14

VI. The Elements For An Injunction Lie Decisively In Plaintiffs' Favor .......... 15

Conclusion .......... 16

# TABLE OF AUTHORITIES

**Cases**

*Amber Resources v. United States*, 73 Fed. Cl. 738 (2006)................................................8

*Berryessa For All v. Bureau of Reclamation*, No. 07-259 (N.D. Cal.)..............................9

*Circle Line-Statue of Liberty Ferry, Inc. v. United States*, 76 Fed. Cl. 490 (2007)...........11

*OTI America, Inc. v. United States*, 68 Fed. Cl. 108 (2005)............................................11

*Tel-Instrument Electronics Corp. v. U.S.*, 56 Fed.Cl. 174 (2003) .....................................6

*Trinity River Lumber Co. v. United States*, 66 Fed. Cl. 98 (2005) ....................................8

*Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748 (1999)................................12

**Statutes and Rules**

Pub. L. No. 93-375, 94 Stat. 1501 ..................................................................2, 4, 8

**Other Authorities**

Administrative Record Excerpts, Ex. D.................................................... *passim*

Correspondence Between S. Buckly (Steele Park) & M. Finnegan
(Bureau of Reclamation), Ex. C..........................................................................13

Def. Br.........................................................................................................10, 11

H. Rep. No. 101-1018 (2004) ..........................................................................5

H. Rep. No. 5278 (1980)................................................................................ 2-3

Bureau of Reclamation Lake Berryessa – Project Request and Approval Form,
Ex. B .............................................................................................................7, 8

Bureau of Reclamation Lake Berryessa – Prospectus ....................................3, 4, 6, 14, 15

Declaration of Robert White, Ex. A...............................................................6, 7, 8, 10, 12

S. Rep. No. 95-871 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 4773 ...............................5

S. Rep. No. 96-980 (1980) .......................................................................................... 3

S. Rep. No. 99-34 (1985), *as reprinted in* 1985 U.S.C.C.A.N. 158 .................................... 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; AND STEELE PARK RESORT, INC., Plaintiffs, | No. 07-636C (Judge Lynn J. Bush) |
| v. | |
| UNITED STATES, Defendant. | |

PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

The Prospectus for the Lake Berryessa procurement is illegal because: (1) the Prospectus violates Public Law 96-375 and the Plaintiffs' contracts by requiring that Plaintiffs remove all of their property prior to the termination dates for their respective contracts, and by declaring that a failure to remove all property will result in abandonment of the property; (2) there are administrative roadblocks that will prevent Plaintiffs from being able to remove their property in a timely manner, thus disqualifying them from consideration for the new concession contracts; (3) Reclamation has failed to properly perform appraisals for Plaintiffs' property, even though Reclamation personnel have acknowledged that they are "super-critical" to the evaluation of bids responding to the Prospectus; and (4) the Prospectus improperly prejudices Plaintiffs by

providing large companies, such as Forever Resorts, a gratuitous 27-point bonus for bidding upon multiple resorts.

In its opposition to Plaintiffs' motion for injunctive relief and cross-motion for judgment upon the administrative record, Defendant essentially ignores the irreparable harm that Plaintiffs, as well as the public, will suffer if the Lake Berryessa procurement is allowed to go forward under the current Prospectus. Moreover, Defendant attempts to circumvent the illegalities of the Prospectus by asserting several erroneous arguments, including a patently incorrect allegation regarding the instructions that were given to appraisers during the appraisal process for Plaintiffs' property. Plaintiffs reply to these erroneous arguments as follows:

## I. The Prospectus Violates Public Law 96-375

Public Law 96-375 provides:

> Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities *shall remain the property of said concessionaires*: Provided, That at the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, *if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.*

Section 5(b) of Pub. L. 96-375. Emphasis added.

