# Exhibit D

## Excerpts from Administrative Record

services. A similar action could release a concession contractor from having to provide a service that both parties agree is no longer necessary.

21. Any successful offeror is not required to retain the existing names for concession areas at Lake Berryessa. As a part of the proposal offeror(s) may suggest the business name they intend to use but it is not required and can wait until final discussions in advance of finalizing the eventual contract(s). Reclamation must approve the eventual names even if the successful offeror(s) intends to retain the existing name. For the sake of clarity in this proposal, when referring to specific operations, all offerors should use the present names.

22. If an existing concessionaire at Lake Berryessa is selected as the winning offeror on any or all of the seven concession locations identified in this prospectus they must comply with any and all applicable requirements of their current contract, the ROD and the stipulations set forth in this prospectus (in regard to existing concessionaires) in advance of any final authorization to proceed and in advance of execution of any future contract. Two specific examples of requirements that must be met in advance of being authorized to operate under a new concession contract or before execution of a new contract at Lake Berryessa for existing concessionaires are:

    a. The existing concession contractors at Lake Berryessa are responsible for ensuring that permittees remove all personal property from the concession area by the termination date of their respective concession contracts including trailers, mobile homes, and appurtenant structures such as decks, stairs and storage sheds. In the event of default, or should permittees abandon any trailers or personal property, Reclamation will take appropriate corrective measures. It is possible that an existing concessionaire could be selected as a winning offeror many months in advance of the date of expiration of their current contract and the date for execution of a new contract but any applicable requirements, as mentioned here or elsewhere in this prospectus, will still impact their eventual ability to continue as a concessionaire into a new contract term. (See Section 1.B. of PART 6 [Draft Contract] for additional information on the matter of abandoned or otherwise un-removed permittee trailers.)

    b. An existing concessionaire, even if they are judged to have the best proposal submitted for any of the seven concession opportunities in this prospectus, will not be selected or authorized a new contract under this prospectus if they have any remaining or unpaid financial obligations to Reclamation as a result of their current concession operations. Such financial obligations would include any unpaid franchise fees or other fees or financial obligations stipulated in their current contract or as a result of written agreements established during the term of the current contract.

    Failure by an existing concessionaire to meet these and/or other identified requirements of the current concession contracts will result in non-consideration or in the cancellation by Reclamation of their selection as a future concessionaire and the selection of another bidder or re-issuance of another prospectus. Similar failures by any bidder in regard to any past or present concession contracts with Reclamation or other Federal agencies could result in similar disqualifications for consideration.

23. Reclamation will work concurrently with new contractors during negotiations to address any conditions that may delay implementation of selected proposals (e.g. abandoned property).



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

## K. Special Instructions and Discussion for: (1) Offerors Submitting Individual Proposals for More Than a Single Concession Opportunity or (2) Offerors Submitting a Combined Proposal for More Than a Single Concession Opportunity

As identified in the introduction to this Prospectus and in other applicable sections, this is a unique concession Prospectus opportunity. This Prospectus covers the new opportunities for seven individual concession contracts. The existing seven concession contracts all expire within the time period December 1, 2007, through May 26, 2009.

There are two approaches besides the standard approach (one single proposal for one location) that an offeror might select in submitting a proposal or proposals. An individual offeror may appropriately decide to participate in one or the other or a combination of both. The two additional approaches are:

1. Proposal on More Than One Single Concession Opportunity – This option is basically the same as a traditional package for a concession opportunity with the exception that an offeror may decide to submit multiple individual proposals for two or more concession locations. For example, an offeror could submit one proposal for Pleasure Cove, a second separate proposal for Putah Creek, and a third for Rancho Monticello. A offeror could submit up to seven separate proposals and could be selected as the successful offeror on one or any combination (including all seven) of the proposals submitted depending upon the strength of their individual packages in competition with other offerors.

   In this scenario, multiple proposals from a single offeror would be evaluated as separate individual proposals during the proposal evaluation process. If a particular offeror is selected as the successful offeror on more than one concession opportunity, Reclamation will combine those two or more operations into a single concession contract. If this situation occurs, all offerors should understand that certain negotiations will occur to rectify any changes necessary from the individual proposals to satisfactorily combine the operations into a single contract. Under no situation will Reclamation authorize multiple concession contracts with the same operator but will combine them into a single contract that covers two or more locations.

   To the extent possible in finalizing a combined contract, Reclamation and the successful concession contractor will address issues such as length of term, franchise fees, scheduling for capital improvement, maintenance and operating plans, etc. in a manner that considers the submitted individual proposals; however Reclamation's decision is pre-eminent in areas of disagreement, and the concession contractor, if dissatisfied, may decide to withdraw one or more of their successful proposals and just settle on a more limited opportunity.

2. Single 'Combined Proposal' that Includes Two or More Locations – This type of proposal would combine from two to seven of the existing operations as a single offer. In this approach, the offeror would be indicating a preference to operate multiple locations (two to seven) in a combined proposal. Such an approach may be preferable to some offerors because of the flexibility and revenue opportunities in operating multiple locations. There would also be an associated level of increased financial risk and management complexity in operating multiple locations. This approach also enhances the ability of an offeror to effectively address integration of commercial public services at Lake Berryessa (See Sec. B.2.d of PART 5 of this Prospectus and Sec. III.1.a of the ROD *[at Lake Berryessa Prospectus website]* for important information on the integration of services).



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

An example of a combined proposal would be one that includes Putah Creek, Rancho Monticello, Lake Berryessa Marina, and Spanish Flat (or any other mixture that may include up to all seven) where the offeror has indicated a desire to operate multiple locations in a single coordinated operation.

As described in PART 5 of this prospectus, the proposal evaluation process will score combined proposals in a manner that enables a comparison between a specific location i.e., Spanish Flat from the combined approach to any other offeror submitting a proposal for Spanish Flat whether combined or individual.

> *For Example: If 'Offeror A' submitted a combined proposal for Spanish Flat, Pleasure Cove and Markley Cove their submission for the Spanish Flat portion of their proposal would be evaluated against all other offerors submitting either individual or combined proposals that include Spanish Flat. Therefore, if 'Offeror B' has submitted a proposal that is only for Spanish Flat and 'Offeror C' a proposal for Spanish Flat and Putah Creek, Reclamation will look at each of their particular proposals as it applies to Spanish Flat to draw a conclusion regarding the differences and similarities as it pertains to just Spanish Flat. However, Reclamation will consider how multiple location bidders have addressed the overall level of facilities and services to assure that they are not penalized for not having a specific type of operation, i.e. an RV Park at a particular location if they have adequately covered that need elsewhere. (See more detailed descriptions of these factors in Criterion B2 (d) of PART 5 of this prospectus)*

The same review/evaluation process will occur for each of the seven concession areas as Reclamation makes determinations on which offeror(s) submit the best proposal for individual locations and/or combined operations.

Because of the operational and managerial flexibilities inherent in a combined proposal, Reclamation will consider the overall combined impacts and provision of services in a combined proposal when comparing it to other (individual or combined) proposals for the same locations.

> *For Example: Assume that an individual Offeror 'A' proposes for Spanish Flat, a well designed 50 site RV Park, a marina similar in size and function as currently exists, 25 short term cabins, 12 long term occupancy cabins, and a combined food & beverage and retail facility that fits satisfactorily with Reclamation's general desires for that area. While at the same time Offeror 'B' submits a combined proposal including Spanish Flat and several other locations that does not include RV sites at Spanish Flat but focuses instead on development of a similar Marina, 55 short term cabins, small full service cafe and a retail facility. They do not include an RV Park at Spanish Flat but do a very good job of adequately including RV Park components at other locations in their combined proposal. In this scenario it might seem that Offeror 'A' would score higher because of their address of an RV Park that Reclamation perceived as a positive addition at Spanish Flat, while Offeror 'B' did not. However, because Offeror 'B' had effectively addressed the overall need at other locations, Reclamation may determine that the 'A' proposal, while good, is not necessarily superior for the Spanish Flat location.*

If Reclamation believes that a combined proposal on multiple locations is very good and in an overall manner more effectively addresses the integration of services and facilities resulting in a



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

potentially better business mix and coordination of lakewide public services, they may select that offeror as an apparent successful proposal. Any selections as a new concession contractor whether from a multiple or individual proposal is conditional on final negotiations between Reclamation and the offeror(s) as earlier outlined in the 'Introduction to the Prospectus'. Because of the significant level of flexibility for offerors in this prospectus and the wide range of likely proposed business components Reclamation reserves the right to adjust proposals in the final negotiations to eliminate certain components that may not be seen as necessary or appropriate or to add components believed important by Reclamation. These final negotiations will be more in the manner of 'fine tuning' a submitted proposal. The final approved operation is still obviously very recognizable from an offerors' original proposal. If any conditional winning offeror does not feel they can agree to the 'fine tuning' proposed by Reclamation, and an impasse is reached, then Reclamation may select the next highest offeror or even re-advertise an individual location if it seems, in Reclamations judgment, that an effective proposal for any particular location does not exist.

Reclamation recognizes that an individual or company that submits a combined proposal covering multiple locations, as highlighted in the previous examples, may have structured the finances and proposed operational components of their overall proposal in such a manner that any deletion of a particular location from their overall combination might result in their non-interest or unwillingness to consider something less. However, Reclamation may determine that a combined proposal for multiple properties may be very good except for the submission on one or two of the locations OR that another offeror has such a superior proposal for a particular location that the subjects combined proposal does not compensate for the other offerors proposal in that one location. In that case, Reclamation may inform an offeror that has submitted a combined proposal on, for example, five locations, that they have been selected as a winning offeror on four of those locations and that a final contract for those four will be negotiated. The offeror that presented the package for 5 properties in this example could decide they are not interested in accepting a lesser package than their proposal in which case Reclamation would go to the next highest offeror(s) for the remaining four locations. However if the subject combined offeror did agree to accept the conditional package that included four locations instead of the five they proposed, then Reclamation would negotiate final contract terms and conditions (contract length, franchise fees if any, final level of investment and construction schedule, any necessary adjustments to proposed services and facilities necessary, etc.) to appropriately cover an operation of 4 locations in a new contract.

