IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; and STEELE PARK RESORT, INC., | Bid Protest |
| Plaintiffs, | No. 07-636C |
| THE UNITED STATES, | (Judge Lynn J. Bush) |
| Defendant. | |

---

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD**

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KIRK T. MANHARDT
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel. 202-353-7972
Fax. 202-514-8640
Attorneys for Defendant

OF COUNSEL:

JAMES E. TURNER
Assistant Regional Solicitor
Office of the Solicitor
Pacific Southwest Region
United States Department of the Interior
2800 Cottage Way
Room E-1712
Sacramento, California 95825-1890
Tel. 916-978-5685
Fax. 916-978-5694

October 15, 2007

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . ii

DEFENDANT'S REPLY IN FURTHER SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD . . . 1

SUMMARY OF ARGUMENT . . . 1

ARGUMENT . . . 3

I. THE PROSPECTUS IS IN ACCORD WITH PUBLIC LAW 96-375 . . . 3

A. Public Law 96-375 Does Not Permit Plaintiffs To Retain Ownership Of Permanent Facilities They Choose To Leave On Federal Land Following The Termination Of Their Contracts And It Permits The Government The Right To Require That Select Permanent Facilities Remain On Federal Land With Compensation Provided To The Concessionaires . . . 3

B. Fair Market Valuation Of Plaintiffs' Permanent Facilities Is Consistent With Public Law 96-375 . . . 6

II. REQUIRING THE PLAINTIFFS TO REMOVE THEIR OWN PROPERTY FROM FEDERAL LAND IS ENTIRELY REASONABLE . . . 8

III. THE APPRAISALS OF PLAINTIFFS' PERMANENT FACILITIES ARE IN ACCORD WITH PUBLIC LAW 96-375 . . . 11

IV. PLAINTIFFS EXISTING CONTRACTUAL RIGHTS ARE NOT THE PROPER SUBJECT OF A BID PROTEST . . . 14

V. THE PREFERENCE FOR A MULTI-CONCESSION OPERATOR IS RATIONAL . . . 18

VI. THE BALANCE OF THE HARMS FAVOR THE GOVERNMENT . . . 19

CONCLUSION . . . 20

# TABLE OF AUTHORITIES

## CASES

ABF Freight System, Inc. v United States,
55 Fed. Cl. 392 (2003) . . . . . 19

Barrett Refining Corp. v. United States,
242 F.3d 1055 (Fed. Cir. 2001) . . . . . 8

Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,
419 U.S. 281 (1974) . . . . . 18

Cane Tennessee, Inc., v. United States,
71 Fed. Cl. 432 (2005) . . . . . 8

Circle Line-Statute of Liberty Ferry, Inc. v. United States,
76 Fed. Cl. 490 (2007) . . . . . 4, 16

El Paso Natural Gas Co. v. Fed. Energy Regulatory Comm'n,
96 F.3d 1460 (D.C. Cir. 1996) . . . . . 8

Northern Telecom Inc. v. United States,
8 Cl. Ct. 376, 381 (1985) . . . . . 4, 16

Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc.,
762 F.2d 1374 (9th Cir. 1985) . . . . . 19

OTI America, Inc. v. United States,
68 Fed. Cl. 108 (2005) . . . . . 16

Seravalli v. United States,
845 F.2d 1571 (Fed. Cir. 1988) . . . . . 7

Software Testing Solutions, Inc. v. United States,
58 Fed. Cl. 533 (2003) . . . . . 19

TRW Inc. v. Andrews,
534 U.S. 19 (2001) . . . . . 5

United States v. 179.26 Acres of Land,
644 F.2d 367 (10th Cir. 1981) . . . . . 7

Wetsel-Oviatt Lumber Co. v. United States,
43 Fed. Cl. 748 (1999) . . . . . . . . . . 16

Winuk v. United States,
77 Fed. Cl. 207 (2007) . . . . . . . . . . 5,6

**STATUTES**

Pub. L. No. 96-375, § 5(a)-(b), 94 Stat. 1505-1507 . . . . . . . . . . passim

National Environmental Policy Act of 1969
42 U.S.C. § 14321, et seq. . . . . . . . . . . 2, 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JOHN C. FRAZIER III and LINDA FRAZIER, d/b/a MARKLEY COVE RESORT; LAGUNA HERMOSA CORPORATION, d/b/a RANCHO MONTICELLO RESORT; REL LIMITED, d/b/a SPANISH FLAT RESORT; and STEELE PARK RESORT, INC., | Bid Protest |
| Plaintiffs, | No. 07-636C |
| THE UNITED STATES, | (Judge Lynn J. Bush) |
| Defendant. | |

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully submits its reply in further support of its cross motion for summary judgment upon the administrative record.

