# EXHIBIT B

SELECTIONS FROM THE ADMINISTRATIVE RECORD NOT ANNEXED IN PLAINTIFFS' OR DEFENDANT'S PRIOR FILINGS

40 Code of Federal Regulations (CFR) 1500-1517. Areas are responsible for preparation of EAs and EISs as required by those guidelines and regulations. All project compliance documents must comply with applicable laws, regulation, and guidelines. Section 404 Clean Water Act permits, statements of findings, findings of no significant impact (FONSI), and Record of Decision (ROD) needed for projects will be prepared by the area.

## 2. NEPA Process

The NEPA process begins with the determination of whether a "proposed action" is subject to NEPA compliance. A proposed action is subject to NEPA if it is a Federal action. A State, local, or private action also may be subject to NEPA if it includes significant Federal involvement. This includes non-Federal actions that are regulated, licensed, permitted, or approved by Federal actions (e.g., the need for Federal permits, licenses, and other approval from a Federal agency program).

A proposed action can be categorically excluded from the EA or EIS requirements if the action does not individually or cumulatively have a significant effect on the human and natural environment. In addition, the proposed action may be excluded if the Federal agency demonstrates that there will be no significant environmental effect through procedures adopted by a Federal agency pursuant to NEPA (e.g., building a fence).

If the proposed action is not exempt from the EA or EIS requirements, the lead Federal agency must prepare the appropriate level of compliance. The EA is a concise public document that should include a brief discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and its alternatives, and a listing of agencies and people consulted. The EA helps to determine if an agency needs to prepare an EIS or if the agency can make a FONSI.

In the EA, the lead Federal agency must assess the proposed action for the following three impacts:

a. **Direct effects** that are caused by the action and occur at the same time and place. Examples of direct effects are the elimination of original land use because of the erection of a building and a change in land use.

b. **Indirect effects** that are caused by the action but occur later. For example, an indirect effect may cause an increase in population density or growth rate which, in turn, can cause growth-induced stress effects on the air, water, and other natural systems.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

0
0
0
1
9
3
4
0

# Future Recreation Use and Operation of Lake Berryessa

## Final Environmental Impact Statement
## Solano Project, Napa, CA
## Mid-Pacific Region

U.S. Department of Interior
Bureau of Reclamation
Mid-Pacific Region
Sacramento, CA

This final Environmental Impact Statement is prepared in compliance with National Environmental Policy Act (NEPA) and the U.S. Bureau of Reclamation (Reclamation) procedures. Reclamation is proposing to amend the 1992 Reservoir Area Management Plan (RAMP) by preparing a Visitor Services Plan (VSP). The Preferred Alternative would permanently remove all private long-term exclusive-use trailer sites and provide increased and improved short-term use opportunities. However, potential mitigation measures could include a phase out period that could involve relocation or consolidation of trailers on an interim basis to a less intrusive, fully developed site; actions that could require additional environmental analysis. The Preferred Alternative would also rehabilitate shorelines in the vicinity of the resort areas and would adopt the criteria of a water recreation management program termed the "Water Recreation Opportunity Spectrum" (WROS). The WROS does not impose specific numeric restrictions on any particular type of motorized or non-motorized watercraft. Rather, the WROS is a zoning classification system designed to better protect the Reservoir's natural resources, ensure public safety, expand opportunities for diverse boating experiences by the visiting public, and more accurately forecast future visitor needs. The WROS process incorporates adaptive management, therefore monitoring of the land and water use classifications (zones) designated for Lake Berryessa and adapting for appropriate or necessary change will be an ongoing process.

This final Environmental Impact Statement (EIS) analyzes the impacts of the Preferred Alternative and three other alternatives, including a No Action Alternative as described in the VSP. The impact categories evaluated include Land Use, Geology, Soils and Topography, Biological Resources, Cultural Resources, Traffic and Circulation, Noise, Recreation, Scenic Resources, Socio-Economic Environment, Public Safety, Hazardous Materials and Soil Contamination. This final EIS also fulfills the requirements of Executive Orders 11990 (protection of wetlands) and 12898 (environmental justice).

