# In the United States Court of Federal Claims

No. 07-636 C

(November 7, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * | Pre-Award Bid Protest; Legal |
| JOHN C. FRAZIER, III, *et al.*, | Standards Governing the Solicitation |
| | of Bureau of Reclamation Concession |
| *Plaintiffs*, | Contracts; Litigation of Contract |
| | Claims within a Pre-Award Bid |
| v. | Protest; Incumbent Contractor |
| | Performance as Responsiveness and |
| THE UNITED STATES, | Responsibility Criteria; Whether |
| | Allegedly Inaccurate Appraisal |
| *Defendant*. | Estimates May Invalidate a |
| | Prospectus. |
| * * * * * * * * * * * * * * | |

*Gregory T. Jaeger*, Washington, DC, for plaintiffs.

*John H. Roberson*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Kirk T. Manhardt*, Assistant Director, Washington, DC, for defendant. *James E. Turner*, Assistant Regional Solicitor, United States Department of the Interior, Sacramento, CA, of counsel.

_____

**OPINION**

_____

**Bush**, *Judge*.

This pre-award bid protest is before the court on plaintiffs' motion for a preliminary injunction, and cross-motions for judgment on the administrative record filed under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC). In this case, plaintiffs challenge a prospectus issued by the United

States Department of the Interior's Bureau of Reclamation (Bureau) on June 7, 2007, for new concession contracts (new contracts) at Lake Berryessa, Napa County, California.  Plaintiffs hold four of the seven current, expiring concession contracts at Lake Berryessa (old or existing contracts), and operate discrete recreational facilities on federal property there.  Their standing for this bid protest, however, is based on their status as likely bidders on the new concession contracts.

An administrative record of over forty-three thousand pages was filed, the parties' motions were fully briefed, and oral argument was held on October 19, 2007, all on an expedited schedule.  Receipt of bids for the contracts described in the prospectus has been twice delayed by the Bureau to accommodate this litigation.  For reasons set forth below, plaintiffs' requests for injunctive relief are denied, and defendant's motion for judgment on the administrative record is granted.

## BACKGROUND

### I.     Existing Lake Berryessa Concession Contracts

Lake Berryessa was created in 1957 by the erection of the Monticello Dam on Putah Creek in northern California, as part of what is now known as the Solano Project.  AR at 348.  In 1958, the Bureau entered into an agreement with Napa County, California, so that the county would administer federal lands for recreational uses of the lake.  *Id.*  Napa County, in turn, entered into seven contracts with seven concessionaires to develop and operate recreational facilities, at seven sites offering good access to the lakeshore.  *Id.*; Compl. ¶¶ 26-29.  These contracts were originally set for approximately twenty or thirty year terms, beginning in 1958 or 1959.  AR at 42557; Def.'s Mot. at 21-26.

During the initial terms of the contracts, all of the concessionaires developed, with approval from Napa County, long-term use mobile home sites.  AR at 348, 42557.  This use of public lands has been the subject of some controversy.  *See id.* at 349.  The concessionaires also built short-term use recreational facilities.  *Id.* at 348.  A substantial and predictable portion of the income from the concessions was derived from the mobile home sites.  Compl. ¶ 31 (describing the mobile home sites as "the core economic base for the concession operations at Lake Berryessa" and noting that the majority of the mobile homes are sited on the concessions of the four plaintiffs in the subject matter); AR at 42562

2

(stating that the mobile home sites provided steady, year-round income).  There are approximately 1300 mobile home sites at the concessions today.  Compl. ¶ 31.  As early as 1971, however, government review of recreational usage of Lake Berryessa noted a conflict between the mobile home sites and public access to the lake.  AR at 42562.

In 1975, the Bureau took over management of recreation on the federal lands and waters of Lake Berryessa, and administration of the concession contracts.  *Id.* Of the seven contracts that came to the Bureau from Napa County, two were renegotiated before they were extended for two terms of approximately ten years each.  Def.'s Mot. at 10.  Another contract was also renegotiated, but because of the bankruptcy of the former concessionaire, this concession is now operated by a replacement concessionaire that is not party to this suit.  *Id.*  The remaining four contracts were not renegotiated, but were also extended, upon expiration of an initial thirty year period, for two terms of approximately ten years each.  *Id.*  Of the four concessions operated by plaintiffs in this suit, two are governed by the terms of what might be called 'renegotiated, approximately fifty year contracts,' and the other two by what might be called 'original, approximately fifty year contracts.' All of the concession contracts demand the regular payment of franchise fees from the concessionaires, calculated on gross receipts.  AR at 42632, 42982, 42993, 43010, 43028.

For ease of reference, the court lists here each plaintiff in this suit, the relevant concession (also known as a resort), the type of contract, and the date of expiration of the current contract with the Bureau:

> Laguna Hermosa Corporation, operating Rancho Monticello Resort, original contract, expiring June 15, 2008;

> REL Limited, operating Spanish Flat Resort, original contract, expiring July 13, 2008;

> John C. Frazier, III and Linda Frazier, operating Markley Cove Resort, renegotiated contract, expiring May 26, 2009;

>     Steele Park Resort, Inc., operating Steele Park Resort,
>     renegotiated contract, expiring May 26, 2009.

Compl. at 1; Def.'s Mot. at 10; AR at 1293-94.  Because the terms of the original
contracts and the renegotiated contracts differ in material ways, and the
renegotiated contracts differ from each other in material ways, the court's analysis
may reference individual contracts by the resort name to address the parties'
arguments in this bid protest.  The most significant shared characteristic of the
concession contracts of plaintiffs is that they all expire within the space of twelve
months, after having each endured approximately fifty years, and they all terminate
approximately one to two years from the issuance of a prospectus soliciting offers
for new concession contracts at Lake Berryessa.

## II.    The Prospectus

There have been plans in place for public recreational use of Lake Berryessa
since 1959.  AR at 42561.  In 1972, a report by the General Accounting Office
(GAO) criticized the over-reliance of the concessionaires on long-term mobile
home rentals, and the 1700 mobile home sites on public lands at the lake.  *Id.* at
540-41.  In 1975, the Bureau took over direct management of the concession
contracts and throughout the 1970s and 1980s developed additional recreational
facilities at the lake.  *Id.* at 42562.

More planning and audit activities concerning recreation at Lake Berryessa
took place in 1992, 1995 and 2000.  *Id.* at 42563.  In 2000, the Bureau initiated a
visitor services planning process involving public comment pursuant to the
National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*
(2000), which developed an Environmental Impact Statement (EIS) by November
2005.  *Id.*  The final EIS adopted a development approach which eliminates long-
term use trailers and mobile homes from the concession sites.[1]  *Id.*  Further input
was solicited concerning the final EIS, and modifications were made.  *Id.*

A record of decision (ROD) was issued in June 2006 announcing the
Bureau's plans for changes to the recreational facilities and uses permitted at Lake

---

[1]/ Although distinctions could be made, the court uses the terms "mobile homes" and
"trailers" interchangeably in this opinion.

Berryessa.  AR at 42555, 42558.  The Bureau prepared a prospectus for new concession contracts and issued the prospectus on June 7, 2007, which attached the 2006 ROD.  Compl. ¶ 44.  Of particular note is the ROD condition that "All privately owned trailers, mobile homes, and associated personal property must be removed from Federal property at Lake Berryessa."  AR at 42558.

The details of the prospectus will be discussed *infra*, in relation to the merits of plaintiffs' specific challenges to the prospectus.  Of note, however, is the chronology of events following the issuance of the prospectus on June 7, 2007.  A bidder's meeting was scheduled for July 9, 2007 at the lake.  AR at 1277. Questions about the prospectus were required to be submitted to the Bureau in writing no later than August 6, 2007.  *Id.* at 1279.  Bids were due on September 5, 2007.  *Id.* at 1257.

## III.   Procedural History

On August 28, 2007, five business days before bids were due, plaintiffs filed a pre-award bid protest complaint in this court, along with a motion requesting a temporary restraining order (TRO) and a preliminary injunction.  Time was of the essence.  On August 30, 2007, the court ordered, based on the parties' recommendations, an expedited briefing schedule for resolving this protest on the merits, and the Bureau agreed to delay bids until the end of October, mooting plaintiffs' request for a TRO.

The expedited schedule was modified due to delays in establishing the administrative record in this matter, and the Bureau again extended the deadline for receiving bids on the new concession contracts, until mid-November 2007.[2]  Oral

_____

[2]/  The mammoth administrative record in this case, filed on September 7, 2007, presented several complications, and the parties consented to defendant's filings of three supplements to the record, on September 13, 17 and 25.  Plaintiffs filed their opposed motion to supplement the record on October 9, 2007, a motion which the court now grants, because the court has endeavored to review all potentially relevant documents in furtherance of its goal of understanding the facts underlying this bid protest.  *See Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 494 (2006) (holding that the court will allow the supplementation of the administrative record when "necessary for a full and complete understanding of the issues") (citation omitted); *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) (stating that the decision to supplement the administrative record rests within the sound discretion of the trial

(continued...)

argument was held on October 19, 2007.  Thus, this matter is now ripe for decision.

Because plaintiffs' challenges to the prospectus are manifold, a brief summary of the four counts listed in the complaint is helpful to understanding this bid protest:

**COUNT I**          Arbitrary, Capricious and Unlawful Failure to Comply with Public Law 96-375

This count alleges that the prospectus fails to comply with Public Law 96-375 in that the prospectus suggests that the new concessionaires will pay plaintiffs less than "fair value," as required by Public Law 96-375, *see infra*, for assets and economic interests transferred to new concessionaires at the termination of the existing concession contracts.  The law states, quite briefly, that:

> [A]t the option of the Secretary of the Interior, the United States may require that the permanent facilities mentioned herein not be removed from the concession areas, and instead, pay fair value for the permanent facilities or, if a new concessionaire assumes operation of the concession, require that concessionaire to pay fair value for the permanent facilities to the existing concessionaire.

Pub. L. No. 96-375, § 5(b), 94 Stat. 1505, 1507 (1980).  Plaintiffs find fault in the way the prospectus addresses the compensation to be paid to plaintiffs by the new concessionaires for selected, retained assets, and specifically complain that the

---

[2](...continued)
court) (citation omitted).  In addition to the administrative record (AR), the court relies on: plaintiffs' complaint (Compl.), filed on August 28, 2007; plaintiffs' preliminary injunction motion (Pls.' Mot.), which incorporates plaintiffs' motion for judgment on the administrative record, and plaintiffs' memorandum in support of their preliminary injunction motion and motion for judgment on the administrative record (Pls.' Mem.), both filed on August 28, 2007; defendant's cross motion for judgment on the administrative record (Def.'s Mot.), filed September 14, 2007; plaintiffs' reply brief (Pls.' Reply), filed October 9, 2007, and defendant's reply brief (Def.'s Reply), filed October 15, 2007.  The court also relies on the transcript of oral argument held October 19, 2007 (Tr.).

"fair market value," mentioned in the prospectus, is not the same as the "fair value" required by the statute.

> **COUNT II**    Arbitrary, Capricious and Unlawful Favorable Treatment of Forever Resorts

This count alleges that the prospectus favors a prospective bidder on the new concession contracts, Forever Resorts, Inc., and disfavors the old concessionaires, including plaintiffs.  The alleged favoritism toward larger businesses, plaintiffs argue, is contrary to agency policy and directives.  Similarly, plaintiffs argue that financial breaks that are available to new concessionaires are denied to the old concessionaires, and that the government's fair competition policy is thus undermined.

> **COUNT III**    Arbitrary, Capricious and Unlawful Discrimination against the Resort Owners

This count again alleges favoritism toward Forever Resorts, Inc., and alleges discrimination against plaintiffs.  Among the several charges of unfair treatment of plaintiffs, this count states that the prospectus creates a *de facto* disqualification of plaintiffs, that the Bureau has made performance of the old contracts difficult or impossible, and that transition help is offered to successful bidders on the new contracts while plaintiffs are denied any transition assistance.  This count focuses on the interplay of old concession contract performance and bid requirements, and how plaintiffs' existing contract performance may prevent them from obtaining a new concession contract.