The legislative history for the statute makes clear its purpose to fully protect the concessionaire's investments at the lake:

> R. LUJAN: … I want to make certain that the language which we have provided in this bill would *fully protect those people who have made sizable investments at this lake.* They have been whipsawed among three agencies over the years, each of whom has had different regulations …

> [M]y understanding is that the *concessionaires have made sizable investments in permanent facilities at the lake*. What happens to those facilities? Does the Government just make a windfall profit in the form of confiscated property simply by declaring the agreements terminated? *Would these people just have to walk away and leave their investments?*
>
> MR. CLAUSEN: *The answer to that is no. As we have discussed previously in the committee, the eventuality has been foreseen, and we have no intent of such a thing happening. It is our intent that all permanent facilities placed by the concessionaires in these seven resorts at Lake Berryessa be considered the property of the respective current concessionaires, along with any permanent additions or modification to those facilities. That is only right and fair*, and the committee has no intention of stripping them of those rights. . . .

Legislative History, H.R. 5278 (1980) (emphasis added).[1]

The Prospectus violates the statute in several ways. First, the Prospectus provides that, in the event Plaintiffs fail to remove their concession facilities and property by the termination dates of their respective concession contracts, that property will be declared "abandoned" and the Government will assume control/ownership. Prospectus at 3-8, AR 1284.[2] This contradicts the statute's clear provision that the property placed by a concessionaire at the lake "shall remain the property of said concessionaire[]." This provision also violates the intent of the statute, *i.e.*, that Plaintiffs not be forced to "walk away and leave their investments," and that the Government should not obtain a "windfall profit" from such a situation. For this reason alone, the Prospectus is illegal and must be enjoined.

---

[1] Senate Report 96-980 (1980) confirms Congress' intent in passing the statute. ("In addition, H.R. 5278 authorizes the Secretary of the Interior to enter into new negotiated concession agreements with the present concessionaires at resorts on Lake Berryessa in California . . . . [T]*he measure provides for the protection of investments made by concessionaires in permanent facilities thereby encouraging the installation of additional facilities of high quality*.")

[2] "AR" refers to pages in the Administrative Record. Copies of those pages cited in this brief are attached as Exhibit D.

The "abandonment" provisions of the Prospectus penalize Plaintiffs even in those situations where it is either physically impossible to remove the property, (*e.g.*, permanent buildings and their foundations, roads and parking lots), or it is impossible to remove because of other reasons, (*e.g.*, because of potential violations of Federal statutes (such as the Clean Water Act ("CWA") and NEPA), or the requirements of state statutes and regulations, such as the California Department of Transportation permit requirements for the transportation of mobile homes). Here again, the legislative history is clear – Congress intended that Plaintiffs should not be forced to "walk away from" their investments at the lake, and that the Government should not be allowed to reap "the windfall" resulting from the forced abandonment of those investments. Yet this is precisely the result of the Prospectus's requirement that all concession property remaining after the relevant contract termination dates is deemed to be abandoned and under the Government's control.

The second conflict between the statute and the Prospectus is the provision that allows Defendant and its new concessionaires to "pick and choose" which of Plaintiffs' assets are to remain and, for those assets not designated, to require Plaintiffs to remove their property and improvements at their own cost and prior to the termination of their contracts. Prospectus at 3-12, AR 1288. Indeed, under this provision, "a successful bidder would only pay the appraised value of the facilities … they wish to retain …." AR 41395. This provision directly contravenes the intent of the statute, which is to "fully protect" Plaintiffs and their investments at the lake. It is evident that the "pick and choose" approach contemplated by the Prospectus does not "fully protect" Plaintiffs and their assets; the term "fully protect" requires that Plaintiffs receive the

"fair value" compensation required by P.L. 96-375 for all of their investments at the lake.[3] Because the Prospectus violates this provision, it is illegal and must be enjoined until it is corrected.

The third conflict between the statute and the Prospectus involves the definition of "fair value" and Defendant's appraisals of Plaintiffs' property to determine that value. As a preliminary matter, in the agency's own words, the appraisals of Plaintiffs' property are "super-critical" to the Prospectus, including the economic feasibility of bids, the valuation of Plaintiffs' assets and the overall development of Lake Berryessa. AR41139. Plainly, the absence of proper appraisals renders defective both the Prospectus and the Lake Berryessa procurement.