These are complicated options that all offerors should be prepared to discuss during the previously identified meetings with Reclamation to eliminate any confusion or concerns.

In recognition of preferences outlined during the EIS and Concession Planning process and the associated added risk and investment requirements those offerors who determine to submit either individual or combined proposals for more than a single location may receive additional points during the evaluation process. Please review Criterion B.2.(g) in PART 5 of this Prospectus for a complete detailed explanation of this potential scoring addition.

## L. Instructions and Discussion Regarding Public Law 96-375 and Compensation to Outgoing Concessionaires by New Concessionaires for Existing Facilities to be Retained for Future Use During a New Contract(s)

This section applies in slightly differing manners among existing concession contractors that compete for



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

and are selected as the winning offeror at the location currently under their concession contract and offerors not currently the concession contractor of record for any specific Lake Berryessa location. Returning concession contractors would become a new concession contractor under a new contract, if they are selected as a successful offeror. There will be no need for them to consider the issue of compensation to an outgoing concession contractor on assets they already own. All offerors, including the existing concession contractors, must make specific determinations in their proposal as to the facilities they wish to retain and those not desired for further use. Each offeror must identify every permanent facility (except personal property) whether standing structures, infrastructure or floating assets that they propose to retain and omit at each location. A statement as simple as, "We do not intend to utilize any of the existing facilities with the exception of the current launch ramp and the restaurant" is acceptable as it notes that all other existing facilities are not intended to remain. Conversely a statement indicating that everything will be retained except the campground restrooms and the sewage treatment facilities provides adequate information. If there is ANY confusion in submitted proposals, Reclamation will ask for clarification in advance of any final negotiations with any winning offeror. As identified in this section, Reclamation retains the right to make all final determinations as to facilities, infrastructure, assets, etc. to be retained or removed as a part of the final negotiation process with any winning offeror.

Section 5b of Public Law 96-375 is shown below in its entirety:

> *(b) Notwithstanding any other laws to the contrary, all permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That at the option of The Secretary of the Interior, the United States may require that the permanent facilities mentioned herein* ***not be removed*** *from the concession areas, and instead, pay fair value for the permanent facilities or, if a new concessionaire assumes operation of the concession, require that new concessionaire to pay fair value for the permanent facilities to the existing concessionaire.(Emphasis added)*

This section of Public Law 96-375 authorizes Reclamation to specify the specific concession contractor owned facilities that are to remain *(not be removed)* for continued use into the next contract term. Concession contractors are to be compensated at fair value which is the same as Fair Market Value (FMV) by Reclamation or a new concession contractor for those identified remaining facilities but there is no right for compensation to the outgoing concession contractor for those facilities that were not designated or specified to remain. The appraisal can be reviewed in PART 7.10 of this Prospectus.

Reclamation considered, at the time the ROD was published, identifying facilities required to ***'not be removed'*** and the reciprocal of that list, those facilities not permitted to remain and therefore not qualifying as compensable; however, it was decided that since this Prospectus is presenting the business model options in a flexible manner and asking offerors to identify the specifics of how they would operate in the various locations (within the parameters provided by the FEIS, ROD, and this Prospectus) that the offerors would be directed by this Prospectus to identify the existing facilities they wish to utilize and therefore purchase at FMV for the next contract term.

This approach also responds to a concern voiced by the existing concession contractors in relation to Reclamation identifying the facilities 'to remain' and 'those to leave'. Existing concession contractors indicated during the public comment process and other meetings with Reclamation, that in relation to their existing property and the enforcement of PL 96-375, they would prefer to let the market decide what facilities should remain. Reclamation is not willing to abrogate the responsibility and legal right under Public Law 96-375 to identify facilities to remain. However, Reclamation believes that by permitting the offerors to this Prospectus to identify the facilities they would retain and use based upon their individual



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Criterion B4 (e) Successful Multiple Proposals (0 to 27 Value Pts.)**

Throughout the EIS and Planning process for the upcoming next contract term Reclamation has been clear and consistent in the stated preference to have fewer than the current number of seven concession contractors. This preference is based upon the following assumptions:

1. The business opportunity is more robust and healthier if a concession contractor(s) is operating multiple locations. Overhead is reduced and several business efficiencies are introduced that result in a better profit potential for an operator. Any improvement to a concession contractors profit potential also reduces the need to propose an 'Annual Occupancy' program as outlined in the ROD and in Criterion B.2.(d) preceding. Reclamation's contracted Economic Feasibility Analysis indicated that financial success was questionable with multiple concessionaires operating independent businesses at Lake Berryessa and that the best opportunity existed with a single concessionaire and the associated business efficiencies. Reclamation continues to have concerns with the opportunity for multiple operators to be financially successful and this Criterion and the additional points for multiple proposals is appropriate to address that concern.

2. The ability for an offeror to respond positively to the ROD's preference for an integrated business approach (also outlined in Criterion B.2 [d] preceding) is enhanced by an offeror who also submits additional individual or combined proposals. An offeror competing for only a single location has limited opportunity to address or impact the overall mix of concession services and facilities at Lake Berryessa through this prospectus.

3. The potential for an offeror to phase in various construction program components in a multi-location coordinated approach that impacts public use in a more subtle manner is enhanced by an operator that is administering more than one location. Reclamation's contracted Economic Feasibility Analysis indicated that phasing in development would be important in helping to assure financial viability.

Any offeror that submits a combined or multiple individual proposals versus offerors that submit one single proposal are also taking on a greater initial investment risk and more complex management burden. The more locations an individual or company competes for, the greater the risk and complexity i.e. a company competing for 5 locations is potentially assuming a somewhat greater burden than a company competing for 3 locations.

Therefore in recognition of the preceding 3 positive factor concerns for submitting proposals on and potentially operating multiple locations, and in recognition of the increased financial requirements and management challenges, Reclamation will provide added 'Value Points' to bona fide proposals that include multiple locations. These added 'Value Points' are on an escalating basis as outlined in the following 'Scoring Options' examples. A bona fide proposal will be one that is judged by Reclamation, during the evaluation process, to be a proposal that is economically feasible and is otherwise judged responsive and in compliance with all of the requirements outlined in Part A and Part B of this section (PART 5) of the Prospectus.

<u>Scoring Options for Offerors Competing for Multiple Locations</u>
Competing for 1 Location = 0 Pts
Competing for 2 Locations = 2 Pts.
Competing for 3 Locations = 5 Pts.
Competing for 4 Locations = 9 Pts.
Competing for 5 Locations = 14 Pts.
Competing for 6 Locations = 20 Pts.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

September 19, 2006

To: Lake Berryessa Recreation Manager Pete Lucero

From: Assistant Regional Solicitor Jim Turner

Subject: Contractor Closeout Responsibilities at Lake Berryessa

In your September 14 memorandum to me on this subject, you asked if I have ever formally opined to Reclamation on this subject. The answer is no.

You then asked me to confirm your determination that Reclamation is not required by any of the 6 existing concession agreements, other than the agreement for Pleasure Cove Resort, to allow the concessioner any time beyond the expiration date of the concession agreement in which to remove their property from the concession area.. Hence, Reclamation is not required to afford them that opportunity. I agree with that determination as it relates to the concession agreements for Putah Creek Resort, Rancho Monticello Resort, Spanish Flat Resort and Berryessa Marina Resort but not with respect to the concession agreements for Markley Cove Resort and Steele Park Resort. Article B.1.c. (page 13) of the concession agreement for Markley Cove Resort and Article B.1. (page 10) of the concession agreement for Steele Park Resort both provide that the concessioner's property will not be deemed abandoned unless it is not removed within 180 days after the expiration date of the respective concession agreement. In light of the fact that Reclamation afforded those 2 concessioners the opportunity to remove their property after the expiration of their concession agreement, I question the reasonableness of Reclamation deciding not to afford the other 4 concessioners the same opportunity.

Let me know what you think.

Jim Turner

ps At some time in the near future, I'd like you to explain to me how you (or Cleve) determined that the concession agreement for Putah Creek Resort expires on 8/13/08, rather than 2/13/09; the concession agreement for Rancho Monticello Resort expires on 6/15/08 rather than 12/15/08; the concession agreement for Spanish Flat Resort expires on 7/13/08, rather thn 1/13/09; and the concession agreement for Berryessa Marina Resort expires on 8/13/08, rather than 3/10/09.

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

0
0
0
1
6
5
9
8

10/05/2006 08:57 FAX 002/002

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Pacific Southwest Region
2800 Cottage Way
Room E-1712
Sacramento, California 95825-1890

IN REPLY REFER TO:

October 5, 2006

To: Pedro Lucero, Lake Berryessa Recreation Manager, CCAO-420

From: Assistant Regional Solicitor Jim Turner, MP-1150

Subject: Concessioners' Respective Responsibilities for Removal of Trailers from Resorts

In your October 2, 2009 memorandum to me on this subject, you asked for my opinion regarding whether each of the existing concessioners is or is not currently required to arrange to have all of the trailers and related personal property that are located in their respective resorts removed by no later than the date on which the their respective concession agreements expire. You also asked me to comment on a draft letter you prepared to advise each of the existing concessioners that they are required so requirwed,..

To provide you with the opinion and the comments you requested, I'd like to know if you are aware of any provision(s) in any of the existing concession agreements and/or in any of the existing Lake Berryessa Operational Policies that expressly state that the concessioner is to have all the trailers and related personal property removed from the resort by the date on which the concession agreement expires. In the draft letter attached to your October 2 memorandum, you state that section E of Operational Policy # 14 is such a provision. But, I can't find any statement in section E of Operational policy # 14, in any other section of Operational Policy # 14 or in any of the other Operational Policies that says that all the trailers and related personal property in each resort should be or must be removed by no later than the date on which the respective concession agreements expire.

Let me know if you have any questions

Jim Turner

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

October 6, 2006

To: Jim Turner

From: Pete Lucero

Subject: Further Clarification

Jim,

This is in response to your request for more information on your memo dated October 5, 2006.