## SUMMARY OF ARGUMENT

None of the arguments plaintiffs advance to delay the issuance of new concessionaire contracts at Lake Berryessa withstand scrutiny. Plaintiffs arguments that the Prospectus violates Public Law 96-375 are incorrect based upon the plain and literal text of that statute. Public Law 96-375 does not permit plaintiffs to retain ownership of permanent facilities that they abandon upon Federal land after the expiration of their contracts. It does, however, permit the Government to select those permanent facilities of plaintiffs that are to remain after the expiration of their contracts, and it is only in that case that the Government is obligated to pay fair value to plaintiffs for their permanent facilities. The statute cannot be read otherwise.

Moreover, contrary to plaintiffs' arguments, the methodology utilized by Government appraisers to value plaintiffs' permanent facilities is in accord with the requirement that fair

value be given for plaintiffs' permanent facilities that the Government requires remain at Lake Berryessa. "Fair market value" valuations are consistent with the "fair value" valuation requirement of Public Law 96-375, and case law demonstrates that the "cost approach valuation" used by Government appraisers is an acceptable method for determining "fair market value."

Plaintiffs arguments concerning alleged "roadblocks" that will prevent the removal of their property from Federal land by the end of their contract terms fail because plaintiffs arguments concern a dispute involving their existing contracts and, thus, are not the proper subject of a bid protest action. Even so, plaintiffs arguments are based upon a sleight of hand where plaintiffs blur the difference between their property (e.g., permanent facilities) and the property of the mobile home owners (i.e., mobile homes). The concessionaire plaintiffs are not mobile home owners. Issues concerning the appraisal, removal and transportation of mobile homes by mobile home owners – who have long acknowledged their obligation to vacate Federal land upon the termination of the concessionaire contracts – are not properly before this Court, and even if they were, they are based upon false premises. The Bureau of Reclamation ("Reclamation") has no obligation to appraise and compensate the mobile home owners. Moreover, plaintiffs' outlandish claim that only two mobile homes can be transported per week is flatly incorrect, as is their claim that Reclamation did not adhere to the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. § 14321, et seq.) ("NEPA").

Plaintiffs' argument that Reclamation failed to adhere to its own appraisal requirements is based upon continued misrepresentations by plaintiffs concerning the appraisal instructions given by Reclamation to the agency that ascertained the fair market value of plaintiffs' facilities. The Government did not utilize plaintiffs' own appraisal instructions, nor did Reclamation provide

plaintiffs with the appraisal instructions that plaintiffs used in obtaining their own appraisals of their permanent facilities. Plaintiffs' allegations to the contrary are demonstrably incorrect.

Finally, there can be little serious discussion concerning the rationales set forth in the administrative record concerning Reclamation's preference for multi-concession operators. The reasons are numerous and well founded, focusing on efficiencies of scale, a capacity to withstand a downturn in business, a capacity to offer lake-wide services, and an ability to phase in development at the lake. In short, Reclamation's decision-making process in preparing the Prospectus was rational, and given that, the agency's action – here, the solicitation of bids pursuant to the Prospectus – must be sustained.

## ARGUMENT

## I. THE PROSPECTUS IS IN ACCORD WITH PUBLIC LAW 96-375

### A. Public Law 96-375 Does Not Permit Plaintiffs To Retain Ownership Of Permanent Facilities They Choose To Leave On Federal Land Following The Termination Of Their Contracts And It Permits The Government The Right To Require That Select Permanent Facilities Remain On Federal Land With Compensation Provided To The Concessionaires

Plaintiffs argue that the Prospectus violates Public Law 96-375 in three ways. First, they argue that Public Law 96-375 bars any requirement that they remove their permanent facilities from Federal land and that this bar remains in effect even after their right to be upon Federal land pursuant to their concession contracts has expired. Pl. Reply and Resp. (Oct. 9, 2007) ("Pl. Op.") at 2. In effect, plaintiffs claim that Public Law 96-375 gives them a property right to their permanent facilities at Lake Berryessa that exists in perpetuity (the property "'shall remain the property of the said concession'"). Thus, plaintiffs assert that, even after their contracts have expired, if they choose to leave their property on Federal land, it can never be deemed

abandoned. Id. at 3-4. In a second and related argument, plaintiffs claim that the Prospectus "contravenes the intent of the statute" because the Prospectus permits new concessionaires to "'pick and choose' which of Plaintiffs' assets are to remain." Pl. Op. at 4.

There are a number of problems with plaintiffs' arguments. First, their arguments concern the rights and obligations connected with their existing contracts. These claims are not the proper subject of a bid protest action. See Def. Mot. at 35-37, 46; see also Circle Line-Statute of Liberty Ferry, Inc. v. United States, 76 Fed. Cl. 490, 496 (2007); Northern Telecom Inc. v. United States, 8 Cl. Ct. 376, 681 (1985). If plaintiffs intend to leave their permanent facilities on Federal land after the termination of their contracts in 2008 and 2009 and dispute the amount of payment -- or lack of payment -- concerning their permanent facilities, or the rights of ownership to their property, these matters can be pursued pursuant to their existing contracts.