For further information regarding this final EIS, contact the Park Manager, Central California Area Office, Lake Berryessa Administrative Center, 5520 Knoxville Road, Napa, California, Telephone (707) 966-2111.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

00019348

# Summary

Reclamation has prepared this final Visitor Services Plan Environmental Impact Statement (VSP EIS) to identify and assess the various management alternatives for the re-development and management of visitor services (commercial and non-commercial) at Lake Berryessa, California. As part of this planning process, Reclamation is complying with the National Environmental Policy Act (NEPA) by preparing an Environmental Impact Statement in conjunction with the VSP.

One of the steps in the NEPA process is to develop a reasonable range of action alternatives that can be compared to the "No Action" or "projection of current conditions" alternative. This document describes the four alternatives developed for the VSP EIS for public review and evaluation.

In developing the alternatives, attention was given to the recreation management objectives of the agency and current issues identified in Chapter 1, "Purpose of and Need for Action." The guiding management document currently in effect at the reservoir is the 1992 RAMP[1]. Elements of the RAMP are tightly integrated with concession contracts that govern operation of seven resort areas at the lake. Those contracts are scheduled to expire in 2008-2009, thereby necessitating the current planning effort. The RAMP and the 1995 and 2000 OIG Audit Reports may be viewed on the Reclamation website www.usbr.gov/mp/berryessa/index.html, "Documents and Forms".

Alternative A is the No Action Alternative, which describes the projection of current conditions through the expiration of the current concession contracts. Alternatives B, C, and D are the action alternatives displaying the range of options for new visitor services at Lake Berryessa.

## Description of the Preferred Action, Alternative B

The focus at Lake Berryessa would be the development of new facilities and programs to better serve the short-term visitor. This alternative would permanently remove all private long-term exclusive-use trailer sites and provide increased and improved short-term use opportunities. However, potential mitigation measures could include a phase out period that could involve relocation or consolidation of trailers on an interim basis to a less intrusive, fully developed site; actions that could require additional environmental analysis. (See Summary Table S 2.1) Lakeshore areas at the resorts would be restored to a more natural setting and public access to those areas would be improved. Reclamation would maintain existing day-use areas and upgrade two vehicle pullouts to improve parking and trailhead access to the reservoir.

As a general framework, additional campsites, picnic areas, and recreational vehicle (RV) sites would be provided, along with customary lodging, houseboat rentals, and food, retail and marina services. A concessionaire would manage the Capell Cove launch ramp

---

[1] *The RAMP is a comprehensive land and water use document that establishes development and use priorities for specific areas of Lake Berryessa through the term of the existing concession contracts (2008/2009).*



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

0
0
0
1
9
3
6
2

# Chapter 2 **Alternatives**

## 2.1 Introduction

This chapter provides detailed descriptions of the alternatives considered during this VSP EIS development process, as required by the National Environmental Policy Act (NEPA). NEPA requires an analysis of a reasonable range of alternatives that could accomplish the agency's purpose and need. These alternatives as described in the VSP EIS, must objectively be evaluated to enable reviewers to assess their comparative merits (40 CFR1502.14). NEPA further requires that range of alternatives to include a No Action Alternative, and a description of any alternatives that were considered but eliminated from further study; these are provided in this chapter, section 2.4. The No Action Alternative, which evaluates impacts that are predicted to occur if current management practices are continued, is used as a benchmark to which other alternatives are compared.

## 2.2 Alternatives, Development and Selection

Reclamation considered a number of possible project alternatives that might meet the purpose of and need for the project and the recreation and land use objectives stated above. Those potential alternatives were developed following public scoping in 2001 based upon public issues and management concerns.

Four alternatives, including the No Action Alternative, were selected for further consideration and analysis.