> **COUNT IV**    Arbitrary, Capricious and Unlawful Failure to Conduct Proper Appraisals of the Resort Owners' Assets and Economic Interests

This count alleges that the appraisals of the assets and economic interests of plaintiffs, upon which bids from new concessionaires will be based, was deficient because:  (1) the appraisals both undercounted and undervalued assets that should have been assessed, in contravention of Public Law 96-375; (2) the appraiser used fewer than the required number of methods to ascertain the correct value of plaintiffs' assets; and (3) the appraisals are outdated and inaccurate, and fail to represent the fair current value of plaintiffs' assets and economic interests.  For

these reasons, plaintiffs allege that the prospectus is invalid and that award of new concession contracts based on the prospectus must not proceed.

Although the four counts of the complaint do not, perhaps, provide a perfect lens through which the court may discern the legal issues underlying this bid protest, they do offer a structure for addressing plaintiffs' claims. This is especially important in this case, because plaintiffs' bid protest claims are only one subset of the legal rights which are referenced in this action, and in other lawsuits, as the old concession contracts expire and new concession contracts are entered into by the Bureau.[3]  For this reason, the court will revisit the four counts of the complaint in its discussion of the merits of this protest.  *See infra* Discussion Section IV of this opinion.

## DISCUSSION

## I.   Jurisdiction

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75, supplies the United States Court of Federal Claims with bid protest jurisdiction.  28 U.S.C. § 1491(b)(1)-(4) (2000); *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1299-1300 (Fed. Cir. 2001); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 268-69 (2004).  The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The statute also states that the Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded."  *Id.* Accordingly, this court has jurisdiction to entertain this bid protest.

## II.   Standards of Review

---

[3]/  Apparently some mobile home owners are attempting to enjoin the Bureau's efforts to ameliorate public access to the lake.  Tr. at 25-27, 73.

### A.     Judgment on the Administrative Record

RCFC 52.1 provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The court must make fact findings where necessary.  *Id.*  The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record.  *Id.*

### B.     Bid Protest Review

It is well settled that "this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706."  *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 19 (2005); *ViroMed Labs., Inc. v. United States*, 62 Fed. Cl. 206, 211-12 (2004); *see also* 28 U.S.C. § 1491(b)(4) (2000) ("In any action under this [bid protest] subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Bannum*, 404 F.3d at 1351 (stating that "the trial court [first] determines whether . . . the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A)").  Accordingly, the court must determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2000); *Bannum*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).  The plaintiff bears the burden of proving the arbitrary and capricious nature of the agency action, by a preponderance of the evidence.  *Hunt Building*, 61 Fed. Cl. at 269 (citations omitted); *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citation omitted).  "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts."  *ViroMed Laboratories*, 62 Fed. Cl. at 212 (citing *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The court should overturn the challenged decision only if "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United*

*States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *see also Hunt Building*, 61 Fed. Cl. at 269.  Essentially,

> [w]hen a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (internal quotations omitted) (citing *Impresa*, 238 F.3d at 1332-33).

## C.    Preliminary and Permanent Injunction Standards

Plaintiffs have requested both preliminary and permanent injunctions of the prospectus issued for new concession contracts at Lake Berryessa.  The standards governing these two types of injunctive relief are similar.  "Four factors are weighed in considering a motion for a preliminary injunction:  (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)).  "In deciding whether a permanent injunction should issue, a court considers:  (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)); *KSEND v. United States*, 69 Fed. Cl. 103, 113 (2005).  Thus, "[t]he test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits." *KSEND*, 69 Fed. Cl. at 113 (citation omitted).  Because the merits

of this matter and plaintiffs' requests for injunctive relief are being resolved
simultaneously by the court, the permanent injunction standard is appropriate here.

## III.    Other Foundational Legal Issues

### A.    Legal Framework Governing the Solicitation of Concession
Contracts at Lake Berryessa

Few statutes and regulations directly address concession contracts at Lake
Berryessa.  The Reclamation Act of 1902 established the Bureau of Reclamation of
the Department of the Interior.  43 U.S.C. § 371 (2000); Pls.' Mem. at 6.  The
Solano Project was implemented by the Interior Secretary under the authority
granted by the Reclamation Project Act of 1939.  43 U.S.C. § 485h(a) (2000);
Def.'s Mot. at 5.  The Solano Project did not include recreational activities as one
of its initial goals.  *See* Def.'s Mot. at 5 (noting the "purposes of providing local
area with water for irrigation and municipal and industrial uses, and controlling
floods"); Pls.' Mem. at 6.

After recreational activities began to expand on Lake Berryessa, and after
the concession contracts held by plaintiffs and others at the lake had been in place
for several years, Congress intervened in the management of the lake.  A task force
was appointed by Congressman Clausen in the early 1970s to study recreation
management at the lake.  Pls.' Mot. App. at 262.  On October 27, 1974, the
Reclamation Development Act of 1974 was enacted.  Pub. L. No. 93-493, 88 Stat.
1486.  The legislation was "[a]n act to authorize, enlarge, and repair various
Federal reclamation projects and programs, and for other purposes."  *Id.*  Congress
funded several actions of the Bureau in relation to the recreational activities at
Lake Berryessa.  Pub. L. No. 93-493, 88 Stat. at 1495.  Title VI of the Act,
regarding Lake Berryessa, is reproduced here in its entirety:

TITLE VI
SOLANO PROJECT RECREATIONAL
FACILITIES, CALIFORNIA

SEC. 601.  In order to provide for the protection, use, and
enjoyment of the esthetic and recreational values inherent
in the Federal lands and waters at Lake Berryessa, Solano
project, California, the Secretary of the Interior is hereby

11

authorized to develop, operate, and maintain such
short-term recreation facilities as he deems necessary for
the safety, health, protection, and outdoor recreational
use of the visiting public; to undertake a thorough and
detailed review of all existing developments and uses on
Federal lands to determine their compatibility with
preservation of environmental values and their
effectiveness in providing needed public services; to
implement corrective procedures when necessary; and to
otherwise administer the Federal land and water areas
associated with said Lake Berryessa in such a manner
that, in his opinion, will best provide for the public
recreational use and enjoyment thereof, all to such an
extent that said use is not incompatible with other
authorized functions of the Solano project.

SEC. 602.  The Secretary of the Interior shall make such
rules and regulations as are necessary to carry out the
provisions of this title and may enter into an agreement
or agreements with the State of California, or political
subdivision thereof, or a non-Federal agency or agencies
or organizations as appropriate, for the development of a
recreation management plan, and for the management of
recreation including the operation and maintenance of the
facilities within the area.  The agency performing the
recreation management functions is authorized to
establish and collect fees for the use of recreation
facilities.

SEC. 603.  There is authorized to be appropriated to the
Secretary of the Interior the sum of $3,000,000 (April
1974 price levels) plus or minus such amounts, if any, as
may be justified by reason of ordinary fluctuations in
development costs as indicated by cost indexes
applicable to the types of development involved herein.
There is also authorized to be appropriated such sums as
may be necessary for administration of existing facilities

12

and for operation and maintenance of the facilities
authorized by this title.

SEC. 604.  All funds authorized to be appropriated by
this title shall be nonreimbursable.

Pub. L. No. 93-493, 88 Stat. at 1494-95.  The court notes that the Bureau was given
a mandate to review existing recreational facilities at the lake and change them, if
necessary, and to promulgate rules and regulations in this regard.

A few years later, Congress again intervened in the management of
recreation at Lake Berryessa.  On October 3, 1980, as part of legislation concerning
a variety of water projects, renegotiation and extensions of the existing concession
contracts were authorized, and property rights of the concessionaires were
protected:

Sec. 5. (a) Notwithstanding any other provision of law,
the Secretary of the Interior is authorized to enter into
new negotiated concession agreements with the present
concessionaires at Lake Berryessa, California.  Such
agreements shall be for a term ending not later than May
26, 1989, and may be renewed at the request of the
concessionaire with the consent of the Secretary of the
Interior for no more than two consecutive terms of 10
years each.  Concession agreements may be renegotiated
preceding renewal.  Such agreements must comply with
the 1959 National Park Service Public Use Plan for Lake
Berryessa, as amended, and with the Water and Power
Resources Service Reservoir Area Management Plan:
*Provided*, That the authority to enter into contracts or
agreements to incur obligations or to make payments
under this section shall be effective only to the extent and
in such amounts as are provided in advance in
appropriation Acts.

(b) Notwithstanding any other laws to the contrary, all
permanent facilities placed by the concessionaires in the
seven resorts at Lake Berryessa shall be considered the

13

> property of the respective current concessionaires.
> Further, any permanent additions or modifications to
> these facilities shall remain the property of said
> concessionaires:  *Provided*, That at the option of the
> Secretary of the Interior, the United States may require
> that the permanent facilities mentioned herein not be
> removed from the concession areas, and instead, pay fair
> value for the permanent facilities or, if a new
> concessionaire assumes operation of the concession,
> require that concessionaire to pay fair value for the
> permanent facilities to the existing concessionaire.

Pub. L. No. 96-375, § 5, 94 Stat. 1505, 1506-07.  To the extent that the meaning of
certain terms in Public Law 96-375 might impact the legality of the prospectus at
issue in this bid protest, the court notes that the terms "fair value" and "permanent
facilities" are not defined in the statute's text.  It is also important to note that,
although extending the existing concession contracts and protecting the property
rights of the concessionaires were goals of this legislation, *see* Pls.' Mem. at 10
(contending that the "intent of Pub. L. 96-375 was to fully protect the investments
of the Resort Owners"), an important goal of Congress' intervention was to further
the development of appropriate public access and recreational opportunities at
Lake Berryessa.  *See* Pub. L. No. 96-375, 94 Stat. at 1506 (noting that the
renegotiated concession contracts and contract extensions must comply with public
use and management plans for the lake); Pls.' Mot. App. at 262 (giving legislative
history of Public Law 96-375, wherein the bill's sponsor alluded to "steps . . .
taken to enhance public access and enjoyment of the lake" and "develop[ment of]
new public day-use facilities," and concluded that the bill's purpose was to "allow
orderly development and improvements to go forward at Lake Berryessa").

       Other than the two statutes excerpted here, the parties have not pointed to
other, more general federal legislation whose terms would govern the solicitation
of concession contracts at Lake Berryessa.  This omission is noteworthy.  Many
government procurements are governed by the Competition in Contracting Act of
1984 (CICA), Pub. L. No. 98-369, tit. VII, §§ 2701-2753, 98 Stat. 1175 (codified
at scattered sections of the United States Code).  There is mixed authority
concerning the applicability of CICA to concession contracts.  *Compare Great S.
Bay Marina, Inc.*, B-296335, 2005 CPD ¶ 135 (Comp. Gen. July 13, 2005) (noting
that "some . . . concession contracts are hybrids, and require the delivery of goods

and/or services to the government, in addition to authorizing the contractor to provide services to . . . visitors" and holding that "a mixed transaction that includes the delivery of goods or services of more than *de minimis* value to the government is a contract for the procurement of property or services within the meaning of CICA") (citations omitted) *with YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 392 n.23 (1993) (commenting that when the government "is not paying for . . . services but collecting fees in exchange for granting a permit to operate a concession business . . . this arrangement does not constitute a procurement"). In any case, because plaintiffs have not alleged a CICA violation here, and the court has found no violations of CICA provisions in the prospectus, the court need not address the issue of whether this solicitation of concession contracts is subject to CICA's provisions.