The agency, however, has failed to conduct the proper appraisals of Plaintiffs' property. In this respect, Defendant argues at length that the definitions of "fair value" and "fair market value" are one and the same. This argument not only is incorrect, it is irrelevant.[4] In this case,

---

[3] The agency's regulations regarding relocation of tenants support Plaintiffs' argument that the agency is required to purchase all of the assets/improvements. *See* 49 C.F.R. Part 24.105(a) and (b) (acquisition of tenant owned improvements).

[4] Contrary to Defendant's argument, there is a difference between the "fair value" required by the statute and the "fair market value" that the agency purported to calculate for Plaintiffs' assets. Indeed, it is apparent that the agency was aware of distinctions between the terms at the time the appraisals were to be performed. AR 41269. Moroever, contemporaneous legislative history in similar areas demonstrates that Congress distinguished between fair value and fair market value. For example, in discussing a bill to sell land to developers to promote housing projects, the Senate recognized that "the advantage to a developer . . . lies in the statute's authorization for the price of land to be set . . . at 'fair value for use' rather than 'fair market value." S.R. 95-871, 47-48, 1978 U.S.C.C.A.N. 4773, 4820 - 4821 (1978). Additionally, when considering a measure to increase the price at which U.S. ships could be resold to other countries, the Senate declared the fair value of the ships to be the fair market value plus the conversion costs. S.R. 99-34, 17, 1985 U.S.C.C.A.N. 158, 176 (1985). During the Oversight Hearings on Outer Continental Shelf Lease Cancellations and Compensation Process, the House compared the current "fair value" compensation, which equaled "excess of cost incurred on the lease minus any revenue derived from the lease" to fair market value, which was "the present value of profits that could be derived from owning the lease and developing the resources." H.R. REP. 101-1018, 54-55 (2004). Thus, Defendant's attempt to rely upon semantics to justify its failure to conduct a "fair value" appraisal of Plaintiffs' property is completely unavailing.

the agency did not conduct an analysis of Plaintiffs' property and improvements under either definition. In fact, the only appraisal analysis conducted by the agency of Plaintiffs' property was a "cost approach valuation" to establish the values for Plaintiffs' concession property; these values are set forth in Appendix 7.10 of the Prospectus and form the basis for offers in response to the Prospectus. AR 41392. (Even this cost analysis was incomplete in that it failed to appraise numerous permanent improvements by Plaintiffs.) White Decl. at ¶ 2, Ex. A.

A cost approach analysis is based solely upon an original cost estimate, less an estimate of the depreciation for the item. This, obviously, is not a valuation of the "fair market value" of Plaintiffs' property and assets. Thus, even assuming that Defendant has properly interpreted the statute to require only "fair market value" compensation, it has utterly failed to meet that requirement in the Prospectus.

In short, Defendant has failed to conduct the appraisals of Plaintiffs' property that are required by the statute and that are "super-critical" to the evaluation of bids responding to the Prospectus. As a result, the Prospectus is illegal and must be enjoined. Moreover, any bids responding to the Prospectus will be invalid and/or non-responsive because they will be unable to provide the "fair value" compensation that is required by the statute. Such bids, will, in effect, have to modify a material term of the Prospectus, as that term is defined under the superior authority of the statute. *Cf. Tel-Instrument Electronics Corp. v. U.S.*, 56 Fed.Cl. 174, 176 (2003) ("If a bidder attempts to impose conditions that would modify material requirements of the solicitation, the bid is not responsive and must be rejected.")

## II. The Prospectus Prohibits Plaintiffs From Bidding On The New Contracts By Imposing On Them Alone The Impossible Requirement Of Removing All Of Their Property Prior To Termination Of Their Existing Contracts

The Prospectus imposes on Plaintiffs alone an impossible requirement — the removal of all of their property, by the termination of their contracts, in order to qualify for consideration for the new contracts. Prospectus at 3-8, AR 1284. This requirement effectively eliminates Plaintiffs from bidding on the new contracts because the State of California will not permit removal of all of the mobile homes by the termination dates of the contracts. Specifically, the California Department of Transportation issues permits for the transport of travel trailers and mobile homes on an extremely limited basis, (two per week); there simply will not be a sufficient number of permits available to allow Plaintiffs to remove all of the property at the lake by the deadlines imposed by the Prospectus. White Decl. at ¶ 4 . This problem was known to the agency long before it issued the Prospectus; nonetheless, the agency chose to disregard it. AR 41223; AR 41368. As a result, the Prospectus has created a circumstance that will disqualify the Owners from consideration for the new contracts, and will force them to "walk away from their investments."