You asked:

"I'd like to know if you are aware of any provision(s) in any of the existing concession agreements and/or in any of the existing Lake Berryessa Operational Policies that expressly state that the concessionaire is to have all the trailers and related personal property removed from the resort by the date on which the concession agreement expires."

No, I am not aware of any contract or OP that expressly states the above. However, my reference to OP-14 related to the following:

As the end of the current contracts draw near, existing permittees must be notified by the concession contractor that a "change in land use" will occur. According to Lake Berryessa Operational Policy 14 (OP-14), there are specific conditions that can prompt a Termination of Tenancy for permittees. One of those conditions is a Change in Land Use.

**"E. TERMINATION OF TENANCY**

**1. Authorized reasons for termination.**

(g) Change of use of the resort or any portion thereof, provided:

(1) After a change of land use for the resort has been approved by the administering agency, the concessionaire shall give the permittees one year's written notice of termination of permit. The concessionaire in the notice shall disclose and describe in detail the nature of the land use change;"

The ROD clearly states that "All privately owned long-term trailers, mobile homes and associated personal property…will be permanently removed…" This action is considered a change in land use and requires notification of the tenants by the concession contractors pursuant to OP-14.

*Excerpted from the ROD, Page 5*

**"3. <u>Concession Operations</u>**

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

b. **Operations.** All privately owned long-term trailers, mobile homes, and associated personal property currently located within the concession areas will be permanently removed from Federal property at Lake Berryessa, and short-term use opportunities will be increased and improved."

At a meeting held on August 7th at Lake Berryessa with some of the concession contractors, I mentioned that a one-year notification was required pursuant to OP-14, and to have all trailers removed by the end of the current contracts. The contractor's vehemently disagreed stating primarily that the trailers were to remain as a revenue source for the new contractor. Additionally, I informed them that only the current contractors have a contractual relationship with the permittees, that neither Reclamation nor the new contractor does, or would have one according to the ROD, as no privately owned property is permitted on the federal land in the new contracts.

On September 25, you provided a response to a specific question I raised as it related to the concessions. Your response was clear as it related to 4 of the seven contracts that Reclamation is not required to allow the existing contractor any time beyond the expiration date of their contract to remove their property from the concession area that is NOT going into the new contract. You also clarified that 2 contracts allow that the concession contractor has 180 days after end of their contract to remove their property before it would be considered abandoned. Essentially giving an additional 6 months to Steele Park and Markley Cove to remove property NOT going into the new contracts.

My specific question is whether or not the contractors are responsible to have the concession areas cleared of their customers (permittees) personal property by the end of the contract when the concessionaire no longer has the right to have agreements with anyone on the federal estate. Should not the concessionaire be required to have all of their customers remove their property while they still have a relationship with them?

?rotected Material To Be Disclosed
)nly In Accordance With U.S.
:ourt Of Federal Claims Protective Order

*of time on but I might do a little explanation that discusses personal property in general.*

- Approved Rates
  *I think for this section it might be good to include all or part of the Comparability Study or the link to it on the LB site. We could get away with just providing the existing rates but it might be instructional for them to see the process. Think about it.*

- Existing Concession Facility Appraisal
  *Whatever we end up with here should be provided as this is going to be a SUPER CRITICAL part of the whole process in re: to economic feasibility, 'the let the market decide the value' issue, and the eventual level of new development for LB. I also think Reclamation needs to consider taking some type of a position here by perhaps indicating that we recognize the limited useful life of many facilities and ant to give no illusions to new bidders or existing concessionaires on the apparent needs. We may even want to mention Kleinfelder and how to review it on the web? Again this will be tied to several other issues already identified here.*

- Other Useful Data
  *There may be some other information that we believe would be helpful that we come up with to add on here. Think about it.*

Pete – I think this gives a fairly good breakdown of some of the efforts necessary in completing the Prospectus so that it is in compliance with Policy and D&S and even more important provides a satisfactory basis for bidders to recognize all the requirements of putting together a bid and then the eventual demands on operating as a concessionaire. In many ways this is even more important for the existing concessionaires to realize that legally and practically their relationship will have to change if they have any chance of making a responsive bid because they will have to agree to do things that have often been anathema or repugnant to them.

Bruce

SPECIAL NOTE – It is apparent from the above descriptions of these sections of the Prospectus that there will be some significant completion efforts needed once final long-term concessionaires are selected. We never discussed this and I had not really thought about it from a work effort stand point but it might be worth the consideration of adding if you wish for finalizing the eventual contract(s) and exhibits?



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Bruce Wadlington <brucewadlington@yahoo.com>
**To:** Cathi Bailey <CBAILEY@mp.usbr.gov>
**Date:** 9/28/2006 11:35:27 AM
**Subject:** Re: Fwd: Re: Mitigation FAQ

Well I am sure that Pete is also getting some mixed messages as some of these things are discussed. However, you were correct that these types of things need to be addressed in the Prospectus however, at this time I do not have enough infor. to properly go forward but I have lots of other things that can be done. Probably a good series of discussions on all this in our next meeting.

Bruce

Cathi Bailey <CBAILEY@mp.usbr.gov> wrote:
Hi Bruce,

Sorry I missed your calls yesterday. I was out of the office on sick leave. I appreciate the info you provided. I feel like I'm getting mixed messages and only partial messages from Pete. I guess I'll shut-up and wait for the whole package to review.

Thanks.

Cathi

>>> Bruce Wadlington
09/27 8:07 AM >>>
Cathi ... I guess I have the benefit of having seen all of the messages back and forth before getting to this. My own thought is that the Prospectus/New Contract(s) can go anyone of several directions depending upon what Reclamation wants.

1. The outgoing concessionaires are responsible for everything in regard to clean up and if they don't do it then they will be billed for it by Reclamation after Reclamation does it (trying to get blood out of a turnip comes to mind)

2. The new concessionaires are responsible for all clean up and return to a usable 'natural' condition. This would have to be anticipated and put in the prospectus so the bidders could figure it into their financail situation as you mention in your note. This would also negatively impact their ability to do great things and likely even keep some companies from bidding.

3. Reclamation could just plan on doing whatever they can coerce the outgoing folks to do (which probably is not much). In this way the new folks would not have to spend their funds on projects of no benefit to them and that limits their financial effectiveness.

There are probably other mixtures of how to do this among the 3 parties (BOR, New, & Old Concess.). I of course do not like the options that put a significant burden on the New Concess because of its impact on their abilities to do wonderful things. Especially if they are also going to have to spend big bucks on infrastructure.

I believe it is appropriate for the new guys to have to get appropriate Enviro Clearances done at their expense when they take on



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

projects needing any level of compliance.

Finally we (Me in writing the Prospectus and REclamation through enforcement) need to have wording that creates an obligation on current concessionaires to do exactly what we want in regard to clean up and mitigation if any of them are selected as new concessionaires. If they dont start right out getting it done then Reclamation needs to be able to immediately find them in default and go to someone new.

The same factors apply in regard to your question in regard to new not buying anything from old and then having it left behind. I think it would be inappropriate and difficult to manuever because we will obviously go into the prospectus with the intent of having current concessionaires be responsible and will not know their level of failure until after we make a selection so it would be after the fact. I think Reclamation needs to make plans for the demolition if the outgoing folks skip town.

Lots of unknowns.

Bruce

Cathi Bailey wrote:
Bruce,

I don't see this requirement in the draft prospectus. How will the new contractor(s) know they need to plan for (and propose in their bid package) removal and clean-up of things like retaining walls? This type
of clean-up/rehab will probably require 404 permits, NEPA, etc. so it won't be cheap and easy. Is this just a "given?" I wouldn't think so since it impacts the financial capability and viability.

Also, what about the scenario that the winning bidder doesn't purchase anything from existing concessionaire and the existing concessionaire walks away and leaves it all. Is the new concessionaire required to remove and clean it all up?

Cathi

Cathi Bailey, Outdoor Recreation Planner
USBR Mid-Pacific Region
Division of Resources Management
2800 Cottage Way
Sacramento, CA 95825
Ph: (916) 978-5558 Fx: (916) 978-5290
Email: cbailey@mp.usbr.gov
Date: Mon, 25 Sep 2006 12:46:41 -0700
From: "Pedro "Pete" Lucero"

To: "Vernon Lovejoy" ,
"Cathi Bailey" ,
"Michael Petrinovich" ,
"Peggi Brooks"
,
"Janet Rogers"



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

CC: "Julie Carpenter" ,
"Karen Wagner" ,
"Lynne Matthias" ,
"Patricia Blackwell"

Subject: Re: Mitigation FAQ

Vernon, Regarding below...

A problem we have with removal of pads, retaining walls, and other supporting devices such as footings for decks and trailers is that we do NOT want the owner to remove these items because of the potential for ground disturbance, broken utility lines, the need for Storm Water Pollution Prevention Plans, permits associated with demo activities etc. Most retaining walls need to remain until a development plan outlines construction activities, then the walls will be removed appropriately by the new contractor, assuring proper drainage and soil stabilization. That is why we used the less direct term "Possibly", these removals will be site specific, ensuring that the removals can be safely done. This is a direct result of our experience at Pleasure Cove where retaining wall and concrete removal would have had a negative impact.

Regarding the rip rap, again the soil stability is an issue, as well as water quality, we may need geo assistance to assure a safe and low impact removal plan.

Pete

>>> Vernon Lovejoy 09/19 7:53 AM >>>
Question 12.
I think the answer to removing the pad should be answered in the affirmative. The trailer owner should remove the pad too.
Other questions not listed but maybe you have an answer I don't know.
In many of the concessions (I refuse to call them resorts) there has been a lot of rip-rap place along the shore some of which is a real eye sore. Who is going to remove that?

Would is going to remove the steps, walkways, and other access stuff built from the shore down to the lake?

Who is going to remove retaining walls?



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Bruce Wadlington <brucewadlington@yahoo.com>
**To:** Pedro Pete Lucero <PLUCERO@mp.usbr.gov>
**Date:** 12/12/2006 5:04:09 AM
**Subject:** Re: NAPA

Pete ... the only thing I would add is the same note I sent you on the message to Rob re: eventual excess $$.