Second, as we demonstrated in our initial brief, plaintiffs' interpret Public Law 96-375 incorrectly. See Def. Mot. at 32. Public Law 96-375 anticipates that, at the end of their contracts, some of plaintiffs' permanent facilities will remain, and some will be removed. If that were not the case, it would have been nonsensical for the statute to recognize that the Government had the option to require that the permanent facilities "not be removed from the concession areas, and instead, pay fair value for the permanent facilities." P.L. 96-375 § 5(b) (emphasis added). The statute recognizes the Government's right to select the permanent facilities to remain at the property and "instead" (i.e., rather than have these facilities removed by plaintiffs) pay fair value for them. Thus, as we noted in our initial brief, plaintiffs' interpretation of the statue fails as a matter of law because their interpretation gives no meaning to the word "instead," which clearly indicates that the Government's obligation to pay fair value exists in an

alternative condition where plaintiffs do not remove their permanent facilities. See Winuk v. United States, 77 Fed. Cl. 207, 215 (2007) ("In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute.") (citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)).

Given that the properties are to remain at the Lake at the discretion of the Secretary of the Interior and in that case compensation be paid to the concessionaires, it does not follow that plaintiffs could leave their property at the Lake beyond their contractual term. That is, there is nothing in the Public Law 96-375 that provides plaintiffs with a right to place their property upon Federal land in perpetuity. From this then, it follows that, if plaintiffs choose not to remove their property and, instead leave it upon Federal land against the Government's wishes, there is no obligation under Public Law 96-375 to compensate them. The statute cannot be read otherwise.

Indeed, plaintiffs' argument amounts to a suggestion that the plain language of the statute is internally inconsistent and cannot mean: a) that the Government has the right to require certain properties to remain on Federal land, b) that plaintiffs own the permanent facilities that they have placed at Lake Berryessa, and c) that plaintiffs be given "fair value" for only the properties the Government requires not be removed from the concession areas. That is, however, exactly what the statute says.[1] Plaintiffs' suggestion that all of plaintiffs' property, whether abandoned or not requires fair value compensation, and that the Government does not have the

---

[1] Public Law 96-375 states that "[A]ll permanent facilities placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: Provided, That . . . the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities. . . or . . . require that new concessionaire to pay fair value." P.L. 96-375 § 5(b).

right to determine which permanent facilities are to remain on Federal land and which are to be removed, improperly disregards the plain text of the statute.[2]/ See Winuk, 77 Fed. Cl. at 215.

Finally, plaintiffs' reading of Public Law 96-375 defies common sense. In effect, plaintiffs want to be able to both abandon their permanent facilities on Federal property and yet claim ownership in perpetuity – even if they no longer have any contractual right over the concession areas. Public Law 96-375 does not require such a tortured state of affairs. Instead, plaintiffs' choices pursuant to Public Law 96-375 are clear. They can remove their permanent facilities from Federal land and retain full ownership of that property, as the statute intends. Or, if they abandon their property on Federal land, their rights to compensation for that abandoned property terminate. The choice is plaintiffs' to make – with the exception of the circumstance where the United States requires that they leave their permanent facilities on Federal land, in which case they are entitled to compensation.

### B. Fair Market Valuation Of Plaintiffs' Permanent Facilities Is Consistent With Public Law 96-375

Plaintiffs third argument with respect to Public Law 96-375 is that the statute requires "fair value" valuation of plaintiffs' permanent facilities. Pl. Op. at 5. There is no inconsistency as a matter of law, however, between the notion of "fair value" and the Prospectus's provisions for "fair market value." See Def. Mot. at 33-34; AR1288. Indeed, plaintiffs cite to no case that holds otherwise. Instead, plaintiffs cite to the Congressional record with respect to circumstances where specific valuation metrics were discussed to further delineate the general notion of "fair

[2]/ Plaintiffs' claim that the Prospectus permits new concessionaires to "'pick and choose' which of plaintiffs' assets are to remain" is incorrect. Pl. Op. at 4. The plain language of the Prospectus states that new concessionaires can merely propose which facilities are to remain, but the final decision as to which assets are to remain belongs to Reclamation. See AR1288.

value" or "fair market value." See Pl. Op. at 5 n.4. Even here, however, none of the passages that plaintiffs cite state that "fair market value" is inconsistent with "fair value."

Plaintiffs next argue that it is irrelevant that "fair value" and "fair market value" are one and the same because the valuation methodology employed was "a cost approach valuation," which plaintiffs' assert is an improper valuation methodology under either category of valuation. Id. at 5-6. Without any supporting authority, plaintiffs assert that a cost approach analysis, "obviously, is not a valuation of the 'fair market value' of Plaintiffs' property and assets." Id. at 6. Plaintiffs are incorrect.

As we noted in our initial brief, the Court of Appeals for the Federal Circuit has held that the law "'is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation. . . . It may be based on comparable sales, reproduction costs, capitalization of net income or an interaction of these determinants." Seravalli v. United States, 845 F.2d 1571, 1575 (Fed. Cir. 1988) (quoting United States v. 179.26 Acres of Land, 644 F.2d 367, 372 (10th Cir. 1981). See Def. Mot. at 34.