These are described in detail in chapter 2, section 2.3. Alternative C was developed as a result of comments received describing a resort upgrade that re-introduced long term trailers modeled on a Bureau of Land Management (BLM) action at Lake Havasu, AZ. It is recognized that this alternative does not conform with Reclamation policy with regard to long term exclusive use.

Alternative D is based upon an alternative submitted by a local group during the formal public scoping period in 2001.

An explanation of the various terms and phrases used in the VSP and associated with the planning and administration of commercial services can be found in Attachment 16.

### 2.2.1 Alternative Concept Proposals

Reclamation received several comprehensive comments from external groups or individuals identified as separate "Alternatives" to be included as part of the consideration in reaching a final decision for the future of visitor services at Lake Berryessa. All of the submitted alternatives have features of their proposals that were included in either the "No Action" or the "action" alternatives outlined in the DEIS.



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

divisions of Berryessa Estates on the northern end of Putah Creek, Berryessa Pines on the western shoreline just south of Pope Creek, the community of Spanish Flat north of Capell Creek, and Berryessa Highlands on the southern shoreline overlooking Steele Park Resort have been zoned as Planned Development. All of these developments are on private land with limited access to the lake. In addition, there are three tracts that are zoned as Commercial Limited, one site zoned as Residential Building Site-1, and one tract is zoned as Residential Country. Napa County has two other zone classes: Marine Commercial (which does not occur in the Berryessa vicinity) and Commercial neighborhood.

A number of commercial establishments are located along the highways leading to the lake. These include food stores, a boat repair shop and supply store, restaurants, mobile home parks, service stations and taverns. There is also a small school located on the north side of the Knoxville-Berryessa Road on the northern end of the lake, and another school north of the intersection of Highways 128 and 121. The nearest community offering typical community services is the city of Napa, 26 miles southwest of the lake.

### Related Plans, Projects and Management Arrangements

NEPA requirements and guidelines specify that projects must be reviewed for consistency and conformity to local and regional plans and policies of those jurisdictions that could be affected by proposed actions. Plans and associated projects applicable to this VSP EIS are described below.

### Programmatic Environmental Impact Statement/Reservoir Area Management Plan

A Programmatic Environmental Impact Statement (PEIS) was prepared in 1992 in compliance with the NEPA, P.L. 91190; Council on Environmental Quality Regulations (40 CFR 1500-1508); Department of Interior Manual 516, "Implementing Procedures"; Bureau of Reclamation, National Environmental Policy Handbook; Floodplain and Wetlands Executive Orders 11988 and 11990; the Fish and Wildlife Coordination Act; the Endangered Species Act; and the National Historic Preservation Act. The PEIS addressed the impacts of a number of actions proposed in the Reservoir Area Management Plan for Lake Berryessa, the most notable of which was correcting the lack of day-use public recreation facilities along the western lakeshore. Until the 1970s, development had occurred mainly in resort-operated trailer parks instead of at non-resort day-use facilities, as recommended in the 1959 Public Use Plan. P.L. 93-493 further attempted to correct this deficiency by mandating the development of day-use facilities at the Oak Shores and Smittle Creek picnic grounds and the Capell Cove boat launch ramp (See RAMP, www.usbr.gov/mp/berryessa/index.html, "Laws and Regulations".

### Lake Berryessa Wildlife Area Management

The Lake Berryessa Wildlife Area is cooperatively managed by Reclamation and the California Department of Fish and Game (DFG). In 1995, the two agencies signed a Memorandum of Understanding (MOU) to formalize a cooperative relationship for the establishment and management of the wildlife area on federal land. The management area includes the shoreline fluctuation zone and appropriate open water. The primary purposes of the MOU are to (1) "restore, enhance, and protect the fish and wildlife resources along the east side of Lake Berryessa," and (2) "develop compatible outdoor recreational opportunities for the public." A 1998 management plan developed jointly by both agencies, details goals, objectives and management actions for the wildlife area. The



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

00019403

# Chapter 3 **Affected Environment, Existing Setting, Environmental Consequences and Mitigation**

This chapter describes the existing environmental setting for the areas potentially affected by the Proposed Action and the project alternatives, including the No Action Alternative. The affected environment is described for each resource of concern in the proposed project areas, and the descriptions include information relating to possible impacts, mitigation efforts, and the final selection of a Preferred Alternative. This chapter also evaluates the effectiveness of mitigation measures to determine whether they would reduce potentially significant impacts to less-than-significant impacts.