### B.    Contract Claims vs. Bid Protest Claims:  Whether Plaintiffs' Claims are Properly Before the Court in a Bid Protest Suit

Defendant argues that almost all of plaintiffs' claims in this suit arise under their old contracts, and are not proper in a pre-award bid protest of a prospectus for new concession contracts.  Tr. at 29-30.  The sole claim which defendant concedes is a bid protest claim is plaintiffs' argument that the preference given in the prospectus to proposals encompassing more than one concession is arbitrary and capricious.  *Id.* at 30.  Plaintiffs have relied on two main arguments to counter defendant's jurisdictional challenge to most of their claims.

Plaintiffs' complaint suggests that plaintiffs base their claims on this court's jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract."  28 U.S.C. § 1491(b)(1).  For example, plaintiffs cite the "'objecting to a solicitation'" language of section 1491(b)(1), and contest "legal deficiencies of Reclamation's Prospectus."  Compl. ¶¶ 16, 18.  This argument is where plaintiffs find their surest jurisdictional footing.  To the extent that plaintiffs challenge the terms of the prospectus under the court's pre-award bid protest "arbitrary and capricious" standard of review, they are indeed objecting to a solicitation and have brought proper bid protest claims.  If, however, plaintiffs seek in this suit to bring claims under their existing concession contracts, or resist performance requirements of those existing contracts, the court must reject such pure contract disputes because these claims do not have the prospectus as their primary focus.  *See* Compl. ¶ 16 (asking that the court "interpret[] the requirements of the Prospectus and

*incorporated documents*" and "declare the rights and other legal relations of the parties") (emphasis added).  In some instances, plaintiffs' bid protest suit asserts claims which have elements of both a contract dispute and a challenge to the lawfulness of a particular prospectus term – although jurisdiction may not be immediately evident for such claims, the court will examine the nature of such claims to see whether the alleged defects in the prospectus could affect the solicitation of bids and the eventual award of contracts by the Bureau.[4]

Plaintiffs' second argument is that, because they allege that their rights under Public Law 96-375 have been violated, their claims fall under the provision of the Tucker Act which gives this court jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  This argument presents some difficulties.  First, this court has twice ruled that concession contracts are not procurement contracts, albeit not in the context of a bid protest jurisdictional challenge.  *See Frazier v. United States*, 67 Fed. Cl. 56, 59 (2005), *aff'd*, 186 Fed. Appx. 990 (Fed. Cir. 2006); *YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 392 n.23 (1993).  Second, there is exceedingly sparse caselaw addressing the issue of whether rights, arising from an incumbent's contract, may be the subject of litigated claims in a bid protest merely because various terms of the incumbent's contract are referenced within a solicitation.

In airing this issue, the parties cite a variety of cases, none of which directly resolves the question.  Defendant, for example, cites a case which decided only that a protestor may not challenge the future performance capability of the awardee of a contract, because such a dispute will be a contract dispute under the new contract, and is not proper in a bid protest.  *N. Telecom Inc. v. United States*, 8 Cl. Ct. 376, 381 (1985) (citing *E.C. Campbell, Inc.*, B-204253, 82-1 CPD ¶ 76 (Comp. Gen. Feb. 2, 1982)).  The legal issues in this case are quite different, because it is the rights under the incumbent contractors' contracts which are asserted in this bid protest.

Plaintiffs also relied on cases which are distinguishable from this bid protest.  First, in *Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748, 751 (1999),

---

[4]/  Plaintiffs concede that some of their claims have "contractual overtone[s]."  Tr. at 28.  Plaintiffs nonetheless insist that their claims are grounded in statutory violations expressed in the terms of the prospectus.  *Id.* at 27.

the court dealt only with the government's "contractual" duty to "fairly and honestly consider [a] plaintiff's bid," and thus did not consider whether an incumbent contractor's contract rights could be the subject of a bid protest. Next, in *OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 117 (2005), this court thoroughly examined whether "a set of identically phrased contracts can be used by a procuring agency as a means of winnowing candidates for a procurement to determine which candidate or candidates will receive or share the ultimate award." *Id.* Here, there is no set of identically phrased contracts used as a winnowing process – rather, an expiring set of contracts is going to be replaced by one or more contracts which depart significantly from the terms of the old contracts. For this reason, the analysis of this court's bid protest jurisdiction in *OTI America* is informative, but its holding is entirely inapposite.

Lastly, the court agrees with defendant that one case offers significant factual similarity to the Lake Berryessa dispute. Defendant relies upon *Circle Line-Statue of Liberty Ferry, Inc. v. United States*, 76 Fed. Cl. 490 (2007), for defendant's contention that claims based on "rights and obligations connected with . . . existing contracts . . . are not the proper subject of a bid protest action." Def.'s Reply at 4; *see* Def.'s Mot. at 35-36, 46; Tr. at 48-50, 80-81. The facts are analogous to this case: an incumbent concession contractor brought a pre-award protest of a solicitation of a new concession contract, based in part on rights arising from the old contract, including rights based on a statute. *See Circle Line*, 76 Fed. Cl. at 491-95 (analyzing contract rights and the statutory scheme affecting concession contracts such as the ones at issue in that case). It is important to note that the *Circle Line* court did not explicitly address whether such claims were proper in a bid protest, but proceeded to the merits of the issue of whether a preference should be accorded the incumbent concession contractor. *Id.*

It is only when the court turned to the solicitation's provision regarding the appraisal of the existing fleet of ferry boats, which would be purchased from the incumbent contractor by the awardee of the concession contract, that the *Circle Line* court addressed the issue of contract claims in a bid protest. *Id.* at 496 (discussing the valuation and transfer of the ferry fleet assets). Again, however, it is not clear that the court barred the plaintiff's contract claims as inappropriate under this court's bid protest jurisdiction:

> The harm plaintiff anticipates–that the Park Service will
> reinterpret the existing contract in a manner contrary to

> its plain meaning and will require the transfer of
> plaintiff's assets in advance of payment–is an injury that
> has not yet occurred and is one that plaintiff has not
> demonstrated is likely to occur.  Putting aside the fact
> that the contract provides no mechanism for transfer
> without compensation and that the Park Service would
> have no authority to effectuate such a transfer, this court
> is simply not willing to take action against such
> speculative harm.  The court therefore finds it sufficient
> that the Park Service specified in the solicitation that the
> transfer of assets will occur pursuant to plaintiff's
> existing contract; the injuries plaintiff imagines are
> strictly conjectural.

*Id.* (citation omitted).  The court's rejection of this particular contract-based argument was based, it appears, on the fact that the plaintiff's allegations were speculative and conjectural, not because contract rights are, *a priori*, barred from pre-award bid protests.

In the final section of the *Circle Line* opinion, the court concluded that if the plaintiff *had* proved that a required preference was missing from the new concession contract solicitation, contract breach damages were a more appropriate remedy than injunctive relief.  *Id.* at 496-97.  The court also appeared to indicate that if the plaintiff wished to contest the breach of its rights under the old contract, it had to wait until those claims became ripe after bids had been submitted and award without preference had occurred.  *Id.* at 497 ("It is not the issuance of a solicitation denying plaintiff's preference in renewal that constitutes an invasion of plaintiff's alleged contractual right.  Rather, the Park Service's failure to recognize that right in the later bid evaluation process would be the source of any potential harm.  Plaintiff's submission of a responsive bid waives nothing.").  Thus, the *Circle Line* decision indicates that the contract rights of an incumbent are better resolved in a breach of contract action, and after the alleged breach has occurred, than in a pre-award bid protest.  *Id.*

Even if *Circle Line* were binding precedent in this case, defendant's jurisdictional challenge to plaintiffs' claims finds only weak support therein.  This court would be reluctant to dismiss, on jurisdictional or prudential grounds, almost all of plaintiffs' claims based on comments in *Circle Line*, which did not explicitly

discuss the jurisdictional basis, alleged by plaintiffs here, for claims founded on "any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1).  Indeed, it appears that the *Circle Line* court rejected the claims before it largely on the merits, rather than on jurisdictional grounds.

The court is not unmindful of the need to distinguish contract claims from bid protest claims.  Indeed, this court has refused to consider contract claims asserted as part of a bid protest, especially when the protestor sought to challenge the government's termination for convenience of a contract.  *See, e.g.*, *Davis/HRGM Joint Venture v. United States*, 50 Fed. Cl. 539, 544 (2001) (dismissing a portion of a bid protest complaint "which relates to the contracting officer's decision to terminate the [protestor's] contract for convenience").  As the *OTI America* court stated, there may be "an implied exception [to the court's bid protest jurisdiction related to alleged violations of statutes or regulations] for cases that could be brought directly under the Tucker Act, 28 U.S.C. § 1491(a), as a claim for breach of contract."  68 Fed. Cl. at 116.  Additionally, there are prudential considerations, notwithstanding any statutory bounds on this court's bid protest jurisdiction, which suggest that contract claims pose an untoward burden hindering the quick resolution of bid protest claims, especially when, as here, it could be argued that many of plaintiffs' contract claims are not yet ripe.  *See infra*.

The court thus has good reason to question whether plaintiffs' contract-related claims may be entertained in this bid protest merely because they allege the violation of a statute.  The court is aware that its bid protest jurisdiction, based on "any alleged violation of statute or regulation in connection with a procurement," 28 U.S.C. § 1491(b)(1), is "very sweeping in scope."  *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (analyzing section 1491(b)(1) and stating that "[t]he operative phrase 'in connection with' is very sweeping in scope").  But the court is also cognizant of conflicting authority as to whether a solicitation for concession contracts is a "procurement" at all.[5]  In

---

[5]/  The court notes that the Supreme Court has declined to rule on the validity of a National Park Service regulation which states that Park Service concession contracts are not procurement contracts, on ripeness grounds.  *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (vacating a decision by the United States Court of Appeals for the District of Columbia Circuit upholding 36 C.F.R. § 51.3 (2002)).  This court has twice ruled that concession contracts are not procurement contracts.  *See supra*.  The Interior Board of

(continued...)

addition, the court is persuaded that pure contract claims are not appropriate in a bid protest, even if clothed in the guise of a protest of an alleged statutory violation occurring in relation to a procurement.  *See Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 72 (2006) (rejecting the proposition that a contract claim "may be refocused as a claim for injunctive relief under the court's bid protest jurisdiction").

The court notes that it would be very difficult to entirely segregate or extract plaintiffs' contract-related claims, which are in part based on the provisions of Public Law 96-375, from a discussion of plaintiffs' overall allegation that the prospectus is arbitrary and capricious or unlawful.  This predicament is the result, also, of the admonition in the prospectus that "[f]ailure by an existing concessionaire to meet these and/or other identified requirements of the current concession contracts will result in non-consideration or in the cancellation by Reclamation of their selection as a future concessionaire and the selection of another bidder or re-issuance of another prospectus."  AR at 1284.  Some of plaintiffs' claims are hybrids, for example, and encompass both a contract dispute and a colorable challenge to the lawfulness or rationality of the prospectus at issue here.  The court will examine the merits of such mixed claims, to the extent they relate to and impact the solicitation of new contracts at Lake Berryessa.

## IV.    Merits

### A.    COUNT I                Arbitrary, Capricious and Unlawful Failure to Comply with Public Law 96-375

#### 1.    Whether New Concessionaires May Select Some But Not All Permanent Facilities at a Concession

---

[5](...continued)
Contract Appeals has consistently held that most concession contracts are procurement contracts. *See, e.g.*, *Watch Hill Concession, Inc.*, IBCA No. 4284-2000, 01-1 BCA ¶ 31298 (Feb. 16, 2001).  The Government Accountability Office has consistently held that concession contracts which offer some service to a federal agency are, at least in part, procurement contracts. *See, e.g.*, *Starfleet Marine Transp., Inc.*, B-290181, 2002 CPD ¶ 113 (Comp. Gen. July 5, 2002).  Much of the authority cited here concerns Park Service contracts, not Bureau of Reclamation contracts, which further complicates the analysis of precedent relevant to the question of whether the prospectus at issue here conducts a "procurement."