In addition, the agency has created its own bureaucratic process to approve property removal, further impairing Plaintiffs' ability to qualify as bidders for the new contracts. Specifically, the agency has implemented a removal plan process under which each mobile home tenant is required to submit a plan for removal of property; after review by Defendant (which has taken up to 180 days), Plaintiffs are then advised if there is agency approval, and the property may be disposed of pursuant to the plan. *See* Ex. B hereto (Project Request and Approval Forms). Plaintiffs may not initiate removal of the mobile homes without this prior written approval from Defendant. Plaintiffs have little, if any, control over the preparation and

submission of the individual plans, and no control over the approval of the plans. White Decl. at ¶ 5.[5]

To date, removal plans have been approved for only a fraction of the mobile homes at the lake. *Id.* Defendant's refusal to issue a blanket removal policy, as Plaintiffs originally requested, and its insistence upon a prolonged individualized approval process, will prevent Plaintiffs from being able to remove all property by the termination dates established by Reclamation, thus eliminating Plaintiffs from consideration for the new concession contracts. White Decl. at ¶ 6. In addition, because Plaintiffs will be unable to remove the property in a timely manner, it will be deemed abandoned by the Prospectus, and Plaintiffs will be forced to "walk away from their investments" in contravention of P.L. 96-375.

In this respect, it must be noted that, in those cases where it has provided removal directions, Defendant has ordered Plaintiffs to refrain from removing any property that is attached to the ground, directing that such items remain undisturbed. Ex. B. This is significant for two reasons. First, it represents the agency's declaration that numerous property items and improvements must remain at the lake; those items, therefore, must be appraised and compensated pursuant to the terms of P.L. 96-375. Such appraisals have yet to be performed, however, and certainly have not been incorporated into the terms of the Prospectus. White Decl. at ¶ 7. As a result, the Prospectus violates the "fair value" requirements of the statute and any bid responding to the Prospectus will be invalid or non-responsive because it will not provide for the compensation that is required under 96-375.

Moreover, Defendant apparently recognizes that it has failed to comply with the requirements of NEPA, which imposes a requirement that Government agencies performing

---

[5] The removal forms do not contemplate the removal of property until after the termination dates. Ex. B.

activities possibly affecting the quality of the human environment make a statement concerning the environmental impact of the action, alternatives to the action, and any "irreversible and irretrievable commitments of resources which would be involved in the proposed action." *See Amber Resources v. United States*, 73 Fed. Cl. 738 (2006) (citing 42 U.S.C. §§ 4321 *et seq.* (2000)). Failure to comply with NEPA is, of course, grounds for an injunction. *See, e.g.*, *Trinity River Lumber Co. v. United States*, 66 Fed. Cl. 98 (2005) (observing that district court permanently enjoined the Forest Service from proceeding with timber plan pending completion of a supplemental EIS meeting the requirements of NEPA).

The Bureau's directions to leave the ground undisturbed (as well as its insistence upon individualized removal plans) reveal that Defendant has failed to conduct the environmental analyses necessary for the removal of the mobile homes. Indeed, e-mails in the record reveal that agency personnel have acknowledged that mobile home removal likely will create environmental issues at the lake, (involving the CWA and NEPA) and that the agency has completely failed to account for this problem as part of the NEPA planning process that is the basis for the Prospectus. AR 41153-154.

This issue is part of the NEPA lawsuit filed by the group "Berryessa For All" that is pending in the Federal District Court in San Francisco. *Berryessa For All v. Bureau of Reclamation*, No. 07-259 (N.D. Ca.). Defendant's failure to comply with NEPA regarding this and other issues likely will result in a finding that the EIS and the Record of Decision, upon which the Prospectus is entirely based, will be found defective. This will necessarily result in the Prospectus being defective as well.[6] Moreover, Defendant's failure to comply with NEPA will

---

[6] In the *Berryessa For All* case, Defendant has agreed to mediate its NEPA case with the plaintiffs, which could result in modifications to the EIS and Record of Decision upon which the Prospectus is based. This, of course raises the question of whether the agency should be

likely result in an injunction that will prevent Plaintiffs from being able to remove any property by the deadlines established by Defendant.