Bruce

Pedro Pete Lucero <PLUCERO@mp.usbr.gov> wrote:
The meeting on Thursday went very well. Attending - Janet Rogers, Bruce Wadlington, Rob Martin, Napa County Counsel; John Woodbury, Napa County Parks and Rec; Patrick Lowe, Napa County Chief of Planning. All three signed non-disclosure agreements and agreed to get the signatures of those that they speak to on this subject. They agree that wide disclosure is NOT good, so their briefing to others is limited to 3 or 4 others, Diane Dillon; Nancy Watt, Napa County CEO; and Hillary Gitelman, Director of Planning. If they feel they need to discuss with others, they will advise me first.

Napa County seems to be on board with our strategies. We limited the conversation on the prospectus to broad brush descriptions without the details. We spoke specifically about the Napa County Emergency Service Surcharge, Section 2.I of the draft concession contract. I think they were please with the concept which varied significantly from their draft proposal. The discussion settled around ensuring that the surcharge was not so onerous that it prevented us from getting quality proposals from all comers and would not discourage new development due to added expenses. I think they agreed in concept.

The county is now editing our paragraph with that in mind so that they have some input into the concept. We advised them that there was no guarantee that it would be approved once the prospectus was sent up for review and that Reclamation had the final say so on the content of the prospectus.

we also spoke about other issues, such as transportation, appraisals, proposed prospectus schedule etc.

Janet, Bruce, this was quick and dirty, if you have anything to add, please feel free.

Pete



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Pedro "Pete" Lucero
**To:** Bailey, Cathi; Lovejoy, Vernon; Petrinovich, Michael; Rogers, Janet; Wadlington, Bruce
**Date:** Tue, Feb 6, 2007 7:57 AM
**Subject:** IMPORTANT - Let's talk

Bruce, et al...

***Please see attached sample evaluation chart with the value points for each Criterion.***

Rick came over yesterday to talk about the prospectus and how best to brief on it. While most of the Prospectus is pretty self-explanatory.

1. We are still struggling with Part 5 - Principle Factor 2 B2(d) and B2(g) and how best to describe the nuance of evaluating a separate bid on one resort vs a combined bid that includes the same resort.
2. Additionally, we need to be able to say at what point does a proposal become "non-responsive".

**On item 2 above**, my thought is that if an offeror has a proposal that has zero points for any Criterion, then that bid would be un-responsive. However, that may be flawed thinking because we would not disqualify someone just because they had not received an Environmental Award in B1(c), yet had a superior proposal in all other areas.

How do we disqualify a proposal or rate one non-responsive? Would it be if they received zero points for an entire Principle Factor or certain critical Criteria?

**On item 1 above:**

We need to develop a very clear explanation on how we would evaluate a single offer for one resort vs a combined offer that includes the same resort. This will be our most difficult briefing bullet and Mike needs to understand it once we brief on the Prospectus up the line. I struggled yesterday with Rick on this even tho at our last meeting it seemed clear. My understanding of this is right on the edge of the limits of my pea brain and I can't seem to pull it in. I think the instructions to the eval team may be a good way to clear it up, perhaps even a mock evaluation showing three proposals. One for a single, and two with combination bids that include the single but with different resorts otherwise. i.e.:

Offer 1 - Spanish Flat
Offer 2 - Spanish Flat, Berryessa Marina, Pleasure Cove
Offer 3 - Spanish Flat, Putah Creek, Rancho Monticello, Marley Cove

For example, if Offer 2 has a superior Spanish proposal, over Offer 1 and Offer 3, how do we pull that out and award it? In contrast, if Offer 2 has a superior Berryessa Marina and Pleasure proposal, how do we award only those 2 and award Spanish to someone else?

Any help on clarifying this would be great. I am stumped...my problem is that I am putting together talking points and from that a Power Point on the Prospectus. While the rest of it is relatively less complex, this section and the subsequent B2(g) will be difficult.

Further, In B2(g) how do the "bonus" points work, for example in Offer 3 above if all are considered responsive, do we add 15 points to each resort proposal for a total of 60 additional points overall? Or do we add a total of 15 points overall because of four responsive proposals. In our conversations at last meeting I understood it to be the former. My question is...if we award 60 additional points does that number carry so much weight that it would disqualify a far superior proposal from an offeror that has an excellent proposal for two of the four resorts and only receives 5 points for each resort for a an overall bonus of 10 additional points.

I'm not sure how much sense that just made but I hope you are all with me.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

Bruce, I would like your assistance on preparing the talking points as a task in your contract...I hope Vernon can carry the nut until your contract is awarded.

Thanks to all for all of your help.

Pete



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Pedro "Pete" Lucero
**To:** Bailey, Cathi; Lovejoy, Vernon; Petrinovich, Michael; Rogers, Janet; Wadlington, Bruce
**Date:** Tue, Feb 6, 2007 10:55 AM
**Subject:** Re: IMPORTANT - Let's talk

Thanks Bruce, I have realized in forming talking points it becomes very apparent that the explanation of the evaluation is very muddy.

>>> Bruce Wadlington <brucewadlington@yahoo.com> 02/06 10:53 AM >>>
Conceptually I agree with Mikes points here. HOwever, we still need to figure out a smooth way to describe it. I thought this was kind of what we had indicated in our last write-up but it obviously is not getting through.

Bruce

Michael Petrinovich <MPETRINOVICH@mp.usbr.gov> wrote:
I'm off to another meeting but just a quick thought.

Just because a bid is rated superior does not mean we need to award the bid to that individual bidder if the genisis of the superior plan is contained in one or other proposals which are giving us more concession areas. Example, just because Markley bid is superion on an individual bid we could award this area to another bidder who agrees to plan facilities in all other areas as long as they provide the minimus acceptable for markley Cove.

So maby there is a minimum we should be looking for when evaluating multiple bidders and that minimum would trump an individuals superior bid.

So maby there are two catagories.

Multiple bids are evalusted first and if they met minimus specs at all areas they win.

If some areas are left out individual bidders would be considered for those areas. Then and only then would we consider individual bids. sort of like second tier bidders.

Just some fast thought as I'm off to the region to meet with Cathi. Maby my mind will clear after lunch and I'll have a rational thought or two.

Petro

>>> Pedro "Pete" Lucero 02/06 7:57 AM >>>
Bruce, et al...

Please see attached sample evaluation chart with the value points for each Criterion.

Rick came over yesterday to talk about the prospectus and how best to brief on it. While most of the Prospectus is pretty self-explanatory.

BOR-0138
41258

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Pedro "Pete" Lucero - Fwd: Re: Fw: Contract Extension**

**From:** Pedro "Pete" Lucero
**To:** Finnegan, Mike; Johnson, Richard
**Date:** 2/14/2007 8:27 AM
**Subject:** Fwd: Re: Fw: Contract Extension

very well...thanks!

>>> Mike Finnegan 02/14 8:25 AM >>>
Its been re-scheduled. I don't have a date or time yet. May be early March.

>>> Pedro "Pete" Lucero 02/14 7:58 AM >>>
excellent, Mike, may I call in to the 3pm meeting? pete

>>> Mike Finnegan 02/14 7:53 AM >>>
For your records.

>>> Richard Rizzi 02/14 7:43 AM >>>
Mike: We have reviewed what you provided, including your Field Solicitor's comments on the Kelley letter. We have a couple of opinions.

1. Request: Allow their appraiser to communicate with the DOI appraiser.

Opinion: We agree with your Solicitor's Office that this is something that is out of Reclamation's hands. Rather the DOI Appraisal Directorate has policies and procedures they must follow. But as Vern Lovejoy provided to me, in order for the government appraiser to complete their assigned task and arrive at an independent value of property they appraise, it is mandatory that they are free from any interference or input from outside sources. This is especially true if any party that might stand to "gain" something has influence or perceived influence on the appraisal process. If the concessionaire's appraiser(s) have input into the governments appraisal, it would likely compromise the established appraisal process and lead to the government appraisal being dismissed. This is one reason that the appraisal staff was consolidated within Interior.

Accordingly, it is likely the DOI appraiser's procedures and policies are pretty strict on this issue.

2. Request: Amend 4 contracts to provide for binding arbitration on the appraisal results.

Opnion: We could also not find any reference to binding arbitration in P.L. 96-375. While we do not have the proceedings from the committee and floor debates as this proposed legislation was working this way through Congress, I doubt Congress intended Reclamation to reopen contracts in place so that binding arbitration could be included as a new requirement. If they had, I am sure the concessionaires would have brought this to Reclamation's attention years ago.

I am sure that the concessionaires that do not have that provision will have other ways available to contest DOI's appraisal if they should choose to do so. We do not believe we are under any obligation to open those contracts to include that provision. However, as you have stated, section 2.A. of LND 04-01 provides the following: "A. Compliance. Existing concession contracts must be brought into compliance with the Concessions Management Policy and Directives and Standards at the first legal opportunity, for example, if the contract is amended." So, if they want to open it up, we will want to make changes too.

3. Request: Extend certain contract to expire in May 2009.

Opinion: We do not believe it is warranted to extend the 4 contacts. There is still time to get this all done in a



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

timely manner. More importantly, as Vern provided to me:

"a. The appraisal process does not have to be completed until the new prospectus for Lake Berryessa is finalized and ready to be sent to the public for bids.

b. Although this will have to be determined, there has been no time frame established that is critical for the prospectus to be issued and a new concessionaire to be in place since nothing can happen until the existing contracts expire.

c. The CCAO has already sent letters to all of the concessionaires informing them of actions they must take regarding the removal of private property and a reminder of impending contract expiration. This letter officially started the count down process to ending the current concession operations on time and in compliance with the P.L. 96-375. This letter notice was issued over a year in advance of contract expiration.

d. Since it will take concessionaires time to compete the removal of property we should not delay implementing the process for no other reason than to have all contracts expire at the same time. When the new contract(s) are awarded, it will require the next concessionaire(s) begin the process of redeveloping their assigned areas. It is imperative that the land be cleared of all property not required to be retained so that construction can commence without delay. Otherwise recreation facilities will be not be available to the public as soon as possible.

e. The two remaining areas in which the contracts expire in 2009 would logically be the last to be redeveloped. If all contracts expired at the same time, then there could a significant delay in providing new facilities and all concessions areas at Lake Berryessa could potentially be closed for a long period of time, instead of a somewhat phased approach. This delay would occur if all contracts expire at the same time as the construction process would be going on at all locations at the same time."