In accord with the trial court's broad mandate for determining fair market value, this Court has held that, like a "comparable sales approach" and an "income capitalization approach," the "cost approach" is a perfectly acceptable method for determining fair market value:

> A third method of valuation is the cost approach, alternatively referred to as the replacement cost or reproduction cost. Snowbank Enters., 6 Cl. Ct. at 485. Applied to improved land, the cost approach 'produces a valuation estimate by establishing the cost to replace the property, less depreciation, at a different but comparable site.' Id. (citing Gelin & Wright The Federal Law of Eminent Domain, § 4.1 at 200); see also Forster v. United States, 2 Cl. Ct. 426, 447 (1983) (recognizing, as an alternative method of determining market value, 'the cost approach, which uses

> depreciated replacement cost as the value of the asset'); Yaist v. United States, 17 Cl. Ct. 246, 260 (1989) (stating that the cost approach method determines the value of [improved] property by estimating the cost to construct the [improvement on the] property at the time of the taking, less depreciation').

Cane v. Tennessee, Inc. v. United States, 71 Fed. Cl. 432, 438-39 (2005). Continuing, the Cane Court emphasized that "[t]he Federal Circuit, however, has made clear that it is 'unwilling to restrict the trial courts to any single basis for determining fair market value.'" Cane, 71 Fed. Cl. at 439 (citing Barrett Refining Corp. v. United States, 242 F.3d 1055, 1061 (Fed. Cir. 2001)).

Thus, contrary to plaintiffs' bare pronouncement, there is nothing "illegal" with the Prospectus's use of a "cost approach analysis." AR1289. As this Court's discussion in Cane demonstrates, a "cost approach analysis" is a well-known methodology for determining fair market value. Thus, even though this Court is obligated to give an agency deference with respect to its choice of valuation methodology (see El Paso Natural Gas Co. v. Fed Energy Regulatory Comm'n, 96 F.3d 1460, 1464 (D.C. Cir. 1996)), a "cost approach analysis" is, deference or not, an entirely valid method for Reclamation to use to determine fair market value here.

## II. REQUIRING THE PLAINTIFFS TO REMOVE THEIR OWN PROPERTY FROM FEDERAL LAND IS ENTIRELY REASONABLE

Plaintiffs' second major argument is that plaintiffs alone have the "impossible requirement" of removing all of their property by the termination of their contracts. Pl. Op. at 7. Our first response, of course, is to question who, if not plaintiffs, would be best suited to remove their own property from their concession areas. Are they making the absurd suggestion that other parties (i.e., new concessionaires) are best suited to remove plaintiffs own property from the concession areas prior to the termination of plaintiffs' contracts? In a related manner, we remain

perplexed how, as a practical or legal matter, a third party could even begin removing plaintiffs' property from their concession areas prior to the termination of their contracts.

Closer examination of plaintiffs' argument reveals, however, that plaintiffs are not really discussing the removal of their property from their concession areas. Instead, when parsed, it is clear that plaintiffs are discussing the mechanisms by which third parties, namely mobile home owners, will remove mobile homes from plaintiffs' concession areas.[3] To be clear, however, the mobile homes are not owned by the plaintiffs. Plaintiffs can remove their own permanent facilities from Federal land in accord with their own contractual obligations. Separately, mobile home owners have their own acknowledged obligations to remove their mobile homes from concession areas by the time the concession contracts with Reclamation terminate. See Def. Mot. at 42 (citing AR41961, AR42019, AR42163, AR42252). It is patently incorrect and misleading to suggest, as plaintiffs do, that plaintiffs are the owners of the mobile homes and that they "will be forced to 'walk away from their investments' in contravention of P.L. 96-375." Pl. Op. at 8. Thus, the entire premise of plaintiffs' argument concerning the "impossibility" of "removing all of their property prior to termination of their existing contracts" (Pl. Op. at 7 (emphasis added)) is faulty because the plaintiffs in this case are not the mobile home owners.

Nor is plaintiffs' argument supported by Public Law 96-375. Public Law 96-375 concerns the concessionaires; the mobile home owners do not enjoy statutory rights pursuant to

---

[3] Plaintiffs argument relies upon a sleight of hand involving a transposition of the word "their" for "the" before the word "property." First, they argue that, to qualify for consideration of the new contracts, "Plaintiffs alone [face] an impossible requirement – the removal of all of their property." Pl. Op. at 7 (emphasis added). Then, when explaining this statement two sentences later, plaintiffs state "there simply will not be a sufficient number of permits to allow Plaintiffs to remove all of the property at the lake by the deadlines." Id. (emphasis added). When plaintiffs discuss "the" property, they are not discussing "their" property.

P.L. 96-375. Nor, under any circumstances, are mobile home owners the future recipients of fair value compensation for their trailers because none will remain on Federal land at the request of the Government. Therefore, no compensation (and thus, no appraisal) will be required. Plaintiffs' objection to the Prospectus based upon a lack of mobile home appraisals fails.