The terms "effects" and "impacts" are used interchangeably in this document. Negative impacts have been given two basic levels of intensity: impacts of major significance and impacts that are less and range from moderate to minor. These levels are meant to be relative to one another only within a specific resource category. In this context, major negative impacts may be characterized as substantial or highly visible adverse changes in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic and aesthetic significance, and may require comprehensive mitigation. Lesser impacts may be characterized as ranging from moderate to minor, with minor impacts described as being marginally visible as compared with moderate impacts described as unexceptional, limited in scope and effect with somewhat greater visibility but having less overall detrimental effects than those described under major impacts.

A more detailed description of the term Significance and its use in NEPA can be found in Chapter 5, under [43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]. In this EIS, impacts have been addressed primarily on a qualitative basis and where sufficient information is available, quantitatively as well. Actions that could result in no new negative impacts or (minor to moderate) less than significant negative impacts have generally been assessed qualitatively. Positive or beneficial impacts have not been given relative values. In summary, this represents a programmatic level assessment of impacts associated with implementing the alternatives. The programmatic assessment complies with all NEPA requirements for completion of the VSP EIS ROD. Subsequent to the ROD, Reclamation will fully evaluate, as appropriate, the environmental impact on each resort area of the applicable site development plan approved by Reclamation through the competitive contracting process.

## 3.1 LAND USE

### 3.1.1 Affected Environment and Existing Setting

**Alternative A (No Action): Continue Existing Commercial Services until Concession Contracts Expire in 2008/2009. Continue Reclamation Services and Facilities in Accordance with the 1992 RAMP EIS.**



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

## Alternative B (Preferred): Remove All Long-term Trailer Sites. Concessionaire to Expand and Develop New Short-Term Facilities at Resorts. Develop Trails and Land and Water Use Zones.

**Impact 3.1.2.11: Potential Impacts Due to Inconsistency with Reservoir Jurisdiction, Mission, Policies, Uses (Grazing), Land Classification (RAMP) and Napa County Land Use Classifications**
With two exceptions, the potential impacts of the Preferred Alternative (Alternative B) on the topics listed above under Impact 3.1.2.11 would be identical to those described for Impacts 3.1.2.1 and 3.1.2.2 and for Impacts 3.1.2.4 through 3.1.2.6 for Alternative A, above. The first exception under Alternative B corrects an inconsistency under Alternative A, 3.1.2.3 that describes a significant impact due to the continuation of existing commercial activities in conflict with Reclamation policy.

The other exception pertains to land classification. Under the No Action Alternative, the land classes described in the 1992 RAMP would continue to be applicable, as that alternative would essentially extend the life of the RAMP. However, under the Preferred Alternative (and under the other action alternatives), Reclamation's more recent WROS recreational-use classification system would be implemented.

The two systems are similar, insofar as Concession and Government Operations are concerned. For example, areas classified as Urban under the WROS system are comparable to the RAMP's Class I – High Density, with both effectively describing resort developments with numerous facilities, infrastructure and public amenities. Areas classified as Suburban or Rural Developed under the WROS system is comparable to the RAMP's Class II - General Outdoor Recreation; and the WROS Rural Natural class is comparable to the RAMP's Class III – Dispersed Recreation category.

Further, if the Preferred Alternative were selected, the WROS system would take effect, and the old 1992 classification system would become defunct. Preferred actions under Alternative B would have to be internally consistent with the WROS recreational-use classification system – which they are; and they are also, in fact, consistent with the 1992 RAMP system.