Plaintiffs' first argument in support of Count I of the complaint is that Public Law 96-375 prohibits a new concessionaire from paying only for selected assets at a concession, rather than for all of the old concessionaire's assets, when taking over a concession. Pls.' Mem. at 21. Because the prospectus outlines a process wherein a new concessionaire may select some or none of the permanent facilities at a concession to retain for future concession development, plaintiffs assert that the prospectus violates the payment rights of plaintiffs embodied in Public Law 96-375. Pls.' Reply at 4-5. Plaintiffs' argument centers on their reading of the congressional intent of Public Law 96-375, which in their view was passed to "'fully protect' Plaintiffs and their investments at the lake." *Id.* at 4.

Defendant reads the statute differently. Relying principally on the text of the statute, defendant notes that payment by a new concessionaire is mandated only for assets which the government prevents the old concessionaire from removing from federal lands. Def.'s Mot. at 32. In defendant's view, plaintiffs' ownership rights of permanent facilities at the concessions can only be exercised in three ways: (1) permanent facilities, if removable, can be transported off federal lands and retained by plaintiffs, if the Bureau has not commanded that they remain; (2) plaintiffs may abandon their property rights in permanent facilities which the Bureau has not selected to remain at the concession, if these are not removable or are not worth removing; and (3) selected facilities chosen by the Bureau to remain will be paid for, either by the Bureau or by the new concessionaire. Def.'s Reply at 6.

"It is beyond debate that statutory interpretation begins with the language of the statute." *Mudge v. United States*, 308 F.3d 1220, 1227 (Fed. Cir. 2002) (citations omitted). Here, the relevant text of Public Law 96-375 states that:

> Notwithstanding any other laws to the contrary, *all permanent facilities* placed by the concessionaires in the seven resorts at Lake Berryessa shall be considered the property of the respective current concessionaires. Further, any permanent additions or modifications to these facilities shall remain the property of said concessionaires: *Provided*, That at the option of the Secretary of the Interior, the United States may require that *the permanent facilities* mentioned herein not be removed from the concession areas, and instead, pay fair value for *the permanent facilities* or, if a new

> concessionaire assumes operation of the concession,
> require that concessionaire to pay fair value for *the
> permanent facilities* to the existing concessionaire.

Pub. L. No. 96-375, § 5(b), 94 Stat. at 1507 (emphasis added).  It is undisputed that this paragraph indicates that all permanent facilities placed at a concession, along with permanent improvements to those facilities, are the property of the existing concessionaire.  Next, the statute states that the Bureau may prevent the removal of permanent facilities that belong to the concessionaires, but if the Bureau does so, the old concessionaire must be compensated for the loss of that property.  Thus, defendant's first two propositions are unassailable from a textual analysis of the statute:  (1) permanent facilities, if removable, can be transported off federal lands and retained by plaintiffs, if the Bureau has not commanded that they remain and (2) plaintiffs may abandon their property rights in permanent facilities which the Bureau has not selected to remain at the concession, if these are not removable or are not worth removing.  And defendant is also correct in stating that payment under Public Law 96-375 is only required when the Bureau exercises its option to require permanent facilities to remain at a concession site.

The real point in controversy here, then, is whether the option of the Bureau to require permanent facilities to remain on site includes the discretion to retain all or some or none of the permanent facilities at each concession, as defendant argues, or whether the option of the Bureau is simply to retain all or none of the permanent facilities at each concession, an alternate reading of the statute.[6]  The language of the statute does not definitively answer this question.  The court notes that the text of the statute does not contain an "all or nothing" provision, and that it

---

[6]/  Plaintiffs have not put forth this reading of the statute, at least not explicitly.  As plaintiffs made clear at oral argument, their position is that the Bureau or the new concessionaire must pay for all of the permanent facilities that remain at a concession, even if none of those facilities is of further use to the public and none has been required by the Bureau to remain.  Tr. at 10.  This reading contradicts the plain meaning of the statute, which gives the Bureau the *option* of retaining, and then compensating the concessionaire, for permanent facilities it retains.  However, because plaintiffs have repeatedly complained that the "select and pay" policy of the Bureau violates Public Law 96-375, the court examines here whether the Bureau may indeed select and retain some, rather than all, of the permanent facilities at each concession for future use.  *See*, *e.g.*, Compl. ¶ 81 ("The Prospectus and its incorporated documents also fail to comply with Pub. L. 96-375 because they wrongly allow new concessionaires to select, and pay for, those assets of the Resort Owners that they wish to retain under the new concession contracts.").

is plaintiffs' burden to show that the prospectus does not comply with Public Law 96-375. *See Banknote*, 365 F.3d at 1351 (stating that a "disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations"). When the text of a statute does not reveal congressional intent on a particular issue, it is appropriate to look at legislative history for indications of the will of Congress. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).

Plaintiffs rely on the legislative history of Public Law 96-375 for their theory that the Bureau may not selectively pay for permanent facilities at the concessions. However, the legislative history does not reflect that Congress generally intended to curtail the Bureau's discretion in developing public access and recreation at Lake Berryessa. The first time Congress acted to address the development of recreation at Lake Berryessa, Congress authorized increased discretion of the Bureau in managing a situation that had produced public outcry. *See* Pub. L. 93-493, 88 Stat. at 1494-95 (granting substantial discretionary powers to the Bureau in developing recreation facilities and correcting defects in existing recreation facilities at the lake). In the second intervention, Congress gave the Bureau contracting and management powers, and placed one limit on those powers. *See* Pub. L. 96-375, § 5(a), 94 Stat. at 1506-07 (authorizing the Bureau to renegotiate, extend or, if the concessionaire did not comply with public use plans for the lake, terminate concession contracts at the lake, but safeguarding certain property rights of the concessionaires, as well). Thus, in the context of these congressional actions, it is not obvious, and indeed, it is illogical to presume, that Congress would insist that the Bureau retain all permanent facilities at a concession, preventing unwanted or dilapidated facilities from being removed by the concessionaire, simply because there were some facilities at that concession that were of benefit to the public.

Plaintiffs insist, however, that because certain debate fragments in the House and Senate emphasize the property rights of the old concessionaires, that the Bureau was deprived of the discretion to selectively pay for permanent facilities it wished to retain at each concession. Pls.' Reply at 2-5 & n.1. Plaintiffs are correct that one of the clear goals of Public Law 96-375 was to prevent unfair confiscation of the concessionaires' property at the time their contracts terminated. However, when the debate is viewed as a whole, it shows that a compromise was struck between the rights of the concessionaires and the authority of the Bureau to improve public access and recreation at the lake.

It is clear that Congress wanted to prevent the following scenario:  the Bureau, having the power to terminate a concessionaire's contract for failure to comply with new strictures for recreation on the lake, might force a hasty departure of that concessionaire, depriving that business owner of the time needed to recoup investments made in permanent facilities, and might also be able to confiscate valuable facilities for either the Bureau or a new concessionaire.  126 Cong. Rec. 1864, 1867 (1980) (colloquy of Rep. Clausen and Rep. Lujan).  It is also clear that the final text of the bill was selected to balance the property rights of the concessionaires and the management rights of the Bureau.  *See id.* (colloquy of Rep. Lujan and Rep. Kazen) (confirming that the proposed language met the concerns of the Bureau).  Plaintiffs point to no portion of the legislative history of Public Law 96-375, and the court is aware of none, that shows that Congress intended to limit the discretion of the Bureau to a retention of either all or none of the permanent facilities at each concession, at the expiration of concession contracts lasting approximately fifty years.  Plaintiffs have failed to persuade the court that the legislative history of Public Law 96-375 compels the insertion of a condition on the Bureau's action which is not present in the agreed-upon text of the law.[7]  This court may not amend a statute's text on the basis of such weak evidence of congressional intent.  *See Groff v. United States*, 493 F.3d 1343, 1354 (Fed. Cir. 2007) ("The Supreme Court has cautioned that '[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.'"  (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979))).

The court holds that defendant's third proposition, *i.e.*, that selected permanent facilities chosen by the Bureau to remain at each concession will be paid for, either by the Bureau or by the new concessionaire, is a rational, and indeed, the most rational interpretation of Public Law 96-375.  Plaintiffs have thus not shown that the prospectus provision which allows the Bureau or new concessionaires to select and pay for only some permanent facilities at a concession is unlawful, arbitrary or capricious.  For this reason, plaintiffs' first argument in support of Count I fails.

---

[7]/  Similarly, plaintiffs' position that the statute mandates payment for any and all permanent facilities remaining at a concession, even if none of those facilities were required by the Bureau, is rejected because it directly contradicts the text of the statute and is not supported by the legislative history of Public Law 96-375.  *See supra* note 6.

### 2.   Whether Fair Value and Fair Market Value Are Synonymous

Plaintiffs' second argument in support of Count I is that the Bureau failed to comply with the "fair value" term in Public Law 96-375 in ordering appraisals of the permanent facilities at the concessions and in incorporating those appraisals in the prospectus. This argument has two facets. First, plaintiffs argue that Public Law 96-375 requires the full protection of plaintiffs' "assets and economic interests" in the concessions. Compl. ¶ 78. Second, plaintiffs complain that fair value is not synonymous with fair market value, and that when the prospectus incorporated appraisals purporting to measure fair market value into the discussion of permanent facilities at the concessions, this substitution of terms violated the statute. Compl. ¶ 79; Pls.' Mem. at 20; Pls.' Reply at 5 n.4.

Neither of plaintiffs' contentions has merit. As discussed above, Public Law 96-375, by its text and legislative history, requires payment only for those selected permanent facilities which are retained at the concessions at the request of the Bureau, not for some greater number of "assets and economic interests" of plaintiffs, whatever those might be. If Congress had wanted the concessionaires to receive full payment for everything they had invested in the concessions, Congress could have said so, but it did not. Indeed, such a bargain would make little sense, because one presumes the concessionaires made prudent business investments which could be recouped over the approximately fifty year duration of their concession contracts.

Furthermore, there is no indication that Congress defined "fair value," as used in Public Law 96-375, as something different or greater than fair market value. Plaintiffs' only authority for such a claim is that Congress appears to have distinguished the two terms in Senate and House Reports from 1978, 1985 and 2004, although these statements were made in the consideration of bills which have nothing to do with the Bureau, concession contracts, Lake Berryessa or Public Law 96-375. *See* Pls.' Reply at 5 n.4. As defendant points out, persuasive authority supports the view that fair value is the same as fair market value, when applied to the context of permanent facilities at the concessions on Lake Berryessa. *See* Def.'s Mot. at 33-34. The Supreme Court has stated that just compensation, for takings purposes, is in many cases the same as fair market value. *See, e.g.*, *United States v. Miller*, 317 U.S. 369, 373-74 (1943). Controlling precedent in this circuit follows *Miller* and holds that fair market value often gives the property owner just

25

compensation for property taken. *Pete v. United States*, 531 F.2d 1018, 1030 (Ct. Cl. 1976) (stating that the goal of compensating a property owner for a taking "can readily be served by the ascertainment of fair market value" of the property) (citations omitted). There is no indication in Public Law 96-375 that Congress intended the concessionaires to receive more than just compensation, or fair market value, in exchange for the permanent facilities for which they were to be paid "fair value." For these reasons, plaintiffs' argument that fair market value was an illegal measure for the appraisals used in the prospectus fails.

**B.    COUNT II        Arbitrary, Capricious and Unlawful Favorable Treatment of Forever Resorts**

In this count of their complaint, plaintiffs allege that three aspects of the prospectus are "contrary to agency policy and directives, and [are] arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Compl. ¶ 85. First, plaintiffs complain that the bonus points preference given proposals from bidders who seek to operate more than one, or perhaps all, of the concessions, is unfair, discriminatory, against agency policies, and arbitrary and capricious. *Id.* ¶ 84; Pls.' Mem. at 21; Pls.' Reply at 14; Tr. at 29. Second, plaintiffs allege that the prospectus contemplates a reduction in franchise fees for the new concessionaires if there are costs related to "tenant removal" at the concessions, but denies this fee reduction to the old concessionaires. Compl. ¶ 84. Plaintiffs suggest that this "constitutes impermissible disparate treatment" and violates the Bureau's 2006 ROD which outlined the plan for the lake and how the transition in recreational facilities would be managed. Pls.' Mem. at 24. Third, plaintiffs suggest that the Bureau's statement that the old concessionaires must pay the costs of removing tenant personal property is an invalid prospectus provision. Compl. ¶ 84; Pls.' Mem. at 24. The court will address each of plaintiffs' allegations in turn.