## III. The Prospectus Is Illegal Because The Appraisals On Which It Is Based Were Not Performed In Compliance With P.L. 96-375

Defendant argues that the appraisal instructions referenced in Plaintiffs' motion were not those given to Defendant's appraisers, but were instructions that Plaintiffs gave to *their* appraisers. Def. Br. at 15, 44. This argument is, at best, a mischaracterization.

As reflected in the e-mails contained in the administrative record, the appraisal instructions at issue came from the agency. In response to a request from Plaintiffs, Reclamation's Mike Finnegan provided the appraisal instructions to Plaintiffs' consultant, Mike Kelly. AR 41752, 41749, White Decl. at ¶ 3. Mr. Finnegan first requested, and was granted, permission from his agency colleagues to provide the appraisal instructions to Plaintiffs. AR 41749. He then provided these instructions, as Defendant observes, to Mr. Kelly to be forwarded to Plaintiffs.

The instructions were provided to Plaintiffs under the representation that the agency would be using the instructions for its own appraisals. White Decl. at ¶ 3. Indeed, in an e-mail, Pete Lucero of the agency advises Mr. Finnegan that "it is wise to share the SOW with the concessionaires so that *they know exactly what the instructions are to the ASD* [(Appraisal Services Directorate)] contractor." AR 41749 (emphasis added). As noted, however, the agency did not use these instructions and, instead, conducted only a cost approach analysis of Plaintiffs' property. This failure to follow the appraisal instructions it provided to Plaintiffs underscores

---

permitted to proceed with a procurement that is based upon a flawed EIS and Record of Decision that realistically will be subject to an injunction and/or revision either by settlement or by judicial decree in another lawsuit. As an equitable matter, it makes little sense that the agency should be allowed to take permanent actions against the Plaintiffs while it has yet to complete its own obligations under NEPA.

that the appraisals were improperly performed. Because the appraisals are "super-critical" to the Prospectus and the procurement, the failure to perform them properly renders the Prospectus defective.

## IV. The Prospectus Is Illegal Because It Violates Plaintiffs' Contracts

The Prospectus requires removal of all property before the termination of two of plaintiffs' contracts (Markley Cove and Steele Park), even though those contracts expressly permit an additional 180 days beyond the termination of the contracts for property removal. AR 42642, 43018. The Prospectus, therefore, violates plaintiffs' contracts and, under established law, is illegal and enjoinable.

The Government acknowledges that, with respect to the Steele Park and Markley Cove contracts, there is no requirement to remove mobile homes until 180 days after the termination date of the contract. Def. Br. at 22. This interpretation is directly confirmed by the Bureau's own counsel, James Turner, who also observed that, given the extended deadlines for these two resorts, it would be unreasonable for the agency not to provide the same extended post-termination deadline for the other resorts as well. *See* AR 23006. Contrary to the plain language of the contracts, and its own counsel's advice, the Prospectus declares that a current concessionaire's failure to remove all mobile units on or before the contract termination date will result in non-consideration of its proposal for a new concession contract. Because this requirement violates the Markley Cove and Steele Park contracts, the Prospectus is defective and should be enjoined.[7]

---

[7] Defendant's attempt to characterize this as a contract matter that is not properly before this Court as a bid protest action is without merit. *See* Def. Br. at 35 (citing *Circle Line-Statue of Liberty Ferry, Inc. v. United States*, 76 Fed. Cl. 490 (2007)). The appraisals in this case are subject to clear statutory requirements and are, in the agency's own words, "super-critical" to many aspects of the bid evaluation process. As a result, the appraisals are a material requirement

With respect to the Rancho Monticello and Spanish Flat contracts, it is to be noted that agency counsel, Mr. Turner not only questioned the reasonableness of not affording the other concessionaires the same 180-day post-termination period to remove property enjoyed by Markley Cove and Steele Park, but also the legality of requiring concessionaires to remove their property before the termination of the contracts. Indeed, Mr. Turner specifically questioned agency personnel regarding the existence of any specific contractual provision that would require the concessionaires to remove their property prior to the termination of their contracts. AR 23008. Agency personnel stated that they were unaware of any such provision. AR 23009. Despite this lack of contractual authority, the Prospectus seeks to force Plaintiffs to remove their property well in advance of their contract termination dates.