As was discussed during the meetings on Lake B., part of the "soft landing" was to phase in the change over a period of time. If all the contracts expire at the same time, this phase-in concept is gone.

I am leaving shortly for the airport. If you still are having the call this afternoon and would like me to sit in on it, give my number a call and leave a message (303-445-2900) with where to call and the time.

thanks, Richard

>>> Mike Finnegan 02/07/07 01:46PM >>>
Richard - reference our previous discussion, we are meeting with Kirk and John on Feb 14 to discuss options they may have in responding to Marc Kelley's letter. I told Kirk we would present your and Rosean's perspective at that time. Attached for your review and consideration is some preliminary stuff from our Solicitor on Kelley's request to extend contracts expiring in 2008 one additional year.

Talk to you soon

Mike





Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Questions & Answers from Lake Berryessa West Side Concession Areas Meeting and Tours**

**June 19-20, 2007**

General Questions:

Q: Will there be subsequent tours?
A: Not scheduled at this time, however, by calling the project manager, Pete Lucero, additional site visits may be arranged. There will also be a meeting on July 9 at 10:00 a.m. at Reclamation's Lake Berryessa headquarters as discussed in the Prospectus.

Q. Who can I contact to get additional information?
A. Questions may be emailed to the Project Manager Pete Lucero at plucero@mp.usbr.gov. Also, Offerors can check the Prospectus website at http://www.usbr.gov/mp/berryessa/prospectus.html for answers to questions already posed

Q: What should bidders do if more time is needed to complete proposal?
A: If Reclamation recognizes that a majority of Offerors are requiring additional time to complete their proposal package, Reclamation may consider an extension to the submission deadline.

Q: Who is obligated to remove facilities which are abandoned?
A: Existing concession contractors are responsible to remove facilities not continuing into new contracts and for assuring permittees remove their personal property prior to the end of the existing concession contract.

Q: Does trailer removal include slabs?
A: Each removal is evaluated independently. Typically, Reclamation will determine what is to be removed in each case. Environmental conditions may require that certain erosion prevention structures must remain.

Q: How has trailer transport down the highway been addressed?
A: Transport permits are required by Napa County and the State for transport of oversized loads on their respective roadways. Reclamation has required the existing concession contractors to develop a plan for trailer removal to assure all trailers are removed by the end of the contracts and to meet the transport requirements of the county and the State. Many of the existing trailers will not likely be safe to transport and may need to be disassembled on site. If that is the case no transport permit is required.

Q: What is the flexibility of the trailer removal phasing process?
A: All trailers must be removed from the federal land by the end of the existing



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

contacts. The existing contractors are responsible for assuring their customers comply with removal plans that assure all trailers are removed by expiration of contracts.

Q: If trailers aren't removed, who is responsible?
A: Any trailer left on the federal estate at the expiration of the existing contract will be considered to be in trespass and subject to appropriate legal action.

Q: What will happen between the end of one contract and beginning of another, assuming there is an award? Who will protect the facilities?
A: Reclamation intends to award new contracts in advance of expiration of the existing contracts for a seamless transition.

Q: What will happen to Capell Boat Launch and Oak Shores? Are they something a contractor can consider putting in for?
A: Refer to the Record of Decision, Part III.2.
http://www.usbr.gov/mp/mp150/envdocs/CCAO_Berryessa_ROD%20Final.pdf

Q: What is the definition of the 455' and 100 linear feet rule?
A: Refer to the Record of Decision Part III.5.
http://www.usbr.gov/mp/mp150/envdocs/CCAO_Berryessa_ROD%20Final.pdf

Q: Any plans for trail up Putah Creek?
A: A trail system around the lake is currently being planned. No specific plans have been developed for the Putah Creek arm.

Q: How would anyone get approval for additional development?
A: A prospective bidder must include all development plans in their proposal.

Concession Area Specific Questions:

Putah Creek Resort

Q: What does the sewer system include?
A: There are three ponds, distribution system, lift stations and other appurtenant devices. There are some maintenance and capital improvement issues which need to be addressed. State authorized discharge is 14,000 gallons per day. Reclamation recommends discussing the condition of all waste systems with the California Regional Water Quality Control Board.

Q: How old is the resort?
A: 48 years

Q: Will Putah Creek management be selling their liquor license?



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** "Marshall Pike" <mp@calparksco.com>
**To:** <mspurgeon@mp.usbr.gov>, <plucero@mp.usbr.gov>
**Date:** Thu, Jul 5, 2007 1:50 PM
**Subject:** Written Questions for Berryessa Prospectus

To: Bureau of Reclamation

Point of Contact:

Marie S. Spurgeon, Contracting Officer via email mspurgeon@mp.usbr.gov

Pete Lucero, plucero@mp.usbr.gov

FROM: Marshall Pike, The California Parks Companies

DATE: July 5, 2007

Please consider these questions in conjunction with the Solicitation Number 07SS240008, posted June 7, 2007 for Water based Recreation Support and Associated Hospitality Services and Facilities Within Concession Areas at Lake Berryessa.

Question 1: What company performed the cost approach appraisal to determine the values provided in the Appendix 7.10?

Question 2: Will BOR release the supporting documentation that is the basis for the Appendix 7.10? In the preparation of Appendix 7.10, does the appraiser use Klinefelder's report which refers to the Inventory for Engineering Evaluation & Condition Assessment Report by Resort, prepared by Ms. Cheryl Riley of the U.S. Department of the Interior, Bureau of Reclamation? This report apparently contains a summary of existing buildings and structures, including color photographs, of each of the buildings to be surveyed. Due diligence is impossible without detail that is available in the work performed in preparation for this Appendix 7.10.

Question 3: What time line does the BOR propose for the release of this (Question 2) information and any other supporting documentation for the appraisal?

Question 4: In Appraisal Appendix 7.10, regarding the cost approach method to appraise the existing concession capital replacement reserves, please provide an explanation of assumptions that were made to arrive at these estimates.

Question 5: If the Klinefelder recommended upgrades were accomplished before the property changes hands to a new concessionaire will the value of the CIR in the appraisal be higher or remain the same? Will the adjusted value be based on the value noted in the Klinefelder improvements schedule or the



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

actual direct cost of the improvements?

Question 6: Does the appraisal value given in the Appendix 7.10, equal the value of the installation, in its current condition, regardless the suitability or need for upgrade or improvements?

Question 7: Has the BOR ever issued written instructions identifying specific restrictions on the removal of " in ground" improvements such as pilings, footings and retaining structures?

Question 8: If the answer to Question 7 is yes, what are the instructions and do they apply to all similar installations?

Question 9: What provisions (fund amounts and specific targeted activities) does the BOR have in current authorizations to fund activity known as "Trailer and Shoreline Structure Removal" and/or rehabilitation to other disturbed areas within the concession areas?

Question 10: Regarding the provisions noted in Question 9, what provisions are planned for or under discussion for FY2008, FY2009 and FY2010.

Question 11: Since the Klinefelder report was issued in 2002, what improvements, based on the record of requests made by concessionaires and approved by the BOR, have been made that would update the costs in the report if done again by Klinefelder?

Question 12: Does the BOR receive copies of any County, State or Federal orders affecting the operation or restricting the operation of any concession at Lake Berryessa?

Question 13: Regarding Question 12, if received, will BOR provide copies of the orders including any abatement correspondence or action taken reports?

Question 14: For what purpose does the sample contract include a definition of Arbitration?

Question 15: What are the circumstances that would lead to arbitration?

Question 16: Does the value of CIR or the use of the cost approach method for appraised value warrant the use of Arbitration?



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

Question 17: In the Concession Prospectus notice in the Federal Business Opportunities page, the synopsis refers to CCR registration. There is no mention of CCR registration included in the RFP document. Are bidders required to be CCR registered contractors?

Question 18: Does Selection Criteria B3(b) scoring allow a concessionaire to engage a qualified professional recreation and hospitality management company to provide key operations, administration and maintenance functions and still receive maximum points?

Question 19: What is Selection Criteria B2(g) of Part 5 of the Prospectus that is referred to in the Instructions to the Offering for Preparing the Proposal on page 3-11?

Question 20: A careful summarization of the points identified for each reveals that the total of all Selection Criteria is 151 points. The Prospectus states on page 5-11 that a total of 156 points is the high score. Which number is correct?

**CC:** "John Koeberer" <jk@calparksco.com>



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Vernon Lovejoy
**To:** Bruce Wadlington; Lucero, Pedro "Pete"
**Date:** Sat, Jul 7, 2007 12:42 PM
**Subject:** Re: New Version

True I thought about that them screaming and if you believe that will happen then I agree with total removal. But if you read their questions carefully what I got out of it was they would like to have the slips for a short time, 2 yr, or just long enough until they can get their own docks in. In the meantime they would provide a service and at least the outgoing person would get something and not have the cost of removing them. I agree that if the docks are unsafe etc they should be removed along with the rest of the stuff by the end of the contract. Do you think the outgoing concessioniares would object when they look at the bottom line? That is removing at their expense rather than selling at a reduced rate and not have the removing expense? How about leasing old slips for 2yr and have the new concessionaire responsible for removal? Are their other options?

>>> Pedro "Pete" Lucero 07/06/07 3:34 PM >>>
My concern in the answer you drafted is this:

A bidder does not want the slips because of their condition. The existing contractor currently has a stable revenue stream of renters on the slips. If the existing must remove the slips, the boaters need to go away until a bidder places new ones. If the bidder buys the slips at a reduced value because the existing does not want to remove it...it would appear that the existing is being taken advantage of. I can hear the complaints ringing in my ears already. We could say that any slips deemed to be unsafe or in poor condition will not be allowed to go into new contracts...under no circumstance.