Aside from the faulty and misleading premise to plaintiffs' "impossibility" arguments suggesting that they are the owners of mobile homes, plaintiffs' arguments fail on the merits. First, for example, plaintiffs make the outlandish claim that the California Department of Transportation only issues two permits per week for the transport of travel trailers and mobile homes. Pl. Op. at 7. This is simply untrue. What is true is that there are only two days a week (Mondays and Wednesdays) that mobile homes can be properly transported on local State roads, but on those two days there are no restrictions on how many mobile homes can be transported.[4]/

As another example of plaintiffs claim of impossibility, plaintiffs argue that an injunction must be issued because "Defendant apparently recognizes that it has failed to comply with the requirements of NEPA" Pl. Op. at 8-9. Plaintiffs are, once again, flatly incorrect. Reclamation has determined that the removal of mobile home trailers at Lake Berryessa falls under the "Categorical Exclusion" under the NEPA. AR1006. Reclamation made the "Categorical Exclusion" determination based upon the fact that the removal of all existing trailers and associated appurtenances involves only minor construction activities on previously disturbed

[4]/ This information was obtained by us on October 10, 2007, through discussion with Robert Orozco of the Cal-Trans Sacramento Transportation Permit Office at 916-322-1297. Plaintiffs claim is based upon the declaration of Robert White, and not the administrative record. Separately, we have opposed the addition of Mr. White's declaration to the record. If Mr. White's uncorroborated statement is to be given any consideration by this Court, however, the Court should also consider the information presented above, refuting plaintiffs' assertion.

land and that there will be no impacts to the waters of the United States. Moreover, NEPA analysis was included in the Environmental Impact Statement from October 2005. See, e.g. AR22501, AR22517, AR22544, AR22583, AR22592, AR22599, AR22605-06, AR22619, AR22632. Thus, all of plaintiffs' arguments alleging a failure to abide by NEPA are incorrect.

## III. THE APPRAISALS OF PLAINTIFFS' PERMANENT FACILITIES ARE IN ACCORD WITH PUBLIC LAW 96-375

Plaintiffs next argument is that the appraisal of plaintiffs' permanent facilities obtained by defendant failed to adhere to defendant's own appraisal instructions. Pl. Op. at 10-11. In our initial brief, we demonstrated that the appraisal instructions plaintiffs alleged Reclamation did not follow were not Reclamation's own appraisal instructions, but, rather, plaintiffs' own instructions given to their own appraisers for the separate appraisal they commissioned. Def. Mot. at 43-45. Thus, we asserted, plaintiffs were incorrect to assert that the appraisals obtained by Reclamation did not follow appropriate Government-issued appraisal instructions. Id.

In demonstrating the incorrect nature of plaintiffs' arguments, we assumed that plaintiffs had merely made an unintentional mistake. Given plaintiffs response, however, it is clear that plaintiffs are intentionally relying upon the wrong appraisal instructions. Plaintiffs now assert that the appraisal instructions used by plaintiffs' own contractor were actually provided to plaintiffs by Reclamation, specifically by Mike Finnegan. This assertion is demonstrably false.

Plaintiffs claim that the appraisal instructions they used were provided by Mr. Finnegan, citing two documents, AR41752 and AR41749. The first document cited by plaintiffs, AR41752 is an email from Pedro "Pete" Lucero to Jim Shaw dated November 15, 2006. In the email Mr. Lucero notes that he had received "the GovWorks interagency agreement [concerning the

appraisals of plaintiffs' permanent facilities] which appears to give authorization to proceed." AR41752. The interagency agreement contains the appraisal instructions for the appraisal to be performed on Reclamation's benefit. Reclamation received the interagency agreement from GovWorks the day before, on November 14, 2006. AR41753. The terms and conditions of the interagency agreement went into effect beginning on November 13, 2006, AR41755, which is the date agency representatives signed the agreement. AR41754. We cited to this agreement and the accompanying appraisal instructions in our initial brief. Def. Mot. at 44. The second document cited by plaintiffs, AR41749, is an email from Mr. Lucero to Mike Finnegan, Charles Johnson, and Richard Johnson dated November 15, 2006. In the email, in which Mr. Lucero apparently attached the appraisal statement of work ("SOW"), Mr. Finnegan stated that "I can provide the SOW to Marc Kelley today." AR41749. Mr. Kelly is a lobbyist working on plaintiffs' behalf.