**Impact 3.1.2.12: Potential Impacts Due to Incompatibility with Related Plans (RAMP)**
Implementation of the Concession Operations and the Government Operations components of Alternative B would not conflict with the ongoing requirements of the 1992 ramp until the expiration of concession contracts in 2008-2009, and no impact is anticipated.

**Impact 3.1.2.13: Cumulative Environmental Impacts To Land Use**

**Definition of Cumulative and Indirect Impacts**

***A cumulative impact*** is defined as the impact on the environment, which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or Non-Federal) or person undertakes such actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. (40 CFR 1508.7-.25)

***An indirect impact*** is one that may *eventually* result from a direct impact of a particular action, which would cause either beneficial or adverse results. Indirect



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order 

engineering study to consider more permanent repairs is scheduled for 2004. This is an on-going condition and not seen as a significant impact.

The engineering report prepared in 1995 can be seen in Attachment 6. No other unstable soil conditions have been identified for this alternative.

## Alternative B (Preferred): Remove All Long-term Trailer Sites. Concessionaire to Expand and Develop New Short-Term Facilities at Resorts. Develop Trails and Land and Water Use Zones.

**Impact 3.2.2.3: Potential Impacts Due to Seismic Instability, Changes in Topography, Erosion and Soil Movement from Excavation, Grading or Fill**
As stated in Alternative A, there is no record of seismic instability having affected any structures at Lake Berryessa and the state of California rates the likelihood of seismic activity occurring in the area as very low.

Under Alternative B, in the absence of design and construction plans for the Concession Operations component, it is assumed that new development at each resort would include the eventual removal and/or rehabilitation and construction of various structures and supporting infrastructure, as necessary. This development is anticipated to include both the excavation and relocation of earth materials with an unknown amount of cut and fill expected to occur at each resort site, depending on individual design requirements. There would be a potential for erosion to occur during these activities. However, with the use of best management practices, the potential effects from development related erosion would be considered minor. Corrective measures would include adhering to all design and construction criteria to insure a separation of construction areas from adjacent sources of water.

Construction of resort facilities would adhere to Title 24 of the 2001 California Code of Regulations, which includes requirements to minimize the potential for soil erosion during construction. Measures would include procedures to separate construction areas from water sources and in the case of Rancho Monticello, insure that the wetlands site adjacent to the sewage treatment plant is protected according to provisions of Section 404 of the Clean Water Act.

Other procedures would include the stockpiling and covering of soils in suitable locations to prevent erosion, and covering or treating disturbed soils (including use of temporary rooted vegetation) to reduce erosion by wind or rain. Rip-rap or other appropriate measures incorporated into project design would reduce erosion impacts to any nearby streams and to the lake. Because these measures would be incorporated into all construction related elements of this alternative, effects are anticipated to be minor.

As a general framework, there are no major changes envisioned for the facilities at Camp Berryessa, a group campground to be managed by the Putah Creek Resort or for Capell Cove Launch Ramp, a Reclamation facility proposed for management by the Spanish Flat Resort, other than modifications required to meeting accessibility standards. Consequently, it is not anticipated that either of these facilities would be affected by erosion from soil movement due to evacuation, grading or fill. The implementation of the Government Operations component, under Alternative B, calls for the development of a trail system and the reclassification of use levels for the reservoir, under WROS criteria. This reclassification would apply to 25 islands, areas along the shoreline as well as the lake surface itself. Reclamation would also continue to manage the day use areas at Oak



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order 22605

00019410

Shores and Smittle Creek, and the dispersed sites (turnouts) at Markley, Olive Orchard, North shore and Pope Creek. As described earlier, the existing unimproved turnout at Eticuera would be closed and reseeded with native grasses consistent with surrounding vegetation and would be replaced with a turnout a short distance further north at mile marker 18 on the Knoxville-Berryessa Road. This site would include graveled parking for 15-20 vehicles, a small vault-type toilet, an information kiosk and a short pedestrian gravel trail to the nearby reservoir. This proposed upgrade would create a minor impact to the surrounding environment since a large part of the site has already been used for unofficial parking, the short trail to the lakeshore would follow an older road track used when the area was part of a grazing allotment and the use of a small portion of grassland as part of this proposal would be offset by the rehabilitation of the existing Eticuera turnout.