**1.    Multi-Concession Operation Bonus Points**

Plaintiffs have not shown how the bonus points allotted to a bid offering to manage more than one concession area violate any laws, regulations, agency policies, manuals, or decisional documents, or, how these bonus points are irrational. Plaintiffs cite no laws or regulations in connection with this argument. Instead, plaintiffs cite to a website announcing the prospectus which suggests that interested small business concerns are invited to bid. Compl. ¶ 84 (citing Pls.'

Mem. App. at 69).  Plaintiffs have proved no violation of regulation or policy in the Bureau's act of inviting small and large bidders to bid on a prospectus.

Plaintiffs also cite to a page of a Bureau policy manual, apparently to underscore the fact that the Bureau intends to "ensure fair competition in the awarding of concession contracts."  The court disagrees that awarding a bonus to comprehensive plans for recreation management at the lake is unfair.  Plaintiffs have cited no standard for fairness that has been abridged by this prospectus provision.

In addition, defendant persuasively argues that there are many reasons the Bureau, and the public, would benefit from new concessionaires who could manage more than just a single concession area.  *See* Tr. at 52-55.  Some of these reasons include economies of scale, greater flexibility in responding to drought conditions, greater ability to phase in changes while maintaining an income stream, and greater flexibility in developing a system of diverse recreational facilities and infrastructure to improve public enjoyment of Lake Berryessa.  *Id.*  The same manual that sets forth a policy for ensuring fair competition in the award of concession contracts, also demands that the Bureau "ensure that concessions are planned, developed, and managed to meet public needs."  Pls.' Mem. App. at 294.  The bonus points in this case are in accord with the Bureau's stated policies in its manual.

Even if the court had been convinced that something in the bonus points provision of the prospectus violated the "fair competition" pronouncement in the Bureau's manual, plaintiffs have not alleged, and have certainly not proved, that the manual carries the force of law.  Unless the Bureau's manual has the effect of a law or regulation, violations of that manual's terms are not enough to prove that the prospectus is invalid.  *See Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 839-40 (1999) (holding, in the bid protest context, that the violation of the rules in an agency document not having "the force and effect of law" does not meet the standard for arbitrary and capricious agency action) (citing *Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995) and *Lincoln Servs., Ltd. v. United States*, 678 F.2d 157, 164 (Ct. Cl. 1982)).  Because plaintiffs have made no showing that the manual's terms are binding on the Bureau, plaintiffs have failed to establish that the prospectus would be unlawful, if in violation of the manual, and "unfair."  *See id.* at 642 (holding that a showing that the agency's document has the

force and effect of law is a "necessary predicate" for proving that a procurement, alleged to be in violation of one of those document's terms, is invalid).

Plaintiffs also contend that the bonus points to multi-concession bids provision of the prospectus cannot be justified, is counterintuitive and is against common sense. Pls.' Reply at 14. Plaintiffs complain that such a preference irrationally rewards risk and complexity, and may permit a bad plan for one resort to win as long as that plan is accompanied by minimally satisfactory plans for the other resorts. *Id.* None of plaintiffs' arguments outweigh defendant's arguments in favor of a comprehensive, flexible plan for recreation at the lake, managed by a concessionaire or concessionaires who can buffer themselves from uncertainty by operating more than one concession. *See supra.* Assuming that plaintiffs were attempting to show that the Bureau had *no rational basis* for its bonus points provision in the prospectus, the standard to which they are held if they are to prevail in their allegations, they have not met that standard. *See Banknote*, 365 F.3d at 1351.

Finally, plaintiffs have made several allusions to favoritism and disparate treatment, which, they allege, are meant to advantage a potential bidder on the new concession contracts, *i.e.*, Forever Resorts, Inc. *See* Compl. ¶ 84; Pls.' Reply at 14. No evidence in the administrative record for this action, which the court has expanded to include any and all documents proffered by the parties, supports an allegation that the Bureau has shown bias in this procurement. The court cannot invalidate a solicitation based on "suspicion and innuendo." *See C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983) (reversing a bid protest decision based on alleged "evil motives" of bid reviewers, because the court relied "on suspicion and innuendo, not on hard facts"); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1340 (Fed. Cir. 2004) (noting that numerous inadequately supported accusations of agency bias do not provide clear and convincing evidence of bias). If plaintiffs are indeed suggesting the Bureau designed this prospectus to favor a particular bidder, the court finds that the record in this case in no way supports such a reading of the facts.

For all of the above reasons, plaintiffs have not shown that the bonus points for multiple-concession bidders provision of the prospectus was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## 2.     The Alleged Reduction in Franchise Fees to Offset Tenant Removal Costs, Available Only to New Concessionaires

Plaintiffs assert that the prospectus favors new concessionaires by offering them a reduction in franchise fees to offset tenant removal costs, if needed, and denies this same fee reduction to plaintiffs.  Compl. ¶ 84; Pls.' Mem. at 24.  The court's analysis of this argument is somewhat hampered by plaintiffs' failure to point out the provision of the prospectus, if such a provision exists, which allegedly provides a fee reduction to new concessionaires for tenant removal costs. An additional barrier to understanding plaintiffs' argument is its brevity, as it is presented in three sentences, Pls.' Mem. at 24, with citations to the record that, at most, provide a bald assertion of the existence of this "discrimination," in the declaration of Robert White.  Pls.' Mem. App. at 67 ("The Prospectus allows a new bidder, such as Forever Resorts, to receive a reduction of franchise fees owed to Reclamation to repay any costs associated with tenant removal.  In contrast, the Prospectus does not provide the Resort Owners with such fees . . . .").

After scouring the prospectus, the court found one provision, not cited in plaintiffs' filings, which may have some tangential relevance to plaintiffs' argument:

> Reclamation will work concurrently with new contractors during negotiations to address any conditions that may delay implementation of selected proposals (e.g. abandoned property).

AR at 1284.  Assuming that plaintiffs rely on this prospectus provision for their argument, the court does not find that this provision addresses franchise fee reductions, necessarily, or that this provision is discriminatory or unfair in nature. Rather than constituting "impermissibl[y] disparate treatment," Pls.' Mem. at 24, this provision shows a concern for a new concessionaire arriving at a concession site and facing impediments to contract performance.  Old concessionaires are not similarly situated and could assess, and address, potential disruptions to new contract performance at their own concessions at an earlier date.

As to plaintiffs' contention that this prospectus provision "is contrary to the ROD's requirement that Reclamation provide the Resort Owners with mitigation through a reduction in franchise fees," Pls.' Mem. at 24, the court cannot conclude

that the prospectus somehow violates the ROD by not explicitly referring to negotiations which may occur between the Bureau and the old concessionaires as they wind down their operations. *See id.* App. at 233 ("At the contractor's request, Reclamation will negotiate in good faith to amend current contract to reduce franchise fees for the duration of the contract to offset potential contract close-out costs."). The prospectus must necessarily focus on the start-up phase of the new contracts. It need not address every aspect of contract close-out for the old concessionaires.

In any case, plaintiffs have not met their burden to show that the prospectus contains an arbitrary, capricious or unlawful provision related to any franchise fee reductions offered to new concessionaires to offset tenant removal costs. Even if they had pointed to a relevant prospectus provision in support of their argument, such a provision, if it indeed exists, has not been shown by plaintiffs to violate any law or standard applicable to this contract solicitation. Plaintiffs' argument in this regard is without merit.

### 3. The Bureau's Statement that Plaintiffs Must, if Necessary, Remove Their Tenants' Personal Property at Plaintiffs' Cost

Plaintiffs correctly assert that the Bureau has stated that their current contracts include a requirement to remove, at no cost to the Bureau, all unwanted permittees' personal property left at the concession sites (*i.e.*, the property of the owners of mobile homes which are not owned by plaintiffs) by the end of plaintiffs' contract terms. *See* Pls.' Mem. App. at 325, 343. The court disagrees, however, that this statement in the prospectus, even if it could be considered a bid requirement, rises to the level of "impermissibl[y] disparate treatment," Pls.' Mem. at 24, because the new concessionaire bidders are not similarly situated as plaintiffs and have no dealings with permittees of their own. The court also disagrees that this statement violates the ROD, which, at least on the pages cited by plaintiffs, *see* AR at 233, 236, does not discuss in specific or general terms the issue of whether the old concessionaires should pay for the removal of the abandoned personal property of their tenants. In fact, the court is unaware of any discussion of this topic in the ROD. The court thus finds that plaintiffs have not shown that the Bureau's announcement that it believes the old concessionaires to be financially responsible for the removal of the abandoned mobile homes and

other property of their permittees, if this could be considered a prospectus provision, is either discriminatory or contrary to the ROD.

Plaintiffs characterize the onus of payment for tenant property removal as a discriminatory or otherwise improper provision of the prospectus, but by its nature, this is a monetary dispute related to the old contracts.  To the extent plaintiffs argue that they have a contract right which is being ignored by the Bureau, the right asserted here, not to pay for the removal of their tenants' abandoned property, is purely a contract breach claim for monetary damages and is not a challenge to a prospectus requirement that is appropriate for a pre-award bid protest.[8]  *See* Discussion Section III(B) of this opinion, *supra*.  If, as plaintiffs urge, the Bureau's statement [that the old concessionaires must pay for mobile home removal, if necessary] could be considered to be a provision of the prospectus, the court finds that neither Public Law 96-375, nor the existing concession contracts, both of which are silent on this topic, are in any way disregarded.  The court holds that plaintiffs have not met their burden to show that this prospectus statement regarding plaintiffs' financial obligation to remove their permittees' property, where necessary, is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

### C.     COUNT III          Arbitrary, Capricious and Unlawful Discrimination against the Resort Owners

Count III of the complaint contains a plethora of assertions, but its general thrust is that plaintiffs receive harsh and unfavorable treatment in the prospectus because the Bureau will penalize them for performance deficiencies under their existing contracts.  Compl. ¶¶ 88-91.  Plaintiffs therefore accuse the prospectus of being discriminatory against plaintiffs and slanted toward new concessionaires.  *Id.* ¶ 87.  The court inquired at oral argument whether the parties considered the statement in the prospectus, which conditions award and threatens cancellation of awarded new contracts on plaintiffs' contract performance under the existing contracts, to function more as a past performance evaluation criterium going to responsiveness of their bids, or a component of the agency's responsibility determination for awardees who happen to be existing concessionaires.  Tr. at 17-

---

[8]/ As to prospectus requirements related to the time-line for property removal and other contract performance issues, the court addresses these arguments in its examination of Count III of plaintiffs' complaint.  *See* Discussion Section IV(C) of this opinion, *infra*.

19.  Plaintiffs responded that their understanding of this prospectus provision is that it is a "qualification requirement," a term which does not clearly fit into the offered choices of responsiveness or responsibility criteria.[9]  Tr. at 19.  Defendant responded that the government is evaluating the past performance of all bidders, not just plaintiffs, and that contract performance goes to responsiveness of the bid.  Tr. at 40.  Defendant also argued that it is rational for the government to prefer bids from contractors who have performed well on existing contracts.  Tr. at 43-44.