Mr. Turner also questioned agency personnel regarding how they "determined that the concession agreements for … Rancho Monticello expires on 6/15/08 rather than 12/15/08; [and] the concession agreement for Spanish Flat expires on 7/13/08 rather than 1/13/09…." AR 23006. Indeed, Mr. Turner correctly identified that the Bureau has mistakenly shortened the contract termination dates for these two Plaintiffs by 6 months; thus, the latter dates he identifies for each Plaintiff are the proper termination dates. Mr. Turner's calculation of dates comports with P.L. 96-375's provision for two ten-year extensions; adding twenty years to the original termination dates for the Rancho Monticello and Spanish Flat contracts results in dates of December 15, 2008, and January 13, 2009, respectively.

---

for the procurement and are properly before the Court as part of a bid protest action. *See OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 115 (2005) (holding that a bid protest was a jurisdictionally appropriate means of addressing an agency's selection decisions "in cases where the terms of existing contracts are used to conduct a competition resulting in the elimination of competitors for the agency's requirements for the duration of the contracts in question"). *See also Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748, 751 (1999) (court considered pre-award protest action involving allegations that Forest Service acted in breach of contract).

The agency, however, added only 9 years and 6 months to the last extension for these two contracts. The reason for this is reflected in an agency e-mail, which reveals that the Bureau shortened the contract termination dates to assist with the transition for the new concession contractors. AR 41262. The agency was concerned that, if all of the contracts expired at the same time, the "soft landing" phase-in that the Bureau wished to have for the new contractors could not be achieved. *Id.* Hence, the agency staggered the contract termination dates by shortening the termination dates.[8]

In similar fashion, the agency currently is in breach of the arbitration clause contained in the Steele Park agreement. Indeed, despite a specific request from Steele Park to engage in arbitration proceedings regarding its concession property, the agency has refused to do so. Ex. C. This is a breach of the terms of this contract, which provide that either party may request an arbitration proceeding at any time. AR 43018. This breach is not simply a matter of contract, but has substantial impact upon the procurement. Until the arbitration proceedings are completed for the Steele Park resort, and a "fair value" for the assets established, the Lake Berryessa procurement, which seeks bidders for all of the resorts, cannot be completed.

[8] It should also be noted that the original Spanish Flat Resort and Rancho Monticello Resort concession agreements have the following clause: "In the event of the termination of the Management Agreement between the United States and the County, the United States shall be deemed to stand in the stead of the County as grantor for the remainder of the term of this agreement: Provided, however, in the event of such termination, the United States, at any time within ninety (90) days thereafter, may terminate this agreement by giving to the Concessioner thirty (30) days written notice thereof and in such event the Concessioner shall have the privilege of selling or removing, *for a period of ninety (90) days after termination of this agreement*, or such longer period as may be determined by the Bureau of Reclamation to be reasonable, improvements which have been constructed on the premises at the sole cost or expense of the Concessioner; otherwise, after the expiration of such period of time, the title to such improvements shall vest in the United States." AR 42978, 42989. This clause also indicates that the agency has no right to force Plaintiffs to remove concession property before the termination of their agreements.