I'm just concerned about eh existing crying foul...this has implications on all facilities.

>>> Vernon Lovejoy 7/6/2007 2:17:21 PM >>>

1. A successful bidder would only pay the appraised value of the facilities (slips in this case) they wish to retain, assuming Reclamation approves those facilities to remain on-site.

Note. Existing concessionaires that do not bid on the new contracts or may not have been the successful bidder, may choose to sell their existing facilities (that Reclamation allows to be retained) below appraised value. An existing concessionaire that will not be the next concessionaire, may be willing to accept an offer to buy their facilities below appraised value, rather than pay the cost of removing them. If such an agreement was agreed to buy a willing buyer and willing seller, the government would not be involved in such a transaction. It is also important to remember that there is no penalty assessed in the bidding process for not retaining existing facilities.

2. Bidders should describe in their proposal how and when they proposed to replace existing slips. Assuming Reclamation would allow the existing slips to remain for a short time (2 years as identified in this question), the replacement time frame of 2 years is probably not excessive, as long as the slips are maintained in satisfactory condition and there is a firm replacement date.

Note. All bidders are reminded that Reclamation acknowledges that it will be necessary to allow successful bidders a reasonable amount of time for construction of new facilities and replacement of existing facilities. One of Reclamation's goal is to have quality facilities that are safe and sanitary and it may take time to reach that goal.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Pedro "Pete" Lucero
**To:** Lovejoy, Vernon; Wadlington, Bruce
**Date:** Tue, Jul 17, 2007 12:16 PM
**Subject:** Re: Greetings

If we get requests to extend, then we allow another 30, but that will put us into November to convene...there is no problem with that except how an award that late will affect the contractor at PC.

>>> Vernon Lovejoy 7/17/2007 10:47 AM >>>
Roger.
Bruce and I both understand the predicament. Lets continue to think about and discuss.
By the way I am in Virginia attending the National Association of State Park Directors Conference and Meeting Aug 30- Sept 7 and then going to Africa Sept 10-24. So I was hoping for early Oct to convene the panel. After talking to Barclay I think it could take him several weeks to get through the financial review, again according to the number of bids. So I anticipate he should be finished by mid to late Sept. If there are request to add more time to respond to the prospectus what then?

>>> Pedro "Pete" Lucero 07/17/07 11:39 AM >>>

The exceptions are these:

Early award of PC before award of the remainder of contracts may give the appearance of pre-selection which is not the case at all but may be seen that way.

PC was awarded a 30 month contract (policy exception) and an extension of that contract would not be a good idea, particularly in the winter season with no tenants, what is the purpose? We would need another policy exception. We could again be seen as trying to keep FR around.

We just need to be very deliberate in our decisions to avoid any perception of collusion during the selection process. I get real concerned because of the negative press we see nearly every day.

>>> Vernon Lovejoy 7/17/2007 10:32 AM >>>

So the question is, can we extend Pleasure in the event the panel is not finished? I don't think it is making an exception for them under the circumstances.

>>> Pedro "Pete" Lucero 07/17/07 11:16 AM >>>
That will fly in the face of our intent to integrate...I can hear it now...we'll see what happens...

>>> Bruce Wadlington <brucewadlington@yahoo.com> 7/17/2007 9:57 AM >>>
I think it is unlikely that anyone will effectively compete against Forever for Pleasure Cove so even if we did not finalize the panel work until late Nov. we could probably make PC a first decision and meet your date as long as some wacky injunction or something else legal does not occur. If there was some type of a legal issue I think Reclamation could justify either an extension on PC or at least a delay on any required removal.

Bruce

Pedro Pete Lucero <plucero@mp.usbr.gov> wrote:
Vernon, we need to try to award Pleasure Cove before Dec 1 (contract expiration) so I would like to get firm dates for an early award. I agree that Barclay needs to spend time reviewing the financials...

I want to convene in Sept or Oct to work out all the bugs for Novemeber awards. How best to facilitiate that schedule??? you got me...

BOR-0295

41413

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Pedro "Pete" Lucero
**To:** Lovejoy, Vernon; Wadlington, Bruce
**Date:** Tue, Jul 17, 2007 1:38 PM
**Subject:** Terry Sides just called to request an additional 30 days (you probably know that already). I instru

Terry Sides just called to request an additional 30 days (you probably know that already). I instructed him to make a formal request. I also advised him that if only one or two vendors request and extension to the deadline, we may not allow it. But as I think of it more, some may need the additional time because their packages may be considerably more complex that one who might be bidding on only one location.

thoughts?



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Pedro "Pete" Lucero - Lake Berryessa Prospectus**

**From:** "Peter White" <peter@rdse.com>
**To:** <plucero@mp.usbr.gov>
**Date:** 7/20/2007 5:01 PM
**Subject:** Lake Berryessa Prospectus
**CC:** "Bill Feid" <bfeid@prpglobal.com>, "Bruce McLellan" <stowlake@pacbell.net>, "Callie McLellan" <c.mclellan@sbcglobal.net>, "Robert Kim Stephenson" <wgcpa@rkscpa.com>

---

Mr. Pete Lucero
Chief, Recreation Resources Division
Central California Area Office
Bureau of Reclamation
5520 Knoxville Road
Napa, CA 94558
Phone: (707) 966-2111 x106
Email: PLUCERO@mp.usbr.gov

Dear Pete,

Now that we have thoroughly reviewed the information you have provided in the Lake Berryessa Prospectus, toured all the concession areas and following preliminary discussions with our consultants who will be assisting us in the preparation of our offer, we have determined that there is not sufficient time to provide the level of detail we feel you will need to make informed decisions about the nature and scope of our proposal. We have tentatively concluded the infrastructures of the resorts will need substantial repairs and upgrades or, in the alternative, replacement. Accordingly, we will need time to identify, engage, and receive the benefit of the services of a number of experts. We would like to formally request an extension of the due date for the submission of the proposals. We would suggest this extension be for approximately ninety (90) days (until Friday, November 30, 2007). We are confident that all interested parties will benefit from this extension and the quality of all the bid packages will improve dramatically. Thank you for your consideration in this matter.

Sincerely,

Peter White
Recreation Del Sol Enterprises, LLC





Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Pedro "Pete" Lucero - RE: Prospectus**

**From:** "Bruce McLellan" <stowlake@pacbell.net>
**To:** "'Pedro Pete Lucero'" <PLUCERO@mp.usbr.gov>
**Date:** 7/24/2007 10:05 AM
**Subject:** RE: Prospectus

Pete,

Thanks for the email. We would be interested in an extension of the due date. See previous correspondence from Peter White.

Bruce.

---

**From:** Pedro Pete Lucero [mailto:PLUCERO@mp.usbr.gov]
**Sent:** Tuesday, July 24, 2007 11:39 AM
**To:** Richard Delaney; Irving Kenzie; John Koeberer; Marshall Pike; Terry Sparkman; dcook@foreverresorts.com; John Schoppmann; Terry Sides; wilded@guestservices.com; Lee Johnson; mike@houseboats.com; cchristner@hughes.net; Carol Kunze; Linda Frazier; stowlake@pacbell.net; David Ffinch; peter@pgwhite.com; Lucy White; bob@ranchomonticelloresort.com; butch@ranchomonticelloresort.com; cass; chris@ranchomonticelloresort.com; lucy@ranchomonticelloresort.com; paul@ranchomonticelloresort.com; David Webb; thomaswayman@sbcglobal.net; wsharper@sbcglobal.net; Sean Buckley; Tim Colvin; Lucy White; dkenzy15@yahoo.com; jinenne@yahoo.com
**Cc:** John Woodbury; Rob Martin; Vernon Lovejoy; Cathi Bailey; Dan Kolda; Janet Rogers; Michael Petrinovich; Pedro Pete Lucero; Richard Johnson; Bruce Wadlington
**Subject:** Prospectus

I have received a few requests for extensions to the deadline for submission of proposals to the prospectus. I am soliciting input to determine if there is a general feeling that an extension is necessary. Please respond to this email as soon as possible.

Thank you,

Pete Lucero
Chief, Recreation Resources Division
Central California Area Office
Bureau of Reclamation
707-966-2111 x106
707-966-0409 fax





Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

FOREVER RESORTS

COPY FOR YOUR INFORMATION

ARIZONA
Lake Powell Houseboats
Mormon Lake Lodge
Sun Country Marine West
Temple Bar Marina
Willow Beach Harbor

CALIFORNIA
Columbia City Hotels
Lake Don Pedro Marina
Lake Oroville Marina
Moccasin Point Marina
Oak Bottom Marina
Pinewood Cove Resort
Pleasure Cove Marina
Trinity Lake Resorts/Marinas

COLORADO
Rocky Mountain Holiday Inn
TrendZ at the Park

INDIANA
Fun Country Marine Industries

KENTUCKY
Mammoth Cave Hotel

MICHIGAN
Isle Royale Resorts

MISSOURI
Lake of the Ozarks Marina
Lake of the Ozarks State Park Marina

NEVADA
Black Canyon River Adventures
Callville Bay Marina
Cottonwood Cove Marina
Lake Mead RV Village

NORTH CAROLINA
Bluffs Lodge
Crabtree Meadows

SOUTH DAKOTA
Badlands Lodge
Cedar Pass Lodge

TEXAS
Big Bend/Chisos Lodge
Box Canyon Marina
Lake Amistad Marina
Marina at Lake Meredith
Padre Island Park Company
Rough Canyon Marina
Southfork Hotel
Southfork Ranch

VIRGINIA
Mabry Mill Restaurant

WASHINGTON
Fairholme Store
Hurricane Ridge
Lake Crescent Lodge

WYOMING
Leeks Marina
Mad River Boat Trips
Signal Mountain Lodge

Lake Berryessa Field Office
JUL 2007

Bureau of Reclamation
Lake Berryessa Field Office

| OFFICIAL FILE COPY | | |
|---|---|---|
| DATE | SURNAME | CODE |
| | VC | 410 |
| | VC | 421 |
| | VC | 427 |
| | | |
| | | |

Via e-mail
Via Facsimile
Original via Overnight Delivery

July 23, 2007

Mr. Pedro "Pete" Lucero
Chief, Recreation Resource Division
Central California Area Office (CCAO)
Mid-Pacific Region
Bureau of Reclamation
U. S. Department of the Interior
5520 Knoxville Road
Napa, California 94558

Re: Lake Berryessa Concession Prospectus - June 7, 2007

Dear Mr. Lucero:

As you are aware, there are seven (7) concession contract opportunities at Lake Berryessa covered under the above referenced U. S. Bureau of Reclamation Prospectus. Further, the business opportunity is for the development and operation of multiple services which include marina (and associated operations), boat rentals (houseboat and small boats), R/V rentals, campgrounds, lodging, retail sales, food services, all of which to serve the future needs of the recreational public at Lake Berryessa.