Plaintiffs claim that these two November 15th emails between Messrs. Lucero and Finnegan indicate that the appraisal instructions used by plaintiffs were actually the appraisal instructions Mr. Finnegan provided to Mr. Kelly. Pl. Op. at 10 ("As reflected in the e-mails contained in the administrative record, the appraisal instructions at issue came from the agency. . . . The instructions were provided to Plaintiffs under the representation that the agency would be using the instructions for their own appraisal"). In their initial brief, plaintiffs cite to their appendix at pages 300, 320, as setting forth the appraisal instructions at issue, that is, the "express requirement in the Statement of Work and Appraisal Instructions that an Income Approach valuation and a Direct Sales Comparison Approach valuation be performed on each of the resorts." Pl. Mem. (Aug. 27, 2007) at 25-26. Plaintiffs now claim that these facts demonstrate that the Government's use of a "cost approach" "contravenes the appraisal

instructions it provided to Plaintiffs." Pl. Op. at 10. As we noted in our initial response, plaintiffs appendix at page 320 (also at AR42549) sets forth the appraisal instructions plaintiffs provided to the company that did their own appraisals; they are not the appraisal instructions that originated from the Government. Def. Mot. at 14-16, 43-45.

Proof that the appraisal instructions plaintiffs used to value their own properties were not instructions Mr. Finnegan provided to plaintiffs can be demonstrated from the following. As noted in the email messages between Mr. Lucero and Mr. Finnegan, the Government's appraisal instructions were part of an interagency agreement effective November 13, 2006. AR41753-80. As noted above, two days later, on November 15, 2006, Mr. Finnegan discussed providing these instructions to plaintiffs' lobbyist, Mr. Kelly. AR41749. The appraisal instructions plaintiffs utilized in commissioning their own appraisals of their property, which plaintiffs cited in their initial brief and which plaintiffs now claim were provided to them by the Government on or about November 15, 2006, state that the appraisal valuation is to be performed as of July 1, 2006. See 42550. Thus the appraisal date on plaintiffs' statement of work is more than three months before the Government's appraisal contract even came into existence. Therefore, it is readily apparent that the appraisal instructions plaintiffs used in valuing their own property (AR42544-54) were not the Government's appraisal instructions (AR41753-80) discussed on November 15, 2006, which Mr. Finnegan may have provided to plaintiff. It is blatant error to claim otherwise.

Accordingly, as we stated in our initial brief, "The [Government's] appraisal of plaintiffs' permanent facilities did, in fact, adhere to the requirements of the appraisal instructions." Def. Mot. at 44. Moreover, as noted above, a "cost approach" valuation methodology is entirely consistent, as a matter of law, with the fair market value valuation required in the Statement of

Work. See above at 7-8. In short, plaintiffs' arguments against the validity of the Government's appraisals of their permanent facilities are without merit.

Finally, as discussed in our initial brief and above, any dispute concerning the valuation of plaintiffs' properties is a matter to be resolved pursuant to plaintiffs' existing contracts; such disputes are not rightfully the subject of a bid protest action before this Court, and in any event are premature given that the Prospectus acknowledges that the appraised values set forth in the Prospectus are not necessarily the final valuations of the permanent facilities. Def. Mot. at 44-45; see above at 4.

## IV. PLAINTIFFS' EXISTING CONTRACTUAL RIGHTS ARE NOT THE PROPER SUBJECT OF A BID PROTEST

Plaintiffs' fourth argument is that the Prospectus violates plaintiffs' contracts because it does not permit "an additional 180 days beyond the termination of the contracts for property removal," whereas, they claim, in the Steele Park and Markley Cove contracts "there is no requirement to remove mobile homes until 180 days after the termination date of the contract." Pl. Op. at 11. Once again, plaintiffs have blurred the distinction between their permanent facilities, which are their property, and the mobile homes, which are not their property.[5]/

The Steele Park contract discusses the concessionaires' obligation to remove its permanent facilities within 180 days after the termination of the contract:

> All permanent facilities on the premises on the effective date of this Agreement are the property of the Concessionaire. . . . Upon expiration or termination of this Agreement, the Government may require that some or all of the permanent facilities mentioned

---

[5]/ The mobile homes are not "permanent facilities: "The Prospectus defines 'permanent facilities' as 'fixed assets which are any structures, fixtures, or capital improvements permanently attached to the Federal estate.'" Def. Mot. at 13 n.6 (citing AR1289 at § M) (emphasis added).

> herein not be removed from the premises. . . . Those facilities that the Concessionaire is required to remove upon expiration or termination of this Agreement shall be removed by the Concessionaire without compensation by the Government and at no expense to the Government. Any such facilities not removed within one hundred eighty (180) calendar days after the date of termination or expiration of this Agreement shall be deemed to have been abandoned by the Concessionaire.

AR43018 at § B.1(A) (emphasis added).

Similarly, the Markley Cove contract requires the removal of permanent facilities within 180 days of the termination of the agreement. AR42642 ("If this agreement expires, the Concessionaire shall have the right to remove permanent facilities and improvements unless the Government directs otherwise. Facilities not removed by the Concessionaire within 180 calendar days after expiration of this agreement shall be deemed to have been abandoned").