A turnout at Steele Park would be upgraded much the same way as Eticuera with a low visibility trailhead, graveled parking for 15-20 vehicles, a portable toilet, picnic table, trash receptacle and a graveled trail that would follow a pre-reservoir roadbed to the lakeshore. These modest improvements are anticipated to create only minor impacts to the environment since the areas has already been used for day-use activities for a number of years. Any cut of fill activities at these two turnouts would be minimal if occurring at all since the terrain is flat and already suitable for parking.

There are no plans for any development of the remaining sites under WROS and no adverse effects are anticipated.

The design and construction of new trails by Reclamation would also adhere to the same applicable state design and construction codes used at the resorts as well as the Department of Interior, Bureau of Reclamation "Recreation Facility Design Guidelines" (See Attachment 7).

The 1992 RAMP estimates that the construction of a trail measuring 3 feet wide by 50 miles long may affect from 10 to 18 acres of surface material including vegetation, but if well planned and aligned in an environmentally sensitive manner, a new trail would have a beneficial effect by directing previously indiscriminate uses to the improved system. Although the trail system proposed under this alternative has not yet been designed, it is anticipated that its extent may be at least twice the size of a trail network envisioned under Preferred Action 7, in the RAMP. However, the development of a reservoir-wide trail system, that adopts the erosion abatement and soil conservation criteria proposed for the resorts and utilizes the numerous existing roads and trails and other informal routes that have been created over the years, would likely create only a minor impact to the resources. However, further environmental analysis may be necessary once the final routes have been determined.

**Impact 3.2.2.4: Potential Impact Due to Land Subsidence or Unstable Soil Conditions**

As noted under the No Action Alternative, the predominant soil types along the western shore are the Bressa-Dibble Complex, the Henneke Gravelly Loam and the Los Gatos Loam. The majority of development along the western shore occurs on the Bressa-Dibble Complex, which becomes unstable when slopes exceed 30%. There have been no reports of unstable soil conditions or land subsidence. Nevertheless, implementation of the Concession Operations component of Alternative B would be accomplished in accordance with design and construction standards that include all applicable codes regarding the presence and use of unstable soils located within the resorts. Earth materials



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order

22606

monitoring program, it is not known whether these emissions are within the limits set by federal and state clean air standards, however, to date there have been no observations or anecdotal data from any source that have indicated that air quality may be negatively affected during peak use periods.

## Alternative B (Preferred): Remove All Long-term Trailer Sites. Concessionaire to Expand and Develop New Short-Term Facilities at Resorts. Develop Trails and Land and Water Use Zones.

**Impact 3.3.2.12: Potential Impacts to Threatened, Endangered or Rare Species**
Implementation of the Concession Operations components under Alternative B would not cause impacts to species protected under the threatened, endangered or rare classifications. One of the two known active nests of bald eagles is located on the west shore, two miles from any developed areas, while the other is located on the western tip of Big Island. Big Island has been given a special designation to insure adequate protection of the eagles, especially during the breeding and nesting seasons. Reclamation has determined that this action will have no effect on listed, proposed, or candidate threatened or endangered species or on designated critical habitats.
The preferred habitat of the valley elderberry longhorn beetle, a federally listed threatened species, occurs next to the Knoxville-Berryessa Road on the shore of Smittle Creek. It is undetermined whether the beetles actually occur there at this time. Nevertheless, the potential beetle habitat would be protected by requiring any proposed road improvements to avoid that area.