The numbered prospectus paragraph which is most relevant to this debate is within a section titled "Cautions to Offerors about Submission and Evaluation of Proposals."  AR at 1280-84.  Because this paragraph of the prospectus is central to the court's analysis, the court reproduces it here in its entirety:

> If an existing concessionaire at Lake Berryessa is selected as the winning offeror on any or all of the seven concession locations identified in this prospectus they must comply with any and all applicable requirements of their current contract, the ROD and the stipulations set forth in this prospectus (in regard to existing concessionaires) in advance of any final authorization to proceed and in advance of execution of any future contract.  Two specific examples of requirements that must be met in advance of being authorized to operate under a new concession contract or before execution of a new contract at Lake Berryessa for existing concessionaires are:
>
> a.    The existing concession contractors at Lake Berryessa are responsible for ensuring that permittees remove all personal property from the concession area by the termination date of their respective concession contracts,

---

[9]/  A contract solicitation typically references bid requirements, which the agency uses to determine whether a bid received is "responsive" to the solicitation and may be considered for award.  *VMS Hotel Partners v. United States*, 30 Fed. Cl. 512, 514 (1994).  A contract solicitation typically also references other criteria which, after responsive bids have been received and evaluated, the agency uses to determine whether the awardee is "responsible," *i.e.*, in a position to perform the awarded contract.  *Id.*

including trailers, mobile homes, and appurtenant structures such as decks, stairs and storage sheds.  In the event of default, or should permittees abandon any trailers or personal property, Reclamation will take appropriate corrective measures.  It is possible that an existing concessionaire could be selected as a winning offeror many months in advance of the date of the expiration of their current contract and the date for execution of a new contract but any applicable requirements, as mentioned here or elsewhere in this prospectus, will still impact their eventual ability to continue as a concessionaire into a new contract term. (See Section 1.B. of PART 6 [Draft Contract] for additional information on the matter of abandoned or otherwise un-removed permittee trailers.)

b.   An existing concessionaire, even if they are judged to have the best proposal submitted for any of the seven concession opportunities in this prospectus, will not be selected or authorized a new contract under this prospectus if they have any remaining or unpaid financial obligations to Reclamation as a result of their current concession operations.  Such financial obligations would include any unpaid franchise fees or other fees or other financial obligations stipulated in their current contract or as a result of written agreements established during the term of the current contract.

Failure by an existing concessionaire to meet these and/or other identified requirements of the current

> concession contracts will result in non-consideration or in
> the cancellation by Reclamation of their selection as a
> future concessionaire and the selection of another bidder
> or re-issuance of another prospectus. Similar failures by
> any bidder in regard to any past or present concession
> contracts with Reclamation or other Federal agencies
> could result in similar disqualifications for consideration.

AR at 1284. The court notes that plaintiffs' description of this prospectus provision, "a qualification requirement," Tr. at 19, is at least partially substantiated by the last sentence of the excerpt of the prospectus provided here, *see* AR at 1284 (employing the phrase "disqualification[] for consideration").

In the court's opinion, this prospectus paragraph cautions plaintiffs that their contract performance goes to both the responsiveness of their bids, and their responsibility if awarded a contract. The court agrees with defendant that bidders who are not current concessionaires are held to similar standards regarding their contract performance elsewhere, especially in the evaluation of bid responsiveness. *See* AR at 1284 ("Similar failures by any bidder in regard to any past or present concession contracts with Reclamation or other Federal agencies could result in similar disqualifications for consideration."); *id.* at 1348 ("Describe involvement in any Federal or other Public Agency concession operation and provide the name, address and phone number of an agency person that would be aware of your organization[']s performance.") (bid requirement applicable to all bidders). The responsibility determination aspect of this paragraph, however, arguably operates to place a particular focus on the existing concessionaires at Lake Berryessa, and not on other awardees, when the Bureau references specific performance requirements under the old concessionaires' contracts. *See* AR at 1284.

Responsiveness, in this case, will be determined at bid opening, well before the existing contracts terminate and plaintiffs' performance under those contracts is certain. *See VMS Hotel Partners v. United States*, 30 Fed. Cl. 512, 517 (1994) ("A contracting officer bases a 'responsiveness' determination on the contents of a bid at bid opening, but the contracting officer may rely upon information secured after bid opening to determine 'responsibility.'"). Responsibility, in this case, will be reviewed at the end of the existing concession contracts, and will impact the retention of awarded contracts. *See id.* The court will examine first whether the prospectus requirement that plaintiffs properly perform their contracts is a rational

and lawful measure of bid responsiveness.  Next, the court will examine whether the Bureau's responsibility determination regarding plaintiffs' ability to perform future concession contracts at Lake Berryessa, as described in the prospectus, is rational and lawful.  This distinction is necessary because, as previously stated, the contract awards here will take place before the termination date of plaintiffs' current contracts.  It is only at the moment that each of these contracts expires that the Bureau could possibly decide how well a particular plaintiff has met the performance benchmarks of its contract with the Bureau.  *See* Tr. at 41-42.

## 1.    Bid Responsiveness

Plaintiffs summon several specters of difficulty, if not impossibility, preventing them from performing their existing contracts in a manner which conforms with the prospectus' description of their obligations under those contracts.  These difficulties are all related to property removal, and include the following allegations:  California law will make it illegal and/or impossible for plaintiffs to dislodge their permittees and rid the concessions of permittee property; permittee leases and disputes will render property removal impossible; the Bureau's failure to identify all property which must be removed will make it impossible to remove unwanted property in time; required environmental impact statements have not been issued by the Bureau and this lapse renders trailer removal impossible; and, only phased removal (extending after contract termination) is feasible and only phased removal will insulate plaintiffs from potential business failure, yet the Bureau refuses to allow plaintiffs more than their existing contract term for property removal.  Compl. ¶¶ 88, 90-91.  Plaintiffs cited not one case supporting their theory that a "*de facto* disqualification," alleged here, merits enjoining a prospectus.  *See* Pls.' Mem. at 21-24, Pls.' Reply at 7-10.  In the absence of cited caselaw or any definition of the term "*de facto* disqualification," the court presumes that plaintiffs rely principally on an argument that the prospectus is arbitrary and capricious because it has included a requirement that is impossible for these plaintiffs to meet.[10]

---

[10]/  If plaintiffs wish to imply that they have been the victims of a *de facto* debarment or agency bad faith, plaintiffs have not met the heavy burden of proof for either of those legal theories permitting the injunction of a solicitation.  *See, e.g.*, *CRC Marine Servs., Inc. v. United States*, 41 Fed. Cl. 66, 84 (1998) ("Case law indicates, however, that at the least, a disappointed bidder must[, for *de facto* debarment,] show evidence 'of a systematic effort by the procuring

(continued...)

Plaintiffs' contracts terminate after the new contracts will be awarded. Given the uncertainties of their contract performance after award, plaintiffs' burden is to show that, as of the date the prospectus issued, the conditions set by that solicitation made it impossible for them to compete for this contract. Mere speculation as to the difficulty of property removal is not sufficient to show that the prospectus is arbitrary or capricious. Furthermore, defendant may rationally balance any inconvenience to these plaintiffs with the public good. Indeed, defendant has amply demonstrated the rationality of the Bureau's decision-making, which has included the solicitation of extensive public comment and thorough planning efforts, culminating in the prospectus challenged here. *See* Tr. at 69 (noting that criticism of the mobile homes at Lake Berryessa concessions began over thirty years ago); Def.'s Mot. at 9 (noting the cap imposed by Congress in 1980 on extensions of the current concession contracts at the lake); *id.* at 12 (noting Bureau decisions made public as early as November 2005 which put plaintiffs on notice that all long-term trailers must be removed).

Other bidders will be judged on their performance on federal contracts, so there is nothing discriminatory or arbitrary in requiring plaintiffs to perform in accordance with contractual requirements on the existing concession contracts, whose expiration dates are old news to plaintiffs. These fifty year contracts, an unusual grant of business opportunity in the government contracting environment, have provided plaintiffs with ample time to plan their exit strategy so as to wrap-up their current business operations and to prepare to compete for new opportunities at Lake Berryessa. In this context, the only question regarding the responsiveness requirement of the prospectus that could conceivably pertain to existing contract performance, is whether the prospectus categorically excludes plaintiffs as bidders by making the property removal requirement impossible to meet. *See* Pls.' Reply

---

[10](...continued)
agency to reject all of the bidder's [present and future] contract bids.'") (quoting *Stapp Towing Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995))); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1337 (Fed. Cir. 2004) (stating that for a bid protestor "to prevail on an allegation of bad faith [by the agency], [it] must show 'almost irrefragable' proof," by clear and convincing evidence) (citations omitted).

at 7 (stating that the property removal requirement "effectively eliminates Plaintiffs from bidding on the new contracts").

Plaintiffs have not shown that the Bureau has required an impossible level of contract performance as a qualification for bidding on these new concession contracts.  Every one of the "roadblocks" to contract performance cited by plaintiffs are either not founded in fact or law, or were caused by plaintiffs' own contract performance choices to date.  It is undisputed that plaintiffs were on notice of the end dates of their contracts, and of the fact that long-term mobile home sites were not going to be allowed under the new contracts.  The alleged state and federal law barriers to trailer removal have been discredited by defendant.  *See* Def.'s Reply at 10 n.4 (no evidence that trailer transportation permits could not be obtained); Tr. at 21-22 (same); Def.'s Reply at 10-11 (refuting plaintiffs' argument that required environmental impact statements would prevent timely trailer removal); Def.'s Mot. at 40-42 (refuting plaintiffs' argument that California law would trump federal policy on federal land and prevent removal of permittees' mobile homes).  Plaintiffs cite no caselaw that is relevant to their claims that certain laws prevent trailer removal here, and the court declines to discuss arguments supported by mere conjecture.[11]  Plaintiffs' leases with their permittees are either no barrier to trailer removal due to disclosure forms signed by the trailer owners acknowledging removal obligations, *see* Def.'s Mot. at 42; *see also, e.g.*, AR at 42224, 42226, or are legal entanglements that plaintiffs created with full knowledge of the termination dates of their contracts.  Another impediment to faster trailer removal has been removed by the Bureau, according to defendant and undisputed by plaintiffs, by authorizing multi-unit trailer removal plans, instead of requiring individual plans from each permittee.  Tr. at 59-60.

Plaintiffs' remaining arguments are that a phased removal process, extending past their contract termination dates, would be preferable, and that facility removal cannot occur before contract termination because the Bureau has not yet identified the facilities which will remain.  Plaintiffs' phased removal argument hinges on preserving economic benefits from trailer rentals, which plaintiffs contend are

---

[11]/  In plaintiffs' reply, plaintiffs cited two cases in support of their allegation that environmental impact statements are required, and have not been issued, for individual trailer removal at the lake.  Pls.' Reply at 9.  Neither of these cases addresses or is at all relevant to the situation here, that of mobile home removal that might or might not necessitate an environmental impact statement.  Plaintiffs' argument fails because it is completely unsupported by authority.

essential to their financial well-being.  *See* Pls.' Mem. at 23-24.  Plaintiffs have not shown that trailer removal is impossible before their contract termination dates.  It is not irrational for the Bureau to prefer expediting trailer removal before the new concessionaires, be they plaintiffs or other bidders, begin work on recreation development at the concessions.  Nor have plaintiffs shown more than a speculative concern that facility removal, once the Bureau has authorized the new concession contracts, will not be possible before the termination dates of the existing contracts.

For all of these reasons, the court finds that plaintiffs have not shown that the existing contract performance requirements, referenced in the prospectus, are impossible to meet.  Because plaintiffs may bid on the prospectus that has not been shown to bar their participation, the court upholds the incorporation of contract performance requirements as bid responsiveness criteria in the prospectus as rational and lawful.  The court next turns to the contract performance benchmarks that will be used as responsibility criteria at the end of plaintiffs' contracts.

## 2.    Responsibility Criteria

Plaintiffs urge the court to enjoin the prospectus because its responsibility criteria of existing concession contract performance, in particular, timely mobile home removal, violates Public Law 96-375.[12]  Pls.' Reply at 8 (claiming that the responsibility criteria will force plaintiffs to abandon their investments at the concessions).  Plaintiffs' argument regarding Public Law 96-375 and mobile home removal is ill-founded.  Whether the mobile homes are plaintiffs' property or their permittees' property, mobile homes will be not be retained by the Bureau and thus do not qualify as permanent facilities for which plaintiffs are entitled to fair value compensation by Public Law 96-375.