**V. The Prospectus Improperly Prejudices Plaintiffs By Awarding Large Corporations, Such As Forever Resorts, An Unwarranted 27-Point Advantage**

For some time, Reclamation personnel have been concerned about the additional 27-point bonus. *See* AR 41252. Defendant's reason for providing additional points was to "reward" a multiple-resort offeror for "the greater initial investment risk and more complex management burden" that came with a multiple-resort bid. Prospectus at 5-47, AR 1366. Stated simply, then, the Bureau's 27-point bonus is designed to reward a bid with greater risk and complexity, and to penalize a bid with lower risk and more efficiency. The lack of common sense in this rationale is reflected in an agency e-mail, where it is observed that the 27-point bonus provision could result in a situation where a highly qualified proposal submitted for a single resort will lose to a minimally satisfactory offer for the same resort if it is accompanied by offers for other resorts. AR 41258; *see also* 41252. There is simply no principled way to justify such a counterintuitive result.

Reclamation employees have been concerned about the appearance of impropriety that has surrounded their contacts with Forever Resorts prior to the issuance of the Prospectus. *See* AR 41413. There is little doubt that Forever Resorts has received preferential treatment from the Bureau at Lake Berryessa. For example, the company was quickly awarded the Pleasure Cove contract after the previous concessionaire was terminated, and continues to operate the resort under an interim contract that expires in December of this year. This award was for a 30-month period, and did not conform with the Bureau's policy for such contracts. *Id.* In fact, a concern of the Bureau in considering whether to allow extensions to the Prospectus deadline was the effect that it would have upon Forever Resorts. *Id.* Agency e-mails further reflect the agency's willingness to accommodate Forever Resorts, particularly the inquiries of its representative, Terry Sides, in the time leading up to issuance of the Prospectus. *See* AR 41416; 41423; 41453.

## VI. The Elements For An Injunction Lie Decisively In Plaintiffs' Favor

Plaintiffs filed their protest as soon as was possible under the circumstances created by the agency. The Prospectus was filed by the Agency on June 7, 2007; after providing the agency with its required "notice" in mid-July, Plaintiffs provided the Government with notice of their protest on August 20, 2007. Contrary to the Government's argument, there is no adverse inference to be drawn from this timetable.

Defendant has utterly failed to demonstrate any harm to its interests, while the complete loss of Plaintiffs' millions of dollars invested over decades is a patently extraordinary hardship. In this respect, it should be remembered that the only reason the lake is accessible for any public use is because of the millions of dollars Plaintiffs have invested in roads, parking lots, and other land improvements. Given the steep hillsides that surround the lake, few if any recreational activities could be conducted in the absence of Plaintiffs' improvements to the land. If the absence of injunctive relief, Defendant stands to obtain the benefit of these multi-million dollar improvements without paying Plaintiffs any compensation.

Defendant's "irreparable harm" and "public interest" arguments in no way overcome the fact that the agency has waited fifty years to initiate this procurement, and that it has offered to share some or all of its franchise fees with new concessionaires to assist them in purchasing the improvements of the current concessionaires and in removing the improvements and personal property of the tenants. Prospectus at 3-9, AR 1285. As for the "general disruption" that the Government speculates will occur at the lake in the absence of Plaintiffs' management, the solution is obvious – maintain the status quo by allowing Plaintiffs to continue to operate the resorts until the Prospectus is corrected and a proper procurement is conducted. Regarding the "potential harm" the Government believes that a delay may cause other bidders if an injunction

is awarded, the Government apparently forgets that many of those same bidders requested a lengthy postponement of the original submission deadline. *See* AR 41418, 41420, 41422.

The Government's request for a bond rests solely upon its bald assertion that it will "incur damages" if the procurement is wrongfully enjoined. Of course, the Government does not provide any specifics regarding its claims of damages. This is unsurprising given that Defendant has promised new concessionaires that it will share some or all of its future franchise fees to assist them in succeeding at the lake. Simply stated, Defendant will suffer no damages if it is required to correct the numerous defects in its Prospectus and conduct a proper procurement.

## CONCLUSION

For all of the foregoing reasons, this Court should enjoin Reclamation from proceeding with the Prospectus for the Lake Berryessa concessions until the deficiencies identified in this lawsuit are corrected.

Respectfully submitted,

/s/Gregory T. Jaeger
Gregory T. Jaeger
MARZULLA LAW
1350 Connecticut Ave, NW, Suite 410
Washington, D.C. 20036
Telephone: (202) 822-6760
Facsimile: (202) 822-6774

Dated: October 9, 2007

Attorney for Plaintiffs