As there are multiple operations under review there is a need to assess each location from an operational and financial perspective as to the real property (facilities) which will be needed (acquired and/or built) in the future as well as services going forward that will be proposed to Reclamation for consideration in an offer. To properly complete the due diligence on this business opportunity requires a significant amount of time which leads me to the purpose of this letter.

Pleasure Cove Marina L.L.C., a Forever Resort, is requesting a 30 day extension of time to fully complete its due diligence of the prospectus business opportunity at Lake Berryessa. This extension of time would move the offer response due date to Reclamation from September 5th to October 5th, 2007.

In closing, if you have any questions please contact me at 480-998-7199, Ext 4416 or 480-688-3049 (cell phone) or e-mail at TSides@ForeverResorts.com

Sincerely,

Terry James Sides
Director of Administration

Classification
Project
Control No.
Folder I.D.

Forever Corporate Plaza • 7501 E. McCormick Parkway • Scottsdale, Arizona 85258
480 998-9977 • Fax 480 998-9965 • ForeverResorts.com

Printed with soy ink on recycled paper 60% recycled fiber, 30% post consumer waste ISO 14001:2004

BOR-0304
41422

Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**From:** Pedro "Pete" Lucero
**To:** Sides, Terry
**Date:** 7/23/2007 9:08:34 AM
**Subject:** Questions

Terry you asked:

If I acquire assets from the existing contractors, does the value of that acquisition go against the CIR?

The answer can be found in PART 4 Section O where it states:

"Similarly, the new concession contractor will then hold CIR's in those improvements for which it paid the former concession contractor upon entering into the new concession contract. The new concession contractor will obtain additional CIR's in any new improvements made with concession contractor funds during the term of the new concession contract, including improvements made using funds from the RAFI. Those CIR's will be valued according to the process described in section 14 of exhibit C of the concession contract."

Does this answer your question?

Pete Lucero
Chief, Recreation Resources Division
Central California Area Office
Bureau of Reclamation
707-966-2111 x106
707-966-0409 fax

**CC:** Lovejoy, Vernon; Wadlington, Bruce



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

4/20/2007

**PRINCIPAL FACTOR 5**

**FINANCIAL BENEFIT TO THE GOVERNMENT**
**(5 Value Points = 3.2% of Total Points)**

*This Principal Factor represents the least level of value for offerors and reflects the fact that Reclamation recognizes that 'Return to the Government' in the form of Franchise Fees is of secondary importance in this prospectus because of the recognized financial demands for the rehabilitation of Lake Berryessa including the development of new facilities. Perhaps in the next stage of concession contracts when some of the issues of today have been successfully addressed there will be an increased opportunity for increased fees. It should be recognized by all involved that in regard to 'Benefit to the Government' other than financial hat successful concessionaires with new facilities appropriately serving the short-term public will be of great benefit in meetings Reclamation's goals and objectives for Lake Berryessa. It will also have a positive impact on government resources. Last but not least if the concession operations at Lake Berryessa make a successful turn around to provide traditional recreation services and facilities it will enhance Reclamation's opportunity to find an eventual 'Managing Partner'.*

**Criterion 5 (a)**

5(a) Franchise Fee (5 Value Pts.)

*Franchise Fees will be evaluated and scored in two ways. First Reclamation will consider the level of proposed fee by each offeror and everything being equal will give more 'Value Points' to the higher indicated fees. However, this will be evaluated in direct comparison with the apparent level of financial viability indicated by the proposal. So if an offeror indicates a franchise fee of any level but the pro-forma's do not support feasibility then a lower score for both this criterion and Principal Factor #4 will be likely. The second consideration in reviewing proposed franchise fees will be how it is explained and supported regardless of the amount proposed. As identified in the prospectus since a specific level is not prescribed it is up to each offeror to justify their proposal. In this way the scoring for this criterion will in part be impacted by how effectively the responses to the other 4 Principal Factors seem to be addressed.*

The preceding analysis outlines the basic discussions and thought processes contributed by the Prospectus Team in establishing the rating criteria for the evaluation of offers to the prospectus. As a recap the following list ranks the level of importance of each of the preceding 5 Principal Factors from Most Important to Less Important:

**MORE IMPORTANT**

**Principle Factor 2 – Development & Description of Proposed Operations**
(58 Value Points = 37.2%)

**Principle Factor 4 – Proposed Financial Packages and Operations**
(57 Value Points = 36.5%)

**Pedro "Pete" Lucero - Re: Appraisal**

**From:** Pedro "Pete" Lucero
**To:** Finnegan, Mike; Johnson, Charles; Johnson, Richard
**Subject:** Re: Appraisal

attached

>>> Mike Finnegan 11/15 11:02 AM >>>
Thanks Pete. Good job. Based upon Jim's advice, I can provide the SOW to Marc Kelley today. Any concerns? If not, can you re-send me a copy of the final SOW. I just want to make sure I have the vinal version.

Mike

>>> Pedro "Pete" Lucero 11/15 10:59 AM >>>
Mike et al, I spoke with Jim Shaw at length about the appraisal...

Regarding the appraisal instructions - He thinks it is wise to share the SOW with the concessions that they know exactly what the instructions are to the ASD contractor. This knowledge will hopefully help to reduce issues at the end of the appraisal if there are differences in the numbers.

He states that the ASD would generally NOT accept a third party appraisal. Once they approve the ASD contracted appraisal, it is done. They will not compare the two appraisals. The only time they would expect to see the other appraisal is in the event of an arbitration in Markley or Steele Parks case. In that case, they would defend their appraisal before the arbiter. As it relates to the others, if there is a dispute, the ASD will discuss the appraisal with the concessions, and defend their position on the appraisal by outlining how they got there. When I asked him if there was any formal appeal process he said no, disputes are dealt with informally through discussions.

Regarding the 2 appraisers working together - He indicates that when the ASD appraisers are on site, the concessions will be along on the inspection, the owners may bring their appraiser along if they so choose. The ASD will be open in their discussions with the concessions and he suggests that they can work together in the on the ground data gathering, fact finding, and description of assets phase, however the analysis and development of the final report will not be in collaboration with the concession appraiser.

That's it in a nutshell.





Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

**Pedro "Pete" Lucero - A Couple More Things**

**From:** Pedro "Pete" Lucero
**To:** Shaw, Jim
**Date:** 11/15/2006 7:55 AM
**Subject:** A Couple More Things
**CC:** Johnson, Charles

Jim

1. The reason for my previous message is that we understand that the concessionaires are going to contract for their own appraisal. They have asked to work collaboratively with the government appraisers and we have made that known to ASD. However, we have not heard definitively whether or not ASD is willing to work with the concessionaires appraisal contractor in some way. Wondering if you can you advise on this.

2. I have received the GovWorks interagency agreement which appears to give authorization to proceed. Can you please let me know how the info stream is to be handled? I note that you are the COR on the project, should I, as the customer contact you for status of the project? Or is there another POC I need to deal with. Also, just so you know the Reclamation leadership has advised me that a weekly status update will be required, so I will be in contact with the POC on a regular basis.

Thanks for all of your help on this...Pete

Pete Lucero
Chief, Recreation Resources Division
Central California Area Office
Bureau of Reclamation
707-966-2111 x106
707-966-0409 fax



'rotected Material To Be Disclosed
)nly In Accordance With U.S.
:ourt Of Federal Claims Protective Order

Arbitration Association appoint an arbitrator in the situations discussed above, the Government shall request that the person or persons appointed shall be impartial and specially qualified in commercial and real estate appraisal. The fair value determined by the Board of Arbitrators shall be binding on the parties. The compensation and expenses of the third member shall be paid by the Concessionaire and one-half of the amount so paid shall be added to the purchase price. Before reaching its decision, the board shall give each of the parties a fair and full opportunity to be heard on the matters in dispute.

c. If this agreement expires, the Concessionaire shall have the right to remove permanent facilities and improvements unless the Government directs otherwise. Facilities not removed by the Concessionaire within 180 calendar days after expiration of this agreement shall be deemed to have been abandoned by the Concessionaire. The Concessionaire shall have the right to be paid the fair value for permanent facilities and improvements which the Government directs him not to remove pursuant to Public Law 96-375.

B.2. Sale of Interest

a. The Concessionaire and/or any person or entity which owns or controls an interest (as herein defined) in a Concessionaire's ownership (collectively defined as the "Concessionaire" for the purposes of this section), shall not assign or otherwise sell or transfer the concession operations authorized hereunder, nor sell or otherwise as sign or transfer (including, without limitation, mergers, consolidations, reorganizations, or other business combination) an interest in such operations, or the Concessionaire's ownership, without the prior written approval of the Government. Failure to comply with this provision or the procedures described herein shall constitute a material breach of this agreement and the Government shall not recognize any right of any person or entity to own or operate the operations authorized

East 1533.4 feet from the Point of Beginning; thence North 84° 01' West along said westerly boundary 1533.4 feet to the point of beginning.