There is no provision in either the Steele Park or Markley Cove contracts permitting mobile homes, which are not permanent facilities, to remain for 180 days past the termination of plaintiffs agreements. Accordingly, contrary to plaintiffs' assertions, the concessionaires have no contractual right to permit the mobile home operators to remain after the termination of the concessionaires contracts. Indeed, both concessionaires and mobile home operators filed signed acknowledgments with Reclamation in which both parties admitted that the mobile home owners were obligated to remove their mobile homes by the date of the termination of the concessionaires' contracts with the Government. See Def. Mot. at 27 (citing AR42018-42161, AR4326-42414, AR42162-42250, AR42415-42503, AR42251-42275, AR42504-42543, AR41960-41968). Plaintiffs ignore these acknowledgments, just as they disregard the plain language of the Steele Park and Markley Cove contracts.

The larger mistake plaintiffs make is, again, that their allegations concerning compliance with their existing contracts are not the proper subject of a bid protest action. If at some time in the future, issues arise in connection with the termination of their contracts, then plaintiffs can pursue contractual remedies if appropriate. See Def. Mot. 35-37, 45; Circle Line, 76 Fed. Cl. at 496; (the adequacy of the appraisal of the existing concessionaires property was not the proper subject of a bid protest because any appraisal related harm was "speculative," and injuries imagined "strictly conjectural"); Northern Telecom Inc. v. United States, 8 Cl. Ct. 376, 381 (1985) (breach of contract claims "are not considered under our bid protest function").

Plaintiffs seek to sidestep the clear holding of Circle Line by suggesting that existing contracts can be the subject of a pre-award bid protest action. For example, plaintiffs cite Wetsel-Oviatt Lumber Co. v. United States, 43 Fed. Cl. 748, 751 (1999), as an example where, they argue, the "pre-award protest action involv[ed] allegations that [the] Forest Service acted in breach of contract." Pl. Op. at 12 n.7. Plaintiffs mischaracterize the decision in Wetsel. In Wetsel this Court was not referring to a separate existing contract apart from the bid solicitation. Instead, the purported breach of contract was with respect to the "contractual duty to fairly and honestly consider" the bid itself. Wetsel, 43 Fed. Cl. at 751 ("the court concluded that the Forest Service breached its contractual duty to fairly and honestly consider plaintiff's bid by improperly rejecting plaintiff's bid."). Thus, Wetsel offers no support for the proposition that this Court can resolve disputes concerning an existing contract through a bid protest action.

Plaintiffs' reliance upon OTI America, Inc. v. United States, 68 Fed. Cl. 108 (2005) is similarly misplaced. Pl. Op. at 12 n.7. In OTI, the terms of the existing contracts were being considered by the Court because those existing contracts were simply "being used to conduct a

competition resulting in the elimination of some contractors as further sources of the agency's requirements." OTI, 68 Fed. Cl. at 116. That is, there were planned temporary contracts issued to several vendors, and the performance of those vendors under the terms of their existing, albeit temporary contracts, was being considered in the bid solicitation process. In that special context, consideration of the existing contracts was held appropriate by the Court. That is not the case here, and accordingly, OTI offers no support for the notion that this Court should address plaintiffs' existing contractual rights through their pre-award bid protest action.

Thus, plaintiffs can point to no analogous case where this Court has determined that a bid protest action was the proper mechanism through which a plaintiff contractor can dispute the terms of an existing contract (here, with respect to contracts issued decades ago).

In any event, however, plaintiffs contract arguments fail on their own terms. For example, plaintiffs now assert that their contracts are improperly shorter than the provisions set forth pursuant to Public Law 96-375. Pl. Op. at 12. This is incorrect. Public Law 96-375 permitted plaintiffs to extend their contracts for "no more than two consecutive terms of 10 years each." P.L. 96-375 § 5(a). The law didn't force plaintiffs to agree to contract terms of only 20 years. That the parties contractually agreed in certain instances to contractual terms lasting less than the full 20 years available under Public Law 96-375, is not the result of a unilateral mistake of Reclamation nor is it in contravention of Public Law 96-375.

Plaintiffs also argue that Reclamation is "currently [] in breach of the arbitration clause contained in the Steele Park agreement." Pl. Op. at 13. Again, plaintiffs are incorrect. The arbitration clause in the Steele Park agreement only requires arbitration concerning the valuation of permanent facilities "which the Government directed the concessionaire not to remove."

AR43018 (emphasis added). The Government has not directed Steele Park not to remove any of its permanent facilities. Thus, the Government's refusal to arbitrate at this time is entirely proper pursuant to the terms of the contract, and even a cursory review of the arbitration clause demonstrates that to be the case. Indeed, plaintiffs argument is so far off base that it is revealed for what it is: an unfounded attempt to delay indefinitely a perfectly legitimate and sound bid solicitation process. See Pl. Op. at 13 ("Until the arbitration proceedings are completed for the Steele Park resort, and a 'fair value' for the assets established, the Lake Berryessa procurement, which seeks bidders for all of the resorts, cannot be completed.").