The presence of other species listed by the USFWS or DFG for the Lake Berryessa area has not been documented within the project area. There are no potential impacts to Threatened, Endangered or Rare Species under this alternative

**Impact 3.3.2.13: Potential Impact to Mammals**
The Concession Operations development component of Alternative B would involve the removal, renovation and construction of concession facilities at each resort. (These activities hereafter are referred to collectively as "build-out.") Wildlife more commonly found in the vicinity of the resorts could be temporarily disturbed while build-out occurs. These impacts would include increased dust, noise and human activity. Due to the abundance of the species that are common to these areas, their familiarity and adaptation to the urban environment, and their ability to move to and survive in other locations, these impacts would be minor.

Also under this alternative, the Capell Cove launch ramp would be managed by Spanish Flat Marina, and Camp Berryessa would be operated by Putah Creek Resort. As no additional development is proposed for Capell and only minor changes are envisioned for Camp Berryessa, no impacts to wildlife would be anticipated.

The Government Operations component proposes the construction of a more extensive trail network bordering the reservoir. Once the trail alignment has been determined, an environmental analysis might be necessary to evaluate further any potential affects to wildlife. However, any such impacts would be no greater than those anticipated for the resort areas, and for the same reasons.

Alternative B also proposes a use-classification change from the use-levels described in the 1992 RAMP to those adopted under the WROS recreational-use classification system,



Protected Material To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order

00019423

sites are inundated by the reservoir and would remain so under Alternative A; no known ethnographic or historical resources would be potentially impacted by continued Reclamation activities; curatorial agreements would remain in effect; and Visitor Center exhibits would remain in place.

However, some 1992 RAMP actions remain to be completed, and some of these may have the potential of uncovering buried cultural remains. For example, Alternative A calls for development of approximately 50 miles of trail. Trail-building activities have a potential to disturb buried cultural resources. Additional cultural resource survey and Section 106 review in consultation with the California State Historic Preservation Office (SHPO) may be necessary if trail routes were finalized and the project became active under this alternative. Even with completion of such work, however, there always remains a possibility that sub-surface cultural remains might be disturbed during construction activities. In the event of an unanticipated discovery of cultural (including human) remains during development, Reclamation would immediately halt activities at that location, notify the California SHPO and comply with all procedures set forth the National Historic Preservation Act of 1966 (16 USC 470) and the Native American Graves Protection Act of 1990 (25 USC 3001), as applicable.

Continuation of the recreation-use classification system utilized by the RAMP would result in ongoing parking in non-designated areas, motorboat-related erosion to some shorelines, and visitor impacts to resource-sensitive areas. Some of these areas have a slight potential to contain sub-surface archeological remains.

In summary, no significant disturbances to ethnographic, historical, archeological or museum resources would occur under Alternative A.

## Alternative B (Preferred): Remove All Long-term Trailer Sites. Concessionaire to Expand and Develop New Short-Term Facilities at Resorts. Develop Trails and Land and Water Use Zones.

### Impact 3.4.2.2: Potential Disturbance to Ethnographical, Historical, Archeological and Museum Resources

Alternative B calls for expanded development of resort facilities, a lakeside trail system, and installation of a vault toilet at the Eticuera turnout. During earth-disturbing activities related to these actions, buried cultural remains potentially could be discovered. In view of the intense development and sustained use at each of the resorts since their construction in 1958, the likelihood of disturbing previously undiscovered cultural resources at those locations is minimal. The proposed toilet site would also be sited in areas of previous disturbance, and its development is unlikely to result in disturbance of archeological, historical, or ethnographic resources.

Survey of the lakeshore area suggests that cultural remains there are few, but buried resources could exist there and could potentially be disturbed by trail-building activities, especially if those activities were to occur across 150 linear miles, as proposed by Alternative B.

As with natural environmental review, additional cultural resource survey and Section 106 review in consultation with the California SHPO may be necessary once development plans were finalized for any of these projects. Such work would allow more



Protected Material To Be Disclosed
Only In Accordance With U.S.
Court Of Federal Claims Protective Order