Plaintiffs also argue that the termination dates of two concessionaire plaintiffs' contracts are six months earlier than the provisions of Public Law 96-375 permit.  Pls.' Mem. at 29 n.4; Pls.' Reply at 12-13; Tr. at 11-12.  This argument is an intriguing attempt by these two plaintiffs to reform their current

---

[12]/  To the extent that plaintiffs' challenge to the responsibility criteria of adequate existing concession contract performance relies on impossibility, agency bad faith, or *de facto* debarment arguments, for the reasons stated above, plaintiffs have not proved that any of these arguments have a factual or legal basis.  *See supra* notes 10-11 and accompanying text.

concession contracts.  As a pure contract matter, the court does not believe that claim is properly raised in this bid protest.  *See supra* Discussion Section III(B) of this opinion.  Even if this claim were somehow germane to plaintiffs' pre-award challenge to the prospectus, due perhaps to some tangential connection with trailer removal deadlines, plaintiffs have failed to argue, or persuade the court, that some doctrine of contract reformation pertains here.

Plaintiffs base their argument on an apparent discordance between the contracts and the statutory term stating that the existing concession contracts "may be renewed at the request of the concessionaire with the consent of the Secretary of the Interior for *no more than two consecutive terms of 10 years each*."  Pub. L. No. 96-375, § 5(a), 94 Stat. at 1506 (emphasis added).  The court is not convinced that two extensions totaling nineteen years and six months contravene the spirit or the letter of Public Law 96-375.  Because each renewal required the consent of the Secretary, and because the extensions did not exceed a sum of twenty years, even if this were a bid protest challenge to the prospectus, it is not clear that the agreed-upon contract expiration dates are unlawful.  Plaintiffs bear the burden to show that the incorporation in the prospectus of these two contract termination dates, June 15, 2008 for Rancho Monticello Resort, and July 13, 2008 for Spanish Flat Resort, is unlawful pursuant to Public Law 96-375, and have not met that burden.

Finally, plaintiffs argue that the responsibility requirements related to property removal referenced in the prospectus offend contract rights under the existing renegotiated contracts.  *See* Pls.' Reply at 11, 13.  First, plaintiffs argue that the contracts for Markley Cove Resort and Steele Park Resort do not require removal of mobile homes until six months after contract termination.  *Id.* at 11.  Second, plaintiffs argue that bid consideration, without first allowing arbitration of fair value compensation, is contrary to the Steele Park Resort contract.  *Id.* at 13.  These arguments are without merit.

The contracts in question do not allow concessionaires to leave mobile homes at a concession after the contract ends.  Instead, these contracts address only permanent facilities, not mobile homes, and state that such facilities remaining after six months beyond contract termination will be deemed abandoned.  *See* AR at 42642, 43018.  Plaintiffs have not shown that the prospectus responsibility requirement related to mobile home removal violates their contracts.  Even if there were a conflict with the existing contracts, no mere reference in the prospectus to disputed contract rights would give rise to a breach of contract claim–such a claim

would not be ripe until the Bureau had actually breached the existing concession contracts. *See Circle Line*, 76 Fed. Cl. at 497. Put another way, prior to contract award and the Bureau's responsibility determination, the Bureau's future actions regarding contract administration are purely speculative and cannot render the prospectus arbitrary and capricious. As defendant has aptly argued, the prospectus does not have the power to compel performance under the existing concession contracts, nor does it constitute an amendment of the existing contracts. Tr. at 42-43.

The court also rejects plaintiffs' arguments concerning a violation of arbitration rights in the solicitation of these contracts. This is another contract claim, and not a bid protest claim. Even if the prospectus had somehow implicated the arbitration rights of one plaintiff in referencing appraisal amounts for the fair market value of permanent facilities at Steele Park Resort, defendant has shown that arbitration is not required by the existing concession contract until facilities have been selected for retention at the concession. *See* Def.'s Reply at 17-18 (citing AR at 43018). Indeed, it violates common sense, and the contract, to compel arbitration for the compensation amount for every permanent facility at that concession, before the new contracts have been awarded, when only some of the facilities at Steele Park Resort may require compensation.

For all of these reasons, the court finds that plaintiffs' challenges to the responsibility requirements noted in the prospectus fail because the challenged requirements are not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

### D.   COUNT IV   Arbitrary, Capricious and Unlawful Failure to Conduct Proper Appraisals of the Resort Owners' Assets and Economic Interests

According to plaintiffs, the appraisals of the permanent facilities at the Lake Berryessa concessions were faulty for a variety of reasons. First, plaintiffs allege that the appraisals of their four concessions omit or undervalue substantial categories of improvements to the land, such as grading, road construction, parking lots, retaining walls, dock facilities, mobile home site pads and sewage and utility connections. Compl. ¶¶ 94, 98. Next, plaintiffs assert that the appraisers were required to use three appraisal methods, not just one, and that the method chosen, the cost approach method, is less valid than an income analysis approach. *Id.* ¶¶

96-97.  Finally, plaintiffs allege that the appraisals are outdated and do not reflect subsequent improvements to the facilities at the concessions, and are thus inaccurate and misleading.  *Id.* ¶ 99.  Plaintiffs allege that the appraisals are "'super-critical'" to the prospectus.  Pls.' Reply at 5 (quoting AR at 41139).  Thus, plaintiffs argue, the alleged flaws in the appraisals render the prospectus defective, because "there is no way to determine accurately the economic feasibility of the bids . . . [and] there is simply no way to evaluate the bids in a principled manner."  Tr. at 14-15.  For these reasons, plaintiffs conclude that the prospectus is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Compl. ¶ 100.  The court will address each of plaintiffs' arguments in turn.

### 1.   Whether the Appraisals are Faulty Due to Omissions of Categories of Permanent Facilities

Although plaintiffs initially made some arguments based on the incompatibility of the appraisals and certain instructions in the statement of work given to the government's appraisal contractors as to how to conduct the appraisals in question here, in plaintiffs' reply and at oral argument plaintiffs no longer relied on the cited documents allegedly containing those instructions.  *See* Pls.' Reply at 10; Tr. at 14-16.  Instead, plaintiffs allege that "the government neglected to consider many permanent assets."  Tr. at 16.  Counsel for plaintiffs stated that "I think in particular [the appraisers] didn't pay any attention to roads and parking lots, and things of that nature, clearly something that the government and the subsequent concessionaires are going to benefit from."  *Id.*

Defendant was able to show that the appraisals indeed assigned values to permanent facilities such as roads, parking lots, retaining walls, dock facilities, sewage and utility connections and site improvements, by referring to the prospectus.[13]  Plaintiffs responded to these documents by stating that even if the appraisals included more categories of permanent facilities than plaintiffs had

---

[13]/  Defendant admitted that these documents were inadvertently omitted from the record filed in the subject matter.  Tr. at 37.  However, these documents were available on the internet, at http://www.usbr.gov/mp/berryessa/prospectus.html, last visited October 28, 2007.  These documents were also in plaintiffs' appendix, filed August 28, 2007, the same date that this suit was filed.  Pls.' Mem. App. at 46-57.  Neither plaintiffs nor the court have been disadvantaged by defendant's omission.

alleged in their briefing, *see* Pls.' Mem. at 25, the appraisals were still inaccurate because the appraisals included only part of the value of permanent facilities such as roadways and retaining walls. Tr. at 74-75. The question for the court is whether the appraisals incorporated into the prospectus have been shown to be inaccurate because of an alleged undercounting of the value of roadways and retaining walls, and perhaps the value of other construction activities performed by plaintiffs over the years.

Plaintiffs have not convinced the court that the appraisals incorporated into the prospectus have undervalued the permanent facilities at the concessions. The court asked both parties at oral argument to define "permanent facilities." Tr. at 6, 32-33. Plaintiffs offered no precise definition, but listed examples such as a building, an attached deck to a building, a convenience shop, underground utility lines, and roads. Tr. at 6. Plaintiffs also suggested, without citation, that a definition could be found in the legislative history of Public Law 96-375 and in unnamed regulations related to that statute, and remarked that the definition "just goes with the notion of what everyone would consider to be a permanent facility." *Id.* at 7. The court reviewed the legislative history of Public Law 96-375, and the only clarification of the term permanent facilities that the court found was this statement: "The concessionaires developed launching ramps, picnic grounds, and limited day-use facilities. In order to realize any return on their investments in these facilities, they began charging fees . . . ." 126 Cong. Rec. 1864, 1866 (1980) (Statement of Rep. Clausen). The court notes that values were assigned in the appraisals for buildings, shops, boat ramps, underground utilities, roads, restrooms, and day use areas. The appraisals have met plaintiffs' definition of permanent facilities that was given at oral argument.

Defendant offered two definitions of permanent facilities in its moving brief, both taken from the prospectus: permanent facilities can be "standing structures, infrastructure or floating assets," and are generally defined as "fixed assets which are any structures, fixtures, or capital improvements permanently attached to the Federal estate." Def's Mot. at 13 (citing AR at 1288-89). The court has reviewed the appraisals and these appear to meet defendant's definitions of permanent facilities as well. The court finds that the appraisals are in accordance with all proffered definitions of the term "permanent facilities."

Plaintiffs' final argument, that the appraisers failed in assigning the correct quantum for the value of roads, retaining walls and perhaps other construction

activities at the concession sites, lacks credibility.  The declaration upon which this argument is based makes several assertions which are not supported by the appraisals themselves.  For example, the declaration stated that roads, parking lots and retaining walls were not appraised, which is incorrect.  *See* Pls.' Mem. App. at 65 (Declaration of Robert White).  The court cannot impeach the reliability of the appraisals on such weak evidence.

Thus, the court rejects, for failure of proof, plaintiffs' argument that the appraisals undervalued permanent facilities and made the prospectus arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  The court need not address defendant's additional contention, that plaintiffs' argument in this regard is a contract claim, not a bid protest claim.

### 2.   Whether the Appraisals are Faulty Due to Their Reliance on the Cost Approach Method

Although plaintiffs initially presented arguments based on an asserted incompatibility of the cost approach used in the appraisals and certain instructions in the statement of work given to the government's appraisal contractors, in plaintiffs' reply and at oral argument plaintiffs no longer relied on the cited documents allegedly containing those instructions.  *See* Pls.' Reply at 10; Tr. at 14-16.  Instead plaintiffs rely on two remaining arguments.  The court will address these in turn.

### a.   One Appraisal Approach is Permissible

First, plaintiffs complain that the government's instructions to its appraisers required that three appraisal methods be used, not just one:

> [the government's] statement of work clearly says that all three approaches to valuation must be performed.  That means an income approach.  That means a comparable sales approach.  And it means a cost approach analysis.  The agency just simply didn't do that.  It decided instead to simply do a cost approach analysis.  So it does contravene its own statement of work.

Tr. at 14.  Plaintiffs point to a sentence in the government's statement of work in its appraisal contract which reads simply:  "Consider all three approaches to value."  AR at 41762.

Defendant argues that the government's statement of work in its appraisal contract does not require that the appraiser perform appraisals which include all three approaches to determining fair market value for plaintiffs' permanent facilities at the concessions, and that the appraisals conducted conform with the fair market value determination required by the government's statement of work.  *See* Def.'s Mot. at 44; Def.'s Reply at 13-14.  The court need not confirm that the government's appraisals conform to its statement of work in every respect.  The court has reviewed the appraisal contract's statement of work and finds, however, that plaintiffs' allegations regarding the alleged inconsistencies between the appraisals and the government's instructions have no merit, assuming, *arguendo*, that such inconsistencies could invalidate the prospectus.[14]

The statement of work to which the parties refer gives somewhat muddled guidance to the reader.  It references three appraisal approaches, but never defines them.  AR at 41762.  It states that the appraiser must "[c]*onsider* all three approaches to value," but does not state that the appraiser must *apply* all three approaches in its calculations.  *Id.* (emphasis added).  The statement of work mentions comparable sales data specifically, but does not clearly indicate whether comparable sales data must always be included, or whether such data must only be included where applicable.  *See* AR at 41762, 41768.

In a section titled "Specific Tasks," the appraiser learns that:  "The appraisal assignment requires preparation of a narrative appraisal report in accordance with [Public Law] 96-375, existing concession contracts, 49 [C.F.R. §] 24.103, and [various general appraisal standards]."  AR at 41763.  The cited regulation, *id.*, defines appraisal requirements for some federal real estate purchases, and contains

---

[14]/  Plaintiffs have cited no authority, and the court is aware of none, for sustaining a bid protest merely because an appraisal referenced within a solicitation was not conducted in accordance with the government's instructions to the appraiser.

two compliance requirements relevant here.  This regulation, at a minimum, requires appraisals to "comply"[15] with the following provisions:

> (ii) All relevant and reliable approaches to value consistent with established Federal and federally-assisted program appraisal practices.  If the appraiser uses more than one approach, there shall be an analysis and reconciliation of approaches to value used that is sufficient to support the appraiser's opinion of value. (See appendix A, § 24.103(a).)

> (iii) A description of comparable sales, including a description of all relevant physical, legal, and economic factors such as parties to the transaction, source and method of financing, and verification by a party involved in the transaction.

49 C.F.R. § 24.103(a)(2)(ii)-(iii) (2006).  The court notes that this regulation again specifies how comparable sales data should be used, but does not address what should be done if there have been no comparable sales.  The regulation also contemplates that using only one relevant appraisal approach is sufficient in some cases.

When reviewed in its entirety, the court finds that the government's statement of work does not mandate that three appraisal methods must be employed, and does not mandate that the appraisals of the permanent facilities at the concessions rely on comparable sales.[16]  As previously stated, the statement of

---

[15]/ The sentence structure of the regulation is somewhat awkward and does not further define how an appraisal must "comply" with the two statements quoted here.  49 C.F.R. § 24.103(a)(2) (2006).

[16]/ A document of somewhat debated origin cited by plaintiffs states that "Due to the unique nature of the subject resorts, a Direct Sales Comparison should not be a requirement as true sales of these assets are rare."  Pls.' Mem. App. at 323.  If indeed this statement reflects an informed opinion as to the applicability of a comparable sales approach in appraising plaintiffs' permanent facilities, it undermines plaintiffs' argument that all three approaches are needed in proper appraisals of their property.  Plaintiffs' preferred appraisal method is the income analysis

(continued...)

work provides only that three appraisal approaches must be considered by the appraiser.  The Bureau's appraiser complied with this requirement in considering the three appraisal methods and reaching the conclusion that the cost approach analysis was the preferable method to be utilized.  In addition, the statement of work is silent as to the proper approach to use, if only one appraisal method is employed.  Therefore, the court concludes that the appraisals incorporated in the prospectus comply with the government's statement of work, by relying only on the cost approach, as long as the cost approach is "relevant and reliable."  49 C.F.R. § 24.103(a)(2)(ii).

### b.   Cost Approach Method is Not Shown to Undervalue Plaintiffs' Permanent Facilities

Plaintiffs' second argument is that the cost approach method has led to a substantial undervaluation of plaintiffs' permanent facilities and thus violates the fair value compensation requirement of Public Law 96-375.  Compl. ¶ 98.  Plaintiffs offer very little support for this argument in their briefing, asserting nonetheless that the cost approach appraisals "resulted in drastic undervaluations of the Resort Owners' assets."  Pls.' Mem. at 26.  The only support for this statement that the court was able to find in the record is a bald assertion by Mr. Robert White, who is affiliated with one of the resorts, that "the Fair Value for Rancho Monticello has been appraised at $27,500,000 while Reclamation's appraisal is for $11,250,000.  The Fair Value appraisals for the other resorts have resulted in similar discrepancies with Reclamation's appraisals."  Pls.' Mem. App. 64-65.  Plaintiffs have offered a declarant's statement that the government's appraisals were, in one instance and perhaps others, substantially lower than plaintiffs' appraisals, and a conclusory statement that the only way to evaluate the economic value of a business is through an income analysis approach.  Pls.' Mem. at 26.  This is not enough to challenge appraisals based on the cost approach.

---

[16](...continued)
approach.  Pls.' Mem. at 26 (stating that "the appraisers' failure to perform an Income Approach valuation for the resorts is particularly egregious").  Plaintiffs appear to suggest that a proper appraisal could rely on only one approach, as long as it is the income analysis approach.  *Id.* ("The only way to properly arrive at the economic value of these businesses is an Income Analysis.").

Defendant persuasively argues that the cost approach is a valid appraisal method, and cites cases which have so held.  Def.'s Reply at 7-8.  There is no one formula for determining fair market value.  *See Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("'[T]he law is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation. . . .  It may be based on comparable sales, reproduction costs, capitalization of net income or an interaction of these determinants.'" (quoting *United States v. 179.26 Acres of Land*, 644 F.2d 367, 372 (10th Cir. 1981))).  The cost approach is a valid, and sometimes the best, means for determining fair market value.  *See Pete v. United States*, 531 F.2d 1018, 1030 (Ct. Cl. 1976) (holding that "[t]he reproduction cost less depreciation approach . . . is a valid method of determining fair market value and one particularly well adapted to use under the circumstances of" a case involving the valuation of specialized recreational facilities on a lake).  Because caselaw supports a view that the cost approach appraisal method is reliable and relevant, and because plaintiffs have cited no specific flaws in how the cost approach method was employed here, the court finds that plaintiffs have not shown that the appraisals included in the prospectus undervalued plaintiffs' permanent facilities.

The court need not address defendant's additional contention, that plaintiffs' argument against the government's use of the cost approach appraisal method is a contract claim, not a bid protest claim.

### 3.    Whether the Appraisals are Faulty Due to the Passage of Time and Subsequent Improvements to the Facilities

Plaintiffs argue that reliance on appraisals that are over six years old and which do not reflect subsequent improvements to the facilities renders the prospectus invalid.  Compl. ¶¶ 99-100.  Plaintiffs point to two cases in support of their argument.  Pls.' Mem. at 26.  These cases do not help plaintiffs, however.

Neither of the cases cited by plaintiffs involved appraisals, and thus neither of these cases, even if binding precedent, would answer the question of whether an inaccurate appraisal is grounds for enjoining a procurement.  *See Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 401 (2005); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 738-39 (2000).  These two cases do, however, discuss the need, to the extent that cost estimates are given in a solicitation, for the government to ensure that those cost estimates reflect reality well enough to produce bids that

may be rationally compared.  *See Arch Chemicals*, 64 Fed. Cl. at 401 ("Thus, if the "most advantageous price" is what the Government is seeking, it would be irrational to exclude the plant shutdown costs [of the incumbent because those costs will affect any bid except that of the incumbent].");  *Overstreet Electric*, 47 Fed. Cl. at 739 (ordering a correction of cost estimates in a solicitation to realistically reflect the costs of required personnel).  Thus, plaintiffs' burden here is to show that the appraisals incorporated within the prospectus prevent a rational comparison of bids.

This is a difficult burden of proof, and plaintiffs have not met it here.  Once the focus is properly on the allegedly unsettling effect of these appraisals on the rationality of the evaluation process for the bids received, rather than on plaintiffs' contract claims for fair value compensation for the permanent facilities retained at the concessions, plaintiffs must show that the bids received based on the prospectus could not produce a meaningful comparison.  This is not proved by the record before the court.

Defendant argues persuasively that bidders can produce meaningful bids based on the prospectus, because the appraisals are not misleading and will not, if inaccurate, produce inaccurate bids that are impossible to compare.  Def.'s Mot. at 36, 44-45.  The prospectus gives the date of the facilities' evaluation and notes that "some conditions have changed at some concession locations."  AR at 1294.  The prospectus warns that "[i]t is extremely important for offerors to evaluate existing facilities at the location(s) they are interested in submitting a proposal(s) upon for the provision of concession contractor services."  *Id.* at 1295.

As to the payment a new contractor will make to an existing concessionaire for retained permanent facilities, the prospectus does not rely exclusively on the appraisals incorporated therein:

> If the compensation for [permanent facilities] that is ultimately determined to be due the former concession contractor under the expiring contract differs from the [assessed value] identified in the Reclamation appraisal . . . for the purposes of this prospectus (and assumed by the successful offeror/new concession contractor), an adjustment will be made to the franchise fee or other financial obligations to be paid under the new concession

> contract so as to not affect the net financial impact on the
> new concession contractor.

AR at 1318.  The prospectus also clearly identifies the obligations of the new
contractor and the government in the case of disputes of appraisal values for
permanent facilities.  *Id.* at 1322.  Given these warnings in the prospectus, the court
finds that the appraisals give only rough estimates of value, and if inaccurate, as
plaintiffs allege, any inaccuracies will not mislead bidders.  Bids based on the
appraised values of permanent facilities may be rationally compared, because all of
the bids from new concessionaires will use the same rough figures whose eventual
adjustment will not affect the comparability of those bids.  Any bids from old
concessionaires bidding on their own concessions will also be insulated from any
inaccuracies in the appraisals, because their bids do not contemplate paying
themselves for their own facilities at the appraised, or indeed any, price.  AR at
1317.  Thus, because all of the bids are protected from inaccuracies in the appraisal
prices, the court finds that there is no justification for invalidating the prospectus
based on alleged inaccuracies in six year old appraisals.

## CONCLUSION

Because the court's consideration of the merits of plaintiffs' bid protest has
not shown that the prospectus was improper, the court need not consider the factors
related to the standard for awarding plaintiffs injunctive relief.[17]  Plaintiffs' motion
for judgment on the administrative record, and their requests for injunctive relief
are denied.  Defendant's cross-motion for judgment on the administrative record is
granted.

The proper time to challenge the provisions of a prospectus is before bids are
required to be submitted, in a pre-award bid protest.  *Blue & Gold Fleet, L.P. v.
United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (holding that "a party who has
the opportunity to object to the terms of a government solicitation containing a
patent error and fails to do so prior to the close of the bidding process waives its
ability to raise the same objection afterwards in a [28 U.S.C.] § 1491(b) action in
the Court of Federal Claims").  However, because the court has upheld the

---

[17]/  The court has attempted to discuss the great majority of plaintiffs' myriad arguments
in this opinion.  Some unsupported, briefly referenced contentions of no merit have been
omitted, but were duly considered and rejected by the court.

challenged terms of the prospectus, plaintiffs' complaint must be dismissed.  The court notes that future challenges, if any, to the contracts awarded here, would necessarily be based not on the alleged unlawfulness of the prospectus, but on alleged prejudicial errors in the Bureau's decision-making as it selects the winning offeror or offerors.  In addition, the court observes that plaintiffs' contract-related claims, if any, related to the close-out of their existing contracts would not be the proper subject for a post-award bid protest in this court.  In the interests of judicial economy, a post-award bid protest of the award of one or more new concession contracts at Lake Berryessa, or any contract claims related to the old concession contracts at Lake Berryessa, should be deemed to be cases related to the subject matter.

Accordingly, it is hereby **ORDERED** that

(1)   Plaintiffs' Motion to Supplement Administrative Record, filed October 9, 2007, is **GRANTED**;

(2)   Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, filed August 28, 2007, is **DENIED**;

(3)   Plaintiffs' Motion for Judgment on the Administrative Record, incorporated in Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, filed August 28, 2007, is **DENIED**;

(4)   Defendant's Cross Motion for Judgment upon the Administrative Record, filed September 14, 2007, is **GRANTED**;

(5)   The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint, with prejudice;

(6)   Each party shall bear its own costs.

/s/ Lynn J. Bush
LYNN J. BUSH
Judge