WHEREAS, the establishment and maintenance of such facilities and services involve a substantial investment of capital and the assumption of the risk of operating loss, and it is therefore proper that the Concessioner be given assurance of security of said investment and of a reasonable opportunity to make a fair profit;

NOW, THEREFORE, the said parties, in consideration of the mutual promises herein expressed, covenent and agree to an with each other as follows:

1. As provided for in the Management Agreement with Napa County for Lake Berryessa (Monticello Reservoir area) the County may issue and administer licenses, permits, and contracts to persons or associations making available services and facilities for the use of the public and for the purpose of regulating the privileges to be exercised in the area. All licenses, permits and contracts, affecting the lands within the primary jurisdiction of the United States, as defined in Article 1, shall be submitted to the Bureau of Reclamation before issuance and all instruments used for such purposes throughout the area shall be subject to applicable terms of this agreement and shall contain certain language recognizing the purposes of the Solano Project and effecting releases and indemnification to and for the United States, its successors and assigns, and its officers, agents, and employees engaged in the construction and operation and maintenance of project works. The terms of such licenses, permits, or contracts shall not exceed twenty (20) years and such licenses, permits and contracts shall contain the following provisions:

(a) In the event of the termination of the Management Agreement between the United States and the County, the United States shall be deemed to stand in the stead of the County as grantor for the remainder of the term of this agreement: Provided, however, in the event of such termination, the United States, at any time within ninety (90) days thereafter, may terminate this agreement by giving to the Concessioner, thirty (30) days written notice thereof and in such event the Concessioner shall have the privilege of selling or removing, for a period of ninety (90) days after termination of this agreement, or such longer period as may be determined by the Bureau of Reclamation to be reasonable, improvements which have been constructed on the premises at the sole cost or expense of the Concessioner; otherwise, after the expiration of such period of time, the title to such improvements shall vest in the United States.

be given assurance of security of said investment and of a reasonable opportunity to make a fair profit.

NOW, THEREFORE, the said parties, in consideration of the mutual promises herein expressed, covenant and agree to and with each other as followings:

1. "As provided for the Management Agreement with Napa County for Lake Berryessa (Monticello reservoir area) the County may issue and administer licenses, permits, and contracts to persons or associations making available services and facilities for the use of the public and for the purpose of regulating the privileges to be exercised in the area. All licenses, permits and contracts affecting the lands within the primary jurisdiction of the United States, as defined in Article 1, shall be submitted to the Bureau of Reclamation before issuance and all instruments used for such purposes throughout the area shall be subject to applicable terms of this agreement and shall contain certain language recognizing the purposes of the Solano Project and effecting releases and indemnification to and for the United States, its successors and assigns, and its officers agents, and employees engaged in the construction and operation and maintenance of project works. The terms of such licenses, permits and contracts shall contain the following provisions:

(a) In the event of the termination of the Management Agreement between the United States and C the County, the United States shall be deemed to stand in the stead of the County as grantor for the remainder of the term of this agreement: Provided, however, in the event of such termination, the United States, at any time within ninety (90) days thereafter, may terminate this agreement by giving to the Concessioner, thirty (30) days written notice thereof and in such event the Concessioner shall have the privilege of selling or removing, for a period of ninety (90) days after termination of this agreement, or such longer period as may be determined by the Bureau of Reclamation to be reasonable, improvements which have been construed on the premises at the sole cost or expense of the Concessioner; otherwise, after the expiration of such period of time, the title to such improvements shall vest in the United States."

(b) "The Concessioner recognizes that Monticello Reservoir is a feature of the Solano Project, constructed for the primary purposes of irrigation and domestic, industrial and municipal water supply in Solano

## PART B. SPECIAL PROVISONS

### B.1. OWNERSHIP OF FACILITIES

A. ALL PERMANENT FACILITIES ON THE PREMISES ON THE EFFECTIVE DATE OF THIS AGREEMENT ARE THE PROPERTY OF THE CONCESSIONAIRE. ANY PERMANENT ADDITIONS OR MODIFICATIONS TO SUCH FACILITIES SHALL BE THE PROPERTY OF THE CONCESSIONAIRE. UPON EXPIRATION OR TERMINATION OF THIS AGREEMENT THE GOVERNMENT MAY REQUIRE THAT SOME OR ALL OF THE PERMANENT FACILITIES MENTIONED HEREIN NOT BE REMOVED FROM THE PREMISES IN WHICH CASE THE GOVERNMENT OR A NEW CONCESSIONAIRE SHALL PAY THE CONCESSIONAIRE THE FAIR MARKET VALUE FOR THOSE PERMANENT FACILITIES. THOSE FACILITIES THAT THE CONCESSIONAIRE IS REQUIRED TO REMOVE UPON EXPIRATION OR TERMINATION OF THIS AGREEMENT SHALL BE REMOVED BY THE CONCESSIONAIRE WITHOUT COMPENSATION BY THE GOVERNMENT AND AT NO EXPENSE TO THE GOVERNMENT. ANY SUCH FACILITIES NOT REMOVED WITHIN ONE HUNDRED EIGHTY (180) CALENDAR DAYS AFTER THE DATE OF TERMINATION OR EXPIRATION OF THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN ABANDONED BY THE CONCESSIONAIRE.

B. IF THE GOVERNMENT, OR THE NEW CONCESSIONAIRE AND THE CONCESSIONAIRE, CANNOT AGREE UPON THE FAIR MARKET VALUE OF PERMANENT IMPROVEMENTS WHICH THE GOVERNMENT DIRECTED THE CONCESSIONAIRE NOT TO REMOVE, EITHER PARTY MAY SERVE A REQUEST FOR ARBITRATION UPON THE OTHER PARTY, AND THE FAIR MARKET VALUE OF THE ITEM OR ITEMS IN QUESTION SHALL BE DETERMINED BY THE MAJORITY VOTE OF A BOARD OF THREE ARBITRATORS, SELECTED AS FOLLOW: EACH PARTY SHALL APPOINT ONE MEMBER, SELECTED FROM THE AMERICAN ARBITRATION ASSOCIATION OR POSSESSING EQUIVALENT SKILLS AND EXPERIENCE, AND THE TWO MEMBERS SO APPOINTED SHALL SELECT THE THIRD MEMBER. IF EITHER PARTY FAILS TO APPOINT AN ARBITRATOR WITHIN FIFTEEN (15) DAYS AFTER THE OTHER HAS APPOINTED AN ARBITRATOR AND SERVED WRITTEN NOTICE, INCLUDING THE NAME AND ADDRESS OF THE ARBITRATOR APPOINTED, UPON THE OTHER PARTY, THEN THE AMERICAN ARBITRATION ASSOCIATION SHALL BE REQUESTED BY THE GOVERNMENT TO APPOINT AN ARBITRATOR TO REPRESENT THE PARTY FAILING TO MAKE THE APPOINTMENT. THE COSTS AND EXPENSES OF THE ARBITRATOR APPOINTED BY THE AMERICAN ARBITRATION ASSOCIATION TO REPRESENT THE PARTY FAILING TO MAKE THE APPOINTMENT SHALL BE PAID FOR BY THAT PARTY. IF THE THIRD MEMBER IS NOT SELECTED WITHIN FIFTEEN (15) DAYS AFTER THE APPOINTMENT OF THE LATTER OF THE OTHER TWO ARBITRATORS, THE AMERICAN ARBITRATION ASSOCIATION SHALL BE REQUESTED BY THE GOVERNMENT TO APPOINT THE THIRD ARBITRATOR. IN REQUESTING THAT THE AMERICAN ARBITRATION ASSOCIATION APPOINT AN ARBITRATOR IN THE SITUATIONS DISCUSSED ABOVE, THE GOVERNMENT SHALL REQUEST THAT THE PERSON OR PERSONS APPOINTED SHALL BE IMPARTIAL AND SPECIALLY QUALIFIED IN COMMERCIAL AND REAL ESTATE APPRAISAL. THE FAIR MARKET VALUE DETERMINED BY THE BOARD OF ARBITRATORS SHALL BE BINDING ON THE PARTIES. THE COMPENSATION AND EXPENSES OF THE THIRD MEMBER SHALL BE PAID BY THE CONCESSIONAIRE AND ONE-HALF OF THE AMOUNT SO PAID SHALL BE ADDED TO THE PURCHASE PRICE. BEFORE REACHING ITS DECISION, THE BOARD SHALL GIVE EACH OF THE PARTIES A FAIR AND FULL OPPORTUNITY TO BE HEARD ON THE MATTERS IN DISPUTE.

### B.2. TRANSFER OF INTEREST

A. EXCEPT AS PROVIDED IN PARAGRAPH C.4. THE CONCESSIONAIRE AND/OR ANY PERSON OR ENTITY WHICH OWNS OR CONTROLS AN INTEREST IN CONCESSIONAIRE'S FACILITIES OR ITS OPERATIONS PURSUANT TO THIS AGREEMENT (COLLECTIVELY DEFINED AS THE "CONCESSIONAIRE" FOR THE PURPOSES OF THIS PARAGRAPH AND PARAGRAPH B. 3.), SHALL NOT ASSIGN OR OTHERWISE TRANSFER SUCH INTEREST (INCLUDING, WITHOUT LIMITATION, MERGERS, CONSOLIDATIONS, REORGANIZATIONS, OR OTHER BUSINESS COMBINATION) WITHOUT THE PRIOR WRITTEN APPROVAL OF THE GOVERNMENT. THE GOVERNMENT SHALL REQUIRE, AS A CONDITION OF SUCH APPROVAL, THAT THE CONCESSIONAIRE COMPLY WITH THE PROCEDURES SPECIFIED IN PARAGRAPH B. 3., OR OTHER APPROPRIATE PROCEDURES PRESCRIBED BY THE GOVERNMENT TO ASSURE PUBLIC ABILITY TO ACQUIRE CONCESSION OPPORTUNITIES. FAILURE TO OBTAIN THE APPROVAL OF THE GOVERNMENT OR COMPLY WITH THE PROCEDURES SET FORTH BY THE GOVERNMENT AS CONDITIONS FOR ITS APPROVAL SHALL CONSTITUTE A MATERIAL BREACH OF THIS AGREEMENT AND THE GOVERNMENT SHALL NOT RECOGNIZE ANY RIGHT OF THE ASSIGNEE OR TRANSFEREE TO OWN THE FACILITIES OR CARRY OUT THE OPERATIONS DESCRIBED HEREIN.