## V. THE PREFERENCE FOR A MULTI-CONCESSION OPERATOR IS RATIONAL

Plaintiffs final substantive argument is that the Prospectus prejudices plaintiffs by favoring multi-concession operators in the evaluation of bid proposals. Tellingly, plaintiffs ignore the many rationales set forth in our brief and in the administrative record supporting Reclamation's preference for multi-concession operators. See Def. Mot. at 18-19 (benefits of economies of scale); id. at 19 (greater capacity to withstand a downturn in business); id. at 20 (better capacity to upgrade infrastructure); id. (better capacity to create an integrated, lake-wide spectrum of recreation experiences); id. at 20-21 (better capacity to phase in development).

Longstanding law instructs that, as long as a rational basis is articulated by the agency, the court cannot substitute its judgment for the agency, even if reasonable minds could reach differing conclusions. See Def. Mot. at 30 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285-86 (1974). This is exactly, however, what plaintiffs request.

Even worse, however, is the fact that, rather than address the merits of the many rationales for the multi-concession preference, plaintiffs invite this Court to ignore all of the

reasons listed above and consider only one rationale to favor multi-concession operators. Indeed, plaintiffs incorrectly suggest that Reclamation only set forth one reason for its multi-concession preference. Specifically, plaintiffs claim that "Defendant's reason for providing additional points was to 'reward' a multiple-resort offeror for 'the greater initial investment risk and more complex management burden' that came with a multiple-resort bid." Pl. Op. at 14. The assertion that we set forth a single "reason" for the multi-concession preference is incorrect. Beyond that, though, plaintiffs create a false dichotomy by claiming that the Prospectus offers an award for "large corporations" for greater risk and complexity, while penalizing small businesses for "lower risk and more efficiency." Id. (emphasis added). There is no such dichotomy concerning large and small business relating to efficiency. Indeed, the record demonstrates the opposite: that Reclamation determined greater efficiencies are to be found in the multi-concession operations. See Def. Mot. at 18-21. In short, plaintiffs argument is entirely without merit.[6]

## VI. THE BALANCE OF THE HARMS FAVOR THE GOVERNMENT

In our initial brief we demonstrated that plaintiffs' dilatory tactics in bringing their bid protest action demonstrates, by itself, that plaintiffs cannot claim irreparable harm from the solicitation of new contracts. Def. Mot. at 47 (citing Oakland Tribune Inc. v. Chronicle Publ'g Co., Inc., 762 F.2s 1374, 1377 (9th Cir. 1985); Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 537 (2003); ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 399-401 (2003). Plaintiffs cannot justify their delay until just four days before the close of the solicitation

---

[6] As for plaintiffs' innuendo of preferential treatment, the lone document plaintiffs cite proves just the opposite. Mr. Lucero actually cautioned against any extension for the Pleasure Cove contract, even though it is set to expire in December 2007, because of his desire "to avoid any perception of collusion during the selection process." AR4143 (emphasis added).

period before filing their bid protest. They merely state, in a conclusory fashion, that "there is no adverse inference to be drawn from this timetable." As a matter of law, they are incorrect.

Further, plaintiffs cannot claim irreparable harm because the majority of their complaint deals with their existing contracts, which, again, are not the proper subject of a bid protest action. See Def. Mot. at 45-46. Moreover, the fact that plaintiffs have had fifty years notice that their concession contracts are coming to an end demonstrates that there is not now a sudden need for injunctive relief to avoid "irreparable harm." Plaintiffs have had plenty of time to prepare for what they have long known was the inevitable day upon which their contracts shall expire.

The harm to the United States, however, takes multiple forms. Plaintiffs claim that, in making our request for a bond should an injunction issue, we have merely made a "bald assertion" that we will incur damages if their injunction is granted. Plaintiffs then proceed to pronounce that "Defendant will suffer no damages" if an injunction is issued. Pl. Op. at 16. That is not the case. In our initial brief, we set forth three categories of likely harms that will be inflicted upon Reclamation if plaintiffs request for an injunction is sustained. Def. Mot. at 48.

Furthermore, we annex the declaration of Pedro Lucero, detailing the likely costs to be borne by the Government should we be found to have been "wrongfully enjoined or restrained." See Ex. A (Lucero Decl. (Oct. 15, 2007)). These costs should form the basis for the bond that this Court should require if it grants plaintiffs' motion for an injunction. See RCFC 65(c).

## CONCLUSION

For the reasons stated above, and in our opposition to plaintiffs' motion for a preliminary injunction, we respectfully request that plaintiffs' motion for injunctive relief be denied and the Government's cross motion for judgment on the administrative record be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit - 8th Floor
Washington, D.C. 20530
Tel. 202-353-7972
Fax. 202-514-8640
Attorneys for Defendant

OF COUNSEL:

JAMES E. TURNER
Assistant Regional Solicitor
Office of the Solicitor
Pacific Southwest Region
United States Department of the Interior
2800 Cottage Way
Room E-1712
Sacramento, California 95825-1890
Tel. 916-978-5685
Fax. 916-978-5694

October 15, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of October 2007, a copy of the foregoing